**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KŌLOA RUM COMPANY,<br><br>                        Plaintiff,<br><br>    v.<br><br>KRISTI NOEM, in her official capacity<br>as Secretary of Homeland Security; and<br>PETE R. FLORES, in his official capacity<br>as Acting Commissioner of U.S. Customs<br>and Border Protection,<br><br>                       Defendants. | Civil Action No. 1:25-cv-554-JEB<br><br>Hon. James E. Boasberg |

**<u>MEMORANDUM IN SUPPORT OF</u>**
**<u>AMERICAN MARITIME PARTNERSHIP AND</u>**
**<u>MARITIME TRADES DEPARTMENT OF THE AFL-CIO'S</u>**
**<u>JOINT MOTION TO INTERVENE</u>**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   FACTUAL BACKGROUND ............................................................................... 2

    A.    The Jones Act ............................................................................................ 2

    B.    Interests of the Proposed Intervenors in the Jones Act .......................... 3

        1.    American Maritime Partnership .................................................... 3

        2.    Maritime Trades Department of the AFL-CIO ............................ 5

III.  ARGUMENT ...................................................................................................... 7

    A.    AMP and MTD are Entitled to Intervene as of Right. ........................... 7

        1.    The Motion to Intervene is Timely ............................................. 7

        2.    AMP and MTD Members Have Numerous Protected Interests at
            Stake ............................................................................................. 8

        3.    Disposition of this Action Will Impair the Ability of AMP and
            MTD to Protect Their Interests. ................................................. 12

        4.    No Party Adequately Represents the Interests of AMP and MTD ........... 14

    B.    AMP and MTD Have Article III Standing ........................................... 18

    C.    AMP and MTD Should Alternatively Be Granted Permissive Intervention ......... 20

IV.   CONCLUSION ................................................................................................. 21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akiachak Native Cmty. v. U.S. Dep't of Interior*,
    584 F. Supp. 2d 1 (D.D.C. 2008) ............................................................7

*Allied Concrete & Supply Co. v. Baker*,
    904 F.3d 1053 (9th Cir. 2018) ...........................................................10

*Am. Great Lakes Ports Ass'n v. Zukunft*,
    2016 WL 8608457 (D.D.C. Aug. 26, 2016) ...........................................19

*Am. Horse Prot. Ass'n, Inc. v. Veneman*,
    200 F.R.D. 153 (D.D.C. 2001)...........................................................9, 19

*Berger v. N. Carolina State Conf. of the NAACP*,
    597 U.S. 179 (2022)...........................................................................17

*Crossroads Grassroots Pol'y Strategies v. FEC*,
    788 F.3d 312 (D.C. Cir. 2015)...........................................................19

*CSX Transportation, Inc. v. Georgia Public Serv. Comm'n*,
    944 F. Supp. 1573 (N.D. Ga. 1996) ...................................................10

*Cty. of San Miguel v. MacDonald*,
    244 F.R.D. 36 (D.D.C. 2007)...........................................9, 13, 14, 19

*Defs. of Wildlife v. Perciasepe*,
    714 F.3d 1317 (D.C. Cir. 2013)...........................................................16

*Diaz v. S. Drilling Corp.*,
    427 F.2d 1118 (5th Cir. 1970) ...........................................................11

*Dimond v. D.C.*,
    792 F.2d 179 (D.C. Cir. 1986)...........................................................14

*Oklahoma ex rel. Edmondson v. Tyson Foods, Inc.*,
    619 F.3d 1223 (10th Cir. 2010) ..........................................................7

*Fund For Animals, Inc. v. Norton*,
    322 F.3d 728 (D.C. Cir. 2003)................................................. *passim*

*Hardin v. Jackson*,
    600 F. Supp. 2d 13 (D.D.C. 2009) .....................................................14

*Indep. U.S. Tanker Owners Comm. v. Dole,*
    809 F.2d 847 (D.C. Cir. 1987) ..................................................................12

*Karsner v. Lothian,*
    532 F.3d 876 (D.C. Cir. 2008) ..............................................................8, 11

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
    140 S. Ct. 2367 (2020) ..........................................................................18

*Local 751 v. Brown Grp., Inc.,*
    517 U.S. 544 (1996) ..............................................................................20

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ..............................................................................18

*Mandan, Hidatsa & Arikara Nation v. United States Dep't of the Interior,*
    66 F.4th 282 (D.C. Cir. 2023) ................................................................11

*Military Toxics Project v. Envtl. Prot. Agency,*
    146 F.3d 948 (D.C. Cir. 1998) ..........................................................18, 19

*N.Y. Republican State Comm. v. SEC,*
    927 F.3d 499 (D.C. Cir. 2019) ................................................................12

*Natural Resources Defense Council v. Costle,*
    561 F.2d 904 (D.C. Cir. 1977) ..........................................................16, 17

*In re New York City Policing During Summer 2020 Demonstrations,*
    27 F.4th 792 (2d Cir. 2022) ....................................................................10

*Roeder v. Islamic Republic of Iran,*
    333 F.3d 228 (D.C. Cir. 2003) ................................................................18

*RUI One Corp. v. City of Berkeley,*
    371 F.3d 1137 (9th Cir. 2004) ................................................................10

*Sierra Club v. Espy,*
    18 F.3d 1202 (5th Cir. 1994) ..................................................................11

*Sierra Club v. Van Antwerp,*
    523 F. Supp. 2d 5 (D.D.C. 2007) ............................................................20

*Taylor v. Sw. Bell Tel. Co.,*
    251 F.3d 735 (8th Cir. 2001) ..................................................................10

*Town of Chester v. Laroe Estates, Inc.,*
    581 U.S. 433 (2017) ..............................................................................18

*Trbovich v. United Mine Workers*,
    404 U.S. 528 (1972) ...................................................................................16

*United States v. Morten*,
    730 F. Supp. 2d 11 (D.D.C. 2010) ..............................................................8

*Utahns for Better Transp. v. U.S. Dept. of Transp.*,
    295 F.3d 1111 (10th Cir. 2002) ...................................................................9

*Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*,
    834 F.3d 562 (5th Cir. 2016) .......................................................................9

*Waterkeeper Alliance, Inc. v. Wheeler*,
    330 F.R.D. 1 (D.D.C. 2018) .......................................................................18

*Wildearth Guardians v. Salazar*,
    272 F.R.D. 4 (D.D.C. 2010) ................................................................*passim*

*Wilderness Soc'y v. Babbitt*,
    104 F. Supp. 2d 10 (D.D.C. 2000) ...............................................................7

**Statutes**

Merchant Marine Act of 1920, 41 Stat. 988, 66th Cong. Ch. 250 (June 5, 1920) ................ *passim*

**Other Authorities**

CABOTAGE, Black's Law Dictionary (12th ed. 2024) ...................................................................2

First Cong., Sess. I, Ch. 3, § 1 (July 20, 1789) ...........................................................................2

Fourteenth Cong., Sess. II, Ch. 31, § 4 (Mar. 1, 1817) ..............................................................2

Fed. R. App. P. 4(a)(4)(A) .........................................................................................................16

Fed. R. Civ. P. 24 ............................................................................................................7, 15, 16

Fed. R. Civ. P. 24(a) ...........................................................................................................6, 7, 11, 18

Fed. R. Civ. P. 24(b) .........................................................................................................6, 20

Fed. R. Civ. P. 24(b)(3) ..............................................................................................................20

## I.    INTRODUCTION

Over 100 years ago Congress found it necessary for the national defense and commerce of the United States to have a merchant marine comprised of the "best equipped and most suitable types of vessels" to carry commerce and "serve as a naval or military auxiliary in time of war or national emergency," and that these vessels be "owned and operated privately by citizens of the United States."  41 Stat. 988, 66th Cong. Ch. 250, § 1 (June 5, 1920).  To accomplish that objective, Congress determined that all merchandise transported by water between points in the United States must be on vessels "built in and documented under the laws of the United States and owned by persons who are citizens of the United States." *Id*. at 999, § 27.

Plaintiff Koloa Rum Company asks the Court to declare that this statute—Section 27 of the Merchant Marine Act of 1920 (the "Jones Act")—is unconstitutional and to enjoin its enforcement at least as to interstate trade with Hawaii.  Am. Compl., ECF No. 13 at 15.

The American Maritime Partnership ("AMP") and the Maritime Trades Department of the AFL-CIO ("MTD") (collectively, "Proposed Intervenors") are two national associations representing hundreds of companies and unions comprising the American maritime industry and embodying Congress's objectives of the Jones Act.  AMP represents companies that build, own, and operate U.S.-flag vessels that comply with Jones Act requirements.  MTD represents the individuals who crew and labor aboard those vessels as well as shipyard workers who labor in U.S. shipyards.  Together, AMP and MTD represent all facets of the American maritime industry.

AMP and MTD jointly seek to intervene in this case to protect their and their members' substantial interests in the Jones Act.  The plaintiff's requested relief would destroy those interests and the existing U.S. maritime industry, costing billions of dollars and thousands of jobs, and leaving the United States without the private merchant fleet Congress found necessary

for commerce and times of war or national emergency.  Because no other party adequately represents the broad interests of AMP and MTD—encompassing shipbuilders, ship owners/operators, and maritime labor—the Court should grant their motion to intervene.[1]

## II.    FACTUAL BACKGROUND

### A.    The Jones Act

Cabotage laws generally reserve transportation, particularly along a country's coast, to vessels flying the flag of that country.  *See* CABOTAGE, Black's Law Dictionary (12th ed. 2024).  Many countries have cabotage laws.  One report found that 91 member states of the United Nations have cabotage laws, covering about 80 percent of the world's coastlines in all geographic regions and across all political, economic and legal systems.  *See* Declaration of Jennifer Carpenter ("Carpenter Decl."), Ex. A ("*Cabotage Laws of the World*") at 10-11.  The objectives of these laws include maintaining national security, promoting ship ownership and shipbuilding, and promoting safety and security of ships in port, among others.  *See id*.

Cabotage laws have a long history in the United States with roots dating back to the nation's founding.  The third law passed by the very first session of Congress in 1789 applied lower duties on cargo transported on U.S.-owned and U.S.-built vessels. *See* First Cong., Sess. I, Ch. 3, § 1 (July 20, 1789).  In 1817, Congress pronounced that "[n]o goods, wares, or merchandise, shall be imported…from one port of the United States to another port of the United States, in a vessel belonging wholly or in part to a subject of any foreign power…" Fourteenth Cong., Sess. II, Ch. 31, § 4 (Mar. 1, 1817).

Congress's enactment of the Jones Act in 1920 was the latest version of longstanding U.S. policy uninterrupted since 1817.  *See* Carpenter Decl., Ex. C (*Shipping Under the Jones*

---

[1] Pursuant to L.C.R. 7(m), Plaintiff and Defendants indicated they oppose this motion.

*Act: Legislative and Regulatory Background*, Congressional Research Service (Nov. 21, 2019), at 2 ("The Jones Act of 1920 was not the first law requiring that vessels transporting cargo domestically be U.S.-built, owned and crewed.")).  Passage of the Jones Act reflected America's commitment to maintaining a strong domestic maritime industry for military and commercial purposes.  41 Stat. 988. That commitment has not waned; recent efforts to amend the Jones Act have failed by large margins.  Carpenter Decl. at ¶ 9.

The Jones Act is the fundamental law of the American maritime industry.  In describing the act's benefits to national and economic security, the commanding four star general of the U.S. Transportation Command—the military command in charge of moving everything from weapons to basic supplies—recently stated:

> The Jones Act allows us to actually have shipping resources…. Because of that Act, we have a way to make sure that we can build ships here in the United States; that we can sail those ships to maintain commerce; that we can produce the crews that sail those ships, so that we have a core of [mariners]…. At the same time, if the nation needs folks to go to sea, we can call on that force to sail. We will be more secure in that way.

Carpenter Decl., Ex. D (Statement of Gen. Randall Reed, USAF, before the U.S. Senate Armed Services Committee, March 5, 2025).

### B.    Interests of the Proposed Intervenors in the Jones Act

#### 1.    American Maritime Partnership

AMP is the largest coalition ever assembled to represent the U.S. maritime industry. Carpenter Decl. at ¶ 3.  AMP is the successor organization to the Maritime Cabotage Task Force, which was founded to counteract attempts by foreign commercial interests to eliminate America's most venerable maritime laws for their own profit and convenience. *Id.*  Guided by that history, AMP exists today to ensure that America's domestic maritime industry and the Jones Act remain a key component of our nation's economic and homeland security. *Id.*  AMP

represents vessel owners and operators, shipbuilders and repair yards, maritime trade associations and national security organizations, among others. *Id.*

There are roughly 40,000 Jones Act vessels operating in the domestic maritime industry, which support nearly 650,000 American jobs and have an annual economic impact of $150 billion. *Id.* at ¶ 5. AMP members have collectively invested over $30 billion into their fleets and rely upon the stability and security provided by the Jones Act regime. *Id.* To promote that regime, AMP actively engages in efforts to support and maintain the integrity of the Jones Act, ensuring that its members' interests are protected, and that the maritime industry continues to thrive under this longstanding framework. *Id.*

One member of AMP with particular interests at stake in this case is Pasha Hawaii. Headquartered in Honolulu, Pasha Hawaii is a part of a worldwide transportation and logistics company. Declaration of George W. Pasha, IV ("Pasha Decl.") at ¶ 3. Pasha Hawaii currently operates five vessels in service between California and Hawaii, and each one of these vessels is U.S.-owned, U.S.-crewed, U.S.-flagged, and U.S.-built, and is therefore qualified under the Jones Act to transport merchandise between points in the United States. Pasha Decl. at ¶ 4. Pasha has invested more than one billion dollars in U.S.-built vessels and the operational assets needed to support them. *Id.* at ¶ 11. These investments were made in reliance on continued enforcement of the Jones Act. *Id.* If foreign built, owned, or operated vessels were permitted to carry cargo between the U.S. mainland and Hawaii, those foreign vessels would have a competitive advantage over Pasha Hawaii's vessels due to both the cost of the vessels as well as their operating costs. *Id.* The value of Pasha Hawaii's vessels is not only in the steel with which they were constructed, but in their qualification to operate in the U.S. coastwise trade. *Id.* Invalidation of the Jones Act, even only as applied to Hawaii, would devalue Pasha Hawaii's

vessels, which were constructed in U.S. shipyards to U.S. standards for the U.S. coastwise trade, but also specifically for transportation between Hawaii and the mainland United States. *Id*. at ¶ 12.

Another AMP member is the Shipbuilders Council of America ("SCA").  SCA is a national trade association for the U.S. shipyard industry, representing over 140 companies that build, repair, maintain, modernize and supply the U.S. shipyard industry.  Declaration of Matthew Paxton ("Paxton Decl.") at ¶ 3.  SCA represents shipyards owned and operated across the country, including facilities on all three U.S. coasts, the Great Lakes, the inland waterway system, Alaska and Hawaii.  *Id*.  The U.S. shipyard industry delivered more than 900 vessels in 2023-2024, which represented more than $9.9 billion in labor income and $12.2 billion in gross domestic product to the national economy. *Id*. at ¶ 5.

SCA shipyards build some of the most technologically advanced vessels in the world. For example, the world's first LNG-powered containership was built in the United States and now serves the Puerto Rico trade.  *Id*. at ¶ 6.  SCA shipyards also build world-class offshore service vessels for oil and gas exploration, offshore wind development, vessels of all types for the U.S. Coast Guard, and the most advanced and lethal fleet for the U.S. Navy.  *Id*.  These technological advancements were made possible by the Jones Act regime.  *Id*.  SCA members are under contract right now to build Jones Act-qualified vessels for U.S. operators, including for the Hawaii trade.  *Id*. at ¶ 8.  Any invalidation of the Jones Act would jeopardize the viability of SCA member shipyards, as well as the jobs of shipyard workers employed at those yards, and the economic, transportation, and national security contributions generated by those shipyards.  *Id*.

### 2.    Maritime Trades Department of the AFL-CIO

MTD is a network of 25 affiliate unions serving the maritime industry.  These unions include the Seafarers International Union, representing seagoing mariners; the International

Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, representing shipyard workers; the International Longshoremen's Association, representing maritime dock workers; the Marine Engineers' Beneficial Organization, representing seagoing engineers on vessels; and other unions indirectly related to the maritime industry.  Declaration of David Heindel ("Heindel Decl.") at ¶ 2.  MTD remains one of the staunchest and most vocal defenders of the Jones Act.  *Id*. at ¶ 4.  MTD's advocacy for the Jones Act has been multifaceted, ranging from education and outreach, to building coalitions with groups like the American Maritime Partnership and U.S. shipbuilders, to mobilizing its member unions to actively campaign in support of the law.  *Id*.  MTD's advocacy on behalf of the Jones Act is core to its mission of protecting American maritime labor.  *Id*.

        If a court were to strike down the Jones Act as unconstitutional, MTD and its members would be harmed in numerous ways.  Without the Jones Act, foreign-flag vessels with cheap foreign labor could dominate domestic shipping.  *Id*. at ¶ 6.  U.S. credentialed mariners represented by MTD could lose jobs to foreign crews that do not have the same credentials, and unionized U.S. maritime jobs could be lost or significantly reduced.  *Id*.  Dispensing with the Jones Act would also allow foreign-flag vessels with their foreign crews to provide waterborne transportation all over the United States, decimate the U.S. maritime industry, and jeopardize the continued existence of a strong pool of U.S.-credentialed mariners available to crew U.S. vessels in time of war or national emergency.  *Id.*

### III.    ARGUMENT

AMP and MTD are entitled to intervene in this case as a matter of right because they meet all the necessary elements under Fed. R. Civ. P. 24(a) and have Article III standing. Alternatively, the Court should grant permissive intervention pursuant to Fed. R. Civ. P. 24(b).[2]

### A.    AMP and MTD are Entitled to Intervene as of Right.

Fed. R. Civ. P. 24(a) provides that:

On timely motion, the court must permit anyone to intervene who…(2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Courts evaluate four factors in determining whether a party is entitled to intervene as a matter of right: "(1) the timeliness of the motion; (2) whether the applicant claims an interest relating to the property or transaction which is the subject of the action; (3) whether the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest; and (4) whether the applicant's interest is adequately represented by existing parties." *Fund For Animals, Inc. v. Norton*, 322 F.3d 728, 731-32 (D.C. Cir. 2003) (internal quotations omitted).  The D.C. Circuit broadly construes Rule 24, taking "a liberal approach to intervention." *Wilderness Soc'y v. Babbitt*, 104 F. Supp. 2d 10, 18 (D.D.C. 2000).

### 1.    The Motion to Intervene is Timely.

Timeliness is determined by looking at all of the circumstances relevant to the case and the motion to intervene, including such factors as the "time elapsed since the inception of the suit, the purpose for which intervention is sought, the need for intervention as a means of

---

[2] Proposed Intervenors filed a proposed answer to the complaint in accordance with Rule 24(c).  However, if granted intervention, Proposed Intervenors plan to file a Rule 12 motion in lieu of an answer.

preserving the applicant's rights, and the probability of prejudice to those already parties in the case." *Akiachak Native Cmty. v. U.S. Dep't of Interior,* 584 F. Supp. 2d 1, 5 (D.D.C. 2008) (citing *U.S. v. Am. Tel. & Tel. Co.,* 642 F.2d 1285, 1295 (D.C. Cir. 1980)). In considering the time elapsed since the complaint was filed, "[t]he critical factor is whether any delay in moving for intervention will prejudice the existing parties to the case," *Akiachak Native Cmty.*, 584 F. Supp. 2d at 5, not whether the intervention itself will cause prejudice. *See also Oklahoma ex rel. Edmondson v. Tyson Foods, Inc.*, 619 F.3d 1223, 1236 (10th Cir. 2010) ("prejudice to other parties must be prejudice caused by the movant's delay, not by the mere fact of intervention").

At this early stage in the case, the timing of Proposed Intervenors' intervention will not prejudice any party. Koloa Rum filed its Amended Complaint less than two months ago, *see* ECF No. 13, and the government has not yet answered or otherwise responded to it. *See Fund for Animals*, 322 F.3d at 735 (intervention was timely where party "moved to intervene less than two months after the plaintiffs filed their complaint and before the defendants filed an answer"). Further, Koloa Rum agreed to extend the date to respond to its Amended Complaint until 30 days after the Court decides the motion to intervene of Matson Navigation Company. *See* April 30 Minute Order. That clock is not yet running, and Plaintiff effectively agreed to hold this case in abeyance until the Court rules on that motion. *See* ECF No. 26 at 1. In any event, Proposed Intervenors agree to comply with the current case schedule. Carpenter Decl. at ¶ 10. Accordingly, there is no prejudice and the motion is timely.

## 2. AMP and MTD Members Have Numerous Protected Interests at Stake.

A putative intervenor must "demonstrate a legally protected interest in the action." *Karsner v. Lothian*, 532 F.3d 876, 885 (D.C. Cir. 2008). "This test for a legally protected interest is primarily a practical guide to disposing of lawsuits by involving as many apparently

concerned persons as is compatible with efficiency and due process." *United States v. Morten*,

730 F. Supp. 2d 11, 16 (D.D.C. 2010) (internal quotation marks and citations omitted).

As described above, Congress intended for the United States to have a merchant marine

that is "owned and operated privately by citizens of the United States." 41 Stat. 988.  The

members of AMP and MTD are the private citizens Congress envisioned would build and

operate this fleet of vessels to provide economic and national security benefits to the nation.  *See*

*id.*; Carpenter Decl. at ¶ 5.  The statutory regime reflects a grand bargain: in exchange for

building and operating this private merchant fleet to promote national interests, U.S. citizens

would be protected from foreign competition.  As such, AMP and MTD's members are the direct

and intended protectees and beneficiaries of the statutory regime that is being challenged in this

case.

Courts routinely allow associations like AMP and MTD to intervene in actions like this

one that challenge the regulatory regime governing their members.  *See Wildearth Guardians v.*

*Salazar*, 272 F.R.D. 4, 15-16 (D.D.C. 2010) (national mining association whose membership

"includes the universe of entities that would benefit from a competitive lease sale" at issue had

protectable interests sufficient to intervene); *Cty. of San Miguel v. MacDonald*, 244 F.R.D. 36,

46 (D.D.C. 2007) (cattlemen's association had a legally protected interest in grazing their cattle

on public and private lands that could be affected by plaintiffs' successful challenge to agency's

decision against listing a bird species as threatened or endangered); *Am. Horse Prot. Ass'n, Inc.*

*v. Veneman*, 200 F.R.D. 153, 157 (D.D.C. 2001) (coalition of associations representing those that

"train the horse, breed them, and enter them in horse shows and exhibitions" was entitled to

intervene in action challenging agency's regulation of show horses); *Wal-Mart Stores, Inc. v.*

*Texas Alcoholic Beverage Comm'n*, 834 F.3d 562, 567 (5th Cir. 2016) (associations representing

licensed business owners had a right to intervene in lawsuits challenging the regulatory scheme that governed their profession); *Utahns for Better Transp. v. U.S. Dept. of Transp.,* 295 F.3d 1111, 1117 (10th Cir. 2002) (transportation trade association could intervene in lawsuit challenging regional transportation plan that may have impaired association members' interests).

Similarly, courts have also determined that labor unions like MTD's members have protectable interests in the regulatory regime that governs their employment.  For example, in *CSX Transportation, Inc. v. Georgia Public Serv. Comm'n*, the court found that a union representing railroad workers was entitled to intervene in an action by the railroad contending that state regulation of the railroad was preempted by federal law.  944 F. Supp. 1573, 1577 (N.D. Ga. 1996).  The court agreed that the union had "a continuing interest in whether" a state commission "will continue to regulate railroads" because the state commission's "inability to regulate…might in fact have a tangible effect on the employment of [the union]'s members." *Id*. *See also RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1146 (9th Cir. 2004) (district court permitted labor union to intervene in action challenging the constitutionality of local "living wage" ordinance that protected its members); *Allied Concrete & Supply Co. v. Baker*, 904 F.3d 1053, 1068 (9th Cir. 2018) ("because [labor union] has an interest in the right to a prevailing wage [under California statute], the district court invalidating the law clearly impaired that interest"); *Taylor v. Sw. Bell Tel. Co.*, 251 F.3d 735, 741 (8th Cir. 2001) (observing that a "labor union is charged with the duty of protecting the interests of its members as a group" and holding that a union had protectable interests in a collective bargaining agreement that could be impaired by the underlying litigation); *In re New York City Policing During Summer 2020 Demonstrations*, 27 F.4th 792, 800 (2d Cir. 2022) (holding that "an interest in the outcome of litigation seeking a determination that certain practices are unconstitutional" may be sufficient to

intervene, and that police union "does have a protectable interest in the continuation or alteration of policies that are alleged to be unlawful").

MTD's members likewise have a similar continuing interest in the constitutionality of the Jones Act and preservation of their jobs crewing Jones Act-complaint vessels. *See* Heindel Decl. at ¶ 6. The Jones Act benefits U.S. workers by excluding foreign workers from the market for jobs aboard vessels plying the U.S. coastwise trade. *See id.* That exclusion, in turn, provides a ready force of U.S. credentialed mariners to support national interests in time of war or national emergency. *See* 44 Stat. 988; Carpenter Decl., Ex. D (statement of Gen. Reed). MTD represents that force, which Koloa Rum's requested relief would harm. *See* Heindel Decl. at ¶ 6.

Courts also routinely find that property and contractual interests are sufficient to intervene where such interests could be impaired by the underlying litigation. *See Mandan, Hidatsa & Arikara Nation v. United States Dep't of the Interior*, 66 F.4th 282, 286 (D.C. Cir. 2023) (state's asserted interests in riverbed, minerals, mining leases and royalties that were the subject of litigation sufficed to intervene); *Karsner*, 532 F.3d at 886 and n. 9 (holding that Maryland's Securities Commissioner had a protected property interest in data reported to a regulatory organization pursuant to a contract specifying that such data was the joint property of various parties including Maryland); *Sierra Club v. Espy*, 18 F.3d 1202, 1207 (5th Cir. 1994) (timber companies had "legally protectable property interests in existing timber contracts that are threatened by the potential" change to forestry management sought by plaintiffs); *see also Diaz v. S. Drilling Corp.*, 427 F.2d 1118, 1124 (5th Cir. 1970) ("Interests in property are the most elementary type of right that Rule 24(a) is designed to protect.").

AMP's members have property and contractual interests in the vessels that they build, own and operate under the Jones Act regime. *See* Pasha Decl. at ¶¶ 4-11 (describing acquisitions

of vessels and related assets for the Jones Act trade between Hawaii and the U.S. mainland worth
"more than a billion dollars"); Carpenter Decl. at ¶ 5 (there are over 40,000 Jones Act-compliant
vessels and AMP members have invested $30 billion to construct such vessels); Paxton Decl. at
¶¶ 7-8 (describing investments in shipyards and employee training, and existing contracts to
build vessels for the Jones Act trade).  These interests are directly protected by the Jones Act and
sufficient to intervene in this case challenging the constitutionality of the Jones Act.

Apart from harm to their members' interests, the membership and funding of AMP and
MTD is also threatened by the relief Koloa Rum seeks in this case.  *See* Carpenter Decl. at ¶ 7;
Heindel Decl. at ¶ 6.  These organizational interests are also sufficient for standing and
intervention.  *See* section III(B), *infra; N.Y. Republican State Comm. v. SEC*, 927 F.3d 499, 504
(D.C. Cir. 2019) ("[a]n organization is obviously harmed if its contributors cease giving it
money") (internal quotation and citation omitted); *Fund for Animals*, 322 F.3d at 735 (finding of
constitutional standing is alone sufficient to establish an interest sufficient to intervene).

Proposed Intervenors have substantial property, contractual, and employment interests
protected by the Jones Act, the subject of this litigation.  For those reasons, and because
Proposed Intervenors have Article III standing,[3] the Court should find they have sufficient
interests to intervene.

> **3.      Disposition of this Action Will Impair the Ability of AMP and MTD to
> Protect Their Interests.**

The relief Koloa Rum seeks would impair the interests of AMP and MTD's members in
the Jones Act regime.  *See Fund For Animals*, 322 F.3d at 735 (describing the third element of
intervention "as looking to the practical consequences of denying intervention" (internal citation
omitted)); *Wildearth Guardians*, 272 F.R.D. at 15 (plaintiffs' action had the "practical

---

[3] *See* section III(B)*, infra.*

consequence" of threatening the intervenor's "ability to remain competitive in the national coal market in both the short and long term").

Foreign-flag vessels are not required to comply with all U.S. laws, are often built with substantial foreign subsidies and lower wage labor, pay their mariner crews substantially lower wages, and have other lower operating costs. *See* Carpenter Decl. at ¶ 8; Paxton Decl. at ¶ 7; Heindel Decl. at ¶ 6. *See also Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 849 (D.C. Cir. 1987) ("American ships typically have higher construction and operating costs than their foreign competitors, not only because they typically must meet more stringent environmental and safety standards, but also because foreign ships often are subsidized and otherwise assisted by their own governments."). These foreign vessels often operate under so-called "flags of convenience" that allow them to conduct their business under the jurisdictions of countries like Panama, Togo, and Vanuatu with lax legal and regulatory regimes. Heindel Decl. at ¶ 6; Carpenter Decl. at ¶ 8. The Jones Act currently bars those vessels from the U.S. coastwise trade. *Id*.

If the Court were to find the Jones Act unconstitutional and enjoin its enforcement as Koloa Rum requests (even only as to the Hawaii trade[4]), AMP and MTD's members will face unfair competition by foreign shipyards and ship owners/operators. *See* Carpenter Decl., at ¶ 8; Pasha Decl. at ¶ 12; Paxton Decl. at ¶ 7; Heindel Decl. at ¶ 6. In addition, the vessels owned by Pasha Hawaii, an AMP member, were built not only to comply with the Jones Act but also specifically for the trade between Hawaii and the U.S. mainland, and enjoining enforcement of the Jones Act as to the Hawaii trade would devalue those vessels from the resulting influx of

---

[4] Plaintiff asks the Court to enjoin enforcement of the Jones Act only as to the Hawaii trade. Am. Compl., ECF No. 13 at 15. But Plaintiff's *lawyers* vow to "abolish[] the Jones Act" and to "put an end to the Jones Act once and for all." *See* Carpenter Decl. at ¶ 7. If accepted, the constitutional arguments they appear poised to assert may be used by other parties to seek a broader facial invalidation of the Jones Act.

foreign-flag vessels.  Pasha Decl. at ¶ 12.  Similarly, SCA members build Jones Act-compliant

vessels for the Hawaii trade, and construction of such vessels would be jeopardized if foreign-

flag vessels could operate in that trade due to invalidation of the Jones Act.  Paxton Decl. at ¶ 8.

The impairment of AMP and MTD's members' interests from the relief Koloa Rum seeks

and resulting unfair competition from foreign-flag vessels satisfies the third element for

intervention as of right.  *See Cty. of San Miguel*, 244 F.R.D. at 44 (finding a "reduction in the

profitability of [the intervenor's] members' business concerns" if plaintiffs were to prevail

constituted "concrete and imminent injuries").  This suit thus represents "an imminent threat of

lost earning," *Cty. of San Miguel*, 244 F.R.D. at 47, and other harms against which AMP and

MTD should be permitted to defend.

### 4. No Party Adequately Represents the Interests of AMP and MTD.

AMP and MTD's interests in defending the Jones Act are not adequately represented by

any other party in this case.  A proposed intervenor must only show that "representation of his

interest 'may be' inadequate; and the burden of making that showing should be treated as

minimal." *Fund For Animals*, 322 F.3d at 735 (citing *Trbovich v. United Mine Workers*, 404

U.S. 528, 538 n.10 (1972)).  The D.C. Circuit commonly finds "inadequacy of governmental

representation when the government has no financial stake in the outcome of the suit." *Hardin v.

Jackon*, 600 F. Supp. 2d 13, 16 (D.D.C. 2009); *see also Dimond v. D.C.*, 792 F.2d 179, 192

(D.C. Cir. 1986) (finding that government had no financial stake in the outcome of a challenge to

the No-Fault Insurance Act, and insurance company's "application for intervention thus falls

squarely within the relatively large class of cases in this circuit recognizing the inadequacy of

governmental representation of the interests of private parties in certain circumstances");

*Wildearth Guardians*, 272 F.R.D. at 15 ("it is well-established that governmental entities

14

generally cannot represent the 'more narrow and parochial financial interest' of a private party")
(citation omitted).

As discussed above, AMP and MTD represent the full spectrum of private interests
Congress intended would bring about its objectives in enacting the Jones Act.  The federal
government does not share the private property, financial and labor interests of AMP and MTD's
members, and so cannot adequately represent those interests.  In addition, while the government
may anticipate that this case will turn on pure issues of law, the novel constitutional theories that
Plaintiff seeks to advance here rely on fact-laden assessments about the maritime industry—
including relative competitive disadvantages between ports (alleged discrimination under the
Port Preference Clause), and a lack of "evidence" that the Jones Act has furthered a compelling
state interest (alleged violation of the Due Process Clause).  *See* ECF No. 13 at ¶¶ 77-78, 85-86.
Given that AMP and MTD collectively represent the full panoply of maritime actors, the
Proposed Intervenors would be uniquely situated to respond to these and other aspects of the
complaint in a manner that the government is not.

Nor does Matson Navigation Company ("Matson"), another proposed intervenor-
defendant, adequately represent the interests of AMP and MTD.  Courts recognize that the
interests of an association are broader than any one member.  *See Wildearth Guardians*, 272
F.R.D. at 17 (permitting both the National Mining Association and a member company to
intervene in an action because the member company "does not share NMA's concern with the
regional and national implications that may emanate from Plaintiff's action"). Like Pasha
Hawaii, Matson operates vessels in the Hawaii trade, *see* ECF No. 15-1 at 6-7, and is also a
member of AMP.  Matson does not, however, represent shipyards (like SCA) or maritime labor

(like MTD), or all other shipping companies from Hawaii to every corner of the United States (like AMP).

At this early stage of the case, when the federal government has not even answered the operative complaint, it is difficult to predict the course of the litigation and any discovery, as well as the strategies and arguments of the parties over time, to assess whether existing parties will provide zealous and adequate representation. Yet Rule 24 imposes a timeliness requirement to intervene, and courts may fault prospective intervenors for waiting too long. By the time AMP and MTD might realize that the other defendants' interests, arguments or legal strategies have diverged from theirs, it may be too late, at least without special dispensation from the Court. For example, if the federal government were to lose before this Court but fail to take an appeal that AMP and MTD find meritorious, it may be too late to renew their motion to intervene and obtain a ruling on that motion before the time for noting an appeal has expired. *See, e.g.,* Fed. R. App. P. 4(a)(4)(A) (a motion to intervene is not among those motions that automatically toll the period of time to file a notice of appeal). Koloa Rum would certainly object on timeliness grounds at that point.

Thus, because the substantial interests represented by AMP and MTD—spanning shipyard, ship owner/operator, and maritime labor interests—are distinct from those represented by the federal government or Matson, that distinction should suffice to meet *Trbovich's* "minimal" showing of inadequacy. 404 U.S. at 538.

The D.C. Circuit's decision in *Natural Resources Defense Council v. Castle* is instructive. 561 F.2d 904 (D.C. Cir. 1977).[5] The court observed that representation of one party

---

[5] The analytical framework in *Castle* is no longer relevant for purposes of assessing Article III standing. *See Defenders of Wildlife v. Perciasepe*, 714 F.3d 1317, 1325 (D.C. Cir. 2013). Nevertheless, *Castle* remains instructive for assessing adequacy of representation for purposes of intervention under Rule 24.

by another may be inadequate "when the parties have different scopes to their interests, i.e., when their interests may not coincide." *Id*. at 912 n. 41 (internal quotation marks and citation omitted). Because of the "differing scope" of the parties' interests, industry parties and the government "may well have honest disagreements…on legal and factual matters." *Id*. at 912. Even where the interests of government and an industry association "coincide," the latter may "'make a more vigorous presentation of the economic side of the argument than would the [government],'" *id*. (quoting *N.Y. Pub. I. R. G. v. Regents*, 516 F.2d 350, 352 (2d Cir. 1975)). Particularly on technical questions, or those that may be informed by industry parties' "experience and expertise in their relevant fields," allowing intervention may "serve as a vigorous and helpful supplement to" the government's defense. *Id*. at 912-13. The court also made distinctions between industry participants, recognizing that the interests of one company may be distinct from another company or industry association. *Id*. at 913.

Some courts apply a presumption of adequate representation where parties share the same ultimate objective in litigation. *See* ECF No. 29 at 2-3; ECF No. 27 at 9-10 (parties' oppositions to Matson's motion to intervene, citing cases from courts other than the D.C. Circuit). But the D.C. Circuit recognized no such presumption in *Castle*, and the opinion reads more like an outright rejection of it. The Supreme Court recently declined to "decide whether a presumption of adequate representation might sometimes be appropriate." *Berger v. N. Carolina State Conf. of the NAACP*, 597 U.S. 179, 197 (2022).

Even if such a presumption applied here, as discussed above it is overcome by the "differing scope" of interests that warrants separate representation for AMP and MTD, who would bring their long history of defending and promoting the Jones Act to bear in providing a "vigorous and helpful supplement" to the government's defense. *Castle,* 561 F.2d at 912-13.

To the extent the Court has concerns about duplicative briefing, AMP and MTD share those concerns and have no intention to duplicate the briefing of the federal government or Matson. Indeed, AMP and MTD agreed to join together in seeking intervention in part to minimize duplication. Carpenter Decl. at ¶ 10. If permitted to intervene, AMP and MTD will endeavor to confer with the other defendants to avoid duplication.

## B. AMP and MTD Have Article III Standing.

In the D.C. Circuit, "a party seeking to intervene as of right must demonstrate that it has standing under Article III of the Constitution." *Fund For Animals*, 322 F.3d at 731-32 (internal citations omitted).[6] "In most instances," however, "the standing inquiry will fold into the underlying inquiry under Rule 24(a): generally speaking, when a putative intervenor has a 'legally protected' interest under Rule 24(a), it will also meet constitutional standing requirements, and vice versa." *Waterkeeper Alliance, Inc. v. Wheeler*, 330 F.R.D. 1, 6 (D.D.C. 2018) (citing *Wildearth Guardians,* 272 F.R.D. at 13 n.5). *See also Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003) ("With respect to intervention as of right in the district court, the matter of standing may be purely academic…[A]ny person who satisfies Rule 24(a) will also meet Article III's standing requirement.").

Standing under Article III requires a party to show an "injury in fact," that is fairly traceable to the challenged action, and that is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). To have associational standing, an

---

[6] Under more recent Supreme Court precedent, the Proposed Intervenors are likely not required to establish independent standing, given that Proposed Intervenors simply seek dismissal of the complaint and no affirmative relief. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2379 n.6 (2020) (intervenor-defendant did not need to demonstrate standing when it sought same relief as defendant-appellant); *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433 (2017) (intervenor of right must have Article III standing in order to pursue relief that is different from a party with standing). In any event, as discussed herein, Proposed Intervenors satisfy Article III standing.

association like AMP or MTD must demonstrate that its individual members have standing, the claims and relief sought do not require participation in the suit by individual members, and the interests it seeks to protect are germane to the association's purpose. *Military Toxics Project v. Envtl. Prot. Agency*, 146 F.3d 948, 953–54 (D.C. Cir. 1998).

AMP and MTD meet these requirements. AMP and MTD's members have the requisite "injury in fact" because of their investments made in reliance on the Jones Act (including specifically its enforcement as to the Hawaii trade) and the revenues and earnings they receive under the current regime, all of which would be harmed if Koloa Rum succeeds. *See* Pasha Decl., at ¶¶ 11-12, Paxton Decl. at ¶¶ 7-8, Heindel Decl. at ¶¶ 6-7. The D.C. Circuit has long found "a sufficient injury in fact where a party benefits from agency action, the action is then challenged in court, and an unfavorable decision would remove the party's benefit." *Crossroads Grassroots Policy Strategies v. FEC*, 788 F.3d 312, 317 (D.C. Cir. 2015); *see also Military Toxics Project v. EPA*, 146 F.3d 948, 954 (D.C. Cir. 1998) (holding that the Chemical Manufacturers Association had standing to intervene on the side of EPA to defend a suit by petitioners who sought to overturn an EPA rule that the association's members would benefit from). AMP and MTD also satisfy the causation element because their injuries would be directly traceable to any judicial invalidation of the Jones Act. *See id.; Wildearth Guardians*, 272 F.R.D. at 13; *Cty. of San Miguel*, 244 F.R.D. at 44-45 (financial injury to the private and public property that the cattlemen "utilize for their livelihoods and business operations" was "fairly traceable to the judicial intervention" sought by plaintiffs). The redressability requirement for standing is also met because these prospective injuries would be prevented if the Jones Act is upheld. *See Am. Horse Prot. Ass'n*, 200 F.R.D. at 156 (association of horse trainers demonstrated that "the injury would be prevented if the government action is upheld").

AMP and MTD also readily meet the other two elements necessary to establish associational standing. *See Military Toxics Project*, 146 F.3d at 953–54 (participation of individual members in the suit is not required, and the interests the association seeks to protect are germane to its purpose). AMP and MTD are not requesting affirmative relief, and thus the participation of their individual members is not required. *See Am. Great Lakes Ports Ass'n v. Zukunft*, 2016 WL 8608457, at *3 (D.D.C. Aug. 26, 2016) ("given that the Pilots Association do not at this time seek any affirmative relief on their member pilots' part, the record provides no indication that the pilots' participation (as opposed to the associations' participation) is required here"); *see also Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 554-58 (1996) (even when associations seek damages on behalf of their members, that fact does not prevent the associations from having standing to sue as a constitutional matter). AMP and MTD's interests in protecting their members' financial interests from unfair competition caused by the invalidation of the Jones Act are indisputably germane to the express purpose for their existence to preserve the Jones Act regime. *See* Carpenter Decl. at ¶¶ 5-8; Heindel Decl. at ¶¶ 3-4.

### C.    AMP and MTD Should Alternatively Be Granted Permissive Intervention.

The Court has discretion to grant permissive intervention under Rule 24(b) and should do so if intervention as of right is denied. Under the rule, the Court may permit, on "timely motion," anyone to intervene who "has a claim or defense that shares with the main action a common question of law or fact," and in "exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

As discussed above, the instant motion is timely and AMP and MTD's participation will not delay the proceedings or prejudice the rights of any party. This motion was filed before any party answered or otherwise responded to the operative complaint, and the Court has yet to begin

to consider any issues on the merits. The case has not substantively progressed since the date that Matson moved to intervene in this matter, without objection from Plaintiffs as to timeliness.

Further, AMP and MTD raise issues that share questions of law and fact in common with the allegations in Plaintiffs' complaint. *See Sierra Club v. Van Antwerp*, 523 F. Supp. 2d 5, 10 (D.D.C. 2007) (granting permissive intervention to developer with an interest in a property that could be impacted by plaintiffs' challenge to government regulation under Clean Water Act and thus shared common questions of law and fact with plaintiffs' claims). Koloa Rum contends that the Jones Act is unconstitutional. AMP and MTD dispute that contention and will argue that the Jones Act comports with the Constitution. Accordingly, AMP and MTD also satisfy the requirements for permissive intervention.

## IV.    CONCLUSION

AMP and MTD respectfully request that the Court grant their joint motion to intervene as a matter of right or, alternatively, for permissive intervention.

Dated: May 22, 2025.

<div style="margin-left: 40%;">

Respectfully submitted,

K&L GATES LLP

By: *s/ J. Timothy Hobbs*
J. Timothy Hobbs (DC Bar # 976470)
Tim.Hobbs@klgates.com
501 Commerce Street, Suite 1500
Nashville, TN 37203
Telephone: (615) 514-1811
Facsimile: (206) 623-7022

Varu Chilakamarri (DC Bar # 90023656)
Varu.Chilakamarri@klgates.com
1601 K Street NW
Washington, DC 20006
Telephone: (202) 778-9165
Facsimile: (202) 778-9100

</div>

*Attorneys for American Maritime Partnership and Maritime Trades Department of the AFL-CIO*