# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KŌLOA RUM COMPANY,

                                        Plaintiff,

        v.

KRISTI NOEM, in her official capacity
as Secretary of Homeland Security; and
PETE R. FLORES, in his official capacity
as Acting Commissioner of U.S. Customs
and Border Protection,

                                        Defendants.

Civil Action No. 1:25-cv-554

## DECLARATION OF JENNIFER CARPENTER IN SUPPORT OF AMERICAN MARITIME PARTNERSHIP AND MARITIME TRADES DEPARTMENT OF THE AFL-CIO'S JOINT MOTION TO INTERVENE

Jennifer Carpenter declares under penalty of perjury as follows:

1.      My name is Jennifer Carpenter.  I am the President of the American Maritime Partnership ("AMP").  I submit this declaration in support of the joint motion to intervene of AMP and the Maritime Trades Department of the AFL-CIO ("MTD").  I am over the age of eighteen years, have personal knowledge of the facts stated herein, and I could and would competently testify thereto if called as a witness.

2.      For over 34 years I have worked for the American Waterway Operators ("AWO"), a national trade association for the U.S. tugboat, towboat and barge industry.  I joined AWO in August 1990 and became President and CEO in January 2020.  AWO members operate on the rivers, coasts, Great Lakes, and harbors of the United States, moving vital commodities safely, reducing air emissions, water pollution, and highway congestion, protecting homeland security, and providing family-wage jobs for tens of thousands of Americans.  AWO promotes the long-

term economic soundness of the industry and works to enhance its ability to provide safe, efficient, and environmentally responsible transportation.  AWO is a member of AMP.

3.      In addition to serving as President and CEO of AWO, which is my "day job" so to speak, I am also the current President of AMP.  I became President of AMP in January 2024 and my term extends until January 2026.  AMP is the successor organization to the Maritime Cabotage Task Force ("MCTF"), which was founded to counteract a misguided attempt by foreign commercial interests to eliminate America's most venerable maritime laws for their own profit and convenience.  Guided by that history, AMP exists today to ensure that America's domestic maritime industry and the Jones Act remain a key component of our nation's economic and homeland security.  AMP encompasses the broadest and deepest coalition ever assembled to represent the domestic maritime industry, representing vessel owners and operators, shipbuilders and repair yards, maritime trade associations and national security organizations, and many more.

4.      Section 27 of the Merchant Marine Act of 1920, known as the "Jones Act," governs the movement of cargo between two points in the United States.  The Jones Act mandates that goods shipped between U.S. points must be transported on vessels built, owned, and operated by U.S. citizens.  Many other countries have similar laws.  Attached hereto as Exhibit A is a true and correct copy of a report describing such laws, titled *Cabotage Laws of the World*, that I obtained from the internet.  Attached hereto as Exhibit B is a true and correct copy of a Congressional Research Service report titled, *Shipping Under the Jones Act: Legislative and Regulatory Background*, that I obtained from the internet.

5.      The members of AMP (and also MTD) are the private citizens Congress envisioned would build and operate the fleet of vessels to provide economic and national security benefits to the nation under the Jones Act. In AMP's assessment, there are roughly 40,000 Jones Act vessels

operating in the U.S. domestic maritime industry, which support nearly 650,000 American jobs and have an annual economic impact of $150 billion. Further, AMP members have collectively invested over $30 billion into their fleets in reliance upon the stability and security provided by the Jones Act regime. To promote that regime, AMP actively engages in efforts to support and maintain the integrity of the Jones Act, ensuring that its members' interests are protected, and that the maritime industry continues to thrive under this longstanding framework.

6.      The primary objectives of the Jones Act are to maintain a merchant marine fleet that can serve as an auxiliary to the military in times of war or national emergency, provide shipping services essential to maintain the flow of U.S. waterborne commerce, and support the domestic shipbuilding and repairing industry. The Jones Act fleet also provides a reserve force of well-trained and credentialed seafarers. For example, following the attacks of September 11, 2001, U.S. vessels and seafarers evacuated more than 500,000 people from Manhattan. Many Jones Act-qualified vessels also supported military operations in Iraq and Afghanistan. Attached hereto as Exhibit C is a true and correct copy of a briefing paper prepared by AMP, titled *America is More Secure Because of its Strong Domestic Maritime Industry*. The paper explains how the Jones Act bolsters American defense interests, both domestically and abroad. Attached hereto as Exhibit D is a true and correct copy of an excerpt of testimony about the national benefits of the Jones Act by Gen. Randall Reed, a four-star general with the United States Air Force and head of the U.S. Transportation Command, before the U.S. Senate Armed Services Committee on March 5, 2025.

7.      If a court were to find that the Jones Act is unconstitutional, AMP and its members would be harmed in numerous ways. At a basic level, the existential purpose of AMP is to promote the Jones Act. If that act is found to be invalid, the purpose for AMP would disappear. It is my understanding from reading the plaintiff's complaint that it seeks only to stop enforcement of the

3

Jones Act as to the Hawaii trade.  In AMP's view, any loss of application of the Jones Act would be detrimental to the act itself and AMP's and its members' interests in it.  The Hawaii trade contributes to the need for U.S. vessel, shipyard, and mariner capacity, and so losing the Hawaii trade from Jones Act coverage would reduce capacity and undermine the Jones Act's objectives. AMP also has grave concerns that any ruling against the Jones Act, even if limited to Hawaii, would be used by others to try to take down the Jones Act elsewhere.  In fact, the plaintiff's lawyers in this case state on their website[1] that the "The Jones Act must go" and that it is time for "[r]epealing the law or defeating it in court."  A press release about this case on the plaintiff's lawyers' website[2] vows to "abolish[] the Jones Act" and to "put an end to the Jones Act once and for all."  Further, even if a court enjoined enforcement of the Jones Act only as to the Hawaii trade, AMP as an organization would still be harmed.  AMP has three members who operate extensively in the Hawaii trade.  If a court enjoined enforcement of the Jones Act as to that trade, there would be no or less reason for those companies to continue to be members of AMP (even assuming they could continue to function as going concerns).  As such, AMP would very likely lose members and funding from the relief the plaintiff seeks in this case.

8.    Beyond the harms to AMP's interests as an organization, the property, economic and other interests of AMP's members would also be harmed by any invalidation of the Jones Act.  AMP's members have entered into contracts and made investments, including to construct and acquire vessels and other property, in reliance on continued enforcement of the Jones Act and the exclusion of competition by foreign vessels in the U.S. coastwise trade.  Foreign-flag vessels are not required to comply with all U.S. laws, are often built with substantial foreign subsidies and lower wage labor, pay their mariner crews substantially lower wages, and have other lower operating costs

---

[1] https://pacificlegal.org/the-jones-act-a-disastrous-legacy-for-the-u-s-economy-and-security/
[2] https://pacificlegal.org/how-the-century-old-jones-act-is-hurting-hawaiis-economy/

including from avoiding certain U.S. taxes.  Foreign vessels also often operate under so-called "flags of convenience" that allow them to conduct their business under the jurisdictions of countries with lax legal and regulatory regimes.  The Jones Act bars those vessels from the U.S. coastwise trade.  If a court were to invalidate the Jones Act, AMP's members would immediately face unfair competition from these foreign vessels with their lower cost structures and ability to charge lower prices by avoiding certain U.S. laws.  The vessels, shipyards, and other property that AMP's members have invested in would be devalued, along with their investments in training individuals to build and operate Jones Act-compliant vessels.  Current and future contracts for the transportation of merchandise by AMP's members and revenues generated by such transportation would also be in jeopardy.

9.      I am aware of two recent legislative efforts to amend the Jones Act.  Both failed.  On April 26, 2023, a proposed amendment to waive the Jones Act for transportation of liquified natural gas failed before the House Transportation and Infrastructure Committee by a vote of 53-4, with eight members absent.  A separate effort to amend the Jones Act in 2022 failed before the Senate Commerce Committee by a vote of 26-2.

10.     AMP has moved expeditiously to intervene in this case.  As a large organization with many members, AMP has internal processes for making decisions that take time.  Apart from deciding whether to intervene, AMP also had to determine how to fund its participation in this litigation, and then to consider whether to jointly move to intervene along with MTD (in part to avoid duplication of efforts) and whether to use joint litigation counsel.  These factors added complexity and necessitated additional time for AMP to act.  AMP does not seek to delay the resolution of this case and will abide by the case schedule agreed to by the parties.

11.    I do not believe that any other party will adequately represent the interests of AMP or its members in this litigation. AMP has unique organizational interests in its continued membership and receipt of dues that no party shares. AMP's members have private property and contractual rights and economic interests at stake that the government does not share. AMP also represents national interests, as well as shipyards, that no other party or proposed intervenor shares.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

EXECUTED on May 21, 2025.

Jennifer Carpenter

# Exhibit A



# CABOTAGE LAWS OF THE WORLD

**2**



Cabotage Laws of the World

**3**

# CABOTAGE LAWS
# OF THE WORLD

**4**

---

First Published 2018 by Seafarers' Rights International
49-60 Borough Road, London SE1 1DR



Copyright © Seafarers' Rights International 2018

The right of Seafarers' Rights International to be identified as the
authors of this work has been asserted by them in accordance with
the Copyright, Designs and Patents Act 1988.

ISBN  978-1-9164166-1-1  Paperback

# CONTENTS

**6**    **FOREWORD**

**7**    **PREFACE**

**10**    **EXECUTIVE SUMMARY**

**12**    **CABOTAGE LAWS**

**21**    **ACRONYMS**

**22**    **CHAPTER 1**      Introduction

**32**    **CHAPTER 2**      Definitions of cabotage

**42**    **CHAPTER 3**      Previous research

**48**    **CHAPTER 4**      States without cabotage

**52**    **CHAPTER 5**      States with cabotage

**64**    **CHAPTER 6**      Policy objectives

**72**    **CHAPTER 7**      Exceptions, waivers and trade agreements

**76**    **CHAPTER 8**      Conclusion

**78**    **APPENDICES**

**94**    **ILLUSTRATIONS**

**95**    **BIBLIOGRAPHY**

**6**

# FOREWORD

The International Transport Workers' Federation (ITF) is a coalition of 670 trade unions representing 19.7 million workers from nearly 150 countries in all transport sectors. Two years ago, the ITF Seafarers' Section recognized the absence of an updated accounting of maritime cabotage laws around the world. The lack of such a recent, comprehensive study was a major impediment to thoughtful policy-making on this subject. Obviously, fact-based decision-making is highly dependent on accurate facts.

As a result, the ITF commissioned Seafarers' Rights International (SRI), a legal analytical organization, to undertake an unbiased and comprehensive study. This was a complex project, given language and cultural barriers. The difficulty of a survey like this is almost surely the reason that no organization had done this kind of study for many years. The ITF limited the study to maritime cabotage, recognising that cabotage in other transportation modes is also common.

We are proud to release this study, one of the most complete cabotage studies ever endeavored and certainly the most current, titled "Cabotage Laws of the World." Its principal finding is that 91 countries within the United Nations employ a legal system that includes some form of maritime cabotage. In other words, it is quite common for countries around the globe to impose restrictions on access to their domestic shipping markets.

The ITF is grateful to SRI for its excellent work. We hope you will find it useful.

**David Heindel**
**Chairman, Seafarers' Section**
**International Transport Workers' Federation**

# PREFACE

For many people, maritime cabotage or coasting, coastwise or coastal trade as it is sometimes referred to, is understood, if at all, only vaguely. This is not surprising since so little is published on the subject. But the subject is important. It affects a very wide range of trades, services and activities around the world, and with significant social and economic consequences. Policy makers especially may want to know more about the subject.

This Report aims to shed some light on the subject. It was written by lawyers, but not for lawyers. Technical jargon and heavy authoritative footnotes have been kept to a minimum. Beginning with the history of the subject, the Report traces some early rudimentary legal principles relevant to cabotage, and then sets out some examples of the many different definitions of cabotage that exist today at the national, regional and international levels. A reference to "cabotage", "cabotage laws" or "cabotage legislation" in the Report is, unless the context indicates otherwise, a reference to the reservation of cabotage to national ships, as well as a reference to the restrictions on foreign flag ships from conducting cabotage.

The Report sets out some previous research that identified states with cabotage laws before identifying 91 member states of the United Nations as described in the Report that have laws restricting foreign activity in their domestic coastal trades. This is a unique finding. It appears to be the first survey that has sought to consider comprehensively the cabotage laws of the world.

The work has been demanding. The relevant laws of 140 member states of the United Nations had to be identified with the assistance of independent professional advice from practising lawyers around the world. Many laws had to be translated. And not infrequently the analysis of the law evoked lively debates between lawyers. But the work has been very interesting and enjoyable. This Report discusses the conclusions that arise from the survey; but it does not enter the debate about the merits of cabotage which are well covered in many other publications many of which are identified in this Report.

I would like to thank the ITF for commissioning this research. And I hope that the Report is helpful.

**Deirdre Fitzpatrick**
**Executive Director**
**Seafarers' Rights International**

**8**

## EDITORIAL BOARD

*(names listed in alphabetical order by surname)*

Deirdre Fitzpatrick, CEO of SRI
Judge Kenneth Keith
Judge Thomas Mensah
Brian Orrell OBE
Emeritus Professor Hilton Staniland
Justice Noel G. Tijam

## ACKNOWLEDGEMENTS

SRI conducts independent legal research on maritime related subjects under the guidance of a pan-industry Advisory Board consisting of judges, professors, lawyers and maritime industry representatives from around the world.  SRI wishes to thank the members of its Advisory Board who provided advice and guidance during this project, and in particular the members of the Editorial Board for their scrutiny of the text.  This Report is based on legislation and advice received from professional law firms in 140 member states of the United Nations.  SRI wishes to thank each of those correspondent law firms, many of whom are part of SRI's independent network of lawyers worldwide.  SRI also wishes to thank all other persons, companies and organisations that it consulted or who furnished information, formally or informally, during the course of the research.

## DISCLAIMER

This Report is based on legislation and advice received from professional law firms in each member state of the United Nations selected for consideration. For readers, this Report does not constitute professional legal advice. Readers who require professional legal advice must consult relevant authorities and/or practising lawyers to obtain such advice.  SRI does not accept any liability or any responsibility for any loss or any damages resulting from any use of this Report.





# EXECUTIVE SUMMARY

This Report is the outcome of a survey that was undertaken of maritime cabotage laws around the world. The survey was conducted with the assistance of professional law firms in each of the states where inquiries were made. The survey appears to be unique. The key findings of this Report are as follows.

### Cabotage exists in a majority of states

The survey revealed that there are 91 member states of the United Nations with cabotage, that is 65% of states that could have cabotage do have cabotage.

### Cabotage exists in every region of the world

Cabotage is widespread. It exists in all geographic regions of the world including Africa, the Americas, Asia, Europe and Oceania.

### Cabotage exists across all political, economic and legal systems

Cabotage exists in states with substantially different political, economic and legal systems, and in developed and developing states. Despite these differences, states share similar cabotage principles.

### Cabotage exists along a majority of the world's coastlines

Cabotage exists along the coastlines of about 80% of the world when comparing the coastlines of states with cabotage as opposed to states without cabotage.

### Cabotage exists in a substantial majority of IMO Council states

Cabotage exists in 70% of states that are members of the Council of the IMO, that is 28 out of 40 states. IMO Council states are identified either in Category A as "states with the largest interest in providing international shipping services"; or in Category B as "states with the largest interest in international seaborne trade"; or in Category C as "states which have special interests in maritime transport or navigation".



## Cabotage laws have endured for centuries

Cabotage laws are steeped in maritime history and have existed, in rudimentary form, in the laws of some states for centuries. Despite the great political, economic and legal changes that have historically occurred in those states, their cabotage principles have endured and evolved down the centuries.

## Cabotage is not subject to a single definition

There is no single definition of cabotage that is accepted as binding on all states under international law. Regional and national definitions of cabotage vary widely.

## Cabotage laws are diverse

In national laws, there is a rich variety of approaches taken by states regarding virtually every aspect of cabotage, and there is great diversity in the interpretation, administration and enforcement of cabotage.

## Cabotage policy objectives are diverse

Policy objectives underlying cabotage laws aim to: maintain national security; promote fair competition; develop human capacity; transfer maritime knowledge and technology to nationals; create jobs for nationals; increase ships on the national register; promote ship ownership, building and supply services; promote safety and security of ships in port; enhance marine environmental protection; encourage transportation by sea; and provide public services. The extent to which these objectives are successfully achieved is not determined in this Report.

## Cabotage policies and laws are evolving

A state's policies and laws may evolve and are subject to change. The list of states with cabotage is neither fixed nor closed. The list of states is open to different reasonable interpretations but a majority of states with cabotage will remain.

## Exceptions, waivers and trade agreements affect cabotage to a greater or lesser extent

Cabotage laws provide for exceptions, waivers and trade agreements. These affect the practice of cabotage to a greater or lesser extent and are often the subject of debate.



**13**

# CABOTAGE LAWS

The following are some primary cabotage laws.  The references include the laws as amended and as supplemented by additional laws.  The list of laws does not seek to trace all secondary legislation; nor does it cite regional laws that have direct effect in states in the region.

### Albania
Ligj Nr. 9251 datë 8.7.2004 Kodi Detar  I Republikës Së Shqipërisë

### Algeria
Ordonnance Nº. 76-80 du 23 Octobre 1976 portant Code Maritime
Dècret Exècutif Nº. 08-57 du 13 Fèvrier 2008

### Angola
Lei n.º 27/12 de 28 de Agosto Lei da Marinha Mercante, Portos e Actividades Conexas
Decreto Presidencial n.º 54/14 de 28 de Fevereiro

### Antigua and Barbuda
The Antigua and Barbuda Merchant Shipping Act 2006

### Argentina
Decreto 19.492 del 25 de Julio de 1944 Régimen para la navegación, comunicación y comercio de cabotaje nacional
Ley 27419 del 29 de noviembre de 2017 Desarrollo de la marina mercante nacional y la integración fluvial regional

### Australia
Coastal Trading (Revitalising Australian Shipping) Act No. 55, 2012

### Bahrain
مرسوم بقانون رقم (23) لسنة 1982 بإصدار القانون البحري

### Bangladesh
Bangladesh Merchant Shipping Ordinance 1983
Bangladesh Flag (Protection) Ordinance 1982

### Benin
Loi Nº. 2010-11 du 07 Mars 2011 portant code maritime Republique du Benin

### Brazil
Lei Nº. 9.432 de 8 de Janeiro de 1997
Resolução Normativa Nº 01-ANTAQ, de 13 fevereiro de 2015
Resolução Normativa Nº 05-ANTAQ, de 23 fevereiro de 2016
Resolução Normativa Nº 18, de 21 de dezembro de 2017



**Bulgaria**

Кодекс на търговското корабоплаване (Загл. изм. - ДВ, бр. 113 от 2002 г.)
Наредба № 10 от 10.02. 2003 г. за извършване на превози на пътници и товари между български
пристанища от кораби, плаващи под чуждо знаме. Обн. - ДВ, бр. 18 от 25.02.2003 г

**Cabo Verde**

Decreto-Legislativo 14/2010 (Código Marítimo) de 15.11.2010

**Cameroon**

Communaute Economique et Monetaire de l'Afrique Centrale Code Communautaire de la Marine
Marchande de 03 Aout 2011

**Canada**

Coasting Trade Act S.C. 1992, c.31
Canada Shipping Act S.C. 2001, c.26

**Chile**

Ley 6415 de 15.09.1939
Decreto Ley 3059 Ley de Fomento a la Marina Mercante de 21.12.1979

**China**

中华人民共和国海商法
中华人民共和国国际海运条例

**Colombia**

Ley 1 de 1991 (enero 10)
Decreto Nº 804 de 2001 (mayo 8)
Decreto Nº 390 de 2016 (marzo 7)

**Congo**

Communaute Economique et Monetaire de l'Afrique Centrale Code Communautaire de la Marine
Marchande de 03 Aout 2011

**Costa Rica**

Código de Comercio de 1853 Comercio Marítimo Ley número 104 de 6 de junio
Código Fiscal Ley No. 8 de 31 de octubre de 1885
Ley de Servicio de Cabotaje de la República número 2220 de 20 junio de 1958
Ley de Incentivos para el Desarrollo Turístico número 6990 de 15 julio de 1985

CABOTAGE LAWS OF THE WORLD



### Côte D'Ivoire
Le Code de la Marine Marchande (Loi numero 61-349 du 9 Novembre 1961)
Decret numero 68-406 du 3 Septembre 1968

### Croatia
Pomorski zakonik "Narodne novine" 181/04, 76/07, 146/08. 61/11, 56/13 i 26/15

### Cuba
Ley no. 115 de la Navegación Marítima, Fluvial y Lacustre, 4 de noviembre de 2013
Decreto no. 317, 6 de julio 2013

### Democratic Republic of the Congo
29 Janvier 1947 Ordonnance 33/AIMO Immatriculation des embarcations

### Dominican Republic
Ley Nº. 180 de Protección y Desarrollo de la Marina Mercante Nacional 30.05.1975

### Ecuador
Reglamento a la Actividad Marítima Decreto Ejecutivo 168 numero 32 de 27 mar 1997

### Egypt
قانون رقم 63 لسنة 1961 بشأن النقل الساحلي

قانون 8 لسنة 1990 بشأن التجارة البحرية

بشأن إعطاء الأولوية في النقل الساحلي لحاويات الترانزيت بين الموانئ المصرية للسفن الرافعة للعلم المصري و الحاصلة
على ترخيص ملاحة ساحلية القرار رقم 132 لعام 2003 صدر بتاريخ 2003/3/16

### Equatorial Guinea
Communaute Economique et Monetaire de l'Afrique Centrale Code Communautaire de la
Marine Marchande de 03 Aout 2011

### Estonia
Kaubandusliku meresõidu koodeks, Vastu võetud 09.12.1991

### Fiji
Maritime Transport Decree 2013 (Decree No. 20 of 2013)

### Finland
Laki Liikenteen palveluista 320 / 2107



**16**

### France
Cod des Douanes version consolidée au 12 août 2018
Loi n° 85-1404 du 30/12/1985
Loi n° 2001- 43 du 16/01/2001

### Gabon
Communaute Economique et Monetaire de l'Afrique Centrale Code Communautaire de la Marine
Marchande de 03 Aout 2011
Loi n° 10/63 du 12 Janvier 1963 portant Code de la Marine Marchande Gabonaise

### Georgia
1997 წლის 15 მაისის საქართველოს საზღვაო კოდექსი (კანონი N715)

### Germany
Verordnung über die Küstenschifffahrt 05.07.2002

### Ghana
Ghana Shipping Act 2003 (Act 645)

### Greece
ΝΟΜΟΣ 2932 Δημοσιεύθηκε στο ΦΕΚ 145 στις 02.07.2001

### Grenada
Shipping Act Chapter 303 of the 2010 Revised Laws of Grenada

### Guinea Bissau
Decreto lei n.° 24.458 de 3 de Setembro de 1934

### Guyana
Guyana Shipping Act 1998

### Haiti
Décret relatif au Code Douanier du 13 juillet 1987

### Honduras
Ley Orgánica de la Marina Mercante Nacional, Decreto 167-94

### India
Merchant Shipping Act 1958 No. 44 of 1958
General Order No. 1 of 2018
General Order No. 2 of 2018

CABOTAGE LAWS OF THE WORLD



**17**

### Indonesia
Undang-Undang Republik Indonesia Nomor 17 Tahun 2008 Tentang Pelayaran

### Israel
חוק ספנות חופית (היתר לכלי שיט זר), תשס"ו-2005

### Italy
Codice della Navigazione Regio decreto 30 marzo 1942 n. 327

### Jamaica
The Shipping Act 1998

### Japan
船舶法 明治三十二年

### Jordan
قانون التجارة البحرية رقم (12) لسنة 1972

### Kazakhstan
Закон Республики Казахстан от 17 января 2002 года № 284-II "О торговом мореплавании"

### Kenya
The Merchant Shipping Act, 2009

### Kuwait
البحرية التجارة قانون بإصدار 1980 لسنة 28 رقم بالقانون مرسوم

### Lebanon
قانون التجارة البحرية قانون – صادر في 1947/2/18

### Lithuania
Lietuvos Respublikos Prekybines Laivybos Istatymas 1996 m. rugsėjo 12 d. Nr. I-1513

### Madagascar
Loi n°99-028 du 3 février 2000 portant refonte du Code maritime

### Malaysia
Ordinan Perkapalan Saudagar 1952



**Mauritania**
Loi numero 2013 - 029 portant Code de la Marine marchande du 30 Juillet 2013

**Mauritius**
Merchant Shipping Act 26 of 2007

**Mexico**
Ley de Navegación y Comercio Marítimos, 1° de Junio de 2006

**Montenegro**
Zakon o moru, Zakon je objavljen u "Službenom listu CG", br. 17/2007 i 6/2008. Vidi: čl. 55. Zakona - 40/2011-1

**Morocco**
Code de commerce maritime du 31 mars 1919

**Mozambique**
Decreto n.º 35/2007 de 14 Agosto

**Nicaragua**
Ley numero 399 Ley de Transporte Acuático de 03.09.2001

**Nigeria**
Coastal and Inland Shipping (Cabotage) Act No. 5 of 2003

**Papua New Guinea**
The Merchant Shipping Act 1975 (Chapter 242)

**Peru**
Ley número 28583 Ley de reactivación y promoción de la Marina Mercante Nacional

**Philippines**
Foreign Ships Co-Loading Act (Republic Act No. 10668)
Domestic Shipping Act of 2004 (Republic Act No. 9295)
Tariff and Customs Code of the Philippines 1957 (Republic Act No. 1937)
Foreign Investment Act (Republic Act 7042, Republic Act 8179, E.O 367)
Public Service Act (Commonwealth Act 146)

**Poland**
Ustawa z dnia 18 września 2001 Kodeks morski

CABOTAGE LAWS OF THE WORLD



**19**

### Portugal
Decreto-Lei número 7/2006 de 4 de Janeiro

### Qatar
قانون رقم (15) لسنة 1980 بإصدار القانون البحري

قانون رقم (16) لسنة 1980 بشأن النقل البحري الساحلي

القانون رقم 8 لسنة 2017 بتنظيم مزاولة الأعمال البحرية في المياه التابعة لدولة قطر

### Republic of Korea
선박법, 법률 제 14476호, 2016.12.27
해운법, 법률 제14748호, 2017.3.21

### Russian Federation
Кодекс торгового мореплавания Российской Федерации от 30.04.1999 N 81-ФЗ

### Saint Lucia
Shipping Act (Chapter 13.27) 19.11.1994

### Saint Vincent and the Grenadines
Shipping Act Chapter 363 Act No. 11 of 2004

### Samoa
Shipping Act 1998, No. 31

### Slovenia
Pomorski zakonik (PZ-UPB5) objavljen v uradnem listu Republike Slovenije št. 26/2001

### Solomon Islands
The Shipping Act No. 5 of 1998

### Spain
Real Decreto 1516/2007
Real Decreto legislativo 2/2011

### Sri Lanka
Merchant Shipping Act No. 52 of 1971

### Sweden
Förordningen den 10 november 1724 angående De Fremmandes Fahrt på Swerige och Finland
Förklaringen den 28 februari 1726 "öfwer förordningen af den 10. Nov. 1724, angående
de Främmandes Fahrt på Swerige och Finland
Förordning (1974:235) om tillstånd till sjöfart i inrikes trafik med utländskt fartyg m.m.



**Syrian Arab Republic**

القانونالتجاري البحري السوري رقم /٤٦/ لعام ٢٠٠٦ وتعليماته التنفيذية الصادرة بقرار وزير النقل رقم /٩٣٥/
تاريخ ١٨ / ٦ / ٢٠٠٦م

**Thailand**

พระราชบัญญัติ เรือไทย พุทธศักราช ๒๔๘๑

**Tunisia**

قانون عدد 34 لسنة 2008 مؤرخ في 2 جوان 2008 يتعلق بإصدار مجلة الديوانة.

**Turkey**

Kanun No: 815 Kabul Tarihi 20 Nisan 1926

**Ukraine**

Кодекс торговельного мореплавства України 09.12.94

**United Arab Emirates**

القانون الاتحادي رقم 26 لسنة 1981 القانون التجاري البحري لدولة الإمارات العربية المتحدة 1981

**United Republic of Tanzania**

The Merchant Shipping Act No. 21 of 2003

**United States of America**

Title 46 of the United States Code

**Uruguay**

Ley N° 12091 Ley sobre navegacion y comercio de cabotaje nacional: 05/01/1954

**Venezuela, Bolivarian Republic of**

Ley Organica de los espacios acuaticos e insulares N° 37330 del 22 de Noviembre de 2001

**Viet Nam**

Bộ luật Hàng hải Việt Nam số 95/2015/QH13 ngày 25 tháng 11 năm 2015

**Yemen**

بشان القانون البحري قرار جمهوري بالقانون رقم (15) لسنة 1994م

CABOTAGE LAWS OF THE WORLD



# ACRONYMS

| | |
|---|---|
| AU | African Union |
| CARICOM | Caribbean Community |
| CBA | Collective Bargaining Agreement |
| ECLAC | Economic Commission for Latin America and the Caribbean |
| ESCAP | The United Nations Economic and Social Commission for Asia and the Pacific |
| EEA | European Economic Area |
| EFTA | European Free Trade Association |
| EU | European Union |
| IMO | International Maritime Organization |
| ITF | International Transport Workers' Federation |
| MERCOSUR | Mercado Comun del Sur |
| OECD | Organisation for Economic Co-operation and Development |
| SADC | Southern African Development Community |
| SRI | Seafarers' Rights International |
| UN | United Nations |
| UNCTAD | United Nations Conference on Trade and Development |
| US | United States of America |
| WTO | World Trade Organization |

**CABOTAGE LAWS OF THE WORLD**



**23**

# CHAPTER 1
# INTRODUCTION

Cabotage is the principle of reserving a nation's maritime and shipping trades, services and activities for its own citizens. The principle has a long legal history. Today cabotage is mostly restricted directly in maritime and shipping laws. But it may be encouraged and supported in other laws, for example laws relating to: ship registration, immigration, employment, taxation, customs, companies, licencing, subsidies for the operation and construction of vessels, and foreign direct investment.

Cabotage law is immensely variable from state to state in many respects: it reserves and restricts trades, services and activities in many different ways and it is closely adapted to national circumstances. It is also widespread across all regions of the world and exists in states with different political, economic and legal systems. Nonetheless, it is often a contested principle at international, regional, national and industry levels.

Before explaining the terms of reference and methodology of this Report, a very brief historical introduction to early cabotage principles sets the scene.

## HISTORICAL LAWS

The historical genesis of cabotage as a rudimentary legal principle is obscure. Some say that it was "first enunciated in the 16th century by the French. Navigation between ports on their coasts was restricted to French ships: this principle was later extended to apply to navigation between a metropolitan country and its overseas colonies."[1] Another view is that Portugal was the first nation to introduce the direct regulation of cabotage in the 15th century to protect the sea trade of its empire and to "prevent other countries from dominating shipping along its coast."[2] Whatever the origin, the cabotage laws of some states are steeped in history.

In England in 1381 in the reign of King Richard II, in order to increase the navy which was declared to be greatly diminished, Parliament stipulated that "Subjects shall export or import merchandices in English ships only" and enacted:

*"That none of our Lord the King's liege People do from henceforth cauſe to be ſhipped any Manner of Merchandize going out of or coming into the Realm of England, in any Part, but only in Ships of our Lord the King's Liegance… ſhall forfeit to the King all his Merchandizes ſhipped in other Veſſels, whereſoever they be found hereafter or the Value of the ſame…"* [3]

Subsequently a series of laws which became known as the Navigation Acts were passed and then repeatedly extended and revised between the 1650s and the 1770s, but their essential thrust was to reserve all commerce between the colonies and Europe to British citizens.[4] In October 1651, the Rump Parliament led by Oliver Cromwell passed the first Navigation Act, long titled "An Act for increase of Shipping, and Encouragement of the Navigation of this Nation."[5] It authorised the Commonwealth to regulate England's international trade, as well as the trade with its colonies, and stated that:

**CABOTAGE LAWS OF THE WORLD**

**24**

"For the increase of the shipping and the encouragement of the navigation of this nation…no goods or commodities whatsoever of the growth, production or manufacture of Asia, Africa or America, or of any part thereof; or of any islands belonging to them …shall be imported or brought into this Commonwealth of England, or into Ireland, or any other lands, islands, plantations, or territories to this Commonwealth … in any other ship or ships, vessel or vessels whatsoever, but only in such as do truly and without fraud belong only to the people of this Commonwealth."[6]

The Navigation Acts were repealed in 1849 under the influence of an emerging free trade philosophy which continues to prevail, and today there is no cabotage in the United Kingdom.[7]

Scholars still debate intensely the degree to which the English Navigation Acts played a role in triggering the American War of Independence.[8] In the United States, at its very first session on September 1, 1789, Congress enacted "An Act for Registering and Clearing Vessels, Regulating the Coasting Trade, and for other purposes" which imposed cabotage principles. In 1817, in an "Act Concerning the Navigation of the United States" it was provided that "no goods, wares or merchandise, shall be imported, under penalty of forfeiture therefore, from one port of the United States to another port of the United States, in a vessel belonging wholly or in part to a subject of any foreign power …".[9]

Then in 1886, the Passenger Vessel Service Act was passed to govern the carriage of passengers. It stated: "That foreign vessels found transporting passengers between places or ports in the United States, when such passengers have been taken on board in the United States, shall be liable to a fine of two dollars for every passenger landed".

Cabotage principles are now comprehensively restated in the Merchant Marine Act of 1920, more commonly known as the Jones Act, where Congress declared: "It is necessary for the national defence and the development of the domestic and foreign commerce of the United States that the United States have a merchant marine..."[10]

Cabotage continues today in Sweden from the time that an Ordinance entitled "Foreign Shipping to Sweden and Finland" was passed in 1724 and clarified in 1726.[11] In the clarification it was stated that:

"… for the support of Swedish Ship Owners and promotion of transport, … ordain that foreign transport to Sweden and Finland, … may not carry hither other than their own Country's products in their own ships on pain of Confiscation of Ship and goods, half to Us and the Crown and half to the Sequestrator; … Foreigners are not only barred from importing in their vessels goods other than the products of their own country in the manner that is stated above, but also that they may not seek cargo to take on any Swedish produce at one place in the realm and carry it to another either, …". *(SRI translation)*.

After the passage of 300 years, this Ordinance is still valid, proclaiming cabotage principles that are confirmed by case law and by government regulation which refers to, and mandates exemptions from, the Ordinance in certain cases.[12]

In France, in a Decree of 1793 "Decret contenant l'acte de navigation 21 Septembre 1793", it was stated that: "Foreign vessels shall not be allowed to carry from one French port to another French port any of the commodities, productions or commodities of the crops, products or manufactured goods of France, colonies or possessions of France, under the penalties laid down in Article 3". *(SRI translation)*. The Decree also provided that:

CABOTAGE LAWS OF THE WORLD



# AN ACT

### FOR

## Increaſe of Shipping,

### And Encouragement of the

## NAVIGATION

### OF THIS

## NATION.



Thurſday *the Ninth of* October, 1651.

ORdered *by the Parliament*, *That this Act be forthwith printed and publiſhed.*

Hen: Scobell, Cleric. Parliamenti.

London, Printed by *John Field*, Printer to the Parliament of *England*, 1651.

**26**

"No foreign goods, products or goods may be imported into France, from the colonies and possessions of France, except directly by French vessels, or belonging to the inhabitants of the country of the crops, products or manufactured goods, or the ordinary ports of France, sale and first export, the officers and three quarters of the foreign crews being from the country whose vessel bears the flag; all under pain of confiscation of the vessel and cargoes, and of three thousand pounds of fine, solidary and by body, against the proprietors, agents and agents of the vessel and cargoes, captain and lieutenant". *(SRI translation).*[13]

In Greece, in 1836[14], a law was passed to the effect that ships flying the national flag had the exclusive rights to carry native products from one port to another within the Kingdom, except where reciprocity treaties signed by Greece provided otherwise.

Costa Rica has two historic enactments regarding cabotage, with restrictions on nationality. In article 537 of the Code of Commerce of 1853, it is provided that: "Commerce between a port of Costa Rica and another port of the same Republic shall be made exclusively by ships registered by Costa Rica, save for the exceptions made or to be made in commercial treaties with foreign powers". *(SRI translation).*  The 1853 Code of Commerce appears to be the oldest statute currently in force in Costa Rica.  And, in the Fiscal Code of 1885, which deals with taxes and tariffs, there are some cabotage provisions that mirror the earlier Code of Commerce.[15]

In Germany, a Law Concerning Coastal Freight was passed in 1881 and came into force in 1882. It provided that:

"Article 1 The right to load goods in a German seaport and to transport it to another German seaport in order to unload it there (coastal freight journey) is

reserved exclusively for German ships. Article 2 Foreign ships may be granted this right by a State Treaty or by Imperial Ordinance with the consent of the Bundesraths. Article 3 The leader of a foreign ship, which operates unauthorised coastal freights, will be punished with a fine of up to three thousand marks. In addition to the fine, the confiscation of the ship and the goods carried without authorization can be recognised, regardless of whether they belong to the condemned or not" …"[16]. *(SRI translation).*

In Brazil, the Constitution of the Republic of the United States of Brazil of 1891 stated that it was within the exclusive competence of the Union to determine the rights of entry, exit and stay of vessels regarding the cabotage trade for domestic goods as well as foreign goods; and that inland navigation was to be conducted by national vessels.[17]

This was pre-dated by decrees in 1836 and 1860.  The 1860 Decree No 2647 provided in article 486 that: "The transportation of goods and merchandise of any origin, from one to the other ports of the Empire, is the exclusive privilege of the national vessels". *(SRI translation).*

Today in Japan an historic law continues to provide for cabotage. In section 3 of the Shipping Act 1899,[18] cabotage was mandated as follows:

"A foreign vessel shall not call at a place of a closed port or transport goods or passengers by water between ports within Japan. However, this restriction shall not apply when there is a special provision in a law or a treaty, when a vessel intends to avoid an accident at sea or a capture or when a special permission by the Minister of Land, Infrastructure, Transport and Tourism is obtained". *(SRI translation).* Although the 1899 Act was last revised in 2014, article 3 of the earlier Act has

— 97 —

# Reichs-Gesetzblatt.

## № 11.

**Inhalt:** Gesetz, betreffend die Küstenfrachtfahrt. S. 97. — Gesetz, betreffend die Oeffentlichkeit der Verhandlungen und die Geschäftssprache des Landesausschusses für Elsaß-Lothringen. S. 98. — Gesetz, betreffend die Besteuerung der Dienstwohnungen der Reichsbeamten. S. 99. — Gesetz, betreffend die Kontrole des Reichshaushalts und des Landeshaushalts von Elsaß-Lothringen für das Etatsjahr 1880/81. S. 100.

(Nr. 1420.) Gesetz, betreffend die Küstenfrachtfahrt. Vom 22. Mai 1881.

## Wir Wilhelm, von Gottes Gnaden Deutscher Kaiser, König von Preußen ꝛc.

verordnen im Namen des Reichs, nach erfolgter Zustimmung des Bundesraths und des Reichstags, was folgt:

### §. 1.

Das Recht, Güter in einem deutschen Seehafen zu laden und nach einem anderen deutschen Seehafen zu befördern, um sie daselbst auszuladen (Küstenfrachtfahrt), steht ausschließlich deutschen Schiffen zu.

### §. 2.

Ausländischen Schiffen kann dieses Recht durch Staatsvertrag oder durch Kaiserliche Verordnung mit Zustimmung des Bundesraths eingeräumt werden.

### §. 3.

Der Führer eines ausländischen Schiffes, welcher unbefugt Küstenfrachtfahrt betreibt, wird mit Geldstrafe bis zu dreitausend Mark bestraft.

Neben der Geldstrafe kann auf Einziehung des Schiffes und der unbefugt beförderten Güter erkannt werden, ohne Unterschied, ob sie dem Verurtheilten gehören oder nicht.

Der §. 42 des Strafgesetzbuchs findet entsprechende Anwendung.

### §. 4.

Bestehende vertragsmäßige Bestimmungen über die Küstenfrachtfahrt werden durch dieses Gesetz nicht berührt.

Ausgegeben zu Berlin den 10. Juni 1881.

**28**

remained substantially unchanged. So, in this sense, the 1899 Act is still in force. It is of note that in the Republic of South Korea, the historical origin of the contemporary cabotage laws can be traced to Japanese colonial statutes of 1914.

In Portugal, article 5 of the Decree of January 23, 1905 contained the following provisions:

"The following are reserved to Portuguese shipping, when the latter fully complies with the conditions laid down in Article 4 of the Decree of July 8th, 1863, with regard to the complete nationalisation of merchant vessels: (1) Maritime traffic between ports on the mainland of Portugal, between these ports and the ports of the Azores archipelago, and between the ports of the latter ; (2) Maritime traffic between the Portuguese Atlantic possessions and the ports on the mainland of Portugal and of the islands of the Azores and Madeira; (3) Maritime traffic between the ports of each of the Portuguese possessions in the Atlantic".

Article 4 of the Decree of 1863 mentioned above stated that: "A vessel is not considered a Portuguese vessel even if of Portuguese construction, if its ownership is not held in its entirety by Portuguese nationals or foreign nationals naturalised as Portuguese". *(SRI translation)*.

The historic laws demonstrate that cabotage principles have existed before and at the dawn of the 20th century in some states, and that despite subsequent political, economic and legal changes, cabotage principles have endured and evolved to a greater or lesser extent. Closely associated with the early cabotage principles were concurrent treaties, foreshadowing the current relationship between cabotage laws and trade agreements today.[19]

## TERMS OF REFERENCE AND METHODOLOGY

SRI was commissioned by the ITF to conduct a survey of the member states of the United Nations to determine how many of those states have cabotage. The survey was conducted through cooperation with independent law firms in each of the states selected for study. Advice was sought and debated, and foreign language laws were translated and read as needed. This Report is based on the advice received. The Report does not enter into the debate on the merits of cabotage which is well covered in other publications, many of which are identified in this Report.

The laws surveyed are mostly maritime and shipping laws that explicitly restrict cabotage. Closely related to the maritime and shipping laws are other laws such as marine transport laws, marine trade laws, navigation laws and customs laws that may also restrict cabotage. These laws were also surveyed. So the reference to maritime law and shipping law in this Report should also be understood to include closely related laws.

Cabotage laws are mostly in primary acts, decrees, ordinances or maritime codes. Sometimes cabotage laws comprise several separate but related legal instruments that raise difficult issues of interpretation regarding the interrelationship and/or hierarchy of the laws; difficulties exacerbated by different rules of statutory interpretation around the world as well as ambiguous laws and frequent translation issues. Unless SRI was advised to the contrary by the lawyers from whom it sought advice, a literal interpretation of cabotage laws was adopted; of course it is always open to lawyers to disagree amongst themselves as to the interpretation of the laws discussed and listed in this Report.

CABOTAGE LAWS OF THE WORLD

**29**

Not every relevant cabotage law is cited in this Report. Where a single primary law demonstrated cabotage, there was simply no need to identify and interpret additional primary or secondary laws. But reference is also made to these additional laws when necessary.

Laws that in effect encourage or support cabotage but do not explicitly restrict cabotage were not surveyed. Such laws may for example provide for tonnage taxes, seafarer exemption from tax or taxation subsidies for the construction and operation of national ships, as well as government loans and guarantees for national shipyards and national shipping companies. Other laws might complement cabotage, such as laws relating to: ship registration, immigration, employment or licencing. There is a great range of such laws around the world and these also were not surveyed since this would not have been manageable within reasonable budget and time constraints. The precise extent to which any of these laws impact on cabotage would often be open to debate.

The Report is organised as follows:

• **Chapter 2** sets out some of the dictionary definitions, regional definitions and international definitions of cabotage. This highlights the very wide range of inconsistent and varied meanings that are accorded to ccabotage. National definitions of cabotage are contained in Chapter 5.

• **Chapter 3** sets out the findings of three significant surveys that have identified states and territories with cabotage laws. The three surveys had different objectives and accordingly adopted different methodologies.

Other significant publications that have given some consideration to the number of states with cabotage are referred to in Chapter 6.

• **Chapter 4** sets out the states that were excluded from the survey. This was either on the grounds that the state was landlocked or with one port and not capable of having cabotage as traditionally or generally understood, or that the state had no cabotage laws or laws that were not considered to be sufficiently significant.

• **Chapter 5** sets out states identified as having cabotage laws deemed to be sufficiently significant. Further it discusses types of reservations and restrictions that typically exist in cabotage laws.

• **Chapter 6** discusses the policy objectives that underpin cabotage laws, either as set out publicly in government policies or as determined by inference from contemporary cabotage laws.

• **Chapter 7** discusses exceptions in cabotage laws, as well as waivers and trade agreements which impact on the operation of cabotage laws to a greater or lesser extent.

• **Chapter 8** concludes with the main findings emerging from the Report.

**CABOTAGE LAWS OF THE WORLD**



# CHAPTER 1 ENDNOTES

**1.** Encyclopaedia Britannica History of Ships (Cabotage) (contributors: James Joseph Stilwell, John B. Woodward and Others)

**2.** Stephen Mihm "Jones Act Descended From Centuries of Lazy Protectionism" October 17, 2017

**3.** See at Appendix 1.

**4.** See Ricardo, John Lewis The Anatomy of the Navigation Acts (London) 1847.

**5.** See Worden Blair, The Rump Parliament 1648-53. Cambridge UP (rev ed 2008).

**6.** See at Appendix 2 extracts from An Act for increase of Shipping, and Encouragement of the Navigation of this Nation 1651.

**7.** See Pestana, Carla Gardina. The English Atlantic in an Age of Revolution: 1640-1661. Cambridge, Massachusetts and London, England: Harvard University Press.

**8.** See Sawers L (1992) The Navigation Acts Revisited.

**9.** See at Appendix 3 extracts from An Act concerning the navigation of the United States 1817.

**10.** Section 50105 of the Jones Act.

**11.** See at appendix 4 the Declaration of 1726 on the Ordinance of 1724.

**12.** See exemption by Regulation 1974:235 and also exemption by Council Regulation (EEC) No 3577/92 of 7 December 1992.  Exemption to the Ordinances of 1724 and 1726 are also provided by bilateral agreements.

**13.** See at Appendix 5 extracts from the Decree of 1793.

**14.** See at Appendix 6 extracts from the Royal Decree of 1836.

**15.** See at Appendix 7 extracts from the Fiscal Code of 1885.

**16.** Gesetz, betrefend die Kustenfrachtfahrt 22 mai 1881.

**17.** See at Appendix 8 extracts from the Constitution of Brazil 1891.

**18.** See at Appendix 9 extracts from Law No. 46, March 8, 1899.

**19.** For example the treaty of 6 August 1661 between Portugal and the Netherlands: article 13 permitted Dutch ships to conduct cabotage between Portuguese ports, subject to duties no higher than those due from Portuguese nationals.



32

**SEAFARERS' RIGHTS INTERNATIONAL** | **DEFINITIONS OF CABOTAGE**

# CHAPTER 2
# DEFINITIONS OF CABOTAGE

There are many different definitions of maritime cabotage. At the international level, there is no single legal definition of cabotage that is binding on all member states of the United Nations. However there are many regional and national definitions of cabotage that may be enforceable in different courts. The word "cabotage" is not always mentioned in national laws. Instead terms such as "coastal trade", "coasting trade", "coastwise trade" or "domestic trade" may be used in place of "cabotage". In this Report, unless the context indicates otherwise, a reference to "cabotage", "cabotage legislation" or "cabotage law" is a reference to the reservation of cabotage to national ships, as well as a reference to the restrictions on foreign flag ships from conducting cabotage.

In this Chapter, some of the dictionary definitions, regional definitions and international definitions of cabotage are set out. This contextualises the national definitions of cabotage that are considered in Chapter 5. The national definitions highlight the great variability of cabotage laws that exist in respect of a very wide range of matters.

## SOME DEFINITIONS IN DICTIONARIES

French dictionaries published in 1702 show that "cabotage" had already entered the French language by that time. Here is an example:[20]

*"CABOTER, Afen aan leggen, of houden; Hengelen*

*C'eſt aller de cap en cap, & de port en port; naviguer le long des côtes; ainſi il faudroit dire, Capoter, mais l'uſage prévaut ſur l'étimologie. Si cette barque ne peut ſervir*

aux grandes traverſées, on l'emploiera au cabotage. Ce bâtiment n'eſt propre qu'au cabotage. Nos galiotes, qui étoient acoutumées à caboter, ne perdirent point ces deux caps de vüe. Les Corſaires ne ſont le plus ſouvent que caboter. "

The translation of the French text is as follows:

*"CABOTER, mooring, wooden; Angling (in Dutch)*

Going from point to point, & from port to port; navigating along the coast; one should say, Capoter, but usage takes precedent over etymology. If a boat cannot be used for long voyages, it will be used for cabotage. This vessel is only suitable for cabotage. Our galiots which were accustomed to caboter, did not lose sight of those two coastal points. Pirates more often than not only undertake cabotage.". *(SRI translation).*

The Oxford English Dictionary reflects early uses of cabotage in English dating from 1831;[21] and, as regards the etymology of cabotage, it states that:

"French cabotage (also Spanish cabotaje, in Italian cabotaggio) in same sense; French caboter to coast; whence French has also caboteur, cabotier, cabotin, cabotinage, cabotiner. Derivation uncertain. Originally a shipping term of the north of France: M. Paul Meyer rejects Littré's guess from Spanish cabo cape, headland, as if 'to sail from cape to cape', as untenable phonetically and historically, and thinks the verb must be from the name of a kind of boat. The gloss 'cabo, trabe, nave' occurs in (MS. Bibl. Nat. 1646 lf. 83 b) a 13th cent. copy of an older glossary; and Littré has cabot, chabot as

**34**

north French equivalents of sabot, which is still applied to a small vessel running two or three knots an hour. (Brachet guesses that caboter may be from the surname Cabot; which may have had the same origin, but compare cabot n.)."

But whether cabotage in the English language means only a maritime trade; or the right to the maritime trade; or a restricted right to the maritime trade, is not clear.

The Oxford Living Dictionaries[22] states that cabotage is: "1 The right to operate sea, air, or other transport services within a particular territory. 1.1 Restriction of the operation of sea, air, or other transport services within or into a particular country to that country's own transport services". The Mirriam-Webster Dictionary[23] defines cabotage more shortly as: "1: trade or transport in coastal waters or airspace or between two points within a country 2: the right to engage in cabotage"; while the Collins English Dictionary[24] defines cabotage as: "1. (Nautical terms) nautical coastal navigation or shipping, esp. within borders of one country".

So, in the English language, "cabotage" may mean either an unrestricted right to conduct cabotage or a restriction of the right to conduct cabotage. The implications are however mutually exclusive.

Black's Law Dictionary[25] defines cabotage as: "1. The carrying on of trade along a country's coast; the transport of goods or passengers from one port or place to another in the same country. • The privilege to carry on this trade is usu. limited to vessels flying the flag of that country. 2. The privilege of carrying traffic between two ports in the same country. … "Some writers maintain [that cabotage] should be applied only to maritime navigation; in this context one can distinguish between petit cabotage — transport between ports situated on the same sea (e.g. Bordeaux–Le Havre) — and grand cabotage — transport between ports situated on different seas (e.g.

Bordeaux–Marseille). However, the term is also properly applied to transport between two inland points on an international river within one State, although the term grand cabotage is sometimes incorrectly applied to transnational transport between the inland ports of different riparian States on the same waterway. River cabotage properly so called is sometimes also referred to as  local transport".

**SOME REGIONAL DEFINITIONS**

Some regional definitions of cabotage merit mention.  In the EU,[26] in Council Regulation (EEC) No 3577/92 of 7 December 1992,[27] applying the principle of freedom to provide services to maritime transport within Member States, it is provided in article 2 that for the purposes of the Regulation:

"1. maritime transport services within a Member State (maritime cabotage) shall mean services normally provided for remuneration and shall in particular include:

a) mainland cabotage: the carriage of passengers or goods by sea between ports situated on the mainland or the main territory of one and the same Member State without calls at islands; (b) off-shore supply services: the carriage of passengers or goods by sea between any port in a Member State and installations or structures situated on the continental shelf of that Member State; (c) island cabotage: the carriage of passengers or goods by sea between: — ports situated on the mainland and on one or more of the islands of one and the same Member State, — ports situated on the islands of one and the same Member State; Ceuta and Melilla shall be treated in the same way as island ports."

This definition has been subject to extensive interpretation in a Communication from the European Commission,[28] amending and replacing the Commission's interpretative communications of 2003[29] and 2006.[30]

Cabotage Law (6th Ed 2022)

35

# DICTIONAIRE

## DE

# MARINE

### CONTENANT

## LES TERMES DE LA

# NAVIGATION

### ET DE

# L'ARCHITECTURE NAVALE

*Avec les Règles & Proportions qui doivent y être observées.*

## OUVRAGE ENRICHI DE FIGURES

Représentant divers Vaisseaux, les principales Piéces servant à leur construction, les différens Pavillons des Nations, les Instrumens de Mathématique, Outils de Charpenterie & Menuiserie concernant la fabrique ; avec les diverses fonctions des Oficiers.



## A AMSTERDAM,

Chez PIERRE BRUNEL, Marchand Libraire, sur le Dam. M. D. CCII.
*Avec Privilége de Noss. les Etats de Hollande & Westfrise.*

V.

V· 1654·

9714

**36**

Eurostat defines cabotage as: "Sea transport between two ports of a national territory or one port sea transport within national territory;" and adds that: "National sea transport can be performed by a merchant ship registered in the Reporting country or in another country."[31]

The Asean Framework Agreement on the Facilitation of Inter-state Transport[32] provides that, for the purpose of the agreement: "(a) 'cabotage' means the carriage of goods loaded in the territory of a contracting party for unloading at a place within the territory of the same contracting party."

The United Nations Economic and Social Commission for Asia and the Pacific states that:

"Cabotage is commonly defined as the reservation of the transport task within a country's territory to the surface (land and water) and air transport industries and the labour of that country. It is the area of water transport with which cabotage is usually associated and indeed the term is derived from the French word caboter, meaning to coast and is one of the most widely practiced measures of protectionism in shipping."[33]

In some regional documents, reference is made to cabotage without any substantial definition of the word.

In article 15 of the Revised African Maritime Transport Charter it is stated that:

"1. States Parties shall promote cabotage and effective participation of private sector  operators at national, regional and continental levels.
2. To this end, the establishment of national and regional maritime cabotage shipping lines should be encouraged in order to promote intra-African trade and facilitate the economic and socioeconomic integration of the continent".

Apart from a definition of "trans-African Cabotage,"[34] there is no definition of

cabotage in the Revised African Maritime Transport Charter.  And, in southern Africa, in article 8.2 (2) of the Southern African Development Community (SADC) Protocol on Transport, Communications and Meteorology [35] it is provided that member states shall "progressively remove restrictions, if any, on cabotage by ships registered in a member state" and that "(3) member states permitting cabotage by ships registered in another member state, affirm their intention to maintain their current policy".  But cabotage is not otherwise defined in the Protocol.

## SOME INTERNATIONAL DEFINITIONS

It appears that no international convention defines and governs cabotage.[36]  But according to the WTO Council for Trade in Services cabotage: "… means all kinds of traffic from port to port within a single State. Apparently only the European Union has laid down specific rules governing these particular forms of cooperation and traffic. The United States, for instance, treats or bans them, as the case may be, as it would treat any shipowner agreement."[37]

In the WTO Glossary cabotage means: "In maritime transport, sea shipping between ports of the same country, usually along coasts,"[38] while in its 2017 Review of Maritime Transport, UNCTAD states that:

"Cabotage is defined as sea transport of passengers, goods and materials between two ports located in the same country, irrespective of the country in which the seagoing vessel is registered. Cabotage encompasses domestic shipping operations; these include domestic trade, as well as operations related to transhipment. Cabotage may involve tramp or liner operations and a variety of cargo-handling techniques."[39]

And, in another publication associated with UNCTAD,[40] it is stated that maritime cabotage refers:

"to sea transport between two ports in the

same country. It involves different operations and different services serving the domestic, intra-regional and international markets. Service patterns vary depending on whether cabotage is part of a hubs-and-spoke network or a regional short sea service".

The OECD glossary of statistical terms defines cabotage as:

"Sea transport between two ports (a port of loading/embarkment and a port of unloading/disembarkment) located in the same country irrespective of the country in which the seagoing vessel is registered. Cabotage (maritime context) can be performed by a seagoing vessel registered in the reporting country or in another country. One port transport is included."[41]

Although the reference to "one port transport" is most unusual, there can be occasions, as explained later in Chapter 5, where a state with only one port can nonetheless reserve certain cabotage trades, services and activities.

## DEFINITIONS IN SOME PREVIOUS RESEARCH

Chapter 3 discusses three significant studies that have identified states and territories that restrict some, or all, foreign flagged ships from conducting cabotage.

In the survey conducted by the League of Nations in 1930, some of the difficulties in defining cabotage were avoided by referring to "coastal trade". The questionnaire forwarded to governments was described as an "enquiry … concerning the meaning which the different States attach to the term "coasting trade", and the laws and practices relating thereto."[42] The term "coasting trade" was not defined.

A different approach was adopted in the survey conducted by US Maritime Administration in 1991. Here, it was stated that:

"The word CABOTAGE is derived from the French word 'caboter' which means to sail coastwise, or 'by the capes.' As it is used here, it refers to a body of law that deals with the right to trade or transport in coastal waters or between two points within a country. A country's cabotage laws are designed primarily to guarantee the participation of its citizens in its own domestic trade. This is done to guarantee a strong national flag merchant marine for defense, employment, and general economic purposes. Where these protections are not provided by law, they are often a feature of the national business ethic.

These legal preferences are expressed in a variety of ways. In addition to traditional cabotage restrictions, many nations limit the transport of all or part of the cargo moving in their trade to national flag vessels. They also provide construction and operating subsidies, as well as government loans and loan guarantees to their shipyards and shipping companies. Special tax treatment is often allowed for vessels and operating equipment. Other benefits include free medical care and training for seamen."[43]

In the Report produced by the Maritime Union of Australia and the ITF in 2010, maritime cabotage was defined as:

"the legal regulation of commercial shipping operating exclusively within the nation's territorial waters. Cabotage laws and regulations set out the conditions governing which vessels may engage in coastal trade. These conditions can relate to a range of factors including: ship registration and ownership; composition of the crew; origin of the ships; and the

**38**

conditions under which permission may be granted to ships not ordinarily authorised to trade. Most maritime cabotage regimes require ships to fly the national flag"[44]

and

"a system of shipping laws and regulations that restrict access to maritime trade conducted exclusively between points within the territorial waters of a nation.

Cabotage laws can apply to marine cargo, passenger services and a wide range of maritime services including dredging, towing, offshore support for oil and gas exploration, floating offshore drilling rigs, seismic research and the laying of submarine cables. In some countries, maritime cabotage is referred to as the "coasting trade".

...

Cabotage laws and regulations set out the conditions governing engagement in coastal trade. In almost all cases, cabotage laws require authorised ships to fly the national flag. These conditions can relate to a range of factors including: ship registration and ownership; citizenship and qualifications of the crew; vessel construction; conditions under which temporary permits may be granted to ships not ordinarily authorised to trade. Sometimes the involvement of foreign owned or crewed vessels, is allowed in clearly defined circumstances. The effect of these requirements is to limit access to coasting trade conferring restricted access rights to appropriately licensed vessels".[45]

The definitions set out above illustrate that a very wide range of inconsistent and varied meanings are accorded to cabotage. The sheer scope and range of these inconsistencies and variations emerges even more clearly in

Chapter 5, which deals with many different definitions – and the lack of definitions - under national laws. This Report does not discriminate between definitions of cabotage at the national level and whatever the definition of cabotage in a particular state may be, provided the reservations or restrictions are deemed to be sufficiently significant, the state is recognised in this Report as having cabotage.

**CABOTAGE LAWS OF THE WORLD**



**40**

# CHAPTER 2 ENDNOTES

**20.** Dictionaire de Marine Contenant Les Termes de la Navigation et de L'Architecture Navale Avec les Règles & Proportions qui doivent y être observées. Ouvrage Enrichi de Figures Représentant divers Vaisseaux, les principales Piéces servant à leur construction, les différens Pavillons des Nations, les Instrumens de Mathématique, Outils de Charpenterie & Menuïserie concernant la fabrique ; avec les diverses fonctions des Oficiers. A Amsterdam, Chez Pierre Brunel, Marchand Libraire, sur le Dam. M.D.CCII. Avec Privilége de Noss. les Etats de Hollande & Westrise.  See Appendix (10).

**21.** The Oxford English Dictionary 2nd edition (2018) cites the following early uses of the word: "1831  J. Sinclair Corr. II. 186  The Cabotage, as they call it, or carrying trade.  1876  R. F. Burton Two Trips Gorilla Land I. 6  Small vessels belonging to foreigners, and employed in cabotage. 1885 Standard 2 Jan. (Article) The Cabotage in China. [From Shanghai correspondent]".

**22.** https://en.oxforddictionaries.com/definition/cabotage.

**23.** https://www.merriam-webster.com/dictionary/cabotage.

**24.** Complete and unabridged, 12th ed, 2014 at: https://www.thefreedictionary.com/cabotage.

**25.** 8th ed, at p 605.

**26.** The EU comprises the flowing member states: Austria; Belgium; Bulgaria; Croatia; Cyprus; Czech Republic; Denmark; Estonia; Finland; France; Germany; Greece; Hungary; Ireland; Italy; Latvia; Lithuania; Luxembourg; Malta; Netherlands; Poland; Portugal; Romania; Slovakia; Slovenia; Spain; Sweden and the United Kingdom.

**27.** Official Journal of the European Communities (O.J.)  No L 364/7, 12.12.1992.

**28.** Communication from the Commission on the interpretation of Council Regulation (EEC) No 3577/92 applying the principle of freedom to provide services to maritime transport within Member States (maritime cabotage) Brussels, 22.4.2014 COM(2014) 232.

**29.** Communication from the Commission to the European Parliament, the Council, the European Economic and Social Committee and the Committee of the Regions on the interpretation of Council Regulation No 3577/92 applying the principle of freedom to provide services to maritime transport within Member States (maritime cabotage) of 22.12.2003, COM(2003)595.

**30.** Communication from the Commission to the European Parliament, the Council, the European Economic and Social Committee and the Committee of the Regions updating and rectifying the Communication on the interpretation of Council Regulation No 3577/92 applying the principle of freedom to provide services to maritime transport within Member States (maritime cabotage) of 11.5.2006, COM(2006)196.

**31.** http://ec.europa.eu/eurostat/en/web/products-manuals-and-guidelines/-/KS-BI-03-002.

**32.** See, article 3 of the Agreement at http://asean.org/storage/images/archive/documents/Inter-State%20Transport%20Agreement.pdf.

**33.** https://www.unescap.org/sites/default/files/Pub_1988_Ch5.pdf.

**34.** Trans-African cabotage is defined in the Charter to mean "the exercise of maritime transport and related activities between ports of Member States".

**CABOTAGE LAWS OF THE WORLD**

**41**

# CHAPTER 2 ENDNOTES

**35.** SADC comprises the following states: Angola, Botswana, Democratic Republic of Congo, Lesotho, Madagascar, Malawi, Mauritius, Mozambique, Namibia, Seychelles, South Africa, Eswatini, United Republic of Tanzania, Zambia, and Zimbabwe.

**36.** The Convention and Statute on the International Regime of Maritime Ports of 1923 provides for "equality of treatment" of vessels "as regards freedom of access to the port, the use of the port, and the full enjoyment of the benefits as regards navigation and commercial operations which it affords to vessels, their cargoes and passengers".  This would cover cabotage.  But article 9 precludes any such construction and states: "This statute does not in any way apply to the maritime coasting trade".

**37.** Maritime Transport Services Background Note by the Secretariat Restricted S/C/W/315  7 June 2010 at page 27.

**38.** https://www.wto.org/english/thewto_e/glossary_e/cabotage_e.htm,

**39.** UNCTAD Review of Maritime Transport (2017) 35.

**40.** "Rethinking Maritime Cabotage for Improved Connectivity UNCTAD", Geneva, 2017 Transport and Facilitation Series" at page 6.

**41.** Glossary for Transport Statistics, prepared by the Intersecretariat Working Group on Transport Statistics – Eurostat, European Conference of Ministers of Transport (ECMT), United Nations Economic Commission for Europe (UNECE).

**42.** See League of Nations, Enquiry Concerning the Meaning Attached to the Term "Coasting Trade" in the Various Countries. League of Nations, 1930.

**43.** "By the Capes Around the World.  A Summary of World Cabotage Practices" (May 22, 1991).

**44.** "Maritime Cabotage:  A Global Analysis.  Including Cabotage Campaigning Tools" (March, 2010) at page 6.

**45.** "Maritime Cabotage:  A Global Analysis.  Including Cabotage Campaigning Tools" (March, 2010) at page 68.

42

[Distributed to the Council and     Official No. : **C. 195. M. 78**. 1931. VIII.
the Members of the League.]                                    [C.C.T.476.]
                                                      [C.C.T./P. & M./48.]

Geneva, April 8th, 1931.

## LEAGUE OF NATIONS

## Advisory and Technical Committee for Communications and Transit



...ORTS AND MARITIME NAVIGATION

# ENQUIRY CONCERNING THE MEANING ATTACHED TO THE TERM "COASTING TRADE" IN THE VARIOUS COUNTRIES.

In accordance with the request of the Advisory and Technical Committee for Communications and Transit, the Secretary-General of the League of Nations forwarded to Governments, under date of January 17th, 1930, a circular letter, as follows :

[C.L.5.1930.VIII.]

Geneva, January 17th, 1930.

At the request of the Chairman of the Advisory and Technical Committee for Communications and Transit, the Secretary-General has the honour to inform the . . . Government that the Advisory and Technical Committee, when examining the action to be taken on the work of the Third General Conference on Communications and Transit held at Geneva in August and September 1927, decided to refer for examination to its Permanent Committee on Ports and Maritime Navigation the question raised by the Japanese delegate in regard to the problem of maritime coasting trade. The Japanese delegate's proposal, as set forth in a subsequent memorandum addressed to the Chairman of the Advisory and Technical Committee, is that an enquiry should be made concerning the meaning which the different States attach to the term " coasting trade ", and the laws and practices relating thereto.

In order to facilitate enquiries to be made by the Committee on Ports and Maritime Navigation, the Chairman of that Committee desires first to collect information, and, to this end, the Secretary-General has the honour to forward to the . . . Government a questionnaire on the subject of coasting trade. He would be very grateful if the reply could reach him before September 1st, 1930.

## QUESTIONNAIRE.

1. What are the laws prescribing, limiting or defining the vessels that may be employed in the " coasting trade " ? Could a summary be given of such laws, regulations or other rules as

# CHAPTER 3
# **PREVIOUS RESEARCH**

Some previous publications have described states with cabotage. These publications typically refer to "some" states or "many" states having cabotage; occasionally the publications state actual numbers of states having cabotage.[46]

At least three significant surveys have identified states and territories with cabotage. These surveys were conducted by the League of Nations in 1930; the US Maritime Administration in 1991; and the Maritime Union of Australia and the ITF in 2010. The three surveys had different objectives and accordingly adopted different methodologies.

This Chapter sets out the findings of the three surveys, while reference is made in Chapter 6 to some other significant publications that also give some consideration to the number of states with cabotage.

## LEAGUE OF NATIONS

In 1930, the League of Nations through its Advisory and Technical Committee for Communications and Transit sent to Governments a circular letter dated January 17, 1930 containing an "Enquiry concerning the meaning attached to the term "coasting trade" in the various countries", and the laws and practices relating thereto.[47]



**LEAGUE OF NATIONS (1930)**    ● States with cabotage

CABOTAGE LAWS OF THE WORLD

**44**

Forty-five replies were received to the circular letter. The enquiry conducted by the League of Nations contains extracts from replies of the Governments and territories. There is no analysis of the contents of the extracts. It would appear however that 33 of the respondents to the enquiry reported that they reserved cabotage for national or regional flagged ships, while 12 respondents reported that they did not restrict their maritime cabotage trades.

States and territories identified in the League of Nations survey that reserved cabotage are:

Albania, Brazil, Bulgaria, Canada, Chile, Costa Rica, Danzig (under League of Nations protection), Denmark, Egypt, Estonia, Finland, France, Germany, Greece, Italy, Japan, Latvia, Mexico, The Netherlands, The Netherlands Indies (Territory of the Netherlands), Surinam (Territory of the Netherlands), Panama, Poland, Portugal, Romania, Spain, Sweden, Turkey, Union of Soviet Socialist Republics, United States of America, Uruguay, Venezuela, Yugoslavia.

## MARITIME ADMINISTRATION OF THE US DEPARTMENT OF TRANSPORT

In 1991, the Maritime Administration of the U.S. Department of Transportation (MARAD) published "By the Capes Around the World. A Summary of World Cabotage Practices"[48] and "A Survey of World Cabotage Laws: Summary of Responses from Countries."[49] These publications described a detailed study carried out by MARAD in order to find out as much information as possible about national flag preferences in regard to cabotage.

MARAD selected 56 countries as a basis for a detailed study of the nature and kind of national preferences and their legal provisions. Countries selected to be included in the survey met one or more of the following four criteria: "an oceangoing fleet of at least 50 national flag vessels of 1,000 deadweight tons or more; coastal shores connecting to international waters; an established government without a major armed conflict which maintains

diplomatic relations with the United States; and existence of MARAD political or commercial interest."[50]

MARAD, through the State Department, contacted foreign officials and solicited information on the various aspects of the cabotage laws of their countries including: extent of restrictions, agencies that enforce cabotage, provisions for waivers and reciprocity agreements, public policy objectives served, subsidies for operation and construction of vessels, crewing and ownership requirements, and reflagging provisions that might allow vessels to move into and out of a country's cabotage service in spite of a change in registry.

Fifty-three countries responded to MARAD's request. The MARAD survey stated that:

"Of the 53 respondents, 40 report that their countries have laws that use national preference as the basis for permitting entry into their domestic waterborne trades; that is, they have underlined exclusionary laws comparable to the U.S. Jones Act. In addition, 7 report non-exclusionary laws that do not automatically exclude foreign vessels but do favour national-flag vessels to various degrees. The respondents of 6 countries report no restrictions whatsoever ... Countries with exclusionary restrictions are countries whose respondents indicated that cabotage laws are utilised to various degrees to exclude foreign nationals from domestic trade and thus maintain national control".[51] Countries with non-exclusionary restrictions "… disclaim the use of cabotage laws, but they nevertheless impose restrictions that limit, or … have laws that may limit, entry of foreign vessels into coastwise trade."[52]

In addition, the survey reported that 17 countries "provide some sort of direct domestic fleet subsidy", 13 countries "provide indirect subsidies", 43 countries report some crewing restrictions, 37 countries "have ownership provisions", six countries have "domestic construction requirements",

CABOTAGE LAWS OF THE WORLD



**MARAD (1991)**     ● States with Cabotage

and 15 countries reported "reflagging restrictions."[53]

States identified in the MARAD survey with exclusionary laws are depicted on the world map above. The states are:

Algeria, Argentina, Australia, Bahamas, Brazil, Bulgaria, Canada, Chile, China, Colombia, Ecuador, Egypt, Finland, France, Germany, Greece, Honduras, Hungary, India, Indonesia, Italy, Japan, Malaysia, Malta, Mexico, New Zealand, Peru, Philippines, Poland, Romania, Saudi Arabia, South Korea, Spain, Sweden, Taiwan, Thailand, Uruguay, USSR, Venezuela, Yugoslavia.

## MARITIME UNION OF AUSTRALIA AND THE ITF

In March 2010, the Maritime Union of Australia and the ITF jointly produced a report: "Maritime Cabotage: A Global Analysis. Including Cabotage Campaigning Tools."[54]

For the purposes of the report, cabotage systems were categorised according to five key features:

"1. The strength and complexity of linkages between cabotage law and broader "cross cutting" national policy goals. …
2. Restrictions governing the ship registration, licensing, ownership and who can crew aboard approved ships.
3. The extent to which regulations allow for the reflagging of foreign vessels and/or the use of vessels not normally authorised for cabotage.
4. The types of maritime activities covered by national cabotage systems: universal vs selective.
5. Strength of institutional and political support for cabotage."[55]

In so far as the survey was concerned with the number of states with cabotage, it found that:

**46**

"Cabotage, in all its various forms, is widespread amongst the world's maritime nations. Among the members of the World Trade Organisation, there are at least 30 maritime nations with well developed systems of cabotage."[56] and … "Maritime cabotage laws are found, in some form, in most of the world's major maritime nations and in most nations with significant domestic coastal shipping trade"; … "Excluding European nations … at least 35 nations have in place some form of maritime cabotage. If we count in the EU, as a form of regional cabotage, there are most probably over 50 maritime nations where cabotage regimes affect the conduct of coastal shipping services."[57]

The three surveys considered in this Chapter had, as mentioned above, different objectives and accordingly adopted different methodologies. It is therefore understandable that each survey determined a somewhat different list of states with cabotage. The surveys are now, to some extent, out of date.

Some laws have changed and some states have changed. In any event, any list of states with cabotage is inherently dynamic. The unique approach adopted in this Report has, for the reasons to be explained in Chapter 5, determined a different – and much longer – list of states with cabotage.



A Survey of World Cabotage Laws: Summary of Responses from Countries

IN THE VARIOUS COUNTRIES.

**47**

## CHAPTER 3 ENDNOTES

In accordance with the request of the Advisory and Technical Committee for Communications and Transit, the Secretary-General of the League of Nations forwarded to Governments, under date of January 17th, 1930, a circular letter, as follows :

**46.** Some other studies have also made mention of the number of states with restrictions on cabotage. See, for example, Torunn Kvinge and Anne Mette Odegard "Protectionism or legitimate protection? On public regulation of pay and working conditions in Norwegian maritime cabotage" 2010.

**47.** See League of Nations, Enquiry Concerning the Meaning Attached to the Term "Coasting Trade" in the Various Countries. League of Nations, 1930.  The questionnaire contained the following questions: "1. What are the laws prescribing, limiting or defining the vessels that may be employed in the "coasting trade"? Could a summary be given of such laws, regulations or other rules as are in force? 2. If the coasting trade is reserved for the national flag: (a) Is it absolutely reserved? (b) Is the right to engage in the coasting trade granted in certain cases to other flags temporarily, or permanently? If so, to the flags of what States has it been granted and on what treaties or agreements is it based? And under what condition as to reciprocity? 3. Do vessels under the national flag employed in coasting trade enjoy preferential treatment? If so, in what form (for instance, reduction of harbour dues, towage charges, pilotage dues, lighthouse charges, etc.)? 4. Do goods carried in the coasting trade under the national flag enjoy preferential treatment? If so, on what routes and under what condition (for instance, reduction of Customs duties in cases where the coasting trade might include carriage of goods between separate Customs territories)?"

**48.** May 22, 1991.

**49.** June 1991.

**50.** By the Capes Around the World.  A Summary of World Cabotage Practices, May 22, 1991

**51.** A Survey of World Cabotage Laws, Summary of Responses from Countries, June 1991, page 4.

**52.** ibid, page 8.

**53.** By the Capes Around the World.  A Summary of World Cabotage Practices. How It's Done.

**54.** The report was created to highlight the prevalence of cabotage around the world and act as a campaign resource. As such, countries were included to highlight the variation in cabotage regimes and provide examples of the most successful/well supported. MARAD survey results were included; as well as WTO data; and interviews were conducted with the representatives of seafarers' unions in certain countries.

**55.** "Maritime Cabotage:  A Global Analysis.  Including Cabotage Campaigning Tools" (March, 2010) at page 9.

**56.** ibid, page 3.

**57.** ibid, page 72

Cabotage Laws of the World



48

**SEAFARERS' RIGHTS INTERNATIONAL**

# STATES WITHOUT CABOTAGE

# CHAPTER 4
# STATES WITHOUT CABOTAGE

The survey initially considered all 193 member states of the United Nations.[58] Various states were then excluded from the survey on geographical grounds, namely states that are landlocked and states that have only one port and are not capable of having cabotage as traditionally and most generally understood.

From the remaining 140 states, other states were also excluded on legal grounds if they had no cabotage laws or if their cabotage laws were deemed not to be sufficiently significant.

## STATES WITHOUT CABOTAGE ON GEOGRAPHICAL GROUNDS

States were excluded from the survey on the ground of being landlocked. Although cabotage can occur in inland waters, if a state is landlocked without a seaport, its actual or potential cabotage as generally understood was deemed insufficiently significant for the purposes of the survey.

States were also as a general rule excluded from the survey if they had only one port; although as mentioned earlier, some definitions of cabotage include one port cabotage and some cabotage trades, services and activities can be undertaken in or around one port. The decision to exclude a one port state depended on whether the state's cabotage laws and actual cabotage trade, services or activities were deemed to be sufficiently significant for the purpose of the survey. Views on whether or not a state should be excluded may reasonably differ.

## STATES WITHOUT CABOTAGE ON LEGAL GROUNDS

Advice was sought from practising lawyers in each of the 140 states included in the survey for the purpose of identifying cabotage laws. States were considered not to have cabotage either if there were no relevant cabotage laws, or if cabotage laws existed but were deemed to be insufficiently significant. To deem cabotage laws insufficiently significant is a matter of judgment in respect of which lawyers and others may reasonably disagree. Here, a few examples of states excluded on legal grounds are mentioned in very brief and general terms.

In Norway cabotage exists to a very limited extent. Legislation requires a work permit for non-EEA nationals serving on board non-EEA registered ships in coastal cabotage for an uninterrupted period of more than three months without calling at a non-Norwegian port. Furthermore, a vessel must have a route permit if it carries more than 12 persons on regular routes between Norwegian ports;[59] and anyone awarded a permit through competition must ensure that those employees who work directly in fulfilling the contract receive wages and working conditions which are not worse than those that follow from current nationwide tariff agreements.[60] And, regarding wages and working conditions in public contracts,

**50**

it is required that, when the Government enters into service contracts (including transport) that exceed specified threshold values, Norwegian working and living conditions set out in a national CBA shall apply, also for sub-contractors.[61]

In Panama, article 43 of Law No. 56 of 2008 provides as follows:

"The Maritime Authority of Panama shall authorise the issue of Operations Licences to any natural or legal person wishing to provide maritime services to ship, cargo or passengers, subject to the terms, conditions and procedures provided for in this Law and in the applicable regulations.

At least 90% of the crew of ships which provide auxiliary maritime services in territorial waters must be Panamanian". *(SRI translation).*

The requirement that 90% of the crew of ships must be Panamanian appears to be the sole restriction for any ship whether national or foreign and is therefore not deemed to be a sufficiently significant restriction for the purposes of this Report.

In New Zealand, section 198 of the Maritime Transport Act 1994 provides that:

"(1) No ship shall carry coastal cargo, unless the ship is—
(a) a New Zealand ship; or
(b) a foreign ship on demise charter to a New Zealand-based operator who employs or engages a crew to work on board the ship under an employment agreement or contract for services governed by New Zealand law; or
(c) a foreign ship—
(i) that is passing through New Zealand waters while on a continuous journey from a foreign port to another foreign port, and is stopping in New Zealand to load or unload international cargo; and
(ii) whose carriage of coastal cargo is incidental in relation to the carriage of the international cargo".

That a foreign ship may carry coastal cargo incidental to the carriage of international cargo in practice only prevents foreign vessels and crews from being based in New Zealand to operate a purely domestic trade or service. That is a restriction; but it is deemed to be insufficiently significant for the purposes of this Report.

A further example of cabotage law deemed to be insufficiently significant is found in the Maldives. Here, under section 2(b) of the Regulation Governing Foreign Tourist Vessels Cruising and Harbouring in Maldivian Waters,[62] "Foreign Tourist Vessels entering and harbouring in the Maldives shall obtain the required permits and authorisations from all relevant Government authorities and shall obtain the permission of the Ministry of Tourism, Arts and Culture as provided in this Regulation, prior to cruising or harbouring in Maldivian waters" *(SRI translation).* Although no such permit or authorisation appears to be required in respect of national vessels when cruising, harbouring or entering the Maldives, the implied reservation in respect of national vessels was deemed to be insufficiently significant.

States without cabotage on geographical grounds and/or legal grounds are depicted on the world map as follows:

The states are:

Afghanistan, Andorra, Armenia, Austria, Azerbaijan, Bahamas, Barbados, Belarus, Belgium, Belize, Bhutan, Bolivia (Plurinational State of), Bosnia and Herzegovina, Botswana, Brunei Darussalam, Burkina Faso, Burundi, Cambodia, Central African Republic, Chad, Comoros, Cyprus, Czech Republic, Democratic People's Republic of Korea, Denmark, Djibouti, Dominica, El Salvador, Eritrea, Eswatini (the Kingdom of), Ethiopia, Gambia (Republic of The), Guatemala, Guinea, Hungary, Iceland, Iran (Islamic Republic of), Iraq, Ireland, Kiribati, Kyrgyzstan, Lao People's Democratic Republic, Latvia, Lesotho, Liberia, Libya, Liechtenstein, Luxembourg,

**51**

Malawi, Maldives, Mali, Malta, Marshall Islands, Micronesia (Federated States of), Monaco, Mongolia, Myanmar, Namibia, Nauru, Nepal, Netherlands, New Zealand, Niger, Norway, Oman, Pakistan, Palau, Panama, Paraguay, Republic of Moldova, Romania, Rwanda, Saint Kitts and Nevis, San Marino, Sao Tome and Principe, Saudi Arabia, Senegal, Serbia, Seychelles, Sierra Leone, Singapore, Slovakia, Somalia, South Africa, South Sudan, Sudan, Suriname, Switzerland, Tajikistan, The former Yugoslav Republic of Macedonia, Timor-Leste, Togo, Tonga, Trinidad and Tobago, Turkmenistan, Tuvalu, Uganda, United Kingdom of Great Britain and Northern Ireland, Uzbekistan, Vanuatu, Zambia, Zimbabwe.



● States without cabotage

## CHAPTER 4 ENDNOTES

**58.** The dependent territories of the states were not included.

**59.** See section 7 of the Law on professional transport by motor vehicle and vessel (Date LOV-2002-06-21-45); See also sections of the Rule on wages and working conditions in public contracts.

**60.** See section 8(5) of the Law on professional transport by motor vehicle and vessel (Date LOV-2002-06-21-45).

**61.** See § 5 of the Rule on wages and working conditions in public contracts (Date FOR-2008-02-08-112).

**62.** Implemented on 01 March 2008. This Regulation is enacted by the Ministry of Tourism, Arts and Culture pursuant to Section 24 of Law No. 2/99 (Maldives Tourism Act) in order to regulate Foreign Tourist Vessels cruising and harbouring in Maldivian waters.

CABOTAGE LAWS OF THE WORLD



SEAFARERS' RIGHTS INTERNATIONAL

STATES WITH CABOTAGE

**53**

# CHAPTER 5
# STATES WITH CABOTAGE

Of the states surveyed, 91 states were identified as having cabotage laws deemed to be sufficiently significant for the purposes of this Report. These states are depicted on the world map as follows:

Democratic Republic of the Congo, Dominican Republic, Ecuador, Egypt, Equatorial Guinea, Estonia, Fiji, Finland, France, Gabon, Georgia, Germany, Ghana, Greece, Grenada,  Guinea Bissau, Guyana, Haiti, Honduras, India, Indonesia, Israel, Italy, Jamaica, Japan,



● States with cabotage

The states are:

Albania, Algeria, Angola, Antigua and Barbuda, Argentina, Australia, Bahrain, Bangladesh, Benin, Brazil, Bulgaria, Cabo Verde, Cameroon, Canada, Chile, China, Colombia, Congo, Costa Rica,  Côte D'Ivoire, Croatia, Cuba,

Jordan, Kazakhstan, Kenya, Kuwait, Lebanon, Lithuania, Madagascar, Malaysia, Mauritania, Mauritius, Mexico, Montenegro, Morocco, Mozambique, Nicaragua, Nigeria, Papua New Guinea, Peru, Philippines, Poland, Portugal, Qatar, Republic of Korea, Russian Federation, Saint

**CABOTAGE LAWS OF THE WORLD**

**54**

Lucia, Saint Vincent and the Grenadines, Samoa, Slovenia, Solomon Islands, Spain, Sri Lanka, Sweden, Syrian Arab Republic, Thailand, Tunisia, Turkey, Ukraine, United Arab Emirates, United Republic of Tanzania, United States of America, Uruguay, Venezuela (Bolivarian Republic of), Viet Nam, Yemen.

The map clearly illustrates the very wide geographic spread of cabotage around the world. Cabotage spans all geographic regions of the world, including Africa, the Americas, Asia, Europe and Oceania. The map also clearly illustrates that cabotage, being essentially concerned with coastwise trade, covers a substantial majority of the coastlines of the world. More specifically, cabotage exists along the coastlines of about 80% of the world when comparing the coastlines of states with cabotage as opposed to states without cabotage.[63]

Further cabotage exists in 70% of states that are members of the Council of the IMO, that is 28 out of 40 states. IMO Council states are identified either in Category A as "states with the largest interest in providing international shipping services"; or in Category B as "states with the largest interest in international seaborne trade"; or in Category C as "states which have special interests in maritime transport or navigation".

A study of the 91 states with cabotage also illustrates that cabotage spans many political, economic and legal systems. Furthermore, there is great diversity amongst states regarding many aspects of cabotage. Diversity exists, for example, regarding definitions of cabotage; types of reservations and restrictions applied; types of vessels covered; maritime zones and areas covered; types of trades, services and activities covered; and the implementation and enforcement of cabotage laws. This diversity appears to be derived from the endeavours of states to tailor their cabotage laws very specifically to meet their own and frequently unique national interests and needs. Some of the relevant laws in the 91 states with cabotage are set out at the front of this Report. The list of states with cabotage is neither fixed nor closed. A state's policies and laws may evolve and are subject to change. And as already explained, it is always open to lawyers to disagree amongst themselves as to the interpretation of the laws discussed and listed in this Report.

## DIVERSE DEFINITIONS

National laws define cabotage or define other terms such as coastal trade, coasting trade, coastwise trade or domestic trade instead of cabotage. The definitions range from the simple to the sophisticated, each tailor made to suit the particular circumstances of the state concerned.

Definitions of cabotage are often determined partly in association with particular voyages. For example, in India, the "coasting trade" is defined as "the carriage by sea of passengers or goods from any port or place in India to any other port or place on the continent of India".

Similarly, in Thailand, "trading in Thai waters" means "… transportation of passengers or objects or pulling objects from any port or place to other port(s) or place(s) within the Thai waters, for commercial purpose" *(SRI translation)*.

"Cabotage" in Venezuela is "the navigation between two points and ports in which the Bolivarian Republic of Venezuela exercises its sovereign power and jurisdiction. Cabotage will be mandatorily performed in vessels registered in the Venezuelan Naval Registry, without prejudice to that established in the international conventions or treaties adopted by the Bolivarian Republic of Venezuela". *(SRI translation)*.

"Cabotage navigation and trade" is defined

**55**

in Uruguay legislation as: "… trade carried out between ports of the Republic, as well as port and beach services, operations of salvage and lightening and those carried out by tugboats, launches and other smaller vessels in waters under Uruguayan jurisdiction, are reserved for national flag vessels". *(SRI translation).*

In Canada, section 2 of the Coasting Trade Act 1992 provides that:

"coasting trade" means (a) the carriage of goods by ship, or by ship and any other mode of transport, from one place in Canada or above the continental shelf of Canada to any other place in Canada or above the continental shelf of Canada, either directly or by way of a place outside Canada, but, with respect to waters above the continental shelf of Canada, includes the carriage of goods only in relation to the exploration, exploitation or transportation of the mineral or non-living natural resources of the continental shelf of Canada".

In Russia, pursuant to the Merchant Shipping Code, it is stated that: "4(1). Carriage and towing in the traffic between seaports of the Russian Federation (cabotage) shall be effected by ships sailing under the State Flag of the Russian Federation". *(SRI translation).* And article 4(2) goes on to specify that:

"The activities connected with icebreaker assistance, search, rescue and towing operations, salvage of property at sea, hydraulic engineering, underwater engineering and other similar works in the inland sea waters or in the territorial sea of the Russian Federation shall be exercised by ships sailing under the State Flag of the Russian Federation" *(SRI translation).*

And, in the Philippines, section 4 of the Republic Act No. 10668 law provides that:

"A foreign vessel:
(a) Arriving from a foreign port, shall be allowed to carry a foreign cargo to its Philippine port of final destination, after being cleared at its port of entry; (b) Arriving from a foreign port, shall be allowed to carry a foreign cargo by another foreign vessel calling at the same port of entry to the Philippine port of final destination of such foreign cargo; (c) Departing from a Philippine port of origin through another Philippine port to its foreign port of final destination, shall be allowed to carry a foreign cargo intended for export; and (d) Departing from a Philippine port of origin, shall be allowed to carry a foreign cargo by another foreign vessel through a domestic transshipment port and transferred at such domestic transshipment port to its foreign port of final destination".

Often national laws do not set out self-contained definitions in one section of the legislation but require a close interpretation of many different interrelated sections. In such cases, the meaning of cabotage must be constructed with reference, for example, to the types of reservations and restrictions; the types of vessels; the maritime zones and areas; the types of trades, services and activities; and the implementation and enforcement of cabotage.

## TYPES OF RESERVATIONS AND RESTRICTIONS

Cabotage laws typically "reserve" or "restrict" many diverse matters that states consider to be within their jurisdiction. Shipping services between domestic ports may, for example, be required to be carried out by national flagged, domestically owned, operated, built and/or crewed ships. Sometimes, the reservations or restrictions are said to be exclusively in favour of national ships. Alternatively, foreign ships may

*CABOTAGE LAWS OF THE WORLD*

56

be prohibited from engaging in cabotage, or they may be permitted to conduct cabotage under certain conditions.  In Brazil, for example, the law provides that: "… foreign vessels may only participate in freight transport in coastal shipping and the national route inland, as well as port support navigation and maritime support navigation, when chartered by Brazilian shipping companies". *(SRI translation)*, subject to other provisions in the law.

Cabotage laws may strictly stipulate that cabotage will or shall be performed by national flagged ships.  On other occasions, the trade, service or activity may be specified, but without indication as to the maritime zones or areas.

A very common reservation or restriction requires a ship to fly the flag of the state concerned and/or to be registered in the state.  So, for example, maritime transport and towage services between the ports of China "shall be undertaken by ships flying the national flag of the People's Republic of China, … ". *(SRI translation)* and in another law, it is further stipulated that: "Foreign international shipping operators may not operate the shipping business between Chinese ports, neither may they operate the shipping business between Chinese ports in disguised forms such as using the rented Chinese ships or shipping space, or exchanging the shipping space, etc.". *(SRI translation)*.

Carriage and towing between the seaports of the Russian Federation shall, as mentioned above, be effected by "ships sailing under the State Flag of the Russian Federation". *(SRI translation)*.  And in Argentina it is stipulated that: "National cabotage navigation, communication and trade shall be carried out solely by Argentine vessels". *(SRI translation)*.

Similarly, in Lebanon, coastwide trading is reserved for "Lebanese vessels"; while in Algeria, commercial shipping between Algerian ports is also reserved

for "the national flag". *(SRI translation)*.

Another common reservation or restriction is that ships employed in cabotage must be owned by citizens of the state concerned.  In Nigeria, among other requirements, a vessel "other than a vessel wholly owned by a Nigerian citizen" shall not engage in cabotage.

Likewise, only Tanzanian ships may be engaged in local trade in Tanzanian waters and no ship may be registered in Tanzania unless it is "wholly owned by persons qualified to own a Tanzanian ship, namely - (a) nationals of Tanzania; (b) individuals or corporations owning ships hired out on bareboat Tanzanian charters to nationals of Tanzania; (c) individuals or corporations in bona fide joint venture shipping enterprise relationships with nationals of Tanzania as may be prescribed; (d) such other persons as the Minister may by Order, specify".

The "carriage of goods and passengers by sea between national ports, including in support of petroleum activities, in Angola, is exclusively reserved to national citizens". *(SRI translation)*.

Reservations regarding the manning of vessels are also common. A percentage of nationals or residents of the state may be required to crew the vessels. A state may also require different percentages regarding officers and crew, while reference may also be made for the application of CBAs. In Nigeria, the vessel must be "wholly manned by Nigerians", which means that "… all the shipboard officers and crew employed aboard the vessel are exclusively of Nigerian citizenship".  In Chile, the ship conducting cabotage must be Chilean "that is commanded by captain and Chilean officers and the crew at least three-quarters are Chilean".   And, in Uruguay, a vessel flying the national flag must have a crew of Uruguayan citizens up to 90% including captain, chief engineer and radioman.

**57**

Sometimes the reservations and restrictions are to be read conjunctively and are therefore cumulative requirements. In Nigeria, for example, the vessel must be wholly owned by a Nigerian citizen; and manned by Nigerians citizens; and built in Nigeria; and registered in Nigeria. Similarly, in Argentina, it is required that a ship, if it is to be authorised to engage in cabotage: must be registered in the national register; and must be crewed by an Argentinian captain and officers with Argentine qualifications; and a proportion of at least 25% of the crew on the log must be Argentinian; and the national official language must be used for verbal and written orders of command and for service of the vessel and for some other documents.

Finally, it should be observed that there may be reservations or restrictions explicitly regarding cabotage as well as other types of maritime activities - not defined as cabotage - that are also reserved or restricted. In Venezuela, there is "cabotage" and also "domestic navigation". Cabotage is the "transport of merchandise, national or not, and the transport of persons between Venezuelan ports" *(SRI translation)*, while domestic navigation is "every activity, other than cabotage, performed in jurisdictional waters of the Republic, such as fishing, dredging, sport recreational and tourist navigation, scientific activities" *(SRI translation)*. Cabotage is compulsorily carried out by vessels registered before the Venezuelan Naval Registry; but the National Institute of the Aquatic Spaces may exceptionally grant, if required by an interested party, a "special license for vessels of foreign flag to perform cabotage or domestic navigation" *(SRI translation)*

## TYPES OF VESSELS

The types of vessels covered by cabotage are generally very broadly defined. Some states apply cabotage to different types of vessels, employing closed lists or open lists of vessels. Australia appears to employ a mostly closed list. In the Coastal Trading (Revitalising Australian Shipping) Act 2012, section 10, it is stipulated that:

"This Act does not apply to or in relation to the following kinds of vessels:
(a) a vessel belonging to, or operated by:
(i) the Australian Defence Force; or
(ii) the naval, military or air forces of a country other than Australia;
(b) a Commonwealth vessel that is used wholly or primarily for non-commercial activities;
(c) a fishing vessel or fishing fleet support vessel;
(d) an inland waterways vessel;
(e) an offshore industry vessel;
(f) a recreational vessel;
(g) a salvage vessel;
(h) a tugboat".

Other states, including Nigerian and Canada employ open lists of vessels. In Nigeria, for example, reference is made to:

"any description of vessel, ship, boat, hovercraft or craft, including air cushion vehicles and dynamically supported craft, designed, used or capable of being used solely or partly for marine navigation and used for the carriage on through or under water of persons or property without regard to method or lack of propulsion", while in Canada, a cabotage vessel means: "… a boat, ship or craft designed, used or capable of being used solely or partly for navigation in, on, through or immediately above water, without regard to method or lack of propulsion, and includes such a vessel that is under construction. It does not include a floating object of a prescribed class".

In Thailand, a "sea vessel" simply

CABOTAGE LAWS OF THE WORLD

Cabotage Laws of the World

## 58

"means a vessel the structure of which is for sailing in the sea" *(SRI translation)*.

On the other hand, the definition of vessels in Turkey is very specific, suggesting a closed list; but then it also includes some generic descriptions that connote an open list:

"The right to perform trade in rivers and lakes, in the Marmara Sea and the Straits, in continental waters, and in gulfs, ports, bays and the like within continental waters, by means of fixed or floating vessels such as ships, tugboats, steamboats, motorboats, barges, lighters, rowboats and, in brief, all types or large or small vessels driven by machinery, sail or oars, and/or dredges, cranes, crane barges, flat-bottomed boats, transport and water boats, salvage vessels, buoys, pontoons, rafts or the like, and by performing navigation and transportation using the same, shall belong exclusively to Turkish nationals" *(SRI translation)*.

### MARITIME ZONES AND AREAS

Cabotage laws are applied in a wide range of maritime zones, sometimes called "areas" in cabotage legislation. Cabotage is most frequently applied to internal waters and territorial waters. In some states, the maritime zones are defined in terms of specific maritime trades, services and activities; while in other states, some maritime zones are explicitly excluded from cabotage in respect of specified trades, services and activities.

The way in which cabotage is applied to internal waters and territorial waters varies widely. Some states apply cabotage to inland waters with reference to separate legislation demarcating maritime zones and areas of the state concerned. In other cases, cabotage is, in effect, applied to inland waters without reference to the phrase. In Ghana and Nigeria, reference is made to inland waters; and in Guyana the legislation mentions internal waters. In Turkey, cabotage in inland waters is expressly applied in respect of rivers, lakes, ports and bays.

Many states expressly also apply cabotage laws to territorial waters, using terms such coastal trade, or coastwise trade, or coastline trade, or trade along the shores. For example, in Antigua and Barbuda reference is made to coastal trade; in Lebanon coastwide fishing and trade is mentioned; and in Costa Rica the law refers to traffic on the ocean coastline. In Turkey reference is made in the cabotage law to "The right to transport goods and passengers from one point to another along Turkish shores and to perform towing and piloting and all other port services of any type whatsoever within or between Turkish ports and shores …". *(SRI translation)*.

Some states also apply cabotage laws to voyages between islands. Examples of states having cabotage in relation to islands include Mauritius, Nigeria and Greece. Associated with trade between islands is trade in archipelagic waters. And the cabotage laws of some states extend to archipelagic waters. There is, for example, cabotage in the archipelagic waters of Indonesia; Fiji; Jamaica and the Philippines.

Cabotage is sometimes also extended to the exclusive economic zone and/or the continental shelf. Here, petroleum activities are often significant activities. Nigeria is an example of a state that provides explicitly that a foreign ship shall not engage in the carriage of cargo or passengers at "any point within the waters of the Exclusive Economic Zone of Nigeria".

In Turkey, the "right to perform trade … in continental waters, and in gulfs, ports, bays and the like within continental waters, by means of fixed or floating vessels … shall belong exclusively to Turkish nationals", while "The right to catch … fish, … extract sand, gravel and the like, extract and salvage sunken ships … perform diving, searching, piloting and maritime supply, work as captain, engineer, secretary, crew or workman or in another capacity on



**60**

Turkish maritime vessels, and carry out wharf porterage or any type of maritime business, within Turkish continental waters, shall belong exclusively to Turkish nationals. However, foreigners holding petroleum rights can carry out petroleum explorations and production activities within Turkish territorial waters".

 In Canada, the coasting trade means "(a) the carriage of goods by ship, or by ship and any other mode of transport, from one place in Canada or above the continental shelf of Canada to any other place in Canada or above the continental shelf of Canada, either directly or by way of a place outside Canada, but, with respect to waters above the continental shelf of Canada, includes the carriage of goods only in relation to the exploration, exploitation or transportation of the mineral or non-living natural resources of the continental shelf of Canada ... (f) the engaging, by ship, in any other marine activity of a commercial nature in Canadian waters and, with respect to waters above the continental shelf of Canada, in such other marine activities of a commercial nature that are in relation to the exploration, exploitation or transportation of the mineral or non-living natural resources of the continental shelf of Canada …".

In Papua New Guinea, cabotage is deemed to include a ship that is an "offshore ship", which means a ship that is " (a) engaged in the exploration or exploitation of the continental shelf of the country; (b) operating to, or from, or is based at, a port or place in the country".

## TYPES OF TRADES, SERVICES AND ACTIVITIES

Cabotage laws cover a very wide range of trades, services and/or activities. The carriage of goods and passengers is most common.  And, the goods that may be carried under cabotage are mostly not defined; although sometimes specified goods may be excluded from cabotage restrictions (and by implication goods not excluded are generally included).  Sometimes many different types of trades, services and activities are specifically listed.  As a matter of interpretation, the lists may appear to be either closed or open.  Occasionally, cabotage appears to cover virtually any type of trade, service or activity.

In Lebanon, cabotage also covers "trading" between the ports of the state; in Haiti, cabotage covers the carriage of goods by vessels, without restriction as to the nature of the goods covered by cabotage; in Ghana, cabotage regulates "local trade in Ghanaian waters" which means the transportation of goods or passengers "for profit or reward"; and, similarly, in Guyana "local trade in Guyana waters" means the transport locally of passengers or goods or the carrying out of any other operation or activity locally, within Guyana waters, for profit or reward.

In Peru, the transport of hydrocarbons in national traffic or cabotage is reserved up to 25% for ships of the Peruvian Navy, for reasons of national security and defence, high public interest and national interest. By contrast, in India, the carriage of some specified goods is recently no longer subject to cabotage restrictions. Previously a foreign ship could load cargo from one place or port in India and discharge at another place or port in India only under a license issued by the Director General under section 407 of the Merchant Shipping Act 1958.  But now a foreign ship is not required to obtain a license for the carriage of "agricultural, fisheries, animal husbandry and horticultural commodities".  The provisions of section 407 also no longer apply to "foreign flag ships engaged, in full or in part, for the transportation of EXIM laden containers for transhipment; and foreign flag ships engaged, in full or in part, for transportation of empty containers".

In Venezuela, "domestic navigation" (as described above) is "performed within the scope of the circumscription of a determined port captaincy or in jurisdictional

**61**

waters of the Bolivarian Republic of Venezuela such as fishing, dredging, sport navigation, recreational or activities of scientific investigation". *(SRI translation)*.

Towage is a trade that is also very frequently covered by cabotage. In China, Lebanon, Nigeria, and Sri Lanka, for example, cabotage includes towage. And, a trade that may also be subject to cabotage is fishing. Lebanon is example of cabotage covering "coastwise fishing"; while in Turkey fishing is extensively defined as "the right to catch or obtain fish, oysters, mussels, sponges, pearls, coral, mother-of-pearl and the like, …" *(SRI translation)*.

Sometimes, highly specialised services are covered by cabotage. In Russia, for example, cabotage includes icebreaker assistance, hydraulic engineering, and underwater engineering.

Finally, the trade, service or activity may also appear to be without any clear restriction, save for the requirement of profit or reward. In Jamaica, "local trade in Jamaican waters" means the "transport locally of passengers or goods or the carrying out of any other operation or activity locally, within Jamaican waters, for purposes of trade, profit or reward". Similarly, "local trade in Saint Lucian waters means the transport locally of passengers or goods or the carrying out of any other operation or activity locally, within Saint Lucian waters for profit or reward; …".

## IMPLEMENTATION AND ENFORCEMENT OF CABOTAGE

Cabotage laws are implemented and enforced in different ways. Occasionally a state may arrange for the competent authority to be advised by stakeholders and role players in the administration of the cabotage laws. In Papua New Guinea, for example, a Coasting Trade Committee may advise the Minister on any matter relating to the coasting trade.

Enforcement of cabotage by way of penalties, fines and/or detentions is common. There may be administrative fines (imposed by a civil authority); or criminal fines; and/or detention of the ship; and/or imprisonment. In the Philippines, the Bureau of Customs, on due notice, hearing and determination of the existence of any breach or violation of the Act Allowing Foreign Vessels to Transport and Co-load Foreign Cargoes for Domestic Transhipment and for Other Purposes "shall impose a penalty or fine on any erring foreign ship operator in accordance with the applicable provisions of the Tariff and Customs Code of the Philippines …".

Albania is an example where a foreign ship engaged in cabotage without permission is apparently punished by way of a fine, while in Turkey the violation of cabotage law may result in an administrative fine and the detention of the ship.

In Antigua and Barbuda, contravention of the reservation of cabotage is a criminal offence and liability on conviction carries not only a fine but also the detention of the ship. Similarly, in Sri Lanka, any person or body, contravening the cabotage law, shall be guilty of an offence and on conviction be liable to a fine and in addition any ship involved in such an offence shall be liable to be detained.

And, sometimes, violation of a cabotage law may lead to imprisonment. Prosecutions may be directed, as in Ghana and Grenada, against the master, owner or agent of the ship concerned.

**CABOTAGE LAWS OF THE WORLD**



In China, enforcement may also take the form of an order to stop the conduct of cabotage; and if "illegal gains" *(SRI translation)* exist, they "shall be confiscated" *(SRI translation)*; and, depending on the amount of the illegal gains, a fine of a certain amount may be imposed. Refusal to stop business operations will result in rejection from the port; and investigation for criminal liability may also ensue.

Insurance is also sometimes a requirement. Foreign ships trading in Antigua and Barbuda waters, for example, must carry insurance cover against risks of loss or damage to third parties. Similarly, every foreign ship trading in Grenadian waters, or Jamaican

waters, or Saint Lucian waters must provide evidence of financial responsibility against risks of damage to third parties, in such manner as may be prescribed.

Finally, interested third parties within a state may themselves take legal proceeding (in some states by way of a writ of mandamus), against the competent authority to compel proper and/or full enforcement of the cabotage laws. The jurisprudence of Brazil, for instance, provides examples of writs of mandamus, concerning the authorisation of foreign vessels to operate in Brazil and/or in relation to issues concerning the application of cabotage law.[64]



## CHAPTER 5 ENDNOTES

**63.** CIA World Factbook and the World Resources Institute.
**64.** See, for example, Writ of Mandamus no. 1009626-84.2016.4.01.3400 (5th Federal Court of the Federal District; Writ of Mandamus no. 1004259-79.2016.4.01.3400 (14th Federal Court of the Federal District; Proceedings no. 003.667/2018-9 at the Brazilian Federal Court of Audit; and Administrative Proceedings no. 08700.00678/2018-44 before the Brazilian Council of Economic Defence.



# CHAPTER 6
# **POLICY OBJECTIVES**

F ew states set out publicly the policy objectives underpinning their cabotage laws. The approach adopted in this Chapter is first, to reflect the policy objectives that were found in some of the previous research; second, to set out some government policies that are publicly available; and finally, to draw reasonable inferences from contemporary cabotage laws regarding policy objectives and to summarise these policy objectives. This Report does not determine the extent to which states are successful in achieving the aims set out in their policy objectives.

## PREVIOUS RESEARCH

In the MARAD report it is stated that:

"The countries included in the survey were asked what policy (sic) was served by their maritime policies. The responses included statements such as, 'to develop a merchant marine,' 'to give preference to Australian labor and industry,' 'to generate employment for Bahamian nationals,' 'to support national security,' and 'to protect the domestic economy.' Clearly, these maritime nations value their merchant fleets and are not willing to turn this vital activity over to foreign hands."[65]

The report jointly produced by the Maritime Union of Australia and the ITF provides that:

"Cabotage is capable of supporting a broad range of national policy goals. Some national cabotage systems have narrow policy focuses.

Other cabotage systems are part of more broader and integrated policy frameworks. Integrated Cabotage systems are used to support a broad range of policy goals such as: Development of maritime industry capacity, National Security & defence preparedness, Parity of employment conditions with the other industries operating within national borders and legal frameworks, National transport, Safety and environmental policy objectives, Merchant marine capability, Foreign reserve earning capacity and retention of revenues through seafarers taxation". [66]

Criticism is frequently levelled against cabotage especially on the grounds of free trade, competition and connectivity between states. On the other hand, the criticism is refuted and cabotage promoted especially on the grounds of national fleet development, employment of nationals and national defence. [67] To enter this debate is not, as previously explained, within the terms of reference of this Report.

## DECLARED POLICY

In the US, the preamble to the Jones Act states:

"That it is necessary for the national defence and for the proper growth of its foreign and domestic commerce that the United States shall have a merchant marine of the best equipped and most suitable types of vessels sufficient to carry the greater portion of its commerce and serve as a naval or military auxiliary in time of war or

**CABOTAGE LAWS OF THE WORLD**

national emergency, ultimately to be owned by private citizens of the United States; and it is hereby declared to be the policy of the United States to do whatever may be necessary to develop and encourage the maintenance of such a merchant marine, and, insofar as may not be inconsistent with the express provisions of this Act, the Secretary of Transportation shall, in the disposition of vessels and shipping property as hereinafter provided, in the making of rules and regulations, and in the administration of the shipping laws keep always in view this purpose and object as the primary end to be attained".

And, in the Philippines, the national cabotage policy is also publicly declared. It is found in Chapter 1, section 2 of the Domestic Shipping Development Act of 2004. This provides as follows:

"Declaration of Policy. - The State recognize that shipping is a necessary infrastructure, which is vital to the economic development of our country. The Philippines needs a strong and competitive domestic merchant fleet owned and controlled by Filipinos or by corporations at least sixty percent (60%) of the capital of which is owned by Filipinos and manned by qualified Filipino officers and crew which shall: (a) bridge our islands by ensuring safe, reliable, efficient, adequate and economic passenger and cargo services; (b) encourage the dispersal of industry and the economic development of our regional communities by ensuring the availability of regular, reliable and efficient shipping services; (c) ensure the growth of exports by providing necessary, competitive and economical domestic sea linkage; (d) serve as a naval and military auxiliary in times of war and other national emergencies; and (e) function as an employment support base for our Filipino seafarers.

To attain these objectives, it is hereby declared to be the policy of the State to; (a) promote Filipino ownership of vessels operated under the Philippine flag; (b) attract private capital to invest in the

shipping industry by creating a healthy and competitive investment and operating environment; (c) provide necessary assistance and incentives for the continued growth of the Philippine domestic merchant marine fleet; (d) encourage the improvement and upgrading of the existing domestic merchant marine fleet and Filipino crew to meet international standards; (e) ensure the continued viability of domestic shipping operations; and (f) encourage the development of a viable shipbuilding and ship repair industry to support the expansion and modernization of the Philippine domestic merchant marine fleet and its strict adherence to safety standards which will ensure the seaworthiness of all sea-borne structures".

This declaration is now to be read in a subsequent countervailing policy in Republic Act No. 10668, an "Act Allowing Foreign Vessels to Transport and Co-load Foreign Cargoes for Domestic Transhipment and for Other Purposes" of 2014. Section 1 states: "Declaration of Policy. – It is the policy of the State: (a) To assist importers and exporters in enhancing their competitiveness in light of intensifying international trade; and (b) To lower the cost of shipping export cargoes from Philippine ports to international ports and import cargoes from international ports for the benefit of the consumers".

In China, the policy may be traced back to the Temporary Customs Law 1963 which did not allow foreign ships to engage in coastal transport. The policy objectives appear to be national security; economic security; and promotion of the national merchant fleet.[68] Somewhat different policy objectives apply in Japan. In the 3rd Basic Plan on Ocean Policy, the objectives that seem to relate to cabotage are, among others, to "secure stable maritime transportation"; to "enhance the business base of coastal shipping"; and "to secure and train Japanese seafarers effectively and stably and maintain cabotage". *(SRI translation).*[69] And in the Republic of South Korea, the policy objectives of cabotage appear to be aimed at: preventing the

**67**

undermining of small and medium-sized national cargo transport companies; preserving the variation of the nation's logistics system and national security; and ensuring fair treatment on a reciprocal basis for Korean flagged ships where cabotage is prohibited in other countries.[70]

In Russia, it appears that the policy is prescribed in two main acts: the "Maritime doctrine of the Russian Federation for the period until 2020"[71] and a Resolution of the Government of the Russian Federation[72] "On the special federal program Russian transport system development for the period 2010-2020."[73]  The first document states that the main objectives of the national marine policy of the Russian Federation are:

"… preservation of sovereignty in the internal sea waters, territorial sea and airspace above them, on the bottom and in the subsoil thereof; realisation of jurisdiction and protection of sovereign rights in the exclusive economic zone for exploration, development and conservation of natural resources, both living and inanimate, on the bottom, in its subsoil and in the covering waters, the management of these resources, production of energy using water currents and wind, creation and use of artificial islands, installations and structures, marine scientific research and preservation of the marine environment; realisation and protection of sovereign rights on the continental shelf of the Russian Federation for the exploration and development of its resources; realisation and protection of the freedom of the high seas including freedom of navigation, flights, fishing, scientific research, freedom to lay submarine cables and pipelines; and protection of the territory of the Russian Federation sea areas, the protection and safeguarding of the State border of the Russian

Federation of the sea and airspace above it". (SRI translation).

The policy objectives of Turkey have their roots in the Ottoman Empire that had granted certain rights and privileges (that is, capitulations) to some foreign countries in respect of maritime commerce and transportation. The capitulations and the cabotage rights of foreigners were gradually terminated following the Lausanne Peace Treaty dated 24 July 1923. In 1926, Law No. 815 was introduced to provide Turkish citizens with rights to maritime transportation. And, the policy objective was, and is, to develop the Turkish maritime sector and to contribute to the Turkish economy.[74]

Today, National Maritime and Cabotage Day celebrations take place in most big coastal cities of Turkey on July 1, every year.  In 2018, on Cabotage Day, the Prime Minister Binali Yıldırım stated that: "Our government provides all kinds of facilities to increase the opportunities provided by our seas.  We are undergoing reforms that will further improve our maritime business by optimally utilising the geopolitical position of our country, surrounded by three seas, enclosing two major straits within the borders and linking the continents." *(SRI translation)*. And the Minister of Transport, Maritime Affairs and Communications said that:

"We pay great importance to the hoisting of the Turkish flag in commercial vessels. As a result of the adjustments we have made, we have determined the target of 6,000 vessels to hoist the Turkish flag. Today, 5,850 commercial vessels successfully carry the Turkish flag all over the world. We will continue to provide top-notch training to raise sailors for the world and to make the necessary adjustments in order to

**68**

effectively benefit from Turkey's location. We are doing a lot of activities for the new generation to love  the sea and learn about it, and we will continue to do so". *(SRI translation)*.

In Thailand, in the Mercantile Maritime Promotion Act, the policy appears to aim to develop the economy of the state by bringing foreign currency to Thailand. And, in the archipelago island nation of Indonesia, in Law No. 17 of 2008, the preamble to the Law refers to national goals based on the Constitution and states:

"Considering: a. that the Republic of Indonesia is characterized archipelago island nation united by very wide waters with boundaries, rights, and sovereignty defined by the Act; b. that in order to achieve national goals based on Pancasila and the Constitution of the Republic of Indonesia Year 1945, realizing Archipelago and strengthen national resilience needed national transportation system to support economic growth, regional development, and strengthen the sovereignty of the country; c. that consists of freight shipping in the waters, ports, safety and security of shipping and maritime environmental protection, are part of the national transportation system must be developed to realize the potential and role of the transport system that effectively and efficiently, and help create a stable national distribution pattern and dynamic;  d. that the development of national and international strategic environment requires the implementation of the cruise line with the development of science and technology, private sector participation and competition, autonomy, and accountability of state officials, while maintaining the safety and security of shipping in the national interest; e. that Act No. 21 of 1992 on the voyage is no longer appropriate to the needs of today's cruise organizing so it needs to be replaced with new legislation; f. that based on the considerations set forth in paragraphs a, b, c, d, and e, it is necessary to form the Law on the voyage…". *(SRI translation)*.

The policy of Antigua and Barbuda touches on the benefits of cabotage for national ships and is set out in the Merchant Shipping Act covering matters such as: bilateral agreements with neighbouring countries for the sharing of the export and import trade exclusively by the national shipping lines of the two countries; tax concessions for exporters and importers who patronise national shipping; and control of the terms of sale and purchase of commodities moving in the export and import to channel as many commodities as possible to national ships.

Finally, in South Africa the transport policy of the Government states that: "The Government is committed to the promotion and development of coastal trade, and the continued maintenance of regular shipping services (and related infrastructural requirements) between South Africa and its trading partners within a well-defined regulatory framework."[75]

In other states such as Canada, the most detailed discussions of the policy objectives underpinning cabotage, or that should underpin cabotage, are set out in various reports.[76]

## POLICY INFERRED

Reasonable inferences regarding policy objectives can also be drawn from cabotage laws where these are not set out publicly.   The policies in developing states sometimes appear to be aimed at the development of specific maritime sectors. In Algeria, for example, the restrictions on cabotage appear to preserve the state monopoly in respect of, for example, the chartering of ships, marine pilotage, ship brokerage, port handling and towing at the entrance and at the exit of Algerian ports and coastal shipping between Algerian ports.

To summarise, policy objectives appear in general to be aimed at: maintaining national security and defence capabilities through national merchant fleets; promoting fair competition and

69

preventing illegitimate competition; developing human capacity and retaining skills in the national workforce and/or promoting the transfer of maritime knowledge and technology to nationals; creating jobs for nationals; increasing ships on the national register and/or promoting ship ownership, ship building and ship supply services; promoting seaworthiness, safety of ships and life at sea and the security of ships and ports; enhancing marine environmental protection and compliance with conventions relating to prevention of marine pollution as well as encouraging transportation by sea instead of transportation by other more polluting and expensive transportation modes; and providing necessary public services where transport services (by land or sea) would be inadequate if left to foreign market forces and especially to ensure principles of universality, equality, continuity, regularity and price accessibility.

Taken as a whole, the policy objectives appear to be tailored to the specific national needs of each state; although regional cabotage tends to enhance consistency in policy objectives.







**71**

# CHAPTER 6 ENDNOTES

**65.** "By the Capes Around the World. A Summary of World Cabotage Practices" (May 22, 1991).

**66.** "Maritime Cabotage: A Global Analysis. Including Cabotage Campaigning Tools" (March, 2010) at page 10.

**67.** See, for example OECD 2001, Regulatory issues in international maritime transport, DST1/DOT (2001); Keith Trace, Barend Frielink, Denis Hew, Southeast Asia Working Paper Series Maritime Connectivity in Archipelagic Southeast Asia: An Overview, No. 1 August 2009; Hodgson JRF and Brooks MR (2007) Towards a North American Cabotage Regime: A Canadian Perspective, Canadian Journal of Transportation Volume 1, Part 1 March 2007 pp 19-35; The World Bank and International Finance Corporation Philippine Country Office East Asia and Pacific Region, Policy Options for liberalizing Philippine maritime cabotage Restrictions, July 2014; Zainnal Ajamain, 33 years of Discrimination, Disfranchising and Marginalizing Malaysians in Sabah National Cabotage Policy, 7/2/2013; Martha Cordero, Logistics and trade facilitation between CARICOM and Central America United Nations (United Nations) July 2014; UNCTAD, Rethinking Maritime Cabotage for Improved Connectivity, Transport and Facilitation Series, Geneva, 2017; the website of the International Chamber of ship, A Maritime Nation: UK Shipping and the EU; Gilberto M. Llanto G.M and Navarro A.M., Relaxing the Cabotage Restrictions in Maritime Transport; UK Chamber of Shipping. On the other hand, see for example the website of the American Maritime Partnership at http://www.americanmaritimepartnership. com; the website of the U.S. Customs and Border Protection website at http://www.cbp.gov/sites/default/ files/documents/pvsa_icp_3.pdf; the website of the Japan Federation of Coastal Shipping Associations at http://www.naiko-kaiun.or.jp/e/; the website of the International Transport workers' Federation at http://www. itfglobal.org; and the Maritime Union of Australia and the ITF joint report: "Maritime Cabotage: A Global Analysis. Including Cabotage Campaigning Tools, March 2010; Conley, Joseph M. (2012) The Jones Act: Its Effect on the U.S. Response to the 2010 BP Deepwater Horizon Oil Spill and Its Relevance in International Law, Washington University Global Studies Law Review Volume 11 Issue 1, January 2012.

**68.** See K X Li and C W M Ingram Maritime Law and Policy in China 2002 (Cavendish Publishing) at 27.

**69.** As to the 3rd Basic Plan on Ocean Policy.

**70.** See the Report submitted to the Regulatory Reform Committee by the Minister of Land, Transport and Maritime Affairs.

**71.** Approved by the Decree of the President of the Russian Federation of July 27, 2001.

**72.** Resolution of the Government of the Russian Federation No. 848, dated December 5, 2001.

**73.** According to Resolution No. 848 the program of Russian transport system development is targeted towards: "increasing the availability of services of a transport complex for people; improving the competitiveness of the transport system of the Russian Federation and realization of the transit potential of the state; improving the safety and sustainability of the transport system".

**74.** With the aim of joining the EU, Law No.815 has been reviewed during EU membership negotiations and identified as an issue.

**75.** See Draft Revised White Paper on National Transport Policy 2017 Department of Transport, Pretoria at p26. Legislation to give effect to the policy is not yet in force.

**76.** For example, in Canada, see the Royal Commission on the Coasting Trade (The Spence Report – 1957); The Coasting Trade of Canada and Related Marine Activity (The Darling Report – 1970) ; The Coasting Trade Act – A position paper dealing with the policy implications of a proposed Bill on the Coasting Trade of Canada (1977; Transport Canada Background Paper – A New Coasting Trade Policy (1982).

72



# CHAPTER 7
# EXCEPTIONS, WAIVERS AND TRADE AGREEMENTS

Cabotage laws often contain exceptions or provide for the operation of waivers, and sometimes provide for trade agreements.  It is beyond the remit of this Report to analyse the use and impact of exceptions, waivers and/or trade agreements.

## EXCEPTIONS

Exceptions generally apply to a very limited set of specified circumstances.  Although "exceptions" and "exemptions" are words that are often used interchangeably, they can be distinguished. Where there are exceptions from cabotage reservations or restrictions, no application is, in general, required to obtain an authorisation for a foreign ship to take advantage of an exception.  An exception may be stated to apply, for example, where there exists a relevant trade agreement between two states, then generally it appears that no application needs to be made for a relevant foreign ship to avail itself of the exception.

But an exemption generally requires an application to be made for a waiver of reservations or restrictions on foreign ships.  In this sense, exemptions are much more common than exceptions. Sometimes, however, the distinction between an exception and exemption is far from clear and whether an application needs to be made is not readily discernible.

Albania provides an example of a rather wide but apparently closed range of exceptions; although each exception may be variously interpreted regarding its scope and whether an application is required.  In Argentina, the cabotage law provides that: "The exception from the restrictions of the preceding article are the vessels engaged in cross-border cabotage in accordance with international treaties, conventions or agreements". *(SRI translation)*.

## WAIVERS

It is very common for cabotage laws to contain provisions that allow for foreign ships to participate in cabotage based on derogations or dispensations from the law.  Terms such as "waivers", "concessions", "authorisations", "permits", "licences", "exemptions", "ministerial orders", or "ministerial decrees" are frequently employed.  Sometimes, waivers are even called exceptions. For convenience, the word "waiver" is used to encompass all these terms. Generally, the laws specify that waivers must be applied for, as well as the terms and conditions for the operation of such waivers and to this extent, the law controls the operation of waivers.

There are many different types of waivers, providing for flexibility in the enforcement of cabotage laws. This is generally because states have different capacities to fulfil their

**CABOTAGE LAWS OF THE WORLD**

## 74

cabotage needs in their national interests; the capacity of each state may grow and develop over time; and /or their capacity may vary from time to time. However, as a general rule, waivers are not granted if national flagged ships are available to conduct the cabotage. Further, they are not transferrable; they are subject to revocation; they are temporary; they are subject to reciprocity; and they are granted on fulfilment of certain conditions in most cases.

In Japan, for example, the restrictions on cabotage would appear, relatively speaking, to be lifted very rarely. The Ship Act in article 3 provides as follows: "A foreign vessel shall not call at a place of a closed port or transport goods or passengers by water between ports within Japan. However this restriction shall not apply when there is a special provision in a law or a treaty, when a vessel intends to avoid an accident at sea or a capture or when a special permission by the Minister of Land, Infrastructure, Transport and Tourism is obtained". *(SRI translation)*.

In Brazil, on the other hand, according to the management information system of the National Agency for Water Transportation, a large number of authorisations have been issued.[77]

Cabotage is occasionally described as a "state monopoly" and/or "public property". In such cases, a concession may nonetheless be afforded to a natural person or legal entity. Algeria provides an example of coastal shipping as a "state monopoly", and "public property", subject to concession: "The state monopoly is imposed on ... coastal shipping between all Algerian ports" and "Maritime transport is a public property. It can be a concession" *(SRI translation)*.

In Bahrain, the competent minister may issue orders authorising foreign ships to undertake cabotage. Sometimes the discretion to grant a waiver is mandatorily limited, providing for the fulfilment of specified conditions before the waiver can

be granted. Israel is such an example. In Venezuela, if foreign flagged vessels are to perform cabotage they must obtain a certificate evidencing that the foreign vessel complies with the maritime safety requirements under national and international laws and proof of lack of national tonnage is required.

In other cases, a waiver may only be possible in a case of extreme necessity and only for a specific duration. Thus, in Kuwait, foreign ships may only be authorised to undertake cabotage in extreme necessity in respect of limited services and activities and only for a limited period. In other instances, such as Syria, a waiver may only be granted to a foreign ship on condition that no national ship is available. Sometimes, as in the case of Finland, before a waiver is granted by the Ministry it will hear interested parties, subject to the nature or urgency of the matter.

In Ecuador, it is only "In exceptional cases, the Directorate General for Merchant Shipping, at the request of the interested party, may authorise the provision of these services on foreign vessels. The Authority must make a decision on the request within eight days and, if it does not do this within this time, it shall be assumed that the request has been approved". *(SRI translation)*. In the Ivory Coast, the reservation of cabotage to Ivorian ships is subject to reciprocity to ships from other countries.

## TRADE AGREEMENTS

Intergovernmental trade agreements or treaties, whether regional or bilateral, are common in international trade relations (hereafter referred to as trade agreements). Trade agreements are said to be increasing in number, detail and complexity. Some of these trade agreements are relevant to cabotage. According to the WTO, as of 2016, all WTO members (164 members) have a trade agreement in force. Of the 91 states listed in Chapter 5 of this survey as

having cabotage, all are members of the WTO, save for Algeria, Equatorial Guinea, Lebanon and Syria.

Cabotage laws, as mentioned above, often provide for, and control, the application of a trade agreement.  For example, a trade agreement may – subject to and in terms of the law – temporarily lift the reservation for the duration of the trade agreement in favour of a foreign flag, as in Algeria; or the cabotage law itself may be made subject to a trade agreement, as in Sri Lanka.  Sometimes, it may be more simply provided that foreign ships may perform cabotage operations in compliance with international agreements, as in Georgia.  In Albania, a foreign ship may be allowed cabotage when, inter alia, "an obligation arises from international law"; although no apparent indication is given of such

an obligation under international law. Sometimes, cabotage law may allow foreign ships to conduct cabotage on the basis of a reciprocal trade agreement.

In conclusion, exceptions, waivers and/or trade agreements flexibly affect the practice of cabotage in the state concerned, and as between states and regions, to a greater or lesser extent in many different ways.  But the practice of cabotage ultimately remains subject to control by the law.



## CHAPTER 7 ENDNOTES

**77.** The following number of authorisations are reported: 2,615 in 2013; 3,590 in 2014; 2,472 in 2015; 2014 in 2016; and 2,559 in 2017.

**CABOTAGE LAWS OF THE WORLD**



# CHAPTER 8
# CONCLUSION

The findings of this Report may be welcomed by some and opposed by others, especially within the context of the debate for extending or reducing cabotage. But the Report itself does not join the debate.

It begins by tracing some of the history of cabotage laws that were enforced by empires and within their colonies, although today cabotage is associated with the exercise of sovereign powers by independent states. The Report also sets out some previous survey findings before excluding states without cabotage and including states with cabotage, finding that 91 member states of the United Nations as described in the Report have laws restricting foreign activity in their domestic coastal trades; that is, 65% of states that could have cabotage do have cabotage as it is usually understood.

Lawyers on either side of the debate may not agree on every exclusion or inclusion. And different interpretations of some complex and unclear laws are certainly possible. But the laws are generally clear enough and even allowing for some reasonable disagreements of interpretation, a majority of states with cabotage will remain.

This is a unique finding. It appears to be the first survey that has sought to consider comprehensively the cabotage laws of the world. Also unique are the consequential and additional findings that cabotage exists in every major geographical region of the world; across many political, economic and legal systems; along the majority of the world's coastlines where cabotage could exist; and in the majority of states that are members of the IMO Council.

Cabotage is therefore very common. One reason for this may lie in the many common cabotage policy objectives set out in the Report, although the extent to which these objectives are successfully achieved is not determined in this Report.

But cabotage laws, despite some uniformity in reservations and restriction, are also very diverse. They vary from state to state, often in many different respects, and the laws are enforced to a greater or lesser extent in states by way of exceptions, waivers, trade agreements, fines and even imprisonment. The limited extent of uniformity that does exist (also due to regional cabotage regimes), is however dwarfed by diversity.

So great is the diversity of cabotage laws that they defy meaningful universal definition, save for bland and generalised descriptions. One reason for the diversity may lie in the way each cabotage law is tailored to meet the national interests of an individual state. Paradoxically, it is this very diversity that may also constitute another reason why cabotage laws are so very common.

Cabotage policies and laws have evolved over time; and, like all policies and laws, they will be subject to further change. The list of states with cabotage is therefore neither fixed nor closed.

But whatever the implications of this Report might be for the future of cabotage, they are left for consideration and debate by other parties with an interest in these issues.

It is to be hoped that this Report may be helpful.

**CABOTAGE LAWS OF THE WORLD**

**78**

# APPENDICES

# Appendix 1

Anno 5 Ric. II Cap III A.D 1381 *(page 1 of 2)*

A.D.1381.     Anno 5° Ric. II. ſt.1. c.2, 3.          45

perſone ſoit deſore duement atteint qil avera fait envoier ou em-
portez depar dela or ou argent aucun, encontre celtes detens et
ordinance, forface devers le Roi meſme la ſomme ttitet emportez
ou envoiez.

II. Et le Roi noſtre Seignur de ſa roiale mojeſtee defende la
paſſage oultremont a toutes manerch des gentz, ſibien clercs come
autres, en cheſcun port et autre ville et lieu ſur la couſte del mere,
ſur paine de forfaiture de toutz leurs biens; horſpris tantſeule-
ment a les ſeignurs et autres grantz perſones de roialme et verrois
et notables marchantz et les ſoldeours le Roi.  Et qolconqe per-
ſone, autre qe defſuz ne ſont exceptz, apres la publication de celte
ordinance faite, paſſe hors del dit roialme ſanz eſpecial congie le
Roi (quele licence le Roy voet et comande qe ne ſoit fait deſore,
ſinoun tantſolement en un des portz defſouſz eſcriptz, ceſtaſſavoir
Londres Sandewiz Dovorr Southampton Plymmuth Dertemuth
Briſtuit Jernemuth Seint Bothulph Kyngeſton ſur Hull Noef
Chaſtell ſur Tyne, et les autres portz et paſſages vers Irlande et
les iſles appertenantz al roialme dEngleterre) forſace devers le
Roi quanqe il ad en biens, come deſſus eſt dit; et jademeins le
maiſtre ou mariner de la nief ou dautre veſſel, en quele il avera
ameſnez depar dela aucuns perſone, forſqe ceux ſoulement qe par-
deſſus ſont exceptz, ſanz la dite licence dont il ſoit convict due-
ment forſace devers le Roi le dit veſſel.

III. Et ſi comande le Roi as touz gardeins et ſercheours de 'es
portz et paſſages parmy Engleterre qils uſent deſore diligeaument
lours offices et facent bone ſerche et eſtroit.  Et ſi nully ſercheour
ou gardein des portz et paſſages parmy le dit roialme, par negli-
gence ou en autre manere, face ou ſoeffre ſcientement eſtre fait en
aucun point le contraire de les ditz deux articles, tourſlantz
la monoie or et argent et le dit paſſage des gentz, et de ce il ſoit
convict duement, forſace devers le Roy ſon dit office et toutz ſes
biens areſqe, et ſoit ſon corps commis a la priſone a y demoree par
un an entier ſanz redemption.  Et ſur ce qekonqe perſone qi eſ-
piera, et provera duement, qe rienz ſoit fait contre lentention des
ditz deux derrains articlez, par ont la dite forfaiture devra eſchere
daucune perſone, eit il la moitee dicell forfaiture pur ſon travaill,
del doun le Roi.

•et, P.

### C A P.  III.

Subjects ſhall export or import Merchandizes in *Engliſh*
Ships only.

[*Explained*
6 H. 2. ſt.1. c. 2.
13 R. 2. c. 6.
confirmed

A LSO, to increaſe the Navy of *England*, which is now greatly
diminiſhed: It is aſſented and accorded, That none of out
Lord the King's liege People do from henceforth cauſe to be
ſhipped any Manner of Merchandize going out of or coming into
the Realm of *England*, in any Part, but only in Ships of our Lord
the King's Liegance.  And every Perſon of the ſaid Liegance,
who after the Feaſt of *Eaſter* next enſuing (at which Feaſt this
Ordinance ſhall firſt begin to hold place), do cauſe to be ſhipped
any Merchandize in any other Ships or Veſſels upon the Sea, than
of the ſaid Liegance, ſhall forfeit to the King all his Merchandizes
ſhipped in other Veſſels, whereſoever they be found hereafter, or
the

21 H. 6. c. 7.
but repealed and
other Proviſion
made 1 Eliz.13.]

No Subject ſhall
export or import
Goods but in
Subjects' Ships.

CABOTAGE LAWS OF THE WORLD

# Appendix 1

Anno 5 Ric. II Cap III A.D 1381 *(page 2 of 2)*

46      Anno 5° Ric. II. ft. 1. c. 3—6.    A.D. 1381.

the Value of the fame: of which Forfeitures the King willeth and granteth, that he that shall duly espy and duly prove that any Person hath any Thing forfeited against this Ordinance, shall have the Third Part thereof for his Labour of the King's Gift.

ITEM pur encrecer la navie d'Engleterre quiel est ore moelt grandement amenusez, est assentuz et accordez qe nul lige per-sone del Roi nostre Seigneur face desore eskipper aucunes maneres des merchandises, en alantz hors ou venantz dedeinz le roialme d'Engleterre, aucune part, forsqe soulement en niefs de la ligeance nostre Seigneur le Roy : Et quelconqe persone de la dite ligeance apres la feste de Pasqe prochein venant, a quele feste comencera pri-mierement ceste ordinance tenir lieu, face eskipper merchandises en autres niefs ou vessels sur la meer, qe de la dite ligeance, forface devers le Roy toutes ses merchandises es autry vessels eskipper, en quelconqe place qe celles serront en apres trovez, ou la value dicelles ; des quelles forfaitures le Roi voet et grante qe cellui qi espiera et duement provera qascune persone avera encontre ceste ordinance rienz forfait, eit eit la tierce partie pur son travaill del doun le Roi.

### C A P. IV.

" The several Prices of several Sorts of Wines to be sold in Gross or by Retail, viz. the best Wine of *Gascony, Osey,* and *Spain,* One hundred Shillings the Tun, and by Retail at Sixpence the Gallon ; and other Wines in proportion."

*[Repealed by 7 Ric. 2. c.11.]*

[*Is several Editions this makes Part of Cap. 4.*]

### C A P. V.

" Sweet Wines and Claret shall not be sold by Retail in *England.*"

*[Repealed 6 R. 2. c. 7. and see 7 R. 2. c.11.]*

[* *See Note to preceding Chapter.*]

### C A P. VI. [or V.*]

Pardon and Indemnity to those that repressed or punished Rebels.

ALSO our Sovereign Lord the King, perceiving that many Lords and Gentlemen of his Realm, and other with them (in the Rumour and Insurrection of the Villeins, and of other Offen-ders, who now of late did traiterously rise by Assemblies in outra-geous Number, in divers Parts of the Realm, against God, good Faith, and Reason, and against the Dignity of our Sovereign Lord the King and his Crown, and the Laws of his Land), did make divers Punishments upon the said Villeins and other Traitors with-out due Process of Law, and otherwise than the Laws and Usages of the Realm required, although they did this of no Malice pre-pensed, but only to withstand them, and appease and cease the apparent Mischief ; and considering the great Diligence and Loy-alty of the said Lords and Gentlemen in this Behalf, which were not learned in the said Laws and Usages, and though they had so been, none could at that Time, upon those Punishments have tar-ried

## Appendix 2

An Act for increase of Shipping, and Encouragement of the Navigation of this Nation, 1651 *(page 1 of 2)*



82

# Appendix 2

An Act for increase of Shipping, and Encouragement of the Navigation of this Nation, 1651 *(page 2 of 2)*

( 1450 )

Commonwealth of England, or into Ireland, or any other Lands, Islands, Plantations or Territories to this Commonwealth belonging, or in their Possession, in any other Ship or Ships, Vessel or Vessels whatsoever, but only in such as do truly and without fraud belong only to the People of this Commonwealth, or the Plantations thereof, as the Proprietors or right Owners thereof: And whereof the Master and Marriners are also for the most part of them, of the People of this Commonwealth, under the penalty of the forfeiture and loss of all the Goods that shall be Imported contrary to this Act; as also of the Ship (with all her Tackle, Guns and Apparel) in which the said Goods or Commodities shall be so brought in and Imported, The one moyety to the use of the Commonwealth, and the other moyety to the use and behoof of any person or persons who shall seize the said Goods or Commodities, and shall prosecute the same in any Court of Record within this Commonwealth, And it is further Enacted by the Authority aforesaid, That no Goods or Commodities of the Growth, Production or Manufacture of Europe, or of any part thereof, shall after the First day of December, One thousand six hundred fifty and one, be Imported or brought into this Commonwealth of England, or into Ireland, or any other Lands, Islands, Plantations or Territories to this Commonwealth belonging, or in their possession, in any Ship or Ships, Vessel or Vessels whatsoever, but in such as do truly and without fraud belong onely to the people of this Commonwealth, as the true Owners and proprietors thereof, and in no other, except onely such Forreign Ships and Vessels

**83**

# Appendix 3

An Act concerning the navigation of the United States 1817

FOURTEENTH CONGRESS. Sess. II. Ch. 31. 1817.

**351**

STATUTE II.

March 1, 1817.

CHAP. XXXI.—*An Act concerning the navigation of the United States.*

Be it enacted by the Senate and House of Representatives of the United States of America, in Congress assembled, That after the thirtieth day of September next no goods, wares, or merchandise, shall be imported into the United States from any foreign port or place, except in vessels of the United States, or in such foreign vessels as truly and wholly belong to the citizens or subjects of that country of which the goods are the growth, production, or manufacture; or from which such goods, wares, or merchandise, can only be, or most usually are, first shipped for transportation: *Provided, nevertheless,* That this regulation shall not extend to the vessels of any foreign nation which has not adopted, and which shall not adopt, a similar regulation.

Restriction of importations to vessels of a particular character.

Proviso : the regulation not to extend to foreign vessels of a certain description.

SEC. 2. *And be it further enacted,* That all goods, wares, or merchandise, imported into the United States contrary to the true intent and meaning of this act, and the ship or vessel wherein the same shall be imported, together with her cargo, tackle, apparel, and furniture, shall be forfeited to the United States; and such goods, wares, or merchandise, ship, or vessel, and cargo, shall be liable to be seized, prosecuted, and condemned, in like manner, and under the same regulations, restrictions, and provisions, as have been heretofore established for the recovery, collection, distribution, and remission, of forfeitures to the United States by the several revenue laws.

Merchandise imported contrary to this act, vessel, &c., forfeited.

SEC. 3. *And be it further enacted,* That after the thirtieth day of September next, the bounties and allowances now granted by law to the owners of boats or vessels engaged in the fisheries, shall be paid only on such boats or vessels, the officers and at least three-fourths of the crews of which shall be proved to the satisfaction of the collector of the district where such boat or vessel shall belong, to be citizens of the United States, or persons not the subjects of any foreign prince or state.

Bounties on vessels employed in the fisheries restricted to such whose officers and 3-4ths of the crews are citizens, &c.

SEC. 4. *And be it further enacted,* That no goods, wares, or merchandise, shall be imported, under penalty of forfeiture thereof, from one port of the United States to another port of the United States, in a vessel belonging wholly or in part to a subject of any foreign power; but this clause shall not be construed to prohibit the sailing of any foreign vessel from one to another port of the United States, provided no goods, wares, or merchandise, other than those imported in such vessel from some foreign port, and which shall not have been unladen, shall be carried from one port or place to another in the United States.

Regulations with respect to importation of goods from one port of the United States to another, &c.

SEC. 5. *And be it further enacted,* That after the thirtieth day of September next, there shall be paid a duty of fifty cents per ton upon every ship or vessel of the United States, which shall be entered in a district in one state from a district in another state, except it be an adjoining state on the sea coast, or on a navigable river or lake, and except also it be a coasting vessel going from Long Island, in the state of New York, to the state of Rhode Island, or from the state of Rhode Island to the said Long Island, having on board goods, wares, and merchandise, taken in one state, to be delivered in another state : *Provided,* That it shall not be paid on any ship or vessel having a license to trade between the different districts of the United States, or to carry on the bank or whale fisheries, more than once a year; *And provided also,* That if the owner of any such vessel, or his agent, shall prove, to the satisfaction of the collector, that three-fourths at least of the crew thereof are American citizens, or persons not the subjects of any foreign prince or state, the duty to be paid in such case shall be only at the rate of six cents per ton; but nothing in this section shall be construed to repeal or affect any exemption from tonnage duty given by the eighth section of the act, entitled "An act to provide for the establishment of certain districts, and therein to

Regulations in relation to tonnage duty on vessels entering from a district in one to a district in another state.

Proviso : as to licensed vessels.

Proviso : as to diminution of duty where 3-4ths of the crew are citizens, &c.

Act of May 1, 1802, ch. 45.

**84**

## Appendix 4

Förklaringen den 28 februari 1726 "öfwer förordningen af den 10. Nov. 1724, angående de Främmandes Fahrt på Swerige och Finland

*The Declaration of 1726 on the Ordinance of 1724*







85

# Appendix 5

Decret contenant l'acte de navigation 21 Septembre 1793

CONVENTION NATIONALE. — 21 SEPTEMBRE 1793.    179

indemnité pour leur déplacement, et ils jouiront de tous les avantages déterminés par le décret en pareil cas.

**21 SEPTEMBRE 1793.** — Décret relatif aux congés des bâtimens sous pavillon français. (L. 16, 5; B. 34, 219.)

*Voy.* loi du 29 décembre 1791 = 18 JANVIER 1792. *Voy.* aussi l'acte de navigation ci-après.

Art. 1<sup>er</sup>. Les congés des bâtimens sous pavillon français seront, dans trois jours à compter de celui de la publication du présent décret pour ceux qui seront dans les ports, et dans huit jours de l'arrivée de ceux qui entreront, rapportés et déposés au bureau des douanes nationales, avec les titres de propriété. Tout déchargement et départ des bâtimens sera différé jusqu'après la délivrance d'un acte de franciation.

2. Tout armateur, en présentant congé et titres de propriété du bâtiment, sera tenu de déclarer en présence d'un juge-de-paix, et signer sur le registre des bâtimens français, qu'il est propriétaire du bâtiment, qu'aucun étranger n'y est intéressé directement ni indirectement, et que sa dernière cargaison d'arrivée des colonies ou comptoirs des Français, ou sa cargaison actuelle de sortie pour les colonies ou comptoirs des Français, n'est point un armement en commission ni propriété étrangère.

3. Si l'armateur ne réside pas dans le port où est le bâtiment, le consignataire et le capitaine seront conjointement et solidairement caution de rapporter, dans un délai convenable, les actes de propriété et la déclaration affirmée et signée par le vrai propriétaire des bâtimens et cargaisons.

4. Si la propriété du bâtiment, et même celle des cargaisons pour le commerce entre la France, ses colonies et comptoirs, n'est pas prouvée française par titres et par serment, les bâtimens et cargaisons seront saisis, confisqués, vendus, et moitié du produit donné à tout dénonciateur.

**21 SEPTEMBRE 1793.** — Décret contenant l'acte de navigation. (L. 16, 7; B. 34, 218; Mon. des 23 et 24 septembre 1793. Rapp. Barrère.)

*Voy.* lois du 9 = 15 AOUT 1791; du 21 SEPTEMBRE = 12 OCTOBRE 1791; du 27 VENDÉMIAIRE AN 2.

Art. 1<sup>er</sup>. Les traités de navigation et de commerce existant entre elle et les puissances avec lesquelles elle est en paix, seront exécutés selon leur forme et teneur, sans qu'il y soit apporté aucun changement par le présent décret.

2. Après le 1<sup>er</sup> janvier 1794, aucun bâtiment ne sera réputé français, n'aura droit

aux privilèges des bâtimens français, s'il n'a pas été construit en France ou dans les colonies ou autres possession de France, ou déclaré de bonne prise faite sur l'ennemi, ou confisqué pour contravention aux lois de la République, s'il n'appartient pas entièrement à des Français, et si les officiers et trois quarts de l'équipage ne sont pas Français.

3. Aucunes denrées, productions ou marchandises étrangères, ne pourront être importées en France, dans les colonies et possessions de France, que directement par des bâtimens français, ou appartenant aux habitans du pays des crûs, produits ou manufactures, ou des ports ordinaires de vente et première exportation, les officiers et trois quarts des équipages étrangers étant du pays dont le bâtiment porte le pavillon; le tout sous peine de confiscation des bâtimens et cargaisons, et de trois mille livres d'amende, solidairement et par corps, contre les propriétaires, consignataires et agens des bâtimens et cargaisons, capitaine et lieutenant.

4. Les bâtimens étrangers ne pourront transporter d'un port français à un autre port français aucunes denrées, productions ou marchandises des crûs, produits ou manufactures de France, colonies ou possessions de France, sous les peines portées par l'article 3.

5. Le tarif des douanes nationales sera refait, et combiné avec l'acte de navigation et le décret qui abolit les douanes entre la France et les colonies.

6. Le présent décret sera, sans délai, proclamé solennellement dans tous les ports et villes de commerce de la République, et notifié par le ministre des affaires étrangères aux puissances avec lesquelles la nation française est en paix.

**21 SEPTEMBRE 1793.** — Décret qui distrait les matières de commerce extérieur des ministères de l'intérieur et de la marine, et les attribue aux douanes. (L. 16, 8; B. 34, 221.)

La Convention nationale distrait du ministère de l'intérieur les archives et balance du commerce, les primes et encouragemens, le commerce d'outre-mer, le remboursement des droits pour l'exportation des marchandises de l'Inde, et tout ce qui est commerce extérieur par mer et par terre; ordonne que les papiers et correspondances y relatifs seront réunis et déposés au bureau central des douanes à Paris.

La délivrance des congés, les rapports et déclarations pour manifestes, jaugeage, propriété, entrée et sortie des navires, sont également distraits du ministère de la marine et des bureaux des classes, et attribués aux douanes extérieures.

Le comité de marine se réunira au comité d'instruction publique, pour présenter, dans

12.

86

# Appendix 6

ΕΦΗΜΕΡΙΣ ΤΗΣ ΚΥΒΕΡΝΗΣΕΩΣ ΤΟΥ ΒΑΣΙΛΕΙΟΥ ΤΗΣ ΕΛΛΑΔΟΣ
Αριθ. 68, 1836, Εν Αθήναις, 3 Νοεμβρίου *(page 1 of 2)*



# Appendix 6

ΕΦΗΜΕΡΙΣ ΤΗΣ ΚΥΒΕΡΝΗΣΕΩΣ ΤΟΥ ΒΑΣΙΛΕΙΟΥ ΤΗΣ ΕΛΛΑΔΟΣ
Αριθ. 68, 1836, Εν Αθήναις, 3 Νοεμβρίου *(page 2 of 2)*



CABOTAGE LAWS OF THE WORLD

88

## Appendix 7

Código Fiscal de 31 de octubre de 1885



## Appendix 8

Constituição da República dos Estados Unidos do Brasil 1891 *(page 1 of 3)*



CABOTAGE LAWS OF THE WORLD

**90**

# Appendix 8

Constituição da República dos Estados Unidos do Brasil 1891 *(page 2 of 3)*



# Appendix 8

*Constituição da República dos Estados Unidos do Brasil 1891 (page 3 of 3)*



92

# Appendix 9

船舶法　明治三十二年



# Appendix 10

NICOLAS, Aubin, Dictionaire de marine contenant les termes de la navigation et de l'architecture navale, Amsterdam: P.Brunel, 1702



140                                                    C A.

C'eſt un terme de Cordier, pour dire, Aſſembler pluſieurs fils, & les tortiller, afin de n'en faire qu'une corde. Cabler de la ficelle.

**CABOTER.** *Af en aan leggen, of houden; Hengelen.*

C'eſt aller de cap en cap, & de port en port; naviguer le long des côtes, ainſi il faudroit dire, Capoter, mais l'uſage prévaut ſur l'étimologie. Si cette barque ne peut ſervir aux grandes traverſées, on l'emploiera au cabotage. Ce bâtiment n'eſt propre qu'au cabotage. Nos galiotes, qui étoient acoutumées à caboter, ne perdirent point ces deux caps de vûe. Les Corſaires ne font le plus ſouvent que caboter.

**CABRE.** *Krikkemik.*

C'eſt une eſpéce de chévre, compoſée de deux ou trois pieux, joints enſemble par le haut, qui s'étendent beaucoup par le bas; au haut deſquels on met une poulie de caliorne avec une étague, pour enlever, ou plutôt pour tirer des fardeaux. C'eſt avec cette machine qu'on retire les groſſes piéces de bois de conſtruction, qui ſont ſur les rivages des riviéres, ou aux bords des ateliers. Les pieux dont le cabre eſt compoſé s'apellent en Flamand, *Beenen;* la caliorne, ou plutôt le palan, *Taakel;* l'étague, *Mantel;* & la poulie, *Strop-blok,* ou *Katte-blok.*

**CABRIONS.** *Klampen onder de wielen.*

Ce font des piéces de bois qu'on met derriére les afûts des canons, quand la mer eſt groſſe, afin d'empêcher qu'ils ne briſent leurs bragues & leurs palans.

CADENE

CABOTAGE LAWS OF THE WORLD

94

# ILLUSTRATIONS

Pages 10,11    WAGHENAER ,Lucas Janszoon, Spieghel der Zeevaerdt, Antwerp, 1584

Page 25        An Act for increase of Shipping, and Encouragement of the Navigation of this
               Nation 1651

Page 27        Gesetz, betreffend die Küstenfrachtfahrt 22 Mai 1881

Page 30        DE BRY, Theodor, America sive Novus Orbis respectu Europaeorum inferior
               globi terrestris pars, Frankfurt, 1596

Page 32,35     NICOLAS, Aubin, Dictionaire de marine contenant les termes de la navigation
               et de l'architecture navale, Amsterdam: P.Brunel, 1702

Page 39        KEPLER, Johannes, Tabulae Rudolphinae, quibus Astronomicae scientiae,
               temporum longinquitate collapsae Restauratio continetur, Ulmae : Saurius, 1627

Page 42        League of Nations, Enquiry Concerning the Meaning Attached to the Term
               "Coasting Trade" in the Various Countries. League of Nations, 1931

Page 46        Maritime Administration of the U.S. Department of Transportation (MARAD), "A
               Survey of World Cabotage Laws: Summary of Responses from Countries" June 1991

Page 62        ORTELIUS, Abraham,Theatrum orbis terrarium, Antverpiae : Apud Aegid.
               Coppenium Diesth, 1570

Page 69        DE BRY, Theodor, Occidentalis Americae Partis, Vel Earum Regionum Quas
               Christophorus Columbus Primu[m] Detexit ... Praesertim Vero Ex Hieronymi
               Benzoni (qui Totis XIIII Annis Eas Provincias Diligenter Perlustravit), Frankfurt, 1594

Page 70        MURILLO VELARDE, Pedro, Carta hydrographica y chorographica de las Yslas
               Filipinas : dedicada al Rey Nuestro Señor por el Mariscal d. Campo D. Fernando
               Valdes Tamon Cavallo del Orden de Santiago de Govor. Y Capn, Manila, 1734

Page 72        The Treaty of The Hague (also known as the Treaty of Den Haag), 1661

Page 76        WAGHENAER, Lucas Janszoon, Spieghel der Zeevaerdt, Antwerp, 1584

All other images composites/courtesy Shutterstock

CABOTAGE LAWS OF THE WORLD

# BIBLIOGRAPHY

Ajamain, Z. 33 years of Discrimination, Disfranchising and Marginalizing Malaysians in Sabah: National Cabotage Policy. July 2013

American Maritime Partnership website at http://www.americanmaritimepartnership.com

Asean Framework Agreement on the Facilitation of Inter-state Transport

C-251/04 Commission of the European Communities v Hellenic Republic. 11 January 2007

C-323/03 Commission of the European Communities v Kingdom of Spain. 9 March 2006

Canada, Report of the Royal Commission on Coasting Trade, 9 December 1957: The Spence Report – 1957

Canada, The Coasting Trade Act – A position paper dealing with the policy implications of a proposed Bill on the Coasting Trade of Canada 1977, Transport Canada, Marine

Canada, The Coasting Trade of Canada and Related Marine Activity: The Darling Report – 1970

Canada, Transport Canada Background Paper – A New Coasting Trade Policy, 1982
Cole, M.  Maritime Cabotage: A Global Analysis Including Cabotage Campaigning Tools. Maritime Union of Australia (MUA) and the International Transport Workers' Federation (ITF), March 2010

Collins English Dictionary: Complete and Unabridged edition 12th Edition, 2014

Communication from the Commission to the European Parliament, the Council, the

European Economic and Social Committee and the Committee of the Regions on the interpretation of Council Regulation No 3577/92 applying the principle of freedom to provide services to maritime transport within Member States (maritime cabotage) of 22.12.2003, COM (2003) 595

Communication from the Commission to the European Parliament, the Council, the European Economic and Social Committee and the Committee of the Regions updating and rectifying the Communication on the interpretation of Council Regulation No 3577/92 applying the principle of freedom to provide services to maritime transport within Member States (maritime cabotage) of 11.5.2006, COM (2006) 196

Communication from the Commission on the interpretation of Council Regulation (EEC) No 3577/92 applying the principle of freedom to provide services to maritime transport within Member States (maritime cabotage) Brussels, 22.4.2014 COM (2014) 232

Conley, J. M. The Jones Act: Its Effect on the U.S. Response to the 2010 BP Deepwater Horizon Oil Spill and Its Relevance in International Law, Washington University Global Studies Law Review. Vol. 11, Issue 1, January 2012

Cordero, M. Logistics and trade facilitation between CARICOM and Central America. United Nations, July 2014

Council Regulation (EEC) No 3577/92 of 7 December 1992 applying the principle of freedom to provide services to maritime transport within Member States (maritime cabotage). Official Journal of The European Communities (OJ) OJ L 364, 12.12.1992, p. 7–10

**96**

Cowie, J. and Ison, S. (ed.) (2018) The Routledge Handbook of Transport Economics. London and New York: Routledge

Encyclopedia Britannica History of Ships (Cabotage) (contributors: James Joseph Stilwell, John B. Woodward and Others) May 15, 2018

Findlay, C. The Impacts and Benefits of Structural Reforms in the Transport, Energy and Telecommunications Sectors in APEC Economies. APEC Policy Support Unit, January 2011

Garner, B. and Black, H. C. (ed.), Black's Law Dictionary. 8th Edition 2004

Geloso Grosso, M. et al. Services Trade Restrictiveness Index (STRI): Transport and Courier Services. OECD Trade Policy Papers, No. 176, 2014

Grotius, H. (1609) The Free Sea, translated by Richard Hakluyt, with William Welwod's Critique and Grotius's Reply, ed. David Armitage. Indianapolis: Liberty Fund, 2004

Hodgson, J.R.F. and Brooks, M. R. Canada's Maritime Cabotage Policy: A Report for Transport Canada, Marine Affairs Program, Dalhousie University 2004

Hodgson, J.R.F and Brooks, M.R. Towards a North American Cabotage Regime: A Canadian Perspective, Canadian Journal of Transportation. Vol.1, Part 1, March 2007

Hunt, F. (ed.) (1841) British Navigation Act. The Merchants' Magazine and Commercial Review, Vol. IV, No. V, pp 393-414. New York: Freeman Hunt

Japan Federation of Coastal Shipping Association's website at http://www.naiko-kaiun.or.jp/e/

Japan's Third Basic Plan on Ocean Policy

Joined Cases C-128/10 and C-129/10 Navtiliaki Etairia Thasou AE and Amalthia I Navtiki Etairia v Ipourgos Emborikis Navtilias Kvinge, T. and Odegard, A. M. Protectionism or legitimate protection? On public regulation of pay and working conditions in Norwegian maritime cabotage 2010

League of Nations, Enquiry Concerning the Meaning Attached to the Term "Coasting Trade" in the Various Countries. League of Nations, 1930

Llanto, G. M. and Navarro A.M., (2014) Relaxing the Cabotage Restrictions in Maritime Transport.

Li, K. X. and Ingram, C. W. M. Maritime Law and Policy in China. London: Cavendish Publishing 2002

Maldives, Regulation Governing Foreign Tourist Vessels Cruising and Harbouring in Maldivian Waters. Ministry of Tourism, Arts and Culture

Maldives, Tourism Act (Law No. 2/99)

Maritime Administration of the U.S. Department of Transportation (MARAD), "By the Capes Around the World. A Summary of World Cabotage Practices" May 22, 1991

Maritime Administration of the U.S. Department of Transportation (MARAD), "A Survey of World Cabotage Laws: Summary of Responses from Countries" June 1991

Merriam-Webster Dictionary

Mihm, S. (2017) Jones Act Descended From Centuries of Lazy Protectionism. Bloomberg Opinion. 14 October 2017

New Zealand, Maritime Transport Act 1994

**CABOTAGE LAWS OF THE WORLD**

Norway, Law on professional transport by motor vehicle and vessel (Date LOV-2002-06-21-45)

Norway, Rule on wages and working conditions in public contracts (Date FOR-2008-02-08-112)

OECD, Regulatory issues in international maritime transport. OECD. DST1/DOT (2001) 3
Pestana, C. G. The English Atlantic in an Age of Revolution: 1640-1661. Cambridge, Massachusetts and London, England: Harvard University Press 2007

Proceedings no. 003.667/2018-9 at the Brazilian Federal Court of Audit

Revised African Maritime Transport Charter, Adopted by the fifteenth ordinary session of the Assembly, held in Kampala, Uganda, 26 July 2010

Ricardo, J. L. (1847) The Anatomy of the Navigation Laws. London: Charles Gilpin

Russian Federation, Maritime Doctrine of the Russian Federation for the period until 2020, approved by the Decree of the President of the Russian Federation of 27 July 2001

Russian Federation, Resolution of the Government of the Russian Federation No. 848, dated 5 December 2001

Sawers, L. The Navigation Acts Revisited. The Economic History Review, New Series, Vol. 45, No. 2 (May, 1992), pp. 262-284

Selden, J. (1652) Of the Dominion or Ownership of the Sea: two books. London: William Du-Gard

South Africa, Draft Revised White Paper on National Transport Policy 2017, Department of Transport, Pretoria

The Oxford English Dictionary. 2nd Edition 2018

The World Bank and International Finance Corporation, Policy Options for Liberalizing Philippine Maritime Cabotage Restrictions. The World Bank and International Finance Corporation Philippine Country Office, East Asia and Pacific Region Report No. 105364-PH, July 2014
Trace, K., Frielink, B., and Hew, D. Maritime Connectivity in Archipelagic Southeast Asia: An Overview. Southeast Asia Working Paper Series, no. 1. Asian Development Bank, August 2009.

UK Chamber of Shipping, A Maritime Nation: UK Shipping and the EU. UK Chamber of Shipping. January 2016

UNCTAD Rethinking Maritime Cabotage for Improved Connectivity. UNCTAD Transport and Trade Facilitation, Series No 9 (UNCTAD/DTL/TLB/2017/1) Geneva, 2017
UNCTAD Review of Maritime Transport 2017 (UNCTAD/RMT/2017)

UNESCAP (1999) 'National Shipping Fleets and Access to Shipping Markets' in Framework for the Development of National Shipping Policies. UNESCAP, August 1999

United Nations Economic Commission for Europe (2002) Glossary for Transport Statistics, prepared by the Intersecretariat Working Group on Transport Statistics. Eurostat, European Conference of Ministers of Transport (ECMT), United Nations Economic Commission for Europe (UNECE).

United Nations Economic Commission for Europe (2003) (3rd Ed.) Glossary for transport statistics: Document prepared by the Intersecretariat Working Group on Transport Statistics. European Communities (2003), United Nations Economic Commission for Europe (2003), European Conference of Ministers of Transport (2003)

US Customs Border Protection, The Passenger Vessel Services Act, April 2010

US Department of Transportation, Maritime Administration, A Survey of World Cabotage Laws: Summary of Responses from Countries US Maritime Administration (June, 1990)

US Department of Transportation, Maritime Administration, By the Capes Around the World: A Summary of World Cabotage Practices. US Maritime Administration (May 22, 1991)

Worden, B. The Rump Parliament 1648-53. Cambridge University Press (rev ed 2008)

Writ of Mandamus no. 1004259-79.2016.4.01.3400 (14th Federal Court of the Federal District, Brazil)

Writ of Mandamus no. 1009626-84.2016.4.01.3400 (5th Federal Court of the Federal District, Brazil)

WTO, Council for Trade in Services - Maritime Transport Services - Background Note by the Secretariat. Restricted S/C/W/315, 7 June 2010

CABOTAGE LAWS OF THE WORLD





# Exhibit B



# Shipping Under the Jones Act: Legislative and Regulatory Background

Updated November 21, 2019

**Congressional Research Service**

https://crsreports.congress.gov

R45725



**Congressional Research Service**
Informing the legislative debate since 1914

SUMMARY

R45725

November 21, 2019

John Frittelli
Specialist in
Transportation Policy

# Shipping Under the Jones Act:
# Legislative and Regulatory Background

The Jones Act, which refers to Section 27 of the Merchant Marine Act of 1920 (P.L. 66-261), requires that vessels transporting cargo from one U.S. point to another U.S. point be U.S.-built, and owned and crewed by U.S. citizens. The act provides a significant degree of protection for U.S. shipyards, domestic carriers, and American merchant sailors. It is a subject of debate because some experts argue that it leads to high domestic ocean shipping costs and constrains the availability of ships for domestic use. The Jones Act has come into prominence amid debates over Puerto Rico's economic challenges and recovery from Hurricane Maria in 2017; in the investigation into the sinking of the ship *El Faro* with 33 fatalities during a hurricane in 2015; and in discussions about domestic transportation of oil and natural gas. The law's effectiveness in achieving national security goals has also been the subject of attention in conjunction with a congressional directive that the Administration develop a national maritime strategy, including strategies to increase the use of short sea shipping and enhance U.S. shipbuilding capability. Defense officials have stated that while the Jones Act helps preserve a baseline of shipyard capability, the dwindling size of the fleet indicates a need to reassess current policy. However, the U.S. Maritime Administrator has credited the law for ensuring the employment of the majority of U.S. merchant mariners.

The Jones Act of 1920 was not the first law requiring that vessels transporting cargo domestically be U.S.-built, owned, and crewed. It restated a long-standing restriction that was temporarily suspended during World War I. Since 1920, Congress has enacted provisions that could be said to tighten Jones Act requirements as well as provisions that exempt certain maritime activity from the requirements. In 1935, Congress forbade Jones Act-qualified vessels that were sold to foreign owners or registered under a foreign flag to subsequently requalify as Jones Act-eligible (P.L. 74-191). This provides additional protection from competition for Jones Act carriers if coastal shipping demand increases, because it can take around two years to construct a new ship. In 1940, Congress expanded the Jones Act to include towing and salvage vessels (P.L. 76-599). In 1988, Congress specified that waterborne transport of valueless material required use of a Jones Act-qualified vessel, such that transport of dredged material would fall under the law (P.L. 100-329). Generally, dredging and towing vessels, as well as Great Lakes ships, have occasioned less debate about the Jones Act than oceangoing ships and offshore supply vessels.

Congress has enacted numerous exemptions or exceptions to the Jones Act. In some cases, Congress has enacted an exemption if there are no Jones Act-qualified carriers interested in serving a particular market (e.g., passenger travel to and from Puerto Rico). Congress has allowed waivers of the Jones Act for national defense reasons, which most often have been executed to speed fuel deliveries to a region after a natural disaster disrupted normal supply lines.

Regulatory interpretations of the Jones Act have been significant in defining what constitutes a "U.S.-built" vessel, what constitutes "transportation" between two U.S. points, and what are "U.S. points." The Coast Guard has determined that a U.S.-built vessel can be assembled with major foreign components such as engines, propellers, and stern and bow sections. This interpretation has been consistent from the late 1800s. Customs and Border Protection (CBP) has determined that cruise ship voyages that involve visits to foreign ports in addition to a domestic port are not domestic transportation and therefore not subject to the Jones Act. This interpretation also dates to the late 1800s. CBP's interpretations of what constitutes domestic transportation and U.S. points are significant to the offshore oil industry, as some of the vessels supporting that industry must be Jones Act-compliant while others need not be.

By long-standing agreement, the military is to utilize U.S.-flag commercial ships for sealift before it utilizes government-owned vessels in its reserve fleet. Jones Act mariners are expected to crew sealift ships when needed,

and thus the decades-long shrinkage of the oceangoing Jones Act fleet and mariner pool has been raised as a concern. The Department of Defense plans to recapitalize the reserve fleet by building new vessels in domestic shipyards, repairing ships in the current fleet to extend their service life out to 60 years, and purchasing used, foreign-built ships. Cost and time considerations may influence the relative weight of each of these approaches.

Much of the commercial fleet is relatively old, raising safety concerns in certain cases. Some commercially useful types of ships are missing from the Jones Act-qualified fleet, and, to some extent, the design needs for commercial ships have diverged from those for sealift vessels. Both situations may appear inconsistent with policy goals established by Congress, which include having a merchant marine "sufficient to carry the waterborne domestic commerce" and "capable of serving as a naval and military auxiliary in time of war or national emergency."

# Contents

Introduction ........................................................................................................................... 1

Legislative Context ............................................................................................................... 2
    Shipbuilding Costs Debated ........................................................................................... 3
    Statement of U.S. Maritime Policy ................................................................................. 5

What the Jones Act Requires ................................................................................................. 5

Regulatory Background ......................................................................................................... 5
    "U.S.-Built" Vessel Defined ............................................................................................ 6
    Passenger Vessel Itineraries ............................................................................................ 7
    Offshore Oil and Gas Vessels ......................................................................................... 8
    Offshore Wind Farms ...................................................................................................... 9
    Foreign Blending Ports .................................................................................................. 10

The Jones Act Since 1920 ................................................................................................... 10
    Actions to Expand Jones Act Applicability ................................................................... 10
    Precedents for Exempting the Jones Act ....................................................................... 10
        Waivers for Specifically Named Vessels .................................................................. 11
        Administrative Waivers in the Interest of National Defense ................................... 12

The Jones Act Fleet ............................................................................................................. 13
    Oceangoing Ships .......................................................................................................... 13
        Ship Designs Missing from the Oceangoing Fleet .................................................. 15
        Seagoing Barges ...................................................................................................... 16
        Fleet Age .................................................................................................................. 16
    The Great Lakes Fleet .................................................................................................... 17
    Inland River Fleet .......................................................................................................... 18
    The Dredging Fleet ........................................................................................................ 18
    Offshore Supply Vessels ............................................................................................... 19

The Jones Act and Sealift Capability .................................................................................. 19
    Sealift Crews ................................................................................................................. 20
    Sealift Ships ................................................................................................................... 21
        Divergence in Design of Commercial and Sealift Ships ......................................... 22
    Shipbuilding and Repair Industrial Base ....................................................................... 22

# Figures

Figure 1. Jones Act Oceangoing Ships .............................................................................. 14
Figure 2. Coastwise Cargo Carried by Vessel Type ........................................................... 16

# Tables

Table A-1. Congressionally Enacted Jones Act Exemptions ............................................... 24
Table A-2. National Defense Waivers of the Jones Act ...................................................... 25

# Appendixes

Appendix. Exemptions and Waivers......................................................................................... 24

# Contacts

Author Information........................................................................................................................ 26

# Introduction

The Jones Act, which refers to Section 27 of the Merchant Marine Act of 1920 (P.L. 66-261),[1] requires that vessels transporting cargo from one U.S. point to another U.S. point be U.S.-built, and owned and crewed by U.S. citizens.[2] The act provides a significant degree of protection from foreign competition for U.S. shipyards, domestic carriers, and American merchant sailors[3], while seeking to address potential national security concerns. The Jones Act seeks to maintain "a merchant marine of the best equipped and most suitable types of vessels sufficient to carry the greater portion of its commerce and serve as a naval or military auxiliary in times of war or national emergency" by supporting

- a U.S.-controlled commercial fleet to supplement the military sealift fleet;
- a U.S. merchant marine workforce qualified to crew reserve military sealift vessels; and
- domestic shipbuilding and repair capacity.

In seeking to accomplish these goals, the Jones Act constrains the availability of a greater variety and number of ships and contributes to both increased domestic shipping and shipbuilding costs in requiring merchant vessels to be built in U.S. shipyards rather than in shipyards abroad. It has been an issue in recent Congresses, coming into prominence amid debates over Puerto Rico's economic challenges and recovery from Hurricane Maria in 2017; in the investigation into the sinking of the 40-year-old ship *El Faro* with 33 fatalities during a hurricane in 2015;[4] and in discussions about domestic transportation of oil and natural gas.[5]

The law's effectiveness in achieving national security goals has also been the subject of attention in conjunction with a congressional directive that the Administration develop a national maritime strategy, including strategies to increase the use of short sea shipping and enhance U.S. shipbuilding capability.[6] At a March 2018 House Armed Services Committee hearing, the general in charge of military sealift testified:[7]

> The Merchant Marine Act of 1920, or the Jones Act, and the Cargo Preference Act [see below] are intended to ensure a baseline of ongoing business to support our inter-coastal shipping capacity and maintain a market for U.S. industrial shipyard infrastructure to build, repair, and overhaul U.S. vessels. However, the dwindling size of the domestic U.S. inter-coastal shipping fleet demands that we reassess our approach to ensure that the U.S. retains

---

[1] 41 Stat. 988.

[2] Another section of the same law that deals with seafarers' rights is also commonly referred to as the "Jones Act."

[3] On this point, see the views of the American Maritime Partnership, a coalition of Jones Act supporters, at https://www.americanmaritimepartnership.com/.

[4] *Journal of Commerce*, "El Faro Hearing Probes Role of Jones Act in Loss," February 17, 2016; https://www.joc.com/maritime-news/container-lines/el-faro-hearing-probes-role-jones-act-loss_20160217.html. The ship captain's routing decisions were the primary cause of the casualty, but the ship's age was a factor in the survivability of the vessel and crew.

[5] CRS In Focus IF10878, *U.S. LNG Trade Rising, But No Domestic Shipping*, by Michael Ratner and John Frittelli; CRS Report R43653, *Shipping U.S. Crude Oil by Water: Vessel Flag Requirements and Safety Issues*, by John Frittelli.

[6] In the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (P.L. 115-232, Sec. 3513), Congress extended the deadline for the strategy to February 2020.

[7] Written testimony of General Darren McDew, U.S. Transportation Command, House Armed Services Committee, Subcommittees on Readiness and Seapower and Projection Forces, Hearing on National Defense Authorization Act for FY2019, March 8, 2018, p. 45.

> critical national security surge sealift capabilities. We also may need to rethink policies of the past in order to face an increasingly competitive future.

At the same hearing, the Maritime Administrator, who leads the Department of Transportation agency charged with promoting the U.S.-flag merchant ship fleet, testified:[8]

> U.S. coastwise trade laws, commonly referred to as the Jones Act, help support national security priorities. Jones Act requirements support U.S. shipyards and repair facilities, as well as the supply chains that produce and repair American built ships, and ensure that intermodal equipment, terminals and other domestic infrastructure are available to the U.S. military in times of war or national emergency. This requirement results in the employment of the majority of U.S. mariners.

In May 2018, the Office of Management and Budget requested public comment on federal requirements that could be modified or repealed to increase efficiency and reduce or eliminate unnecessary or unjustified regulatory burdens in the maritime sector.[9] Although the Jones Act is a statutory and not a regulatory provision, many of the comments received discuss the act.[10]

# Legislative Context

The Jones Act of 1920 was not the first law requiring that vessels transporting cargo domestically be U.S.-built, owned, and crewed. Rather, it was a restatement of a long-standing restriction that was temporarily suspended during World War I by P.L. 65-73, enacted October 6, 1917.

Laws favoring a U.S.-flag fleet over a foreign fleet were initiated by the third act of the First Congress (1 Stat. 27, enacted July 20, 1789), which assessed lesser duties on vessels built and owned domestically than on those foreign-built and -owned. On September 1 of the same year, Congress specified that only a U.S.-built vessel owned by U.S. citizens and with a U.S. citizen captain could register as a U.S. vessel (1 Stat. 55).[11] In 1817, Congress enacted a precursor to the Jones Act by disallowing any vessel wholly or partially foreign-owned from transporting domestic cargo between U.S. ports (3 Stat. 351). In 1886, this prohibition was extended to vessels transporting passengers domestically (24 Stat. 81).

The early United States had a comparative advantage in shipbuilding due to its ample supplies of large timber. During the second half of the 1800s, it lost that advantage as wooden sailing ships gave way to iron steamships, with the advantage shifting to Scotland and England. Congress began debating how to respond to the steep drop-off in the share of U.S. foreign trade carried by U.S. vessels. The fall-off in domestic coastwise transport was less severe, but railroads began offering competition to coastal shipping. Proposals to allow foreign-built vessels to sail under the U.S. flag became known as the "free ship" movement. Opponents of the free ship movement argued that the higher cost of U.S. crews in and of itself would prevent a resurgence of trade carried by U.S. vessels even if foreign-built ships were allowed. While bills that would have allowed foreign-built vessels to qualify for U.S.-flag international service were reported by House and Senate committees in the late 1800s, it was in 1912 that Congress enacted such a measure

---

[8] Written testimony of Mark Buzby, Maritime Administrator, House Committee on Armed Services, Subcommittees on Readiness and Seapower and Projection Forces, Hearing on National Defense Authorization Act for FY2019, March 8, 2018, p. 65.

[9] 83 *Federal Register* 22993, May 17, 2018.

[10] Comments can be viewed at http://www.regulations.gov by searching under "maritime regulatory reform."

[11] The law also grandfathered foreign-built vessels owned and captained by U.S. citizens as of May 16, 1789.

(P.L. 62-33, 37 Stat. 562). Thus, since 1912, the domestic build requirement has principally applied to vessels making domestic voyages.[12]

In the late 1800s, Congress considered but did not pass bills that would have allowed foreign-built ships in domestic trade. Rather, Congress tightened the language concerning coastwise transport in response to shippers' attempts to avoid high-cost U.S. vessels. For instance, in 1891 a shipper loaded 250 kegs of nails at the Port of New York with an ultimate destination of Los Angeles (Redondo).The shipper loaded the merchandise on a foreign-flag ship bound for Antwerp, Belgium, where the goods were transferred to another foreign-flag ship bound for Los Angeles. Despite the circuitous routing and extra port charges, the freight charges were apparently less than they would have been using a U.S.-built and U.S.-owned ship to carry the nails directly between New York and Los Angeles. A court found that the shipper had acted legally.[13] Similarly, shipments from Seattle to Alaska often were routed via Vancouver, Canada, so shippers could use foreign-flag ships for both legs. Congress amended the coastwise law in 1893 (27 Stat. 455) and again in 1898 (30 Stat. 248) to prohibit shippers from routing cargo through a foreign port so as to avoid coastwise laws.

Nonetheless, U.S. shippers continued to use foreign-flag vessels in the Alaska trade by moving cargo between the United States and Vancouver, Canada, by rail. In the Merchant Marine Act of 1920, Senator Wesley Jones of Washington, chair of the Commerce Committee, sought to stop this practice by requiring Alaska-bound cargo to move through the Port of Seattle by amending the coastwise language to cover shipments "by land and water" and replacing shipments between "U.S. ports" with shipments between "U.S. points." These amendments remain current law.[14]

## Shipbuilding Costs Debated

Requirements under the Jones Act seek to maintain U.S. shipbuilding capacity to reduce U.S. reliance on foreign shipyards in the event of military conflict. The Merchant Marine Act of 1970 (P.L. 91-469) added as an additional objective of U.S. maritime policy to have a merchant marine "supplemented by efficient facilities for building and repairing vessels." To some extent, the Jones Act treats the comparatively high cost of domestic shipbuilding as necessary to maintain such capacity for national security reasons. The relative cost of building ships in the United States versus foreign countries was part of the debate leading up to passage of the Jones Act. Four years earlier, in the Shipping Act of 1916, Congress had requested annual reports on the subject from the federal agency in charge of maritime transportation.[15] The minority report to a 1919 House committee report to the bill that would become the Jones Act expressed the view that banning foreign-built ships would result in more costly domestically built ships:[16]

> … in order to build up and sustain an American merchant marine it is absolutely necessary to remove every restriction against American merchants acquiring ships, whether built in the United States or out of the United States, at the lowest possible price, in order to enable them to compete with other nations in the transportation of the commerce of the world. If

---

[12] At times, it has also applied to U.S.-flag international vessels receiving an operating subsidy.

[13] United States v. 250 Kegs of Nails, 61 Fed. 410 (9th Cir. 1894), as discussed in Mark Aspinwall, "Coastwise Trade Policy in the United States: Does It Make Sense Today?" *Journal of Maritime Law and Commerce*, v. 18, no. 2, April, 1987.

[14] 46 U.S.C. §55102(b).

[15] Current law (46 U.S.C. §50105(a)(1)) requires the U.S. Maritime Administration (MARAD) to keep current records of the relative cost of constructing ships in the United States and in foreign countries.

[16] House Committee on the Merchant Marine and Fisheries, Protection of United States Coastwise Trade, 66th Congress, 1st Sess. H.Rept. 135, part 2, Minority Report, July 22, 1919.

our merchants are allowed to buy ships in the open world market and place them under American registry with the privilege of using them both in the coastwise and overseas trade, it will inevitably follow that ships under the American flag will be bought as cheaply as ships under other flags.

On the other hand, if the American merchant shall be permitted to buy ships only from American builders in order to engage in our coastwise trade, it necessarily follows that every ship built in the United States will command a higher price than any foreign-built ship.

Our American iron and steel manufacturers were unable to compete until they had to. When they had to they did compete successfully. Our shipbuilders can and will do likewise.

A 1922 government report on shipbuilding concluded that U.S.-built ships cost 20% more than those built in foreign yards.[17] The cost differential increased to 50% in the 1930s.[18] In the 1950s, U.S. shipyard prices were double those of foreign yards, and by the 1990s, they were three times the price of foreign yards.[19] Today, the price of a U.S.-built tanker is estimated to be about four times the global price of a similar vessel,[20] while a U.S.-built container ship may cost five times the global price, according to one maritime consulting firm.[21] Some 91% of the 911 vessels built in U.S. shipyards between 2007 and 2017 were sold domestically, suggesting that U.S. shipyards compete infrequently with foreign shipyards on price or vessel characteristics.[22]

The cost differential with respect to oceangoing ships is an issue for Department of Defense officials in charge of military sealift ships. As discussed later in this report, the military has modified a plan to build sealift ships domestically, finding it costly, and instead intends to buy more used foreign-built cargo ships.

However, as was argued in the late 1800s, shipbuilding costs are not the only cost factor. U.S. crewing costs are higher than those of foreign-flag vessels. U.S.-flag ships have an operating cost differential estimated to be over $6 million per ship per year compared to foreign-flag ships. While crewing is the primary cost element, this estimate also includes insurance and ship maintenance costs.[23] A 2011 study by the U.S. Maritime Administration (MARAD) found that in 2010, the average operating cost of a U.S.-flag ship was 2.7 times greater than a foreign-flag ship,[24] but MARAD estimates that this cost differential has since increased.[25]

---

[17] U.S. Shipping Board, "Government Aid to Merchant Shipping," 1922.

[18] U.S. Maritime Commission, "Economic Survey of the American Merchant Marine," November 10, 1937.

[19] René De La Pedraja, *A Historical Dictionary of the U.S. Merchant Marine and Shipping Industry*, Greenwood Press, Westport, CT; 1994, p. 149.

[20] Kinder Morgan, "Kinder Morgan Continues to Expand Its Growing Product Tanker Fleet for the Jones Act Trade," Press Release, August 10, 2015; Business Wire, "ExxonMobil Marine Affiliate Names Eagle Bay, New U.S.-Flag Tanker in Philadelphia," January 12, 2015.

[21] *Journal of Commerce*, "Drewry: Repeal the Jones Act," November 18, 2013.

[22] Laurent Daniel and Cenk Yildran, *Ship Finance Practices in Major Shipbuilding Economies* (Paris: OECD, 2019), p. 54.

[23] Estimated by the U.S. Maritime Administration. Government Accountability Office, *Maritime Security: DOT Needs to Expeditiously Finalize the Required National Maritime Strategy for Sustaining U.S.-Flag Fleet*, GAO-18-478, August 2018, p. 24.

[24] U.S. Maritime Administration, *Comparison of U.S. and Foreign-Flag Operating Costs*, September 2011.

[25] Government Accountability Office, *Maritime Security: DOT Needs to Expeditiously Finalize the Required National Maritime Strategy for Sustaining U.S.-Flag Fleet*, GAO-18-478, August 2018, p. 24.

Despite the cost issues, the Jones Act ensures that the United States maintains enough shipbuilding capacity and maintenance capability to support a domestic merchant fleet. This capacity is available to the U.S. military in times of war or national emergency.

## Statement of U.S. Maritime Policy

A main thrust of the Merchant Marine Act of 1920 concerned the sale of a surplus of government cargo ships constructed for World War I. A second important and enduring aspect of the bill is its statement of maritime policy. The policy goals stated in the 1920 act, which appear in Section 27, have continued to the present day (46 U.S.C. §50101). The law stated the following:

> That it is necessary for the national defense and for the proper growth of its foreign and domestic commerce that the United States shall have a merchant marine of the best equipped and most suitable types of vessels sufficient to carry the greater portion of its commerce and serve as a naval or military auxiliary in times of war or national emergency, ultimately to be owned and operated privately by citizens of the United States; and it is hereby declared to be the policy of the United States to do whatever may be necessary to develop and encourage the maintenance of such a merchant marine.

This statement reflects the United States' status as an emerging power at that time. When World War I began in 1914, European nations utilized their ships for the war effort or kept them in harbors for fear of submarine attacks, leaving the United States with a shortage of ships for carrying its foreign trade. The Merchant Marine Act therefore emphasized that the United States should have its own merchant marine so as not to be dependent on any other nations' merchant vessels. Congress has subsequently adopted additional maritime policy goals on several occasions.

# What the Jones Act Requires

The Jones Act applies only to domestic waterborne shipments. It does not apply to the nation's international waterborne trade, which is almost entirely carried by foreign-flag ships.[26] The U.S. citizen crewing requirement means that the master, all of the officers, and 75% of the remaining crew must be U.S. citizens. If the U.S. owner of a Jones Act ship is a corporation, 75% of the corporation's stock must be owned by U.S. citizens.

Regarding U.S. territories, the U.S. Virgin Islands, America Samoa, and the Northern Mariana Islands are exempt from the Jones Act. Therefore, foreign-flag ships can transport cargo between these islands and other U.S. points. Puerto Rico is exempt for passengers but not for cargo. Vessels traveling between Guam and another U.S. point must be U.S.-owned and -crewed but need not be U.S.-built. The Jones Act is applicable to the State of Hawaii.

# Regulatory Background

The Coast Guard is in charge of enforcing the U.S.-build requirement for vessels (46 C.F.R. §§67.95-67.101), U.S. ownership of the carriers (46 C.F.R. §§67.30-67.43), and U.S. crewing (46 C.F.R. §10.221)—essentially, the licensing of Jones Act operators. It enforces these requirements when an operator seeks a "coastwise endorsement" (46 C.F.R. §67.19) from the agency. The terms "coastwise qualified" and "Jones Act qualified" are synonymous. Customs and Border

---

[26] A U.S. flag ship engaging in international trade must be U.S.-owned and -crewed but need not be U.S.-built. The U.S.-flag international fleet primarily carries government cargoes reserved for it, such as military cargo and food aid. CRS Report R44254, *Cargo Preferences for U.S.-Flag Shipping*, by John Frittelli.

Protection (CBP) is primarily responsible for determining what maritime activity falls under the act, namely defining what constitutes "transportation" and whether the origin and destination of a voyage are "U.S. points" (19 C.F.R. §§4.80–4.93). Agency interpretations of domestic shipping restrictions have been consistent since the late 1800s and early 1900s, as discussed further below.

## "U.S.-Built" Vessel Defined

A significant element of the Jones Act is the requirement to use only "U.S.-built" vessels. Competing freight transportation modes have no requirement to purchase only domestically built equipment. Congress has not defined what constitutes a U.S.-built vessel, leaving this determination to the Coast Guard. Coast Guard regulations deem a vessel to be U.S.-built if (1) all "major components" of its hull and superstructure are fabricated in the United States, and (2) the vessel is assembled in the United States.[27] The "superstructure" means the main deck and any other structural part above the main deck (e.g., the bridge, forecastle, pilot house).

The Coast Guard holds that propulsion machinery (the ship's engine), other machinery, small engine room equipment modules, consoles, wiring, piping, certain mechanical systems and outfitting have no bearing on a U.S.-build determination.[28] Consequently, for oceangoing ships, U.S. shipyards typically import engines from foreign manufacturers. This is allowed because engines are deemed components that are attached to the hull rather than an integral part of the hull's structure. A ship part or component that is self-supporting and independent of the vessel's structure and does not contribute to the overall integrity of the vessel or compromise the watertight envelope of the hull can be manufactured in a foreign country. However, the part or component must be attached or joined to the vessel in a U.S. shipyard, not an overseas yard.[29]

The Coast Guard's test for "major components" of the hull or superstructure is based on weight; up to 1.5% of the steel weight of hull and superstructure components can be manufactured abroad. By this reasoning, the propeller, stern bulb, bulbous bow, some rudders (depending on their design), and watertight closures used in U.S.-built vessels are often imported, as long as they (in the aggregate) do not exceed the steel weight limit.[30] The Coast Guard also permits steel products in standard forms ("off the shelf") to be imported with no limit on their weight, but any shaping, molding, and cutting of the steel that is custom to the design of the vessel must be performed in a U.S. shipyard.

Shipyards typically seek confirmation from the Coast Guard that incorporating certain foreign-built components in construction of a vessel will not disqualify the vessel from the Jones Act trade. These "determination letters" written by the Coast Guard detail which and to what extent

---

[27] 49 C.F.R. 67.97.

[28] *Philadelphia Metal Trades Council v. Allen* (2008), No. 07-145, 2008 WL 4003380, as discussed in Han Deng, "Built or Rebuilt? That Is the Question: Risk of Losing the Coastwise Privilege After Vessel Modification Projects Outside the United States," *Tulane Maritime Law Journal*, v. 35, 2010.

[29] Ibid.

[30] Coast Guard, National Vessel Documentation Center, Letter to Jonathan Waldron regarding vessels to be built for SeaRiver Maritime by Aker Philadelphia Shipyard, April 11, 2012; https://www.dco.uscg.mil/Portals/9/DCO%20Documents/NVDC/Aker_Philadelphia_Shipyard_Inc_SeaRiver_Maritime_Inc_04-11-2012.pdf?ver=2017-05-05-132913-937.

foreign components are permissible.[31] In the Coast Guard Authorization Act of 2018 (P.L. 115-282, §516) Congress directed the Coast Guard to publish these letters.[32]

Shipyard unions refer to ships built in this manner as "kit ships."[33] They sued the Coast Guard in 2007, arguing that the Coast Guard's interpretation of the statute violated the Administrative Procedure Act. The U.S. District Court for the Eastern District of Pennsylvania sided with the Coast Guard, noting in part that the Coast Guard's interpretation is rooted and consistent with the Treasury Department's interpretation dating to at least the late 1800s (the Treasury Department was the agency of jurisdiction at that time), as well as U.S. Attorney General interpretations dating to the early 1900s.[34] The shipyard unions' lawsuit was prompted by a Philadelphia shipyard's partnership with a South Korean shipbuilder, begun in 2004, to use the Korean builder's ship designs and other procurement services to build a series of Jones Act tankers. This partnership continues today and also includes container ships built in the Philadelphia shipyard. Since 2006, General Dynamics NASSCO of San Diego, another builder of Jones Act oceangoing ships, has partnered with Daewoo Shipbuilding of South Korea to procure vessel designs, engineering, and some of the materials for the commercial ships it has since built for Jones Act carriers.

The extent to which foreign-built components may be used in a U.S.-built ship highlights the tension between the national security aims of the Jones Act and the cost effects arising from it. Importing engines and other major ship components may undermine the Jones Act policy objective of supporting a domestic shipbuilding capability independent of foreign yards. In the court case cited above, the shipyards argued that not allowing use of such foreign components would increase the cost of ships further. They asserted this would reduce orders for new ships and harm the domestic fleet.[35]

## Passenger Vessel Itineraries

The United States is the largest cruise ship market, but most Americans board foreign-flag cruise ships. This is because CBP has determined that a cruise ship serving a U.S. port does not have to be Jones Act-compliant as long as it has visited a *distant* foreign port (any port outside North and Central America, Bermuda, the Bahamas, and the Virgin Islands). Thus, for example, if a cruise ship includes Aruba or Curaçao in its itinerary, it does not need to be Jones Act-compliant. The reasoning is that the main objective of such a cruise itinerary is to visit such foreign ports, not to transport passengers from one U.S. port to another U.S. port. This reasoning was articulated in a 1910 Attorney General's opinion.[36]

Another significant regulatory interpretation allowing for the prevalence of foreign cruise ships at U.S. ports is a 1985 rulemaking by the U.S. Customs Service (the predecessor of CBP). In this

---

[31] Coast Guard, National Vessel Documentation Center, https://www.dco.uscg.mil/Our-Organization/Assistant-Commandant-for-Prevention-Policy-CG-5P/Inspections-Compliance-CG-5PC-/National-Vessel-Documentation-Center/National-Vessel-Documentation-Center-Determination-Letters/National-Vessel-Documentation-Center-US-Build-Determination-Letters/.

[32] They are now posted on a Coast Guard website; https://www.dco.uscg.mil/Our-Organization/Deputy-for-Operations-Policy-and-Capabilities-DCO-D/National-Vessel-Documentation-Center/.

[33] *Journal of Commerce*, "Unions Sue Over 'Kit' Ships," January 15, 2007; *PR Newswire*, "Metal Trades Department (AFL-CIO) Sues Coast Guard to Block Kit Ships," January 12, 2007.

[34] *Philadelphia Metal Trades Council v. Allen* (2008), No. 07-145, 2008 WL 4003380.

[35] Ibid., pp. 36-38.

[36] 46 C.F.R. §4.80a; 28 O.A.G. 204, February 26, 1910.

rulemaking, Customs allowed foreign-flag cruise ships to make round trips from a U.S. port and to visit other U.S. ports as long as they also include a visit to a *nearby* foreign port (such as those in Canada, Mexico, or Bermuda). All passengers must continue with the cruise until the cruise terminates at the same dock at which it began. Again, the reasoning is based on the primary intent of the cruise voyage; if the main purpose of the voyage is not domestic transportation of passengers then the Jones Act is not violated.[37]

Another type of passenger vessel excursion involves visits to no other ports. The purpose of the voyage could be whale watching, recreational diving, gambling, duty-free shopping, or deep-sea fishing, for example. These are so-called "voyages to nowhere" since passengers do not visit any other ports besides the one at which they embark and disembark. In these cases, CBP has determined that if such vessels stay within the 3-mile zone of U.S. territorial waters they must be Jones Act-compliant since CBP considers any places within such waters as "U.S. points." This interpretation is based on Treasury Decision 22275, issued in 1900. However, CBP has determined that if the vessel journeys beyond 3 miles from shore (into international waters), then it does not need to be Jones Act-compliant. This determination is based on a 1912 Attorney General opinion.[38] But the policy regarding charter fishing boats differs from that regarding other passenger vessels. If charter fishing boats venture into international waters, they still must be Jones Act-compliant. This determination is by virtue of a 1936 ruling by the Bureau of Navigation and Steamboat Inspection (Circular Letter No. 103, June 3, 1936), and affirmed by Treasury Decision 55193(2) in 1960.

Another element of CBP's interpretation of the Jones Act with respect to passenger vessels is its definition of a passenger. According to CBP, a passenger need not be a paying customer (such as a tour boat or cruise ship ticket holder); rather, the term encompasses anyone aboard a vessel who is not a member of the crew or an owner of the vessel.[39] Thus, for example, an owner of a yacht who chooses to entertain business clients aboard his or her vessel must comply with the Jones Act. A construction company transporting construction workers to a construction site must use a Jones Act-compliant vessel.

## Offshore Oil and Gas Vessels

In the offshore oil market, CBP's interpretations of the Jones Act have affected "lightering" (the transfer of oil offshore from an oil tanker too large to transit a harbor to a smaller vessel)[40] and offshore supply vessels (OSVs) used to supply oil platforms. CBP has determined that if a tanker to be lightered is anchored to the seabed and within 3 nautical miles of shore (which are U.S. territorial waters), it is a "U.S. point." Many lightering areas in the Gulf of Mexico are 60 to 80 miles offshore and therefore the lightering vessels can be foreign-flagged. Lightering operations in the Delaware Bay and elsewhere are within the 3-mile zone, and therefore lightering vessels operating in these areas must be Jones Act-compliant (in which case tank barges rather than ships are typically used as lighters).

---

[37] See 50 *Federal Register* 26981, July 1, 1985. In addition to the 1910 Attorney General opinion cited in the text, other Attorney General opinions cited by CBP as the basis for examining the intended purpose or objective of a passenger voyage are 18 O.A.G. 445 (1886), 29 O.A.G. 318 (1912), 30 O.A.G. 44 (1913), 34 O.A.G. 340 (1924), and 36 O.A.G. 352 (1930).

[38] 29 O.A.G. 318.

[39] 19 C.F.R. §4.50(b).

[40] With the lifting of the crude oil export ban, reverse lightering has also taken place at Texas ports.

Regarding OSVs, two factors determine whether these vessels must be Jones Act-compliant in servicing offshore oil rigs. By virtue of the Outer Continental Shelf Lands Act of 1953 (P.L. 83-212), U.S. waters extend 200 miles offshore strictly for purposes related to the exploration, development, and production of offshore natural resources. CBP has determined that within this zone, only oil rigs attached to the seabed (anchored or submerged to) are "U.S. points."[41] Another type of oil rig is not attached to the seabed: some mobile offshore drilling units (MODUs) are semisubmerged and can hold their positions with the use of propellers. CBP had determined that MODUs not attached to the seabed are not "U.S. points," and therefore foreign-flagged vessels were permitted to service these units. However, in 2008, Congress required that OSVs servicing MODUs be U.S.-owned and -crewed, but need not be U.S.-built (P.L. 110-181, §3525), which is the same requirement applied to U.S.-flag vessels engaged in international voyages.

A second factor determining whether OSVs must be Jones Act-compliant is whether the OSV is *transporting* supplies or workers to the oil rig, or if the vessel is involved in *installing equipment* necessary for the operation of the rig. CBP defines "vessel equipment" as anything "necessary and appropriate for the navigation, operation or maintenance of a vessel or for the comfort and safety of persons on board."[42] Consequently, a vessel laying cable or pipeline in U.S. waters does not need to be Jones Act-compliant. Similarly, while OSVs transporting supplies and rig workers must be Jones Act-compliant (if the rig is attached to the seabed), vessels involved in installing rig equipment or conducting geophysical surveying or diving inspections can be foreign-flagged, as well as "flotels," which are vessels that provide living quarters for construction workers. The distinction can be unclear. In 2017, CBP proposed that most or all activities performed by OSVs fall under the Jones Act, but after reviewing comments, the agency withdrew the proposal.[43]

## Offshore Wind Farms

Some question whether the Outer Continental Shelf Lands Act, and therefore the Jones Act, applies to offshore wind farms located beyond 3 miles from shore.[44] Currently, wind farm developers are being guided by CBP's interpretations of the Jones Act with respect to OSVs and oil rigs. The Department of Energy has noted that the nonavailability of Jones Act-compliant "Tower Installation Vessels" (TIVs) can be a hindrance to offshore wind farm development, especially for installations in deeper water.[45] In Europe, TIVs not only install the towers but also transport the equipment from shore to the offshore site. Since there are no Jones Act-compliant TIVs, U.S. wind developers either transport the equipment from foreign countries or use Jones Act-compliant vessels to transport the equipment to the site from a U.S. port alongside non-Jones Act-compliant TIVs to install the equipment.[46] According to press reports, the first Jones Act-compliant barge to support installation of offshore wind towers is expected to enter service by the end of 2019. The barge was converted from an older Jones Act-compliant vessel.[47]

---

[41] Treasury Decision 54281, January 9, 1957.

[42] This interpretation is based on Treasury Decision 40934 (1925) and Treasury Decision 49818(4) (1939).

[43] *Customs Bulletins and Decisions*, vol. 51, no. 19, May 10, 2017, p. 11.

[44] Joshua Sohn and Daniel Lewkowicz, "How the Offshore Wind Energy Industry Can Overcome the Jones Act," PowerMag.com, March 1, 2018.

[45] Department of Energy and the Department of the Interior, *National Offshore Wind Strategy*, September 2016.

[46] Nicolas Martino, Comment, "Offshore Wind Energy: Sophisticated Technology Struggling with Outdated Legislation," 58 *Jurimetrics* 59, 2017.

[47] "Flurry of US offshore vessel deals prepares market for huge turbines," New Energy Update, May 9, 2018, https://analysis.newenergyupdate.com/wind-energy-update/flurry-us-offshore-vessel-deals-prepares-market-huge-

## Foreign Blending Ports

A third CBP interpretation of the Jones Act has been significant in shaping coastal maritime activity. CBP determined that if merchandise is transformed (manufactured or processed) into a new and different product at an intermediate foreign port, then the vessels transporting the original product from a U.S. port to this foreign port and transporting the transformed product from the foreign port to a U.S. port do not need to be Jones Act-compliant.[48] For example, a Texas oil producer has shipped a gasoline product to a Bahamian storage facility where its product is blended with a different imported petroleum product to produce a final gasoline product that is shipped to New York. Foreign-flag tankers are allowed to make all of these shipments even though it could be argued that a portion of the cargo is being shipped between two U.S. points (Texas and New York).[49] The transformation of the product into a new and different product at an intermediate foreign port distinguishes this case from the 1891 kegs-of-nails case mentioned above. This interpretation has precedent in a 1964 Customs Service ruling involving California rice being processed in the U.S. Virgin Islands (exempt from the Jones Act) before being shipped to Puerto Rico, with both shipment legs involving foreign-flag ships.[50]

# The Jones Act Since 1920

Since 1920, Congress has enacted provisions that could be interpreted as tightening Jones Act requirements, as well as provisions that exempt certain maritime activities from the requirements.

## Actions to Expand Jones Act Applicability

In 1935, Congress forbade Jones Act-qualified vessels sold to foreign owners or registered under a foreign flag to subsequently requalify as Jones Act-eligible (P.L. 74-191), meaning that they could never again be used in U.S. domestic trade. This provides additional protection from competition for Jones Act carriers if coastal shipping demand increases, because it can take two years to construct a new ship. In 1940, Congress expanded the Jones Act to cover towing vessels, such as river tugs that push barge tows and harbor tugs that assist larger ships, and salvage vessels operating in U.S. waters (P.L. 76-599). In 1988, Congress specified that waterborne transport of valueless material, such as dredge spoil or municipal solid waste, requires use of a Jones Act-qualified vessel (P.L. 100-329).[51]

## Precedents for Exempting the Jones Act

Congress has enacted numerous exemptions or exceptions to the Jones Act. A list of these legislated exemptions and exceptions can be found in the **Appendix**.

It has waived the Jones Act's restrictions when finding that no Jones Act-qualified operator was interested in providing service in a particular market, reasoning that the waiver thus would bring no harm to the domestic maritime industry. For instance, in 1984, Congress exempted passenger travel between Puerto Rico and any other U.S. port as long as no Jones Act-qualified operator was

---

turbines.

[48] 46 C.F.R. §4.80b.

[49] Argus, "U.S. Reaffirms Non-Jones Act Gasoline Move," April 7, 2015.

[50] Treasury Decision 56272(2), 1964.

[51] The Dredging Act of 1906 required that dredging vessels that also transport dredged material must be U.S.-built, owned, and crewed.

able to provide comparable service (P.L. 98-563). This exemption remains in force, allowing foreign-flag cruise ships to carry passengers between the U.S. mainland and the island. On two occasions, in 1996 (P.L. 104-324) and again in 2011 (P.L. 112-61), Congress has permitted certain foreign-flagged liquefied natural gas (LNG) tankers to provide domestic service because none existed in the Jones Act fleet; no ship owners have made use of these exemptions (see **Table A-1**).

Congress has also enacted exemptions due to a sudden spike in demand for Jones Act-qualified vessels. To address a vessel shortage, Congress enacted an exemption for iron ore carried on the Great Lakes during the 1940s that was related to a surge in steelmaking for the war effort. It did the same for a bumper grain harvest in 1951 (see **Table A-1**). In 1996, Congress enacted an exemption for vessels participating in oil spill cleanup operations when an insufficient number of Jones Act-qualified vessels are available.

Congress has enacted Jones Act waivers for two innovations in vessel designs used in foreign trade but whose cargo operations included domestic legs that would otherwise fall under the Jones Act. One concerned a ship designed to carry river barges on international voyages, a technology known as Lighter Aboard Ship (LASH). In 1971, Congress exempted these specific barges from the Jones Act (P.L. 92-163). The exemption is no longer relevant, as this type of shipping is not now in use.

In 1965, as container ships were about to come into use internationally, Congress exempted the movement of empty containers between U.S. ports from the Jones Act (P.L. 89-194). This exemption is restricted to containers used for international shipments, thus allowing the foreign-flagged container carriers to reposition their empty equipment along U.S. coastlines. Once loaded, containers of imports are discharged from a ship in a U.S. port, Jones Act-compliant vessels must be used if they are transshipped by water to other U.S. ports. This distinction between carriage of loaded and unloaded containers has ramifications for the development of marine highways or short sea shipping routes. Transshipment of international containerized cargo by feeder ships is prevalent abroad, but the practice does not exist in the United States. Instead, essentially all movement of containers between ports in the contiguous United States, including import and export containers, occurs by truck or train.[52]

## Waivers for Specifically Named Vessels

In addition to authorizing exemptions to the Jones Act under certain circumstances, Congress has enacted exemptions for specific vessels identified by name and identification number (a registration number with a state government, the Coast Guard, or International Maritime Organization). Typically, the legislative language does not indicate why a waiver was needed or describe the kind of vessel, its size, or its function. A search of the statutes at large under the terms "coastwise" and "endorsement" and "certificate of documentation" indicates that since 1989, at least 133 specific vessels have been granted Jones Act waivers by Congress in 16 separate legislative acts.[53]

These waivers typically appear in maritime-related legislation, such as a Coast Guard authorization bill. One act contains waivers for 67 vessels and another for 35 vessels. It appears in most cases that these vessels are not commercially significant—for instance, that they are not large or even moderately sized cargo or passenger vessels. Some of them are owned by nonprofit entities. One exception was the previously mentioned 2011 granting of waivers to three LNG

---

[52] Relative to the number of containers imported and exported, a very small number of containers are transshipped by barge between a handful of U.S. ports. Such services have typically been short-lived.

[53] Specific details on these vessels and acts are available to congressional users upon request.

tankers built in the United States in the late 1970s that subsequently became foreign-registered (P.L. 112-61). In many cases, it appears the vessel needs a waiver because of a technicality in meeting Jones Act requirements; for example, the U.S.-citizen ownership history may be missing some records. In many cases, the statute granting the waiver places specific conditions on how the vessel can be used.

### Administrative Waivers in the Interest of National Defense

While the Jones Act intends to maintain a merchant marine to serve as a military auxiliary in times of war or national emergency, Congress has also authorized waivers of the Jones Act in the interest of national defense. As noted previously, the domestic shipping restrictions were waived during World War I. They were waived again in preparation for World War II (P.L. 77-507, 1942). In 1950, after the Korean War began, Congress enacted a provision allowing the executive branch to issue waivers "in the interest of national defense" (P.L. 81-891). This authority is still in effect, as the language did not specify that it was intended only for the conduct of that war.[54] In 1991 and 2011, waivers were granted on national defense grounds to expedite oil shipments from the Strategic Petroleum Reserve in response to the Persian Gulf War and a conflict in Libya, respectively.[55]

In addition to military conflicts, the executive branch has waived the Jones Act for fuel resupply in the aftermath of natural disasters. This so-called "national defense waiver" authority has been the basis for recent waivers granted in the aftermath of major hurricanes, beginning with Hurricane Katrina in 2005 up to and including Hurricanes Harvey, Irma, and Maria in 2017 (see **Table A-2**). In 2008 (P.L. 110-417), Congress inserted a role for MARAD to check on the availability of any Jones Act-qualified vessel before granting certain waivers.[56]

The lack of heavy-lift vessels in the Jones Act fleet has also prompted national defense waivers: in 2005 to allow a foreign-flag heavy-lift vessel to transport a radar system from Texas to Hawaii and in 2006 to allow an oil company to use a Chinese-flagged heavy-lift vessel to transport an oil rig from the Gulf Coast to Alaska.[57] The national defense justification for the oil rig waiver was apparently based on addressing a fuel shortage in that region of Alaska. Other requests related to heavy-lift vessels have not been approved. In 1992, Customs denied a waiver request to use a foreign-flag heavy-lift vessel to transport replicas of Christopher Columbus's Niña, Pinta, and Santa Maria vessels from Boston to San Francisco.[58] A specific type of heavy-lift vessel is used in the construction of offshore oil rigs, but CBP has denied Jones Act waivers for these vessels notwithstanding the Coast Guard and the Bureau of Safety and Environmental Enforcement in the Department of the Interior advising that not granting a waiver created a safety hazard for these operators.[59]

---

[54] As amended, the provision is codified at 46 U.S.C. §501.

[55] The public record as to how many times the executive branch has issued waivers for national defense reasons appears to be incomplete. Only in some cases is a waiver published in the *Federal Register* or in an agency publication such as *Treasury Decisions.*

[56] In 2012 (P.L. 112-213), Congress expanded MARAD's role in the waiver process.

[57] Constantine G. Papavizas, Brooke F. Shapiro, "Jones Act Administrative Waivers," *Tulane Maritime Law Journal*, vol. 42, 2018, pp. 317-357.

[58] U.S. Customs Service, HQ 112237, May 27, 1992.

[59] Constantine G. Papavizas, Brooke F. Shapiro, "Jones Act Administrative Waivers," *Tulane Maritime Law Journal*, vol. 42, 2018, pp. 317-357.

CBP has stated that the "national defense" justification is a high standard and that national defense waivers would not be issued for economic reasons such as commercial practicality or expediency.[60] Consistent with this view, while CBP has issued national defense waivers in circumstances involving fuel shortages, it has not issued waivers that would merely favor domestic supply lines over offshore ones, even though some might argue the latter is a national security issue. For instance, in 1976, arguing that offshore supply lines are more vulnerable, some Members of Congress representing Gulf Coast states sought to have the Jones Act extended to the U.S. Virgin Islands. At the time, the largest refinery in North America was located in the U.S. Virgin Islands, and the refinery supplied petroleum products to the U.S. Northeast on foreign-flagged tankers.[61] In 2014, northeast refineries reportedly contemplated seeking a Jones Act waiver to ship crude oil from Texas.[62] These refineries import much of their crude oil. In 2018, the United States exported between 40 million and 80 million barrels of crude oil per month on foreign-flag tankers, imported about 150 million barrels per month from overseas sources on foreign-flag tankers, and shipped about 15 million barrels per month domestically on Jones Act tankers.[63]

A similar situation is occurring with liquefied natural gas: the United States has begun exporting substantial quantities by ship while continuing to import LNG by ship, but no LNG is shipped domestically. No LNG tankers are in the Jones Act fleet, and it is unclear why shippers have not utilized the 1996 or 2011 waivers for LNG tankers mentioned above.[64] Puerto Rico, which currently imports LNG from Trinidad and Tobago, has sought a 10-year waiver of the Jones Act to receive bulk shipments of LNG from the U.S. mainland.[65]

# The Jones Act Fleet

The Jones Act applies to any type of commercial vessel. Recent controversies have concerned the oceangoing ship and offshore supply vessel sectors. The law also covers ships on the Great Lakes, river barges, harbor tugs, dredging vessels, and various kinds of passenger vessels. The Jones Act oceangoing ship fleet, in particular, has certain shortcomings compared to the merchant fleet desired by the drafters of the 1920 act as they described it in the aforementioned statement of U.S. maritime policy.

## Oceangoing Ships

As of March 2018, there were 99 oceangoing ships in the Jones Act-compliant fleet,[66] employing about 3,380 mariners. The largest category of oceangoing Jones Act ships is tankers. Of the 57 tankers in the fleet, 11 carry Alaskan crude oil to refineries on the West Coast, 44 are medium-sized product tankers that mostly carry refined products along the Atlantic Coast, and 2 are chemical or asphalt tankers. The dry cargo fleet includes 24 small to medium-sized container ships, 7 ships that have ramps for carrying vehicles (known as roll on/roll off vessels), and 2 dry

---

[60] U.S. Customs Service, HQ 111930, October 8, 1991.

[61] Senate Committee on Commerce, Subcommittee on Merchant Marine, Hearing—Amend the Merchant Marine Act of 1920, February 25 and March 30, 1976.

[62] Energy Monitor Worldwide, "Refiners Cite Cost of Keeping Up With Jones Act," December 1, 2014.

[63] Energy Information Administration, Petroleum and Other Liquids, Imports/exports and movements.

[64] CRS In Focus IF10878, *U.S. LNG Trade Rising, But No Domestic Shipping*, by Michael Ratner and John Frittelli.

[65] Hellenic Shipping News, "Lawmakers, Maritime Sector Decry Notion of Jones Act Waivers for U.S. LNG," March 9, 2019.

[66] U.S. Maritime Administration, "Fleet Statistics," https://www.marad.dot.gov/resources/data-statistics/.

bulk vessels designed to carry such commodities as grain and coal in bulk form. The fleet also includes 9 relatively small general-cargo vessels supplying subsistence harbors along Alaska's coast.

As **Figure 1** indicates, the number of oceangoing ships in the Jones Act fleet has shrunk from 434 in 1950 to 99 in 2018. The ships are much larger today than they were then, but their aggregate carrying capacity (DWT) is still less than in 1950.

### Figure 1. Jones Act Oceangoing Ships



**Source:** CRS using data from U.S. Maritime Administration (MARAD).

**Note:** DWT = deadweight tonnage, a measure of ship cargo capacity.

As shown in the figure, there was a pronounced drop in the size of the fleet in the late 1950s and early 1960s. At a time of concern about the availability of sealift during the Vietnam war, the Lyndon B. Johnson Administration called for the repeal of the Jones Act.[67] It appears to be the only Administration in the modern era that has done so. Subsequently, in the late 1960s and 1970s, additional oceangoing ships with greater cargo capacity joined the Jones Act fleet, increasing the overall available tonnage. In the 1970s, this included large tankers for carrying Alaska crude oil domestically.

While domestic ships are carrying fewer tons of freight today than they did in the 1950s, their most direct competitors, railroads and pipelines, are carrying more.[68] Domestic ships have lost market share to land modes even though ships have certain economic advantages. Ocean carriers do not need to acquire and maintain rights-of-way like railroads and pipelines. They can move much more cargo per trip and per gallon of fuel than trucks and railroads. Although ships are

---

[67] For the Johnson Administration's view, see testimony of Alan Boyd, Secretary of Transportation, Senate Committee on Commerce, Subcommittee on Merchant Marine and Fisheries, Hearing: "U.S. Maritime Policy," May 1, 1967, p. 97.

[68] Association of American Railroads, *Railroad Facts*; Eno Transportation Foundation, *Transportation in America, With Historical Compendium 1939-1999*; U.S. Department of Transportation, *Freight Analysis Framework*; U.S. Army Corps of Engineers, *Waterborne Commerce Statistics*.

slower than truck and rail modes, many shippers are willing to sacrifice transit time for substantially lower costs, as long as delivery schedules are reliable.[69]

The oceangoing Jones Act fleet is almost entirely engaged in domestic trade routes where overland modes are not an option, serving Alaska, Hawaii, and Puerto Rico.[70] In other words, it operates in markets where shippers have little alternative. The Jones Act appears to have preserved a nucleus of a U.S. maritime industry, but not to have fully attained its stated goal of having a U.S. merchant marine "sufficient to carry the waterborne domestic commerce." Nor is the current Jones Act fleet arguably capable of providing "shipping service essential for maintaining the flow of the waterborne domestic … [commerce] at all times."[71]

## Ship Designs Missing from the Oceangoing Fleet

Not all ship designs are represented in the oceangoing Jones Act fleet. "Project cargo" or "heavy-lift" vessels are often used to carry oversized pieces of equipment such as smaller vessels,[72] ship engines and modules, wind turbine parts, and power generation equipment. They would be useful for moving dredging fleets to project sites. There have not been any such vessels in the Jones Act fleet in recent decades. The Department of Defense has used "national defense" waivers of the Jones Act to move radar systems and newly built vessels on foreign-flag heavy-lift vessels. This type of cargo typically does not generate regular shipments in any one region; thus these ships would likely need to extend their market reach beyond the United States to include the international market. However, the higher cost structure of Jones Act operators is an obstacle to competing for international shipments.

Other ship designs have small representation in the oceangoing Jones Act fleet. Two dry bulk ships are in the oceangoing Jones Act fleet, and they appear to be mostly inactive, possibly because they are nearly 40 years old. This is twice the economic life of a ship in the global fleet (where ships are typically sent for scrapping between 15 and 20 years of age). The sole Jones Act-qualified chemical tanker was built in 1968. No LNG tankers are in the Jones Act fleet despite new domestic markets as a result of the shale gas boom. The lack of sufficient Jones Act-qualified tanker capacity to move booming shale oil production coastwise was one of many factors considered regarding lifting the crude oil export ban in 2015.[73]

---

[69] This is evidenced by the large share of U.S. shippers on the East Coast that import Asian goods through the Panama Canal rather than by rail across the United States after unloading the ships at West Coast ports. While the sea route is less costly, it is slower than transcontinental rail.

[70] For tankers, this can also include Florida and New England, which are not connected to national pipeline networks. Air cargo is economically feasible only for products with exceptionally high value-to-weight ratios.

[71] 46 U.S.C. §50101(a)(1).

[72] Some heavy-lift vessels have a platform that can be lowered and raised relative to the waterline to carry other vessels. This type of vessel may have been useful to transport newly constructed New York harbor ferries built in Gulf Coast shipyards. The vessels were too small to be unconcerned about sailing in open coastal waters but too large for the intercoastal waterway (the first vessel attempting this route grounded in a Florida segment of the waterway). *New York Times*, "Facing Gators and Detours, First of New York's New Ferries Voyages North," March 27, 2017. When the Navy has needed to transport damaged and unseaworthy destroyers to repair yards, it has used foreign-flag heavy-lift ships.

[73] CRS Report R44403, *Crude Oil Exports and Related Provisions in P.L. 114-113: In Brief*, by Phillip Brown, John Frittelli, and Molly F. Sherlock.

## Seagoing Barges

In response to the high cost of U.S.-built and U.S.-crewed ships, the U.S. market has developed a unique vessel design, a seagoing barge called an articulated tug barge (ATB). MARAD estimates that over 150 ATBs are operating in the Jones Act trades.[74] While ATBs are more capable than flatwater barges in handling sea swells (with a hinge between the tug and barge), they are less capable than ships in handling heavy sea states. They are less reliable and less efficient over longer voyages because they are slower and smaller than tanker ships, and the notch between the barge and tug creates more resistance through the water than a single hull. Since ATBs sail closer to the coasts, they could pose a higher risk of grounding and provide less time to prevent spilled oil from reaching shorelines.[75] ATB crews are not qualified to sail sealift ships. ATBs now carry more cargo tonnage (predominantly oil) on coastal voyages than does the ship fleet (see **Figure 2**).[76]



**Figure 2. Coastwise Cargo Carried by Vessel Type**

**Source:** U.S. Army Corps of Engineers, Waterborne Commerce Statistics, National Summaries, Table 1-12.

## Fleet Age

The oceangoing Jones Act fleet today is relatively young compared to its prior composition because of shipbuilding undertaken after the large increase in shale oil production and before the lifting of the oil export ban. In part, new ships were needed to comply with tighter emissions requirements in the newly created North American emission control area. Today, just over one-third of the Jones Act oceangoing fleet (35 ships) is 21 years old or older, down from two-thirds (64 ships) in 2007.[77]

---

[74] U.S. Maritime Administration, "Fleet Statistics," https://www.marad.dot.gov/resources/data-statistics/.

[75] "Pacific Coast ATBs Moving Ahead Amid Questions, Challenges," *Professional Mariner*, April 26, 2018; http://www.professionalmariner.com/May-2018/Pacific-Coast-ATBs-moving-ahead-amid-questions-challenges/.

[76] CRS Report R44367, *Federal Freight Policy: In Brief*, by John Frittelli.

[77] U.S. Maritime Administration, U.S.-Flag Fleet Statistics.

The Jones Act general cargo ship *El Faro* sank in a hurricane in 2015. Because the ship was built in 1975, it was required to have only open lifeboats rather than the closed lifeboats with auto launchers required on ships built since 1983.[78] After its sinking, the Coast Guard forbade its sister ship of the same age from sailing, and in congressional testimony noted concern about the condition of the rest of the U.S.-flag fleet:[79]

> We looked a little further beyond this particular incident, caused us to look at other vessels in the fleet and did cause us concern about their condition.… And the findings indicate that it is not unique to the *El Faro*. We have other ships out there that are in substandard condition.… You know, some of our fleet—our fleet is almost three times older than the average fleet sailing around the world today. Just like your old car, those are the ones likely to breakdown. Those are the (inaudible) one—the ones that are more difficult to maintain and may not start when I go out, turn the key.

In the Merchant Marine Act of 1936 (P.L. 74-835, Section 101), Congress added having a domestic fleet of the "safest" vessels to the policy goals of Jones Act. The Coast Guard's concern suggests that the law may not be accomplishing this purpose.[80]

## The Great Lakes Fleet

Domestic commerce on the Great Lakes is particularly important to the steel industry in Michigan, Indiana, and Ohio. Jones Act-compliant Great Lakes ships are much narrower for their length compared to the global dry bulk fleet because of the dimensions of the Soo Locks in Michigan. It appears that the cost of shipping of iron ore and other commodities on the Great Lakes is competitive with other modes of transport, in part because some vessels are designed to be "self-unloaders" that do not require landside workers to deliver their cargo. The Jones Act assures that this domestic trade is carried entirely on U.S.-registered ships.

Jones Act-compliant vessels operating in the Great Lakes are considerably older than the oceangoing fleet. The Great Lakes fleet consists of 33 dry bulk ships and several large barges carrying mostly iron ore, limestone, and coal used in steelmaking, and cement. The U.S. fleet of 1,000-foot freighters, the largest ships operating on the Great Lakes, was built between 1972 and 1981. The second-largest class of ships, around 700 feet in length, is older, with some of the vessels having originally been built in the 1940s or 1950s; a number of these were rebuilt in the 1970s. According to the U.S. Lake Carriers Association, ships operating in freshwater, such as the Great Lakes, can have longer lives than oceangoing vessels. Domestic tonnage on the Great Lakes has declined steadily since the 1950s. It is now about half what it was then, due to the increased use of scrap metal as a replacement for iron ore in steel manufacturing and to the development of single-cargo "unit trains" that help railroads compete with vessels in domestic transport of grain and coal.[81]

---

[78] CRS Report R45923, *The Coast Guard's Need for Experienced Marine Safety Personnel*, by John Frittelli.

[79] Testimony of Assistant Commandant Nadeau, Prevention Policy, Coast Guard, House Committee on Transportation and Infrastructure, Subcommittee on Coast Guard and Maritime Transportation, Hearing on the *El Faro* Marine Casualty and Coast Guard's Electronic Health Records, January 30, 2018.

[80] Another recent example of safety issues affecting the oceangoing Jones Act fleet occurred in February 2019, when the crew of the 46-year-old Jones Act container ship *Matsonia* found a crack in the hull when looking for the source of an oil sheen in Oakland harbor. "Containership with Fractured Hull Leaks Fuel in Oakland," *Professional Mariner*, February 27, 2019, http://www.professionalmariner.com.

[81] U.S. Army Corps of Engineers, Waterborne Commerce Statistics Center, "Lakewise" traffic; https://www.iwr.usace.army.mil/About/Technical-Centers/NDC-Navigation-and-Civil-Works-Decision-Support/. CRS CRS Report R44664, *The Great Lakes-St. Lawrence Seaway Navigation System: Options for Growth*, by John Frittelli.

The Canadian Great Lakes fleet illustrates the effect that vessel import policy can have on a domestic fleet. Canada's fleet was of similar age as the Jones Act fleet, with the youngest ship having been built in 1985, before Canada imposed a 25% tariff on newly constructed imported ships. While this import tariff was in effect, no new ships were added to the Canadian fleet. In 2010, Canada repealed the import tariff, and since then over 35 new dry bulk ships have been constructed in other countries specifically for service on the Great Lakes.[82] These vessels cannot carry cargo between U.S. points.

## Inland River Fleet

Thousands of tugs and barges carry mostly dry and liquid bulk commodities on the nation's inland rivers. The fleet includes several thousand Jones Act-compliant tugs or pushboats that push the barge tows, about 20,000 dry cargo barges, and several thousand tank barges that carry liquid bulk cargoes.[83] Tonnage is dominated by the export of corn and soybeans and domestic movement of coal; few cargo containers move domestically by barge. Since 1990, overall tonnage on the system has been flat or declining slightly. One of the two leading manufacturers of river barges ceased operation in April 2018 in response to the fall-off in demand for coal deliveries by barge.[84]

The inland river fleet offers economic benefits by providing competition to trains in the long-distance movement of bulk cargo. However, it does not directly address national security issues considered in the Jones Act, such as the ability of the merchant marine to support military sealift needs. The distinct nature of the inland river fleet highlights the complexities of addressing all types of waterborne transportation within the framework of the Jones Act.

## The Dredging Fleet

The Dredging Act of 1906 (P.L. 59-185, 34 Stat. 204) requires that vessels engaged in dredging in U.S. waters be U.S.-built, -operated, and -crewed. The 1906 act was prompted by dredging work then being carried out in Galveston Bay, TX, after a calamitous 1900 hurricane. It required all dredge vessels henceforth to be U.S.-built. In 1988, Congress amended the Jones Act to define "merchandise" transported domestically by vessel to also include any valueless material (P.L. 100-329). This change effectively required that dredged material be transported in Jones Act-qualified vessels.

According to U.S. Army Corps of Engineers figures, while federal spending on navigation dredging has increased over the last decade, the spending increase has not resulted in a larger volume of material being dredged from U.S. harbors.[85] Multiple factors are believed to have

---

A unit train carries a single commodity in all the railcars from origin to destination without intermediate transfers of railcars to other trains.

[82] "Major Great Lakes Fleet Renewal On The Horizon?" *Canadian Transportation Logistics*, October 2010; "Dawn of 'New Era' for Great Lakes Shipping: Trade As Old As Canada Itself Welcomes $4.1 Billion in Shiny State-Of-The-Art Vessels," *Toronto Star*, October 22, 2015.

[83] U.S. Army Corps of Engineers, Waterborne Transportation Lines of the United States, October 2018; https://publibrary.planusace.us/#/series/Waterborne%20Transportation%20Lines%20of%20the%20US.

[84] Associated Press, "Barge Builder Jeffboat to Shut Down Ohio River Shipyard," March 26, 2018; CRS Report R45211, *Prioritizing Waterway Lock Projects: Barge Traffic Changes*, by John Frittelli.

[85] Sheryl A. Carrubba, U.S. Army Corps of Engineers, presentation to American Association of Port Authorities, Harbors and Navigation Committee Meeting, April 9, 2019, see slide 8; http://aapa.files.cms-plus.com/PDFs/4_DredgeSheryl.pdf. See also, CRS Insight IN11133, *Harbor Dredging: Issues and Historical Funding*, by John Frittelli.

contributed to the increased cost per cubic yard: changes in dredged material disposal, mobilization costs, cost inflation of inputs (fuel and steel), environmental factors, and relatively little competition for dredging contracts.[86] The relative significance of each is unclear.

According to the U.S. Army Corps of Engineers, hopper dredges are generally the most efficient vessels for dredging coastal harbors.[87] The availability of hopper dredges in the U.S. fleet is limited. The private hopper dredge fleet is relatively old, with 11 of the 15 vessels reportedly in service for more than 20 years.[88] When the Corps of Engineers bids harbor work requiring a hopper dredge, Corps data indicate that one of four U.S. firms is the sole bidder over a third of the time.[89]

When the Corps schedules dredging projects for an upcoming year, it has periods when an insufficient number of dredges can perform the work.[90] In addition to the dredge vessel, dredging projects involve a number of support vessels. One study found that mobilization and demobilization of the equipment in the U.S. market can amount to more than one-third of total project costs.[91] Foreign firms use semi-submersible heavy-lift vessels to transport their dredge fleets between projects. As indicated earlier, no such vessels are available in the Jones Act fleet.

## Offshore Supply Vessels

In 2017, the offshore supply vessel fleet consisted of about 1,800 vessels, working mainly in the Gulf of Mexico. Over the last decade, annual construction averaged 32 vessels, but ranged between 4 and 53 vessels.[92] The Jones Act-compliant fleet transports crews and supplies to offshore rigs. Vessels engaged in construction of offshore rigs need not be Jones Act-compliant. Foreign-built vessels are relied upon for construction of rigs in deeper waters. These vessels need dynamic positioning propulsion systems to keep the vessel in place while performing the construction work, as the waters are too deep for anchoring. As mentioned above, similar vessels are lacking in the Jones Act fleet for installing wind towers in deeper waters.

# The Jones Act and Sealift Capability

As indicated above, one purpose of the Jones Act is to provide a trained maritime workforce that can be called upon to crew sealift vessels in a military emergency. As with the commercial aspirations stated in the maritime policy of the Jones Act, there are also perceived shortcomings with respect to the domestic fleet's ability to serve as a naval auxiliary in times of war or national emergency (as per 46 U.S.C. §50101(a)(2)). Since 1920, Congress has enacted programs that

---

[86] U.S. Government Accountability Office, *Army Corps of Engineers: Action Needed to Ensure the Quality of Maintenance Dredging Contract Cost Data*, GAO-15-810, September 2015, pp. 14-15.

[87] U.S. Army Corps of Engineers, *Dredging and Dredged Material Management*, EM 1110-2-5025, July 31, 2015.

[88] Vessel fleet obtained from, U.S. Army Corps of Engineers, "Corps/Industry Dredge Fleet Status," as of October 11, 2019; https://publibrary.planusace.us/#/series/Dredging%20Information. The build year for each vessel obtained from https://www.dredgepoint.org/dredging-database/.

[89] Based on 104 contracts let from 2014 to 2018; U.S. Army Corps of Engineers, Dredging Statistics, https://publibrary.planusace.us/#/series/Dredging%20Information.

[90] Sheryl A. Carrubba, U.S. Army Corps of Engineers, presentation to American Association of Port Authorities, Harbors and Navigation Committee Meeting, April 9, 2019, see slide 15; http://aapa.files.cms-plus.com/PDFs/4_DredgeSheryl.pdf.

[91] Aaron Barkley, "Cost and Efficiency in Dynamic Government Outsourcing: Evidence from the Dredging Industry," Ph.D. Dissertation, Carnegie Mellon University School of Business, 2017, p. 11.

[92] U.S. Army Corps of Engineers, Waterborne Transportation Lines of the United States, October 2018; https://publibrary.planusace.us/#/series/Waterborne%20Transportation%20Lines%20of%20the%20US.

designate other fleets for sealift support, but the merchant mariners crewing Jones Act ships are still identified as contributing to the pool of mariners available to crew the sealift fleet. The shrinking size of the U.S. mariner pool puts in doubt its ability to sufficiently crew a reserve sealift fleet, as discussed further below. In 2014 (P.L. 113-76), Congress directed the Department of Transportation and the Department of Defense to develop a national sealift strategy. This has yet to be issued.

## Sealift Crews

The crews of Jones Act oceangoing ships are arguably the most salient and immediate element that could be called upon to support military sealift. Jones Act mariners typically have six months of shore leave per year, and those mariners on shore leave would be expected to be available to crew a reserve fleet of government-owned cargo ships kept on standby for military sealift purposes (the Ready Reserve Force, or RRF). About 3,380 merchant mariners serve aboard Jones Act-qualified oceangoing ships, which is about 29% of the total pool of 11,678 mariners that MARAD estimates would be required to crew the government-owned reserve fleet while concurrently being able to operate the commercial fleet.[93] The remaining requirement for mariners would be met from (1) the U.S.-flag privately owned international fleet enrolled in the Maritime Security Program (MSP), consisting of 60 ships and 2,386 commercial mariners, and (2) the Military Sealift Command (MSC) fleet of government-owned ships consisting of about 120 ships and 5,576 mariners.[94]

According to 2019 testimony by the Commander of the U.S. Transportation Command before the House Committee on Armed Services, Subcommittees on Seapower and Projection Forces and Readiness,

> Commercial industry plays a critical role for DOD sealift by augmenting capacity, providing access to global trade networks, and generating a supply of qualified private sector Merchant Mariners essential to crew every surge sealift ship. Although the U.S. Merchant Mariner pool is currently sufficient to crew the surge sealift fleet, long-term, sustained conflicts could overstress the commercial industry's supply of contract mariners needed for sustainment operations.[95]

MARAD estimates that there is a sufficient commercial mariner pool to crew the reserve sealift fleet during a surge lasting up to 180 days. A more prolonged sealift effort would start to entail crew rotations, and MARAD estimates a shortfall of about 1,800 mariners in that scenario.[96] That the mariner pool could sustain an immediate surge but is insufficient for a longer sealift effort has been a consistent finding of sealift officials for decades, even in previous periods when the mariner pool was much larger than it is today. For instance, this was the same finding by the Department of Defense Transportation Command (TRANSCOM) in 2004, when the RRF

---

[93] U.S. Maritime Administration, "Maritime Workforce Working Group Report," September 29, 2017. MARAD considers only seafarers with the necessary credentials to work aboard oceangoing ships when counting the mariner pool (e.g., see page 9). Industry has suggested that other mariners could be considered. Reserve ships are expected to be ready to sail within five days, leaving little time for crew training.

[94] U.S. Maritime Administration also estimates that about 500 mariners working in the offshore oil and gas industry could have the qualifications necessary to crew oceangoing ships.

[95] Testimony of General Steve Lyons, U.S. Transportation Command, before the House Committee on Armed Services, Subcommittees on Seapower and Projection Forces and Readiness, "U.S. Transportation Command and Maritime Administration: State of the Mobility Enterprise," March 7, 2019.

[96] Testimony of Mark Buzby, Maritime Administrator, House Committee on Armed Services, Subcommittee on Seapower and Projection Forces, "Mobility and Transportation Command Posture," March 8, 2018.

consisted of 59 ships and the mariner pool was 16,900.[97] And in 1991, when the RRF consisted of 96 ships and the mariner pool was 25,000 (more than twice the size that it is today), the then MARAD Administrator testified that the mariner pool was barely sufficient to crew the reserve sealift fleet.[98]

## Sealift Ships

While the Jones Act's statement of maritime policy indicated a desire for a commercial fleet that also could provide sealift in times of war, since then three other fleets of ships have been established for purposes of military sealift: the RRF, MSC, and MSP. These ships are predominantly foreign-built. The RRF, a concept that originates in a 1954 act of Congress (P.L. 83-608),[99] today consists of 46 ships that can sail upon either 5 or 10 days' notice and are on standby with a skeleton crew of about 600 commercial mariners (13 per ship), but would require an additional 1,200 mariners to sustain its operation once activated.[100] The MSC fleet is controlled by TRANSCOM and has a subset of about 50 ships that carry military cargoes in port-to-port voyages similar to those undertaken by commercial ships. MSC ships are mostly crewed by civilian mariners who are federal employees. The MSP ships, a fleet established by Congress in 1996 (P.L. 104-239), receive an operating subsidy of about $5 million per vessel per year to cover the additional cost of American crews and rely heavily on government cargoes (military and food aid) that pursuant to "cargo preference" law are reserved for them.[101] As per long-standing agreements between MARAD, acting as advocate for the U.S. maritime industry, and the Department of Defense, the military is to utilize MSP ships and exhaust that capacity before it utilizes MSC ship capacity.[102]

While Jones Act operators are required to purchase more costly U.S.-built ships, the military sealift fleet is largely composed of more economical foreign-built ships. Jones Act operators are competing in the commercial marketplace while the sealift fleet is not. Instead of relying on the Jones Act commercial fleet to provide oceangoing shipbuilding capability, the sealift fleet could be required to be built domestically. The higher cost of the domestically built sealift fleet would be shared nationally, as is the case with other defense assets. Lower-cost coastwise ships would be more price-competitive with railroads, pipelines, and ATBs, thereby enlarging the mariner pool available for sealift support and increasing repair and maintenance work for U.S. shipyards. The sealift ships could also be designed to military specifications rather than be in conflict with commercial needs (see below).[103]

---

[97] Testimony of General John Handy, U.S. Transportation Command, Senate Committee on Armed Services, Subcommittee on Seapower, "Defense Seapower Programs," S. Hrg. 108-440, Part 2, March 10, 2004; MARAD, "Merchant Mariner Training to Meet Sealift Requirements," August 2004; https://www.marad.dot.gov/wp-content/uploads/pdf/MRR_Rpt_to_Congress_8-2004-T_Jones.pdf.

[98] Testimony of Warren Leback, Maritime Administrator, House Committee on Merchant Marine and Fisheries, Subcommittee on Merchant Marine, "Operation Desert Shield/Desert Storm Sealift Performance and Future Sealift Requirements," April 23, 1991.

[99] In this act, Congress appropriated funds to repair a subset of ships in the National Defense Reserve Fleet so that the ships would be ready for sailing on short notice.

[100] Oral testimony of MARAD Administrator Paul N. Jaenichen, House Committee on Armed Services, Subcommittee on Seapower and Projection Forces, "Sealift Force Requirements," July 30, 2014.

[101] CRS Report R44254, *Cargo Preferences for U.S.-Flag Shipping*, by John Frittelli.

[102] The agreement originates in the 1950s but was reaffirmed in 1989. For further details, CRS Report R44254, *Cargo Preferences for U.S.-Flag Shipping*, by John Frittelli, pp. 3-6.

[103] They also could be designed with features specific for military use, such as at-sea refueling capability.

### Divergence in Design of Commercial and Sealift Ships

The military seeks cargo ships with flexible capabilities: ships not so large that they could face draft restrictions in some overseas harbors, ships with ramps or onboard cranes so that they can still unload cargo at underdeveloped or damaged ports, and ships that can carry a wide variety of cargo types and sizes. The majority of the military sealift fleet consists of product tankers for carrying fuel and roll-on/roll-off (Ro/Ro) ships that have ramps for moving tanks, trucks, and helicopters. It also consists of container ships used for moving ammunition and other supplies.

The military's preference for versatility is in conflict with the commercial fleet's trend toward more specialized and larger ships, a trend driven by the need for ships with the lowest operating cost. General cargo and break-bulk ships capable of carrying a wide variety of cargo types and sizes and that were typically equipped with their own onboard cranes have been largely replaced by container ships without onboard cranes. If Congress wishes to have self-unloading general-purpose cargo ships available for military sealift purposes, it may need to subsidize their construction and operation directly, as there seems likely to be only limited future demand for such vessels for domestic commercial use.

The largest container ships require 45 to 50 feet of water below the waterline, far more depth than many ports can provide. Ro/Ro ships have been replaced by "pure car carriers" that maximize the number of passenger cars they can carry, but may be less useful for military purposes. Cost pressures have induced commercial carriers to install engines that minimize fuel costs by operating at lower speeds and cannot achieve the higher speeds generally desired for military sealift ships. In addition, more stringent sulfur emission regulations recently enacted have prompted ship operators to convert to LNG-fueled engines, a fuel not globally available, or to install scrubbers, equipment that takes up cargo space and has no military utility. Licensing of engine crews is specific to engine type. Thus, a growing disparity exists between the military's ideal vessel designs and those of commercial carriers.

## Shipbuilding and Repair Industrial Base

Besides the deep-sea ship crews, another desired Jones Act contribution to military sealift is preservation of a shipyard industrial base with the knowledge and skills to build and repair ships. As mentioned above, the Merchant Marine Act of 1970 (P.L. 91-469) added as an additional objective of U.S. maritime policy to have a merchant marine "supplemented by efficient facilities for building and repairing vessels." U.S. shipyards typically build only two or three oceangoing ships per year, and none for export, so they do not achieve economies of scale. There may be gaps of several years in between orders for container ships. In recent years, the demand has been sufficient to sustain one shipyard that builds only commercial ships. As of October 2019, this yard had no vessels under construction or on order but was repairing two sealift ships belonging to the military.[104] The other shipyard that builds commercial ships also relies heavily on Navy orders.

A larger number of shipyards build smaller vessels such as tour boats, ferries, tugs, barges, and offshore supply vessels. U.S. shipyards appear to be relatively efficient in building barges, in part because they enjoy economies of scale: around 1,000 barges are built in a typical year. These vessels fall under the Jones Act domestic build requirement.

---

[104] Philly Shipyard ASA, "Q3 2019 Results," October 29, 2019, http://www.phillyshipyard.com/s.cfm/3-17/Reporting.

However, the shipyards building smaller vessels lack dry docks of sufficient size to repair large ships. The government-owned sealift fleet is 44 years old on average, and many of the vessels are in need of repair. According to the Maritime Administrator, there is an insufficient number of large dry docks to service the sealift fleet, delaying their readiness to sail.[105] Some of the reserve fleet has failed Coast Guard safety inspection; statistics on the reasons for failure are not available. Some ships have too much steel rusted from their hulls to be seaworthy. For example, while sailing to a readiness exercise, one of the ships was found to have a hole in its hull.[106]

According to TRANSCOM, the Navy's plan to recapitalize the reserve fleet includes building new vessels in domestic shipyards, repairing ships in the current fleet to extend their service life out to 60 years, and purchasing used, foreign-built ships. The Navy has found that repairing the vessels has thus far been three times more expensive and has taken twice as long as originally projected, although it has not released detailed data. The Navy is contemplating accelerating the purchase of used foreign-built ships because building new ships in U.S. yards is estimated to be 26 times more expensive than purchase of a foreign-built used ship.[107]

In addition to the Jones Act, the Tariff Act of 1930[108] is intended to support U.S. shipyards by assessing a 50% duty on the price of any nonemergency repairs on U.S. flag ships done in foreign shipyards. A 2011 MARAD study[109] found that many U.S.-flag international trading ships have repairs performed in foreign yards because, even with the 50% duty, the total cost is less than if the repairs were performed in a domestic shipyard. A U.S.-flag operator confirms that this was still the case in 2018.[110]

---

[105] Statement of Mark Buzby, Maritime Administrator, House Committee on Armed Services, Subcommittees on Seapower and Projection Forces and Readiness, "U.S. Transportation Command and Maritime Administration: State of the Mobility Enterprise," March 7, 2019. A shortfall in dry-dock capacity is also an issue for the Navy's combatant ships; DOD, *Assessing and Strengthening the Manufacturing and Defense Industrial Base and Supply Chain Resiliency of the United States*, September 2018, pp. 78-80.

[106] DOD Inspector General, *Military Sealift Command's Maintenance of Prepositioning Ships*, Report No. DODIG-2018-151, September 24, 2018; https://media.defense.gov/2018/Sep/27/2002045333/-1/-1/1/DODIG-2018-151%20-%20REDACTED%20(003).PDF.

[107] Testimony of General Steve Lyons, U.S. Transportation Command, before the House Committee on Armed Services, Subcommittees on Seapower and Projection Forces and Readiness, "U.S. Transportation Command and Maritime Administration: State of the Mobility Enterprise," March 7, 2019.

[108] 19 U.S.C. §1466.

[109] U.S. Maritime Administration, *Comparison of U.S. and Foreign-Flag Operating Costs*, September 2011.

[110] Comments of A.P. Moller-Maersk Group (USA), Submitted to Office of Information and Regulatory Affairs, Office of Management and Budget, Request for Information on Maritime Regulatory Reform, July 11, 2018.

# Appendix. Exemptions and Waivers

### Table A-1. Congressionally Enacted Jones Act Exemptions

| Year | Public Law # | Purpose of Exemption |
|------|--------------|----------------------|
| 1938 | Pub. Res. No. 89 | Allowed Canadian vessels to transport passengers between two New York State ports on Lake Ontario until such time as a U.S. operator stepped forward to offer the service. |
| 1941 | P.L. 77-90 | Canadian vessels allowed to transport iron ore between U.S. ports on the Great Lakes this shipping season (subsequent amendments allowed same through 1952). |
| 1941 | P.L. 77-134 | Canadian vessels allowed to transport members of American Legion between Cleveland and Milwaukee for their annual convention. |
| 1947-1959 | P.L. 80-277, P.L. 81-258, P.L. 81-584, et al. | Allowed passengers and certain commodities to be transported either on foreign or Canadian vessels between certain Alaska ports and other U.S. ports, if no Jones Act-qualified operator offering such service. |
| 1951 | P.L. 82-162 | Allowed Canadian vessels to transport grain between U.S. ports on the Great Lakes during that year's harvest season. |
| 1962 | P.L. 87-877 | Allowed temporary exemption to ship lumber from the U.S. Pacific Northwest to Puerto Rico in order to compete with Canadian sourced lumber. |
| 1965 | P.L. 89-194 | Allows foreign-flagged container carriers to reposition their empty containers along U.S. coastlines. |
| 1971 | P.L. 92-163 | Exempted Lighter Aboard Ship (LASH) barges, which are loaded barges carried aboard ships on international voyages, on their domestic leg between ship and river ports. LASH barges are no longer in use. |
| 1984 | P.L. 98-563 | Exempts passenger travel between Puerto Rico and any other U.S. port as long as no Jones Act qualified operator is able to provide comparable service. |
| 1988 | P.L. 100-329 | Exempts certain kinds of vessels used in the construction of offshore oil rigs. |
| 1996 | P.L. 104-324 | Exempts vessels participating in oil spill clean-up operations. |
| 1996 | P.L. 104-324 | Allowed certain foreign-flagged or foreign-built tankers, believed to number 37 in total, to transport LNG to Puerto Rico from any U.S. port. (These ships have not done so.) |
| 1998 | P.L. 105-383 | Authorizes the Maritime Administration to grant waivers to small passenger vessels carrying no more than 12 passengers if it finds no adverse effect on U.S. vessel builders or operators. (MARAD has granted an average of 100 waivers per year.) |
| 2002 | P.L. 107-295 | Allowed use of foreign-flag tanker in Jones Act trade if construction of a Jones Act-compliant tanker was delayed by unusual circumstances. |
| 2010 | P.L. 111-281 | Exempts vessels used in the anchoring of oil rigs off the coast of Alaska. |
| 2011 | P.L. 112-61 | Allowed three U.S.-built LNG tankers to reenter the Jones Act trade after they had become ineligible for sailing under a foreign flag. (None of the ships reentered, and all are now 40 years old.) Exempted support vessels in America's Cup sailing race in San Francisco Bay. |

**Source:** CRS.

## Table A-2. National Defense Waivers of the Jones Act

Partial List

| Period | Purpose of Waiver(s) |
|--------|----------------------|
| 1951 | For vessels requisitioned by the government for any emergency evacuation. |
| Mid-1950s | Numerous waivers for Canadian vessels (tows, dredges, other workboats) involved in construction of the St. Lawrence Seaway. |
| 1960s to 1970s | Several waivers granted to vessels transporting seabed cabling equipment. |
| 1963 | For carrying molten sulfur, up to nine months and up to 100,000 tons. |
| 1965 to 1974 | Several vessels transporting cargo or passengers from Florida to Puerto Rico. |
| 1977 | Various waivers for specifically named LNG and liquefied petroleum gas (LPG) tankers for shipments from Alaska or the Gulf Coast to the East Coast or Puerto Rico. |
| 1989 | Various specifically named vessels assisting in the *Exxon Valdez* oil spill cleanup. |
| 1989 | For one ship voyage carrying propane from Houston to Pennsylvania and to New Hampshire. |
| 1990 | For shipment of propane from Houston to Virginia. |
| 1991 | For drawdown of the Strategic Petroleum Reserve (SPR) due to the Persian Gulf War; duration of several months. |
| 2005 | To allow a foreign-flag heavy-lift vessel to transport a radar system from Texas to Hawaii. |
| 2005 | In response to Hurricane Katrina, to move Strategic Petroleum Reserve oil because pipelines were without power; duration about 18 days. |
| 2005 | In response to Hurricane Rita, to move oil from Gulf Coast; duration about one month. |
| 2006 | To allow an oil company to use a foreign-flag heavy-lift vessel to transport an oil rig from the Gulf Coast to Alaska. |
| 2010 | For oil spill cleanup from *Deepwater Horizon*, waiver was not actually effectuated, as spilled oil stayed beyond 3 miles from coast. |
| 2011 | To transport Navy high-speed vessel from Mobile, AL, to launch site. |
| 2011 | For drawdown of SPR due to conflict in Libya; duration almost two months. |
| 2011 | For an emergency fuel delivery to Nome, AK, by a Russian ice-class tanker. |
| 2012 | In response to Hurricane Sandy and fuel delivery to the Northeast. |
| 2017 | In response to Hurricanes Harvey, Irma, and Maria, for moving oil and for any product in the case of Puerto Rico. |

**Source:** U.S. Customs Service communication to CRS, October 1998; CBP communication to CRS, November 2018.

## Author Information

John Frittelli
Specialist in Transportation Policy

---

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

# Exhibit C




# AMERICA IS MORE SECURE

## BECAUSE OF ITS STRONG DOMESTIC MARITIME INDUSTRY

AMERICAN MARITIME PARTNERSHIP

> Under U.S. domestic maritime laws, commonly known as **THE JONES ACT**, cargo shipped between two U.S. ports must move on American vessels. These laws are critical for American economic, national, and homeland security and have had the support of the U.S. Navy, Members of Congress of both parties, and every President in modern history.

## THE DOMESTIC MARITIME INDUSTRY IS KEY TO AMERICA'S ECONOMIC STRENGTH AND SECURITY.

From the earliest days of our nation, shipping has been the grease for America's economic engine. Today, the maritime industry is by far the most economical form of domestic transportation, moving nearly 1 billion tons of cargo annually at a fraction of the cost of other modes. Fundamental U.S. industries depend on the efficiencies and economies of domestic maritime transportation to move raw materials and other critical commodities.

America's domestic shipping industry is responsible for nearly 650,000 jobs and more than $154 billion in annual economic output. Labor compensation associated with the domestic fleet exceeds $41 billion annually with those wages spent in virtually every corner of the United States. The American domestic fleet, with more than 40,000 vessels, is the envy of the world. Every job in a domestic shipyard results in four additional jobs elsewhere in the U.S. economy.

"[W]e believe that the ability of the nation to build and maintain a U.S. flagged fleet is in the national interest, [and] we also believe it is in the interest of the DoD for U.S. shipbuilders to maintain a construction capability for commercial vessels."

- U.S. Department of Defense

### THE DOMESTIC MARITIME INDUSTRY

- Over **$154** billion in total economic output

- Over **$16** billion in taxes

- **$41** billion in labor income

- Adds **$72** billion to the value of U.S. economic output

- Creates nearly **650,000** jobs

- Approximately **40,000** vessels in the American domestic fleet

- **1 shipyard job creates 4 jobs** elsewhere in the economy



A small number of individuals and organizations support repeal of the Jones Act, which would allow foreign-built, foreign-operated, foreign-manned, and foreign-owned vessels to operate on American waters. The result would be to take a core American industry like shipbuilding and transfer it overseas to nations like China and South Korea, which heavily subsidize their shipyards and play by their own set of rules. Additional losses would occur from the outsourcing of American shipping jobs to foreign nations.

## THE U.S. NAVY SAYS THE JONES ACT IS CRITICAL TO NATIONAL SECURITY.

The U.S. Navy's position is clear – repeal of the Jones Act would "hamper [America's] ability to meet strategic sealift requirements and Navy shipbuilding." Over the past several decades the Navy has consistently opposed efforts to repeal or modify key U.S. maritime laws.

America's domestic fleet is an important part of the national maritime infrastructure that helps ensure there will be ample U.S. sealift capacity to defend our nation. American ships, crews to man them, ship construction and repair yards, intermodal equipment, terminals, cargo tracking systems, and other infrastructure can be made available to the U.S. military at a moment's notice in times of war, national emergency, or even in peacetime. In addition, during a major mobilization, American domestic vessels move defense cargoes to coastal ports for overseas shipments.

During Operations Enduring Freedom and Iraqi Freedom (2002 – 2010), U.S.-flag commercial vessels, including ships drawn from the domestic trades, transported 57% of all military cargoes moved to Afghanistan and Iraq.

As important, the American domestic fleet also provided fully half of the mariners used to crew U.S. government-owned sealift vessels activated from reserve status, which carried an additional 40% of the total cargoes delivered.

The Department of Defense ("DOD") has consistently emphasized the military importance of maintaining a strong domestic shipbuilding industry, stating "[W]e believe that the ability of the nation to build and maintain a U.S. flagged fleet is in the national interest, [and] we also believe it is in the interest of the DoD for U.S. shipbuilders to maintain a construction capability for commercial vessels." A study by the U.S. Department of Commerce, Bureau of Export Administration, reached a similar conclusion:

"The U.S. shipbuilding and repair industry is a strategic asset analogous to the aerospace, computer, and electronic industries. Frontline warships and support vessels are vital for maintaining America's national security and for protecting interests abroad. In emergency situations, America's cargo carrying capacity is indispensable for moving troops and supplies to areas of conflict overseas. A domestic capability to produce and repair warships, support vessels, and commercial vessels is not only a strategic asset but also fundamental to national security."

## AMERICA'S DOMESTIC MARITIME INDUSTRY MAKES OUR HOMELAND MORE SECURE.

As America works to secure its borders, it must also secure its waterways. Homeland security is enhanced by the requirement for American vessels that operate in full accordance with U.S. laws and with the consistent

oversight of the U.S. government. In that respect, the Jones Act is as effective a homeland security measure as any federal agency could ever write and enforce.

Today, it takes a small army of Customs agents, Immigration Services officials, Homeland Security staff, and others to regulate foreign ships that enter and exit the United States in international trade, even within the carefully controlled structure of U.S. ports. However, there is no precedent for allowing foreign-controlled ships operated by foreign crews to move freely throughout the 12,000 miles of America's navigational bloodstream. Inland lakes, rivers, and waterways go to virtually every corner of the nation.

There is considerable uncertainty about which laws would apply to a foreign shipping company operating in U.S. domestic commerce if the Jones Act were repealed. However, it is certain that the task of monitoring, regulating, and overseeing potentially tens of thousands of foreign-controlled, foreign-crewed vessels in internal U.S. commerce would be difficult at best and fruitless at worst. Repeal or modification of the key domestic maritime laws would make America more vulnerable and less secure.

## U.S. MARITIME LAWS ENSURE A LEVEL PLAYING FIELD FOR AMERICAN BUSINESSES.

American domestic maritime laws ensure a level playing field by requiring that all shipping and shipbuilding companies that operate in U.S. domestic commerce play by the same set of rules. Allowing foreign companies to operate in the U.S. outside of our immigration, employment, safety, environmental, tax, labor, and other laws would be unfair. American laws are often stricter than the laws that govern shipping and shipbuilding in international trades. No other industry operates exclusively in American domestic commerce yet outside of our laws (e.g., paying third world wages to its employees). No country in the world would – or does – permit businesses to operate domestically without complying with its national and local laws. Companies that do business here must fully obey American laws, regulations, and other rules.

"Without the Jones Act, vessels and crews from foreign nations could move freely on U.S. waters, creating a more porous border, increasing possible security threats, and introducing vessels and mariners who do not adhere to U.S. standards into the bloodstream of our nation."[1]



**12,000 miles** of inland waterways

## CURRENT JONES ACT SECURITY MEASURES

- American-built vessels
- American-crewed vessels
- American-owned vessels

## POTENTIAL RISKS OF REPEAL

- Insufficient supply of militarily-crucial civilian mariners
- Reduction of militarily-vital shipbuilding capacity
- Reduced military sealift capacity
- Decreased homeland security
- Loss of economically vital American industry, including reduced transportation capacity, outsourced jobs, and lesser economic impact



## ABOUT AMERICAN MARITIME PARTNERSHIP

American Maritime Partnership (AMP) is the voice of the U.S. domestic maritime industry, a pillar of our nation's economic, national, and homeland security. More than 40,000 American vessels built in American shipyards, crewed by American mariners, and owned by American companies, operate in our waters 24/7, and this commerce sustains nearly 650,000 American jobs, $41 billion in labor compensation, and more than $150 billion in annual economic output.

## REFERENCES

1. Reps. Duncan Hunter & Steve Scalise, *Making Headway with America's Maritime Industry*, Wash. Times (Mar. 25, 2014), available at http://www.washingtontimes.com/news/2014/mar/25/hunter-and-scalise-americasmaritime-industry-lead/.



1601 K Street NW
Washington, DC 20006-1600
Phone: 202-661-3740

Email: info@americanmaritimepartnership.com
**www.americanmaritimepartnership.com**

# Exhibit D

Stenographic Transcript
Before the


Subcommittee on
Readiness and Management Support

COMMITTEE ON
ARMED SERVICES

# UNITED STATES SENATE


TO RECEIVE TESTIMONY ON THE POSTURE OF THE UNITED
STATES TRANSPORTATION COMMAND IN REVIEW OF THE
DEFENSE AUTHORIZATION REQUEST FOR FISCAL YEAR 2026
AND THE FUTURE YEARS DEFENSE PROGRAM

Wednesday, March 5, 2025


Washington, D.C.



ALDERSON COURT REPORTING
1029 VERMONT AVE, NW
10TH FLOOR
WASHINGTON, DC 20005
(202) 289-2260
www.aldersonreporting.com

1

1    TO RECEIVE TESTIMONY ON THE POSTURE OF THE UNITED STATES

2        TRANSPORTATION COMMAND IN REVIEW OF THE DEFENSE

3          AUTHORIZATION REQUEST FOR FISCAL YEAR 2026

4              AND THE FUTURE YEARS DEFENSE PROGRAM

5

6                    Wednesday, March 5, 2025

7

8                              U.S. Senate

9                              Subcommittee on Readiness and

10                             Management Support

11                             Committee on Armed Services

12                             Washington, D.C.

13

14       The committee met, pursuant to notice, at 2:31 p.m. in

15   Room SD-106, Dirksen Senate Office Building, Hon. Roger

16   Wicker, chairman of the committee, presiding.

17       Committee Members Present:  Senators Sullivan

18   [presiding], Wicker, Fischer, Scott, Hirono, Reed, Shaheen,

19   Kaine, and Warren.

20

21

22

23

24

25



1  to pursue.

2       Senator Hirono:  Are you asking for authorization to

3  buy 10 more?

4       General Reed:  I'm asking authorization to buy 10

5  more.

6       Senator Hirono:  Well, good luck with that.  No, that

7  was -- forget I said that.  I mean, we want you to be able

8  to do your job.  Just one more thing.  You mentioned the

9  Jones Act.  Are people who, sometimes, do not understand

10  the importance of the Jones Act.  Can you very briefly tell

11  us why the Jones Act is important to TRANSCOM and to

12  national security?

13       General Reed:  The Jones Act allows us to actually

14  have shipping resources here and a fleet.  And so, because

15  of that Act, we actually have a way to make sure that we

16  can build ships here in the United States, that we can sail

17  those ships to maintain commerce, that we can actually

18  produce the crews that actually sail those ships so that we

19  have a core of folks that can actually operate at the same

20  time.  If the nation needs folks to go to sea, we can call

21  on that force to actually sail, and there are citizens, and

22  then we will be more secure in that way.

23       Senator Hirono:  Yeah.  One aspect of the Jones Act

24  that's very important is that you can work with the

25  commercial shippers, private sector ships.  Isn't that

