## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KOLOA RUM COMPANY,

        Plaintiff,

    v.

KRISTI NOEM, in her official capacity
as Secretary of Homeland Security; and
RODNEY S. SCOTT, in his official
capacity as Commissioner of
U.S. Customs and Border Protection,

        Defendants,

    and

MATSON NAVIGATION COMPANY, INC.;
AMERICAN MARITIME PARTNERSHIP;
and MARITIME TRADES DEPARTMENT
OF THE AFL-CIO,

        Intervenor-Defendants.

Case No. 1:25-cv-00554-JEB

**Oral Argument Requested**

## MEMORANDUM IN SUPPORT OF INTERVENOR-DEFENDANT
## MATSON NAVIGATION COMPANY, INC.'S MOTION TO DISMISS

## TABLE OF CONTENTS

**Page**

BACKGROUND ................................................................................................ 3

    I.      The Jones Act ................................................................................. 3

    II.     Koloa Rum's Constitutional Challenges ......................................... 7

LEGAL STANDARD ....................................................................................... 8

ARGUMENT ..................................................................................................... 9

    I.      Koloa Rum Fails To Plausibly Allege Facts Establishing Article III Standing ................................................................................... 9

          A.     Koloa Rum Does Not Plausibly Allege Injury Caused By The Jones Act ......................................................................... 10

          B.     Koloa Rum Does Not Plausibly Allege Injuries Redressable By A Favorable Decision ................................................... 14

          C.     Koloa Rum's Failure To Plead Causation Also Defeats An Element Of Its Claims ................................................... 16

    II.     Koloa Rum's Claims Are Time-Barred Under 28 U.S.C. § 2401(a) ................... 17

    III.    Koloa Rum Fails To State A Claim That The Jones Act Violates The Port Preference Clause ............................................................. 17

          A.     Koloa Rum's Discriminatory Effects Theory Is Not Cognizable ............ 17

          B.     Koloa Rum Does Not Plausibly Allege That The Jones Act Has A Discriminatory Purpose ......................................... 24

    IV.    Koloa Rum Does Not Plausibly Allege That The Jones Act Violates The Due Process Clause ....................................................... 35

CONCLUSION ............................................................................................... 39

i

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*,
495 F.3d 695 (D.C. Cir. 2007) ........................................................................38

*Ala. Great S. R.R. Co. v. United States*,
340 U.S. 216 (1951)..........................................................................................19

*Alaska v. Brown*,
850 F. Supp. 821 (D. Alaska 1994) ..................................................................33

*Alexis v. District of Columbia*,
44 F. Supp. 2d 331 (D.D.C. 1999)....................................................................38

*Amoco Oil Co. v. United States*,
63 F. Supp. 2d 1332 (Ct. Int'l Trade 1999) .................................................24, 25

*Armour Packing Co. v. United States*,
209 U.S. 56 (1908)......................................................................................18, 19

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015) ...........................................................................11

*\* Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...............................................8, 11, 12, 14, 16, 34, 35

*Augusta Towing Co. v. United States*,
5 Cl. Ct. 160 (Ct. Cl. 1984)..............................................................................19

*Autolog Corp. v. Regan*,
731 F.2d 25 (D.C. Cir. 1984) ...........................................................................27

*Azam v. D.C. Taxicab Comm'n*,
46 F. Supp. 3d 38 (D.D.C. 2014) .....................................................................26

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).......................................................................8, 11, 14

*\* Cent. Vt. Transp. Co. v. Durning*,
294 U.S. 33 (1935)...............................................................4, 5, 9, 35

*Cir. City Stores, Inc. v. Adams*,
532 U.S. 105 (2001)..........................................................................................32

*Citizens for Const. Integrity v. United States*,
57 F.4th 750 (10th Cir. 2023) ...........................................................................29

*City of Houston v. FAA*,
679 F.2d 1184 (5th Cir. 1982) ..........................................................18, 19, 20, 21

# TABLE OF AUTHORITIES
(continued)

<u>Page(s)</u>

\* *City of Milwaukee v. Yeutter*,
  877 F.2d 540 (7th Cir. 1989) ..............................................................................18, 20, 21, 22

*Colon Health Ctrs. of Am., LLC v. Hazel*,
  733 F.3d 535 (4th Cir. 2013) ...............................................................................................37

*Conoco, Inc. v. Skinner*,
  970 F.2d 1206 (3d Cir. 1992)...............................................................................................26

*Consumers Power Co. v. Fed. Energy Admin.*,
  1977 WL 793 (D.D.C. July 8, 1977).................................................................................24, 25

*Cramer v. Skinner*,
  931 F.2d 1020 (5th Cir. 1991) ..............................................................................................18

*Ctr. for Biological Diversity v. EPA*,
  106 F. Supp. 3d 95 (D.D.C. 2015).........................................................................................8

*Defeo v. IonQ, Inc.*,
  134 F.4th 153 (4th Cir. 2025) ...............................................................................................16

*Des Moines Midwife Collective v. Iowa Health Facilities Council*,
  23-cv-67 (S.D. Iowa) ...........................................................................................................36

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)...............................................................................................................16

*Fam. Div. Trial Laws. of Superior Ct.-D.C., Inc. v. Moultrie*,
  725 F.2d 695 (D.C. Cir. 1984)...............................................................................................36

*FCC v. Beach Commc'ns, Inc.*,
  508 U.S. 307 (1993)..........................................................................................................37, 38

*FERC v. Mississippi*,
  456 U.S. 742 (1982)...............................................................................................................35

*Matter of Gabriel Inv. Grp., Inc.*,
  24 F.4th 503 (5th Cir. 2022) .................................................................................................12

*Grand Lodge of Fraternal Ord. of Police v. Ashcroft*,
  185 F. Supp. 2d 9 (D.D.C. 2001)............................................................................................8

*Guerrero-Lasprilla v. Barr*,
  589 U.S. 221 (2020)................................................................................................................8

*Hecate Energy LLC v. FERC*,
  126 F.4th 660 (D.C. Cir. 2025)..............................................................................................15

# TABLE OF AUTHORITIES
(continued)

<u>Page(s)</u>

*Hettinga v. United States,*
    677 F.3d 471 (D.C. Cir. 2012) ..................................................................................38

*Hunter v. Underwood,*
    471 U.S. 222 (1985) ..................................................................................................25

*Indep. U.S. Tanker Owners Comm. v. Dole,*
    809 F.2d 847 (D.C. Cir. 1987) ....................................................................................4

\* *Kansas v. United States,*
    16 F.3d 436 (D.C. Cir. 1994) ...................................................17, 19, 21, 25, 30

*Kansas v. United States,*
    797 F. Supp. 1042 (D.D.C. 1992), *aff'd*, 16 F.3d 436 (D.C. Cir. 1994) ................18

*Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.,*
    909 F.3d 446 (D.C. Cir. 2018) ..................................................................................30

\* *Kauai Kunana Dairy Inc. v. United States,*
    2009 WL 4668744 (D. Haw. Dec. 8, 2009) .................................................9, 13, 15, 16

*La. Pub. Serv. Comm'n v. Tex. & New Orleans R.R. Co.,*
    284 U.S. 125 (1931) ..................................................................................................18

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014) ..................................................................................................16

*Lillemoe v. United States Dep't of Agric., Foreign Agric. Serv.,*
    344 F. Supp. 3d 215 (D.D.C. 2018) ..........................................................................38

\* *Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ...............................................................................................9, 13

*Marine Carriers Corp. v. Fowler,*
    429 F.2d 702 (2d Cir. 1970) ......................................................................................27

*Medeiros v. Vincent,*
    431 F.3d 25 (1st Cir. 2005) ........................................................................................37

*Minnesota v. Clover Leaf Creamery Co.,*
    449 U.S. 456 (1981) ............................................................................................28, 31

*Mylan Pharms. Inc. v. U.S. Food & Drug Admin.,*
    789 F. Supp. 2d 1 (D.D.C. 2011) ................................................................................8

*Nat. Res. Def. Council v. Wheeler,*
    2019 WL 13525026 (D.D.C. Sept. 24, 2019) ..............................................................8

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
366 F.3d 930 (D.C. Cir. 2004) ........................................................................10, 14

*Nevada v. Watkins*,
914 F.2d 1545 (9th Cir. 1990) .......................................................................19

*New York v. Mnuchin*,
408 F. Supp. 3d 399 (S.D.N.Y. 2019).............................................................25

\* *Novak v. United States*,
795 F.3d 1012 (9th Cir. 2015) ..............................................9, 13, 14, 15, 27, 39

*Nuclear Energy Inst., Inc. v. EPA*,
373 F.3d 1251 (D.C. Cir. 2004)........................................................................18

*Omnipoint Corp. v. FCC*,
78 F.3d 620 (D.C. Cir. 1996) ..........................................................................26

*Pa. R.R. Co. v. Dillon*,
335 F.2d 292 (D.C. Cir. 1964)..........................................................................27

\* *Pennsylvania v. Wheeling & Belmont Bridge Co.*,
59 U.S. 421 (1855)......................................................................17, 18, 19, 20

*Perez-Kudzma v. United States*,
940 F.3d 142 (1st Cir. 2019).......................................................................12, 13

*Pers. Adm'r of Mass. v. Feeney*,
442 U.S. 256 (1979).......................................................................................26, 33

*Prosser v. Fed. Agric. Mortg. Corp.*,
593 F. Supp. 2d 150 (D.D.C. 2009)..................................................................10

*Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.*,
489 F.3d 1267 (D.C. Cir. 2007)........................................................................14

*Sanchez v. OSSE*,
45 F.4th 388 (D.C. Cir. 2022)........................................................................37, 38

*Sonzinsky v. United States*,
300 U.S. 506 (1937).......................................................................................25

*South Carolina v. Georgia*,
93 U.S. 4 (1876)...............................................................................................18

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*,
560 U.S. 702 (2010) ......................................................................................35

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Territory of Alaska v. Troy*,
    258 U.S. 101 (1922)................................................................................9

*Thomson Multimedia Inc. v. United States*,
    340 F.3d 1355 (Fed. Cir. 2003)......................................................18, 24

*Tiwari v. Friedlander*,
    26 F.4th 355 (6th Cir. 2022) ...............................................................36

*Trump v. CASA, Inc.*,
    145 S. Ct. 2540 (2025)........................................................................15

*Trump v. Mazars USA, LLP*,
    39 F.4th 774 (D.C. Cir. 2022) .............................................................25

*United States v. Johnson*,
    40 F.3d 436 (D.C. Cir. 1994) ..............................................................29

*United States v. O'Brien*,
    391 U.S. 367 (1968).............................................................................25

*United States v. Suquilanda*,
    116 F.4th 129 (2d Cir. 2024) ..............................................................29

*Ute Indian Tribe of Uintah & Ouray Rsrv. v. U.S. Dep't of Interior*,
    560 F. Supp. 3d 247 (D.D.C. 2021)....................................................26

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977).......................................................................26, 28

*Va. Uranium, Inc. v. Warren*,
    587 U.S. 761 (2019).............................................................................25

*W. Va. Univ. Hosps., Inc. v. Casey*,
    499 U.S. 83 (1991)...............................................................................27

*Washington v. Davis*,
    426 U.S. 229 (1976).......................................................................37, 38

*Washington v. Glucksberg*,
    521 U.S. 702 (1997).............................................................................37

### Constitutional Provisions

U.S. Const. art. I, § 9, cl. 6............................................................2, 17

### Statutes

28 U.S.C. § 2401(a) .............................................................................17

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

46 U.S.C. § 501 .................................................................................................................6

46 U.S.C. § 501(a) ...........................................................................................................4

46 U.S.C. § 501(b) ...........................................................................................................4

46 U.S.C. § 8103(b) .........................................................................................................4

46 U.S.C. § 12103 ............................................................................................................4

46 U.S.C. § 12111(b) .......................................................................................................4

46 U.S.C. § 12112 ............................................................................................................4

46 U.S.C. § 50101(a) ......................................................................................................20

46 U.S.C. § 55101 ............................................................................................................4

46 U.S.C. § 55101(b) .......................................................................................................4

46 U.S.C. § 55102(b) .......................................................................................................4

49 U.S.C. § 41703(c) ......................................................................................................28

Act of Apr. 30, 1900, ch. 339, 31 Stat. 141 ....................................................................6

Act of April 12, 1900, ch. 191, § 9, 31 Stat. 77 ..............................................................6

Act of Feb. 15, 1893, ch. 117, § 1, 27 Stat. 455 .............................................................5

Act of Feb. 17, 1898, ch. 26, § 1, 30 Stat. 248 ...............................................................5

Act of July 20, 1789, ch. 3, 1 Stat. 27 .............................................................................5

Act of July 27, 1868, ch. 273, § 5, 15 Stat. 240 ..............................................................6

Act of June 19, 1886, ch. 421, § 8, 24 Stat. 79 .............................................................32

Act of Mar. 1, 1817, ch. 31, § 4, 3 Stat. 351 ..................................................................5

Act of Mar. 3, 1813, ch. 42, § 1, 2 Stat. 809 ..................................................................5

Act of May 7, 1822, ch. 62, § 11, 3 Stat. 684 .................................................................6

Act of Oct. 6, 1917, ch. 88, § 1, 40 Stat. 392 .................................................................6

Act of Sept. 1, 1789, ch. 11, § 1, 1 Stat. 55 ....................................................................5

Haw. Rev. Stat. § 271G-16 ............................................................................................12

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Haw. Rev. Stat. § 271G-17 ................................................................12

Merchant Marine Act of 1920, ch. 250, § 1, 41 Stat. 988.............................4, 20, 27, 33

## Rules

Fed. R. Civ. P. 12(b)(1)..................................................................8, 16

Fed. R. Civ. P. 12(b)(6)..................................................................8, 16

Fed. R. Civ. P. 12(c) ........................................................................8

## Treatises

5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure
§ 1350 (2d ed. 1987) .....................................................................8

## Other Authorities

2 The Complete Anti-Federalist (Herbert L. Storing ed. 1981).........................22

58 Cong. Rec. 3519 (Aug. 1, 1919) ................................................33, 34

58 Cong. Rec. 3520 (Aug. 1, 1919) ...................................................32

59 Cong. Rec. 6811 (May 10, 1920) ..................................................34

59 Cong. Rec. 8607 (June 4, 1920) ...................................................34

Annals of Cong. (Joseph Gales ed., 1834)............................................28

Charles Warren, *The Making of the Constitution* (1928)...........................22

Charlie Papavizas, *Journey to the Jones Act: U.S. Merchant Marine Policy 1776–
1920* (2024)..............................................................................37

Constantine G. Papavizas, *The Story of the Jones Act (Merchant Marine Act,
1920): Part I*, 44 Tul. Mar. L.J. 459 (2020)............................................5

David P. Currie, *The Constitution in Congress: Substantive Issues in the First
Congress, 1789-1791*, 61 U. Chi. L. Rev. 775 (1994)..............................28

*Establishment of an American Merchant Marine: Hearings Before the S. Comm.
on Com.*, 66th Cong. 1331 (1920)...............................................32, 33, 34

The Federalist No. 11 (Alexander Hamilton) .........................................23

H.R. Rep. No. 56-375 (1900) ...........................................................30

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

Hawaii Department of Transportation, *Harbor Statistics*,
  https://hidot.hawaii.gov/harbors/harbor-users/cargo-statistics/ .................................................12

*Hill hails lawsuit against Jones Act, Matson intervenes to try and stop it* (Apr. 24,
  2025), https://www.grassrootinstitute.org/2025/04/hill-hails-lawsuit-against-
  jones-act-matson-intervenes-to-try-and-stop-it/ .......................................................10

John Frittelli, Cong. Rsch. Serv., R45725, Shipping Under the Jones Act:
  Legislative and Regulatory Background (2019) ...........................................................6

Keli'i Akina, *Kōloa Rum challenge could be what kills the Jones Act* (Mar. 4,
  2025), https://www.grassrootinstitute.org/2025/03/koloa-rum-challenge-
  could-be-what-kills-the-jones-act/ .......................................................................10

Letter from Gerald L. Dillingham, Assoc. Dir., Transp. Issues. U.S. Gov't
  Accountability Office, to the Hon. John McCain, Chairman, Senate Comm. on
  Commerce, Science, & Transp. (Mar. 6, 1998), available at
  http://www.gao.gov/assets/90/87426.pdf......................................................................13

Matson, *Shipping To Hawaii*,
  https://www.matson.com/matnav/services/hawaii.html ...............................................12

Max Farrand, *2 Records of the Federal Convention* (1787)............................................21, 22, 23

Pacific Legal Foundation, *It's Time to End the Jones Act*,
  https://www.youtube.com/watch?v=UGN3sPF8UrU (last visited July 30,
  2025) ...............................................................................................................10

Pasha Hawaii, *Container Shipping Routes Overview*,
  https://www.pashahawaii.com/services/shipping-routes/container-shipping-
  routes-overview...............................................................................................12

Paul Maxwell Zeis, *American Shipping Policy* (1938).........................................................5

Sam Heavenrich, Note, *The Neglected Port Preference Clause and the Jones Act*,
  132 Yale L.J. 559 (2022) ................................................................................29

Sarah Beason et al., *Myth and Conjecture? The "Cost" of the Jones Act*, 46 J.
  Mar. L. & Com. 23 (2015)..................................................................................13

United States Census Bureau, Kauai County, Hawaii,
  https://data.census.gov/profile/Kauai_County,_Hawaii?g=050XX00US15007 ....................11

William Stuart Forth, Wesley L. Jones: A Political Biography (Nov. 2, 1962)
  (Ph.D. dissertation, University of Washington) (ProQuest) .......................................29

## INTRODUCTION

The Jones Act reserves the shipping routes between points in the United States—otherwise known as the "coastwise trade"—for American-owned and -built vessels operated by American crews. Like similar enactments dating back to the Founding, the Act is designed to strengthen our nation's merchant marine and protect national security. The suggestion that the Act is unconstitutional would astound the 1789 Congress that enacted this policy as a tax; the 1817 Congress that converted the tax into a ban; and the 1920 Congress that readopted the ban in its modern form shortly after World War I. Any notion that the Act was meant to discriminate against Hawaii, not even a U.S. territory until nearly a century after the ban was first enacted, is even more farfetched. No matter how much Plaintiff Koloa Rum Company opposes the policy of the Jones Act, this law is not close to unconstitutional. Koloa Rum's claims to the contrary should be rejected.

At the outset, Koloa Rum has not alleged a plausible basis for Article III standing. Koloa Rum asserts that the Jones Act harms it by restricting shipping options and raising prices for shipping and goods—on the assumption that if this Court were to enjoin enforcement of the Jones Act in the Hawaii trade, Koloa Rum's costs would drop. But that assumption has no basis either in the Complaint or in reality. For this reason, courts have repeatedly held that challenges to the Jones Act failed to satisfy the traceability and redressability elements of Article III standing. Koloa Rum's Complaint founders on the same shoals. The Complaint does not plausibly allege any facts showing that Koloa Rum's costs are inflated by the Jones Act, as opposed to obvious geographic considerations, other federal and state laws and regulations, independent decisions by third parties, and the myriad other factors that affect the price of goods in commerce.

In any event, Koloa Rum's Complaint also fails to state a claim on the merits. Koloa Rum brings its primary claim under the Constitution's Port Preference Clause, a provision on which no

court has ever relied to invalidate an act of Congress. The Clause states: "No Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another; nor shall Vessels bound to, or from, one State, be obliged to enter, clear, or pay Duties in another." U.S. Const. art. I, § 9, cl. 6. Koloa Rum claims that the Jones Act violates the Clause because of the Act's supposedly discriminatory effect on Hawaii, and its supposedly discriminatory purpose. The discriminatory effects theory fails for the same reason it failed every previous time it was tried—the Clause does not proscribe facially neutral laws that merely have disproportionate effects on certain states' ports. The Supreme Court held as much in 1855, and its reading of the Founding-era history was correct and remains binding. And assuming Koloa Rum's discriminatory purpose theory is legally cognizable, Koloa Rum has failed to plausibly allege any such purpose behind the Jones Act. The Jones Act is but the latest in a series of laws, dating to the Founding, meant to promote the U.S. merchant marine by reserving a domestic market for American-owned, -built, and -crewed vessels. Such cabotage laws have been commonplace around the globe for centuries, and Congress passed laws materially indistinguishable from the Jones Act when Hawaii was still a kingdom. When Hawaii became a U.S. territory, twenty years before the Jones Act was passed, Congress incorporated those laws into the territory's organic legislation. The Jones Act reaffirmed that preexisting policy. The stray remarks of two individual legislators and a territorial governor referenced (and often mischaracterized) in Koloa Rum's Complaint do not change history or imbue the Jones Act with an unconstitutional purpose. Koloa Rum's Port Preference Clause claim should be dismissed.

Koloa Rum's second claim, that the Jones Act violates the Fifth Amendment's Due Process Clause, is even more clearly meritless. The Supreme Court has explicitly held that the Jones Act does not violate the Fifth Amendment. And in any event, a law does not violate the Constitution

2

simply because it allegedly raises someone's cost of doing business. The Jones Act—legislation that allocates economic benefits and burdens, while providing for the national defense—is the textbook example of a law that is not subject to heightened scrutiny. Koloa Rum cannot evade this point by styling its due process claim as a supposed fundamental right to "earn a living." Courts uniformly reject that reframing of ordinary economic regulation as a purported "fundamental right"—and here, in a case brought by a corporation that by its own admission "continues to grow" despite what it views as unnecessary business costs, there is no occasion to recognize the right for the first time.

Beneath the constitutional buzzwords, Koloa Rum's Complaint rests on its view that the Jones Act is bad policy. That is not a meritorious legal claim. The Constitution simply does not require Congress to open coastwise trade to foreign ships and foreign crews. During the Constitutional Convention, the Framers debated a proposal to restrict Congress's ability to reserve trade to domestic ships. But they thought better of it, and instead empowered Congress to set the proper balance between promoting international commerce and domestic trade, protecting national security, and ensuring that the United States has shipbuilding and merchant marine capacity. Ever since the Founding, Congress has exercised that discretion in favor of domestic ships and American crews. Koloa Rum's claims that this choice violates the Constitution should be dismissed.

## BACKGROUND

### I.    The Jones Act

Section 27 of the Merchant Marine Act of 1920, known as the Jones Act, reserves trade between points in the United States to ships that were built in the United States, are registered in

3

the United States, are owned by American entities, and are crewed predominantly by U.S. citizens. *See* Dkt. 13 ("FAC") ¶¶ 18–19; 46 U.S.C. §§ 55101, 55102(b), 8103(b), 12103, 12112.[1]

Congress passed the Merchant Marine Act, and the Jones Act within it, to encourage the growth of "a merchant marine of the best equipped and most suitable types of vessels." Merchant Marine Act of 1920, ch. 250, § 1, 41 Stat. 988, 988; *see also* FAC ¶ 24. America needed such a fleet, Congress determined, "to carry the greater portion of its commerce and serve as a naval or military auxiliary in time of war or national emergency." 41 Stat. 988. But this aim had a potential impediment: American vessels historically have had "higher construction and operating costs than their foreign competitors, not only because they typically must meet more stringent environmental and safety standards, but also because foreign ships often are subsidized and otherwise assisted by their own governments." *Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 849 (D.C. Cir. 1987); *see also* FAC ¶¶ 31, 33. The Jones Act therefore creates conditions for American carriers to invest in growing the domestic merchant marine to serve the nation's commercial and security needs.

This policy of reserving domestic shipping routes for domestic carriers (also called "cabotage") was not an innovation of the Jones Act. Rather, the Jones Act is the latest in "a series of statutes" passed by Congress, "beginning with the first year of the government, which have imposed restrictions of steadily increasing rigor on the transportation of freight in coastwise traffic by vessels not owned by citizens of the United States." *Cent. Vt. Transp. Co. v. Durning*, 294 U.S. 33, 38 (1935). In 1789—in the third federal law ever enacted, even before Congress created the lower courts in the Judiciary Act—Congress provided that "every ship or vessel employed in the

---

[1] The law has exceptions for Guam, American Samoa, the U.S. Virgin Islands, and the Northern Mariana Islands, and may also be waived "in the interest of national defense." 46 U.S.C. §§ 501(a)–(b), 12103, 12111(b), 55101(b).

transportation of any of the produce or manufactures of the United States, coastwise within the said States, except such ship or vessel be built within the said States, and belong to a citizen or citizens thereof, . . . on each entry," had to pay duties at a rate of "fifty cents per ton." Act of July 20, 1789, ch. 3, 1 Stat. 27, 27–28. In contrast, American-built and -owned vessels had to pay only "six cents per ton" at most "once in any year." *Id.* In practice, this duty nearly "reserved completely" the coastwise trade to American vessels; by 1794, American vessels transported over ninety percent of the nation's imports. *See* Paul Maxwell Zeis, *American Shipping Policy* 4 (1938).

In 1817, Congress formally converted this tax into an outright ban on goods "imported . . . from one port of the United States to another port of the United States, in a vessel belonging wholly or in part to a subject of any foreign power." Act of Mar. 1, 1817, ch. 31, § 4, 3 Stat. 351, 351. Over the next century, Congress retained this policy while closing various loopholes. *See, e.g.*, Act of Feb. 15, 1893, ch. 117, § 1, 27 Stat. 455, 455; Act of Feb. 17, 1898, ch. 26, § 1, 30 Stat. 248, 248.[2]

The Jones Act's essential features have existed in combination since 1898, when Congress further restricted the coastwise trade to vessels that were U.S.-flagged. *See* 30 Stat. 248. This also meant that the ships had to be U.S.-built, because U.S.-flagged vessels had to be U.S.-built. *See* Act of Sept. 1, 1789, ch. 11, § 1, 1 Stat. 55, 55. Meanwhile, the requirement that vessels engaging in coastwise trade be predominantly U.S.-crewed has existed in some form since 1813. *See* Constantine G. Papavizas, *The Story of the Jones Act (Merchant Marine Act, 1920): Part I*, 44 Tul. Mar. L.J. 459, 472 n.83 (2020); *see also, e.g.*, Act of Mar. 3, 1813, ch. 42, § 1, 2 Stat. 809, 809.

_____

[2] The 1893 law extended the cabotage restrictions to coastwise transportation of goods routed through an intermediary foreign port. *Cent. Vt. Transp. Co.*, 294 U.S. at 38. The 1898 law further reinforced that restriction. *Id.* at 38–39. In 1920, the Jones Act extended the law to the transportation routes that included a rail component. *See id.*

Thus, when Hawaii was annexed to the United States in July 1898, the relevant features of what would later be enacted as the Jones Act were already extant in the United States's cabotage laws.

In 1900, two years after Hawaii's annexation, Congress passed a comprehensive law establishing Hawaii as a territory. *See* Act of Apr. 30, 1900, ch. 339, 31 Stat. 141. The law included provisions structuring the Hawaiian government, conferring United States citizenship on native Hawaiians, guaranteeing to Hawaiian citizens certain federal constitutional rights—and providing that "the coasting trade between [Hawaii] and any other portion of the United States, shall be regulated in accordance with the provisions of law applicable to such trade between any two great coasting districts." *Id.* §§ 4–6, 66, 98. Congress's action in this regard was not unique to Hawaii; Congress similarly had applied the cabotage laws to other U.S. territories, including Florida, Alaska, and Puerto Rico, shortly after they became part of the United States.[3]

The cabotage laws that applied to Hawaii and the rest of the United States continued in place for all but short periods. The main exception was in 1917 when Congress temporarily relaxed the cabotage laws during World War I because the nation had diverted its commercial vessels to military use. *See* Act of Oct. 6, 1917, ch. 88, § 1, 40 Stat. 392, 392. Three years later, with the war over, the Jones Act restored the cabotage provisions in their modern form.[4]

---

[3] *See* Act of May 7, 1822, ch. 62, § 11, 3 Stat. 684, 685 (Florida); Act of July 27, 1868, ch. 273, § 5, 15 Stat. 240, 241 (Alaska); Act of April 12, 1900, ch. 191, § 9, 31 Stat. 77, 79 (Puerto Rico).

[4] Jones Act restrictions were also waived in preparation for World War II, and have been waived in certain situations, including, for example, following natural disasters. *See* John Fritelli, Cong. Rsch. Serv., R45725, Shipping Under the Jones Act: Legislative and Regulatory Background 10–13 (2019); *see also*, *e.g.*, 46 U.S.C. § 501 (authorizing Customs and Border Protection to "waive compliance" with the Jones Act "in the interest of national defense").

## II.    Koloa Rum's Constitutional Challenges

Koloa Rum Company operates a rum distillery in Hawaii.  Koloa Rum brought suit against the Secretary of Homeland Security and Acting Commissioner of Customs and Border Protection, contending that the Jones Act is unconstitutional as applied to Hawaii and seeking to enjoin them from enforcing it.  FAC ¶¶ 2, 13, 79.  Koloa Rum's Complaint focuses on the alleged economic costs of the Jones Act.  Koloa Rum, which ships its products to "36 mainland states and several foreign countries," contends that "[b]ecause of the Jones Act's restrictions, shipping to and from Hawai'i is significantly more expensive than it would be" otherwise.  *Id.* ¶¶ 13, 41; *see also id.* ¶ 55.  Koloa Rum claims it is at a competitive disadvantage to "[i]nternational rums" as well as "mainland distilleries that do not face these shipping constraints."  *Id.* ¶¶ 62, 65.  Koloa Rum alleges that "[b]usinesses located in mainland states have shipping options that do not require Jones Act-flagged ships."  *Id.* ¶¶ 45–46.  It also alleges that "[e]ven for its international sales, [it] must first ship goods to the mainland United States due to a lack of international routes passing through Hawai'i ports," unlike "ports located in states on the lower 48 [that] have options to ship directly in foreign commerce without first transporting interstate."  *Id.* ¶¶ 13, 46, 57.

Koloa Rum brings claims under two clauses of the Constitution.  First, Koloa Rum alleges that the Jones Act violates the Constitution's Port Preference Clause because (1) the law dispro-portionately affects Hawaii and (2) the law's purpose was to discriminate against Hawaii.  *Id.* ¶¶ 69–79.  Second, Koloa Rum alleges that the Jones Act violates the Fifth Amendment's Due Process Clause by interfering with Koloa Rum's purported "fundamental" "right to earn a living." *Id.* ¶¶ 80–86.  Koloa Rum asks this Court to declare the Jones Act unconstitutional and grant "a permanent injunction prohibiting Defendants from enforcing [the Jones Act's restrictions] against Koloa Rum Company as applied to interstate trade with Hawai'i."  *Id.* Prayer for Relief.

Founded in 1882, Matson Navigation Company, Inc. is incorporated and headquartered in Hawaii. As the leading Jones Act carrier for coastwise trade with Hawaii, Matson intervened on behalf of the Defendants, Dkt. 36, and now moves to dismiss.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), "the plaintiff bears the burden of establishing that the court has jurisdiction." *Grand Lodge of Fraternal Ord. of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). The Court has "an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." *Id.* In resolving a 12(b)(1) motion, the Court must therefore give the plaintiff's factual allegations "'closer scrutiny' . . . than in resolving a 12(b)(6) motion for failure to state a claim." *Id.* at 13–14 (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987)).

Under Rule 12(b)(6), a complaint must be dismissed if it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 227 (2020).[5]

---

[5] Matson files this motion pursuant to Rule 12(b). *See* Dkt. 15-1 (Mot.) at 5 n.2; April 30, 2025 Minute Order ("Any party shall file its Answer or otherwise respond to Plaintiff's Complaint within 30 days of this Court's ruling on the . . . Motion to Intervene."); *Mylan Pharms. Inc. v. U.S. Food & Drug Admin.*, 789 F. Supp. 2d 1, 4–6 (D.D.C. 2011) (resolving an intervenor-defendant's motion to dismiss filed after it submitted a proposed answer). Alternatively, the Court may deem this motion timely filed pursuant to Rule 12(c). *See Ctr. for Biological Diversity v. EPA*, 106 F. Supp. 3d 95, 99 n.3 (D.D.C. 2015) (considering intervenor-defendant's motion for judgment on the pleadings alongside the federal government's motion to dismiss); *Nat. Res. Def. Council v. Wheeler*, 2019 WL 13525026, at *2 (D.D.C. Sept. 24, 2019) (same).

**ARGUMENT**

This lawsuit is the latest in a series of unsuccessful constitutional challenges to the Jones Act stretching back more than a century.  *See*, *e.g.*, *Territory of Alaska v. Troy*, 258 U.S. 101, 111 (1922) (rejecting territory's challenge under Port Preference Clause); *Cent. Vt. Transp. Co.*, 294 U.S. at 40 (rejecting challenge under the Fifth Amendment's Due Process Clause); *Novak v. United States*, 795 F.3d 1012, 1020–22 (9th Cir. 2015) (rejecting challenge under the Commerce Clause); *Kauai Kunana Dairy Inc. v. United States*, 2009 WL 4668744, at *6 (D. Haw. Dec. 8, 2009) (dismissing challenge under the Commerce Clause).  Koloa Rum does not plausibly allege any facts sufficient to show that its challenge is any different, under either the Port Preference Clause or the Due Process Clause.  Its challenge should likewise be rejected.

## I.     Koloa Rum Fails To Plausibly Allege Facts Establishing Article III Standing.

At the outset, Koloa Rum lacks Article III standing.  Standing requires pleading an "injury in fact" that has a "causal connection" with the challenged law and that is likely to be "redressed by a favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  The injury must be the plaintiff's own injury, not a "generalized grievance."  *Id.* at 575.  Here, even assuming Koloa Rum alleges an adequate injury, it fails to plausibly allege causation and redressability.

To establish standing here is an especially tall order because Koloa Rum challenges a law that does not directly regulate it.  When "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation . . . of *someone else*"—here, ocean cargo carriers—"much more is needed" to establish causation and redressability than when "the plaintiff is himself an object of the [law]."  *Lujan*, 504 U.S. at 561–62.  This is because causation and redressability "hinge on the response of the regulated (or regulable) third part[ies]," "whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict."  *Id.*  Even under the more "generous [motion-to-dismiss] standard," to plausibly allege standing the plaintiff must plead

"substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938, 941 (D.C. Cir. 2004), *abrogated on other grounds by Perry Cap. LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017). Causal chains that are "contingent on speculative assumptions about the past and future acts and motives of strangers to this suit, and even about market forces" will not suffice. *Prosser v. Fed. Agric. Mortg. Corp.*, 593 F. Supp. 2d 150, 155 (D.D.C. 2009).

### A. Koloa Rum Does Not Plausibly Allege Injury Caused By The Jones Act.

The Complaint asserts that Koloa Rum "faces increased costs, supply chain delays, and barriers to expanding its market share, placing it at a competitive disadvantage compared to mainland distilleries that do not face these shipping constraints"—and that this harm is "[d]ue to the Jones Act." FAC ¶ 65. Yet the Complaint pleads no facts linking *Koloa Rum's* asserted harm to the Jones Act. Instead, it cites a policy paper authored by an advocacy organization that is promoting this suit and which attempts to quantify the "excess costs" that "*businesses and consumers* in Hawai'i pay" each year. *Id.* ¶ 50 & n.1 (emphasis added).[6] The Complaint is also sprinkled with assertions about the Jones Act's effect on costs allegedly borne by "Hawai'i, Alaska, and U.S. territories," *id.* ¶ 31, "military logistics," *id.* ¶ 39, and other purported public costs. But these assertions say nothing about Koloa Rum's *own* costs and lost business opportunities.

---

[6] The policy paper was published by the Grassroot Institute of Hawaii, an organization that is vigorously promoting Koloa Rum's lawsuit alongside plaintiff's counsel. *See, e.g.*, Keli'i Akina, *Kōloa Rum challenge could be what kills the Jones Act* (Mar. 4, 2025), https://www.grassrootinstitute.org/2025/03/koloa-rum-challenge-could-be-what-kills-the-jones-act/; *Hill hails lawsuit against Jones Act, Matson intervenes to try and stop it* (Apr. 24, 2025), https://www.grassrootinstitute.org/2025/04/hill-hails-lawsuit-against-jones-act-matson-intervenes-to-try-and-stop-it/; Pacific Legal Foundation, *It's Time to End the Jones Act*, https://www.youtube.com/watch?v=UGN3sPF8UrU (last visited July 30, 2025).

When the Complaint does get to Koloa Rum, its assertions are conclusory and contradictory. The Complaint asserts that Koloa Rum's costs of importing and exporting are "significantly more" and "significantly higher" "due to Jones Act restrictions," FAC ¶¶ 54–55, but it pleads no facts backing up that claim. It alleges no facts about Koloa Rum's actual costs and overhead, no facts about its mainland competitors and their relative costs, and, significantly, no facts establishing a causal connection to the Jones Act's cabotage provisions. Nor does the Complaint allege facts about the options and costs for Koloa Rum to export its product by air freight as an alternative to ocean freight. And although the Complaint asserts that Koloa Rum "would be able to expand its operations and enter new markets on the mainland" absent the Jones Act's restrictions, *id.* ¶ 68, it alleges no facts about those markets or about Koloa Rum's thwarted expansion plans. To the contrary, the Complaint boasts that Koloa Rum "continues to grow" *despite* the Jones Act. *Id.* ¶ 4.

Koloa Rum's conclusory and contradictory assertions of causation are fatal to its Article III standing because of the "obvious alternative explanation[s]" for any allegedly higher costs it experiences compared to mainland distilleries. *Twombly*, 550 U.S. at 567; *see also Iqbal*, 556 U.S. at 680, 686 ("conclusory allegation[s]" must be discounted and factual allegations must "nudge" claim "across the line from conceivable to plausible"); *Arpaio v. Obama*, 797 F.3d 11, 25 (D.C. Cir. 2015) (affirming dismissal of complaint for failing to plead a plausible basis for standing). Hawaii is a remote island chain in the Pacific Ocean that lacks the rail and highway links connecting other states. *See* FAC ¶ 40. That feature of geography inevitably—and obviously—creates differences in the price of goods in Hawaii relative to other states. Within Hawaii, Koloa Rum has chosen to locate its business on the small island of Kauai, *id.* ¶ 2, with a population of fewer than 75,000 and only small port facilities. *See* United States Census Bureau, Kauai County, Hawaii, https://data.census.gov/profile/Kauai_County,_Hawaii?g=050XX00US15007. Shipping products

to and from Kauai generally entails an intrastate leg of transportation by barge service from Kauai to the Port of Honolulu, followed by transshipment to larger vessels for ocean carriage.[7]  Moreover, for many barge shipments on that intrastate leg, Hawaii's Public Utilities Commission regulates prices and services for interisland transportation under state law.  *See* Haw. Rev. Stat. § 271G-16, -17.  This, too, is an obvious alternative explanation for why it is allegedly "more expensive to ship from Kaua'i to Los Angeles than it is from Los Angeles to Australia," FAC ¶ 58, and renders the Complaint's rote assertions of causation implausible.  *Iqbal*, 556 U.S. at 682.

The complex interplay of international politics and domestic and foreign laws also undermines Koloa Rum's attempt to connect its purported injuries to the Jones Act.  To start, Koloa Rum glosses over the "byzantine patchwork" of state alcohol regulations, *Matter of Gabriel Inv. Grp., Inc.*, 24 F.4th 503, 503 (5th Cir. 2022), that would inevitably affect the company's ability to "enter new markets on the mainland," FAC ¶ 68.  Further, the specific routes and prices available to Koloa Rum depend on numerous factors external to the Jones Act, including labor and immigration laws, fleet and port characteristics, and international tariffs, all of which affect the decisions of international container carriers.  *Cf. Perez-Kudzma v. United States*, 940 F.3d 142, 145–46 (1st Cir. 2019) (plaintiffs failed to allege causation and redressability "in terms specific enough" to tie the Jones Act to costs and delays in rebuilding post-hurricane as opposed to the "multitude of other factors" that may bear on the costs of goods in Puerto Rico).  Even without the Jones Act, foreign carriers in the coastwise trade would still face substantial costs from complying with other U.S. laws,

---

[7] *See*, *e.g.*, Hawaii Department of Transportation, *Harbor Statistics*, https://hidot.hawaii.gov/harbors/harbor-users/cargo-statistics/;    Matson,    *Shipping To Hawaii*,    https://www.matson.com/matnav/services/hawaii.html; Pasha Hawaii, *Container Shipping Routes Overview*, https://www.pashahawaii.com/services/shipping-routes/container-shipping-routes-overview.

12

including costs related to "taxes, labor, and employee protection."[8]  Accordingly, it is "nearly impossible to quantify a 'cost' of the [Jones] Act," Sarah Beason et al., *Myth and Conjecture? The "Cost" of the Jones Act*, 46 J. Mar. L. & Com. 23, 24–25 (2015), much less to allocate a share of such a "cost" to Hawaii or to Koloa Rum's purported injury.

Recognizing that such independent factors defeat causation, courts repeatedly have dismissed challenges to the Jones Act on standing grounds.  When Hawaii residents challenged the Jones Act under the Commerce Clause, the Ninth Circuit agreed that the plaintiffs had a heightened burden to show causation because their "asserted injury ar[ose] from the government's . . . regulation of someone else."  *Novak*, 795 F.3d at 1019 (quoting *Lujan*, 504 U.S. at 562).  Because the plaintiffs alleged that many factors—including "market concentration, significant barriers to entry, ease of information sharing, lack of viable alternatives to ocean shipping, and the commodity nature of ocean shipping services"—affected Hawaii coastwise shipping prices, the plaintiffs could not simply assume that the Jones Act caused their allegedly higher costs.  *Id.*  A District of Hawaii decision addressing a similar challenge likewise explained that because "the cost of goods are impacted by a multitude of other factors and federal and state laws, including immigration laws, labor standards, and workplace standards," "there [wa]s no credible way . . . to gauge whether the Jones Act . . . actually results in higher prices."  *Kauai Kunana Dairy*, 2009 WL 4668744, at *5.  And the First Circuit held that a complaint challenging the government's decision not to waive the cabotage provisions of the Jones Act for Puerto Rico following Hurricane Maria failed to satisfy Article III standing because the plaintiffs' injuries could not be "identified as resulting from increased shipping costs imposed by the Jones Act."  *Perez-Kudzma*, 940 F.3d at 146.

---

[8] Letter from Gerald L. Dillingham, Assoc. Dir., Transp. Issues. U.S. Gov't Accountability Office, to the Hon. John McCain, Chairman, Senate Comm. on Commerce, Science, & Transp., 11–13 (Mar. 6, 1998), available at http://www.gao.gov/assets/90/87426.pdf.

So, too, here. Koloa Rum does not plausibly allege that any specific wallet injury it experiences is caused by the Jones Act's cabotage provisions and not the myriad unrelated, obvious alternative explanations for price levels in Hawaii. *See Twombly*, 550 U.S. at 567; *Iqbal*, 556 U.S. at 682 (noting that legitimate law enforcement response to September 11 attacks could obviously explain observed disparate results in the absence of unlawful discrimination). Koloa Rum therefore falls well short of pleading "substantial evidence" that leaves "little doubt as to causation" between the Jones Act and Koloa Rum's alleged injuries. *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 941.

**B.    Koloa Rum Does Not Plausibly Allege Injuries Redressable By A Favorable Decision.**

The Complaint independently fails to plead facts establishing that any harm caused by the Jones Act is redressable by an injunction from this Court. Because Koloa Rum's injuries depend on the conduct of independent third-party carriers, it must satisfy a "heightened showing" by alleging facts "sufficient to demonstrate a substantial likelihood that the third party directly injuring [it] would cease doing so as a result of the relief [it] sought." *Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 489 F.3d 1267, 1273, 1275 (D.C. Cir. 2007). Koloa Rum does not allege any facts showing a substantial likelihood that third-party carriers would open new routes from Hawaii to the mainland or lower shipping prices if Koloa Rum prevailed. As described above, *see supra* 11–13, the many other factors that affect ocean shipping services suggest prices might remain unchanged "even if the Jones Act were invalidated," *Novak*, 795 F.3d at 1020. In fact, enjoining enforcement of the Jones Act might *increase* costs for Koloa Rum and others in Hawaii, because it could undermine the conditions that induced the existing carriers like Matson to invest heavily in the vessels, crews, ports, and equipment employed in the Hawaii trade.

For the same reasons Koloa Rum fails to establish causation, it also fails to establish redressability. When "plaintiffs sue the government in order to change third-party behavior," "redressability . . . imposes a significant barrier to establishing standing—courts have routinely rejected suits for injunctive relief that are directed against executive agencies but that seek to change the behavior of third parties." *Hecate Energy LLC v. FERC*, 126 F.4th 660, 665 (D.C. Cir. 2025) (quotation marks and alteration omitted). Koloa Rum has not shown that "it [is] likely—let alone substantially likely—that its requested relief would spur" foreign carriers to open new routes. *Id.* at 667 (citation omitted); *see also Novak*, 795 F.3d at 1020 (dismissing Jones Act challenge for failing to plausibly allege redressability); *Kauai Kunana Dairy*, 2009 WL 4668744, at *5 (same).

Indeed, it is not obvious that the order that Koloa Rum seeks—a universal injunction covering trade between Hawaii and every other State in the nation—is even permissible. *See Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2550–54 (2025) (holding that the government was likely to succeed in showing that the Judiciary Act of 1789 does not authorize district courts to issue universal injunctions). Such universal injunctive relief could not be justified on the grounds that it is necessary to award Koloa Rum complete relief, because Koloa Rum has other options. It could attempt to plead and certify a class, *see Novak*, 795 F.3d at 1016 n.1, or it could try to persuade the State of Hawaii to bring an action if, in fact, the State believes its ports are experiencing unconstitutional discrimination. But under *CASA*, Koloa Rum cannot simply ask this Court to enjoin the enforcement of a federal law everywhere to redress one plaintiff's asserted injury. And because the Complaint makes no attempt to show that plaintiff-specific relief would redress Koloa Rum's injury, Koloa Rum has not shown Article III standing.

### C.    Koloa Rum's Failure To Plead Causation Also Defeats An Element Of Its Claims.

Although the failure to plead facts plausibly establishing causation defeats an element of Article III standing, it also means that Koloa Rum has not adequately pleaded a substantive element of its claims.  Federal causes of action "incorporate a requirement of proximate causation." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)).  Koloa Rum must allege a "sufficiently close connection" between its economic harm and the alleged constitutional violations. *Id.* at 133.  When, as here, there is a "tangle of factors affecting price," it is not enough to assert that higher costs are consistent with causation.  *Dura Pharms., Inc.*, 544 U.S. at 343; *see also Defeo v. IonQ, Inc.*, 134 F.4th 153, 164 (4th Cir. 2025) (affirming dismissal of complaint because "correlation does not equal causation").

For the reasons discussed above, Koloa Rum has not plausibly alleged that the higher shipping costs it allegedly suffers are attributable to the alleged constitutional violations rather than the other myriad factors affecting shipping costs.  *See supra* 10–14.  Koloa Rum's location on Kauai, which requires interisland shipping and transshipment before its goods can even leave Hawaii, *see supra* 11–12, along with the "multitude of other factors and federal and state laws" impacting the cost of shipping and goods, *Kauai Kunana Dairy*, 2009 WL 4668744, at *5, mean that Koloa Rum's allegations do not "nudge[] [its] claims" of causation "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680.  Thus, Koloa Rum's pleading deficiencies require dismissal not only under Rule 12(b)(1) for lack of jurisdiction, but also under Rule 12(b)(6) for failure to state a claim.

## II.    Koloa Rum's Claims Are Time-Barred Under 28 U.S.C. § 2401(a).

The First Amended Complaint alleges that "in 2009 . . . Kōloa Rum Company was born," FAC ¶ 2, yet it did not file this lawsuit until 2025.  Koloa Rum's right of action accrued more than six years ago and its claims are thus untimely.  *See* 28 U.S.C. § 2401(a).  Heeding this Court's order to avoid duplicative briefing, *see* Dkt. 36 at 4, Matson adopts and incorporates by reference the timeliness arguments that the American Maritime Partnership and Maritime Trades Department of the AFL-CIO assert in their motion to dismiss.

## III.    Koloa Rum Fails To State A Claim That The Jones Act Violates The Port Preference Clause.

The Port Preference Clause states that: "No Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another; nor shall Vessels bound to, or from, one State, be obliged to enter, clear, or pay Duties in another."  U.S. Const. art. I, § 9, cl. 6.  This Clause "has never been relied on by the federal judiciary to hold an act of Congress unconstitutional."  *Kansas v. United States*, 16 F.3d 436, 439 (D.C. Cir. 1994).  This case should not be the first to do so.  First, Koloa Rum's discriminatory effects theory is not cognizable under the Port Preference Clause.  And even assuming its discriminatory purpose theory were cognizable, Koloa Rum does not plausibly allege that the Jones Act's purpose was to give preference to the ports of some states over those of Hawaii.

### A.    Koloa Rum's Discriminatory Effects Theory Is Not Cognizable.

Koloa Rum's "discriminatory effects" theory of unconstitutionality under the Port Preference Clause, FAC ¶ 8, is foreclosed by an unbroken chain of binding precedent stretching back 170 years.  And even if the question were open for reconsideration, Founding-era history confirms that Koloa Rum's claim fails.

**1.**  The Supreme Court long ago rejected the "discriminatory effects" theory of the Port Preference Clause that Koloa Rum now espouses.  In the seminal Port Preference Clause case, *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. 421 (1855), the Supreme Court refused to condemn a statute that approved a bridge in Virginia that blocked tall boats from reaching upstream ports in Pennsylvania.  Although that law advantaged Virginia ports over Pennsylvania ports, the Court held that this was immaterial because the Clause does not proscribe "advantages that might possibly result from the legislation of congress upon other subjects connected with commerce."  *Id.* at 435.  It instead covers only "a direct privilege or preference of the ports of any particular State over those of another."  *Id.*  Absent that direct privilege, a law can "greatly benefit particular ports" in favor of others without violating the Port Preference Clause.  *La. Pub. Serv. Comm'n v. Tex. & New Orleans R.R. Co.*, 284 U.S. 125, 131 (1931).  Put another way, "the fact that regulation, within the acknowledged power of Congress to enact, may affect the ports of one State more than those of another, cannot be construed as a violation of [the Port Preference Clause]."  *Armour Packing Co. v. United States*, 209 U.S. 56, 80 (1908).  These cases are part of an "unbroken line reject[ing] contentions" that "[d]isparate consequences of neutral rules . . . violate the Port Preference Clause."  *City of Milwaukee v. Yeutter*, 877 F.2d 540, 545 (7th Cir. 1989).[9]

---

[9] *See also*, *e.g.*, *South Carolina v. Georgia*, 93 U.S. 4, 13 (1876) (holding that the Port Preference Clause "does not extend to acts which may directly benefit the ports of one State and only incidentally injuriously affect those of another"); *Kansas v. United States*, 797 F. Supp. 1042, 1050 (D.D.C. 1992) (noting that "facially neutral statutes that disparately affect states do not violate the clause"), *aff'd*, 16 F.3d 436 (D.C. Cir. 1994); *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1307 (D.C. Cir. 2004) (a law does not violate the Port Preference Clause when "the legislation was based on neutral factors or only incidentally burdened or benefitted a particular State"); *City of Houston v. FAA*, 679 F.2d 1184, 1198 (5th Cir. 1982) (holding that the Clause does not cover "what another realm of constitutional law would term a facially neutral rule"); *Thomson Multimedia Inc. v. United States*, 340 F.3d 1355, 1364 (Fed. Cir. 2003) (the Clause "does not prohibit a facially nondiscriminatory law that has incidental, disparate effects on ports of one or more states"); *Cramer v. Skinner*, 931 F.2d 1020, 1032 (5th Cir. 1991) (the Clause does not bar any advantages "incident to some otherwise legitimate government act regulating commerce");

In keeping with this unbroken line of authority, the D.C. Circuit has also rejected discriminatory effects claims under the Port Preference Clause as foreclosed by precedent. In *Kansas v. United States*, the court considered Kansas's challenge to a law that restricted interstate air traffic from Love Field, an airport near Dallas, Texas, except for flights to the contiguous states of Louisiana, New Mexico, Oklahoma, and Arkansas. 16 F.3d at 438.[10] In finding no constitutional violation, the Court dismissed the preference as "rather insignificant" because "[t]he Supreme Court, long ago, recognized that the Clause does not bar 'incidental advantages that might possibly result from the legislation of Congress upon other subjects connected with commerce, and confessedly within its powers.'" *Id.* at 441 (quoting *Wheeling*, 59 U.S. at 439). This principle applied even though the challenged law, on its face, conferred a preference to certain named states to which direct flights from Love Field were permitted, *see id.* at 437 n.1, and even though the law "speaks directly to a port preference," *id.* at 441. The "primary impact" of the law was a permissible one—"to protect" Dallas-Fort Worth Airport "from competition from Love Field"—and therefore the law was "of no concern to the Port Preference Clause." *Id.* at 440–41.

Discriminatory effects claims are not cognizable under the Port Preference Clause even when basic geographic facts make the differential effects obvious. The disparity is caused by "natural advantages" and not the "statutory law." *Armour Packing*, 209 U.S. at 80; *see also Ala. Great S. R.R. Co. v. United States*, 340 U.S. 216, 229 (1951) (rejecting Port Preference Clause claim because any benefits were "the result of geography"). For instance, there is nothing more

_____

*Nevada v. Watkins*, 914 F.2d 1545, 1558 (9th Cir. 1990) (rejecting a Port Preference Clause claim because the alleged effect was "merely an incident to a valid congressional enactment"); *Augusta Towing Co. v. United States*, 5 Cl. Ct. 160, 165 (Ct. Cl. 1984) ("Acts of Congress that only incidentally benefit some ports at the expense of others do not confer a preference on the ports of one state over those of another within the meaning of the clause.").

[10] Courts assume that the Port Preference Clause covers airports. *See City of Houston*, 679 F.2d at 1196.

geographically predictable than that some states are more than 1,000 miles away from Reagan National Airport, and others less. Even so, a regulation blocking airports beyond that radius from directly accessing National Airport was held to be constitutional. *City of Houston*, 679 F.2d at 1198. "The perimeter rule, which for geographic reasons ha[d] an incidental effect on air travel from certain states, d[id] not thereby violate the Constitution." *Id.*

Similarly, the Seventh Circuit held that a law did not violate the Port Preference Clause even though its preference for domestic shipping disparately affected certain states. In *City of Milwaukee*, a federal law reserved for U.S.-flagged vessels the right to ship certain food aid to foreign countries. 877 F.2d at 545–46. This law had the effect of disadvantaging Wisconsin's ports because few domestic vessels were equipped to navigate up to the Great Lakes. *See id.* at 545. But the Seventh Circuit found that this disparate effect did not establish a Port Preference Clause violation. Because "[f]or two hundred years courts have understood that only explicit discrimination violates the Port Preference Clause," Milwaukee's constitutional claim was "doom[ed]." *Id.* at 546.

Like the law in *City of Milwaukee* and the other statutory provisions courts have considered over the years, the Jones Act is a facially neutral law that applies evenly to all states. The Jones Act does not single out any state for favored or disfavored treatment, making it even more unassailable than the statute providing a port preference to airports in certain named states that the D.C. Circuit upheld in *Kansas*. Moreover, Congress enacted the Jones Act pursuant to its unquestionable power to regulate "foreign and domestic commerce" and provide for the "national defense," 41 Stat. 988, and has continually recodified the policy in the decades since, *see* 46 U.S.C. § 50101(a). A policy more "confessedly within [Congress's] powers," *Wheeling*, 59 U.S. at 435—powers that Congress has exercised continuously for more than two centuries—is difficult to

conceive.  It is immaterial that the law allegedly raises Hawaii businesses' transportation costs more than those of other states.  If Hawaii's businesses experience higher transportation costs than other states, it is because of Hawaii's unique geography, FAC ¶ 40, and other economic factors "quite independent" of the Jones Act, *Kansas*, 16 F.3d at 440—not because of "deliberate discrimination," *City of Houston*, 679 F.2d at 1198; *see infra* 24–35.  The Port Preference Clause does not allow courts to strike down acts of Congress because they have a perceived discriminatory effect on the ports of some states over others.

**2.**  Although this Court can dismiss based on precedent alone and need not retread Founding-era history, it is worth noting that the history, too, refutes Koloa Rum's theory.  Indeed, the Framers explicitly considered—and rejected—a proposal, motivated by fears that cabotage laws would affect states disparately, to place procedural limits on Congress's authority to pass those laws.  Having expressly rejected this *procedural limit*, it is implausible that the Framers included a different provision that obliquely imposes an outright *ban*.

As far as constitutional provisions go, it is unusually clear what mischief the Port Preference Clause was meant to prevent: explicit discrimination between the ports of different states. The Clause was inserted at the request of the Maryland delegation to the Convention, which feared that Congress would "favor the ports of particular States, by requiring vessels destined to or from other States to enter & clear thereat, as vessels belonging or bound to Baltimore, to enter & clear at Norfolk &c."  Max Farrand, *2 Records of the Federal Convention* 417 (1787).  The Maryland delegation "got what it wanted—not only the explicit ban on an obligation to clear customs at the coastal ports but also the more general prohibition of preferences."  *City of Milwaukee*, 877 F.2d at 546; *see* Farrand, *supra*, at 417–18.

At the same time, the delegation understood that the Clause would not condemn neutral laws solely because they have a discriminatory effect. Delegate Luther Martin, "the force behind the Clause," had hoped for a broader prohibition. *City of Milwaukee*, 877 F.2d at 546. He feared that Congress might favor Virginia over Maryland more subtly—for example, by compelling "all ships which cleared or entered in Maryland" to "enter at George-Town [then in Maryland], on Potowmack," a location so inconvenient that ships in the Chesapeake Bay would inevitably reroute through Virginia. 2 The Complete Anti-Federalist 63 (Herbert L. Storing ed. 1981). But Martin understood that the Clause would not prohibit such a law. "[W]e endeavoured to obtain a [stronger] provision," he lamented, "but we could not obtain this alteration." *Id.* at 63–64. "Martin, as the proponent of the Port Preference Clause, was in the ideal position to know what he had and hadn't obtained from his colleagues at the Convention." *City of Milwaukee*, 877 F.2d at 546. And Martin "got a ban on express discrimination; he wanted, and couldn't get, a ban on disparate impact." *Id.*

Were there any doubt that the Port Preference Clause does not prohibit cabotage laws with merely a disparate effect on particular states, the same week the Framers debated the Clause, they rejected a proposal that would have limited Congress's power to pass "navigation acts"—such as cabotage laws—that could disproportionately affect northern states more than southern states.[11]

During the Founding era, "the Northern and Southern" states had a "difference of interest" "in the case of regulating navigation, commerce & imposts." Farrand, *supra*, at 83. While the "Northern & middle States" had shipbuilding industries and felt they "w[ould] be ruined, if not

---

[11] The "principal form" of "navigation act[s]" were the "statutes of Great Britain which confined shipment of goods to English-built and English-owned ships." Charles Warren, *The Making of the Constitution* 579 (1928). Similar "statutes had been enacted by the New England States in 1784 and 1785." *Id.* at 579–80.

22

enabled to defend themselves against foreign [interests]," the southern states did not yet "build ships for themselves." *Id.* at 450–51. Delegates from southern states were therefore "apprehensive" about empowering Congress to enact "navigation" laws, which would cause a "rise of freight" for those states. *Id.* at 451. Accordingly, the southern delegates proposed requiring a supermajority to pass any such law. But the Framers voted to remove this draft provision from the Constitution, as part of a compromise regarding the slave trade. *Id.* at 396, 449.

It would make no sense that, having voted against this explicit check on Congress's power to pass cabotage and other "navigation" laws that could have a disparate effect, the Framers would bring an even stricter limit—an outright ban—into the Constitution through the backdoor of the Port Preference Clause. Nor is there any evidence that the Framers thought they were doing so. There was no discussion of navigation laws when the Framers considered the Port Preference Clause, *see*, *e.g.*, Farrand, *supra,* at 417, and the Virginia delegation attempted to resurrect the supermajority proposal after the Clause had already been approved, which would be wholly unnecessary if the Clause already made those laws illegal. *Id.* at 631. Inside and outside the halls of Philadelphia, the Framers understood that Congress would have broad powers to enact navigation laws with disparate effects, including cabotage laws.[12]

Koloa Rum seeks now to rehash the very worries about alleged discriminatory effects that the Convention rejected. Even worse, Koloa Rum alleges that the Port Preference Clause imposes a *stronger* substantive limit on Congress than the voting threshold that southern states had

---

[12] *See also*, *e.g.*, The Federalist No. 11 (Alexander Hamilton) (justifying the promulgation of the Constitution because it reserved as a "right[] of the Union" the ability to "exclude from [domestic navigation] such dangerous competitors," lest foreign nations conspire and "embarrass our navigation in such a manner as would in effect destroy it, and confine us to a PASSIVE COMMERCE").

proposed. Consistent with this Founding-era evidence, the Port Preference Clause does not admit Koloa Rum's discriminatory effects claim against the Jones Act.

*    *    *

In sum, Koloa Rum's theory, if accepted, would have astoundingly broad consequences that the Framers could not possibly have intended. Koloa Rum's theory is that Hawaii, as an island, is disproportionately disadvantaged by the Jones Act simply because it is "uniquely dependent on maritime shipping," whereas "[b]usinesses located in mainland states have shipping options that do not require [water transport]." FAC ¶¶ 40, 45. By this same logic, *any* regulation of shipping would disproportionately affect Hawaii. Any tax on shipping, any regulation of what kinds of vessels may enter American ports—all would disproportionately affect Hawaii in the same way the Jones Act allegedly does. If Koloa Rum's theory held water, every neutral shipping regulation would be condemned, substantially restraining Congress's powers to regulate foreign and domestic commerce and provide for the national defense. The Supreme Court correctly rejected this possibility long ago, and every court since then has heeded that precedent in rejecting discriminatory effects claims of the sort Koloa Rum now advances. This Court should do the same.

**B.    Koloa Rum Does Not Plausibly Allege That The Jones Act Has A Discriminatory Purpose.**

Koloa Rum's second theory, that the Jones Act has a discriminatory purpose, is equally unavailing. As an initial matter, there is considerable doubt that a facially neutral law would violate the Port Preference Clause even if it was motivated by a discriminatory purpose. No case has ever accepted such a theory. And many have stated that the Port Preference Clause reaches only facially discriminatory laws. *See*, *e.g.*, *Thomson Multimedia Inc.*, 340 F.3d at 1364 n.5 (rejecting "out of hand" Port Preference Clause argument because the challenged exemptions did not "give[] express preference to the ports of one state over another"); *Consumers Power Co. v. Fed. Energy*

24

*Admin.*, 1977 WL 793, at *7 (D.D.C. July 8, 1977) (rejecting Port Preference Clause claim when a law "d[id] not by its terms create a preference for the ports of one state over those of another"); *Amoco Oil Co. v. United States*, 63 F. Supp. 2d 1332, 1341 (Ct. Int'l Trade 1999) ("A violation of the Port Preference Clause requires that an Act explicitly discriminate against the ports of a particular state.").  Those holdings comport with the "familiar principle" across constitutional provisions that—outside of Equal Protection racial discrimination claims, *see*, *e.g.*, *Hunter v. Underwood*, 471 U.S. 222 (1985)—courts "will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive."  *United States v. O'Brien*, 391 U.S. 367, 383 (1968) (First Amendment); *see also Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 777 (2019) (Supremacy Clause); *New York v. Mnuchin*, 408 F. Supp. 3d 399, 419–20 (S.D.N.Y. 2019) (citing *Sonzinsky v. United States*, 300 U.S. 506, 513–14 (1937)) (Taxing and Spending Clauses); *Trump v. Mazars USA, LLP*, 39 F.4th 774, 809 (D.C. Cir. 2022) (refusing to examine Congress's motive in assessing constitutionality of investigative subpoena).  This Court would be in good company in holding that Koloa Rum's discriminatory-purpose theory fails as a matter of law because the Jones Act is a facially neutral law enacted pursuant to Congress's admitted powers to regulate commerce and provide for the national defense.  *See Amoco Oil Co.*, 63 F. Supp. 2d at 1341 (dismissing Port Preference Clause claim because plaintiff "fail[ed] to allege that Congress explicitly discriminated against particular states"); *cf. Kansas*, 16 F.3d at 440–41 (rejecting a Port Preference Clause challenge to a law that granted an *express* but "rather insignificant" preference to named states while also providing for other permissible objectives).

    Even if a discriminatory-purpose theory were available, however, Koloa Rum fails to plausibly allege that the Jones Act has an invalid purpose.  The express purpose behind the Jones Act was to promote the American merchant marine.  Congress enacted similar laws since the Founding

with that same purpose. These laws long predate Hawaii's membership in the Union and so could not possibly discriminate against Hawaii as a state. Koloa Rum's minimal snippets of legislative history say nothing different.

A discriminatory purpose is a serious accusation that must be established with an equally serious showing. A "'[d]iscriminatory purpose' . . . implies more than . . . volition or . . . awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). It means that someone "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects." *Id.* To determine whether a law was enacted with a discriminatory purpose, courts consider "the historical background of the decision," "the specific sequence of events leading up to the challenged decision," and any "departures from the normal procedural sequence." *Omnipoint Corp. v. FCC*, 78 F.3d 620, 634 (D.C. Cir. 1996) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)) (internal quotation marks and alterations omitted). They also may consider "contemporary statements by members of the decisionmaking body." *Arlington Heights*, 429 U.S. at 268. Courts routinely determine on a motion to dismiss that a government action does not plausibly have a discriminatory purpose. *See*, *e.g.*, *Azam v. D.C. Taxicab Comm'n*, 46 F. Supp. 3d 38, 49–50 (D.D.C. 2014) (dismissing equal protection claim because the "spare facts and allegations" did not plausibly allege discriminatory purpose); *Ute Indian Tribe of Uintah & Ouray Rsrv. v. U.S. Dep't of Interior*, 560 F. Supp. 3d 247, 264 (D.D.C. 2021) (dismissing equal protection claim for failing to "adequately allege animus"). Here too, Koloa Rum has failed to allege facts sufficient to plausibly infer that the 66th Congress that passed the Jones Act and President Wilson who signed it into law intended to discriminate against Hawaii.

Koloa Rum's work is cut out for it because the "best evidence of [Congress's] purpose"—"the statutory text [it] adopted," *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991)—reveals that the Merchant Marine Act (and with it, the Jones Act) had an "unmistakably clear" nondiscriminatory purpose, *Conoco, Inc. v. Skinner*, 970 F.2d 1206, 1221 (3d Cir. 1992).  As Koloa Rum concedes, Congress expressly stated its purpose:  to regulate "foreign and domestic commerce" and provide for the "national defense" by creating "a merchant marine of the best equipped and most suitable types of vessels."  41 Stat. 988; *see* FAC ¶ 24.  This was the Merchant Marine Act's unquestionable intent, as courts have routinely recognized.  *See*, *e.g.*, *Autolog Corp. v. Regan*, 731 F.2d 25, 28 (D.C. Cir. 1984) (noting that coastwise restrictions are "bulwarks of a legal structure that . . . promotes development of the American merchant marine"); *Pa. R.R. Co. v. Dillon*, 335 F.2d 292, 295 n.5 (D.C. Cir. 1964) ("Encouragement of a strong United States-flagship Merchant Marine was the primary motivation for the Merchant Marine Act of 1920.").  One section directed the government to sell World War I ships into the private domestic fleet, requiring the government to prioritize American buyers.  41 Stat. at 990.  Another appropriated funding for loans "to aid persons, citizens of the United States, in the construction by them in private shipyards in the United States of" "the best and most efficient" vessels.  *Id.* at 993.  A third directed the newly created Shipping Board to develop new steamship lines as needed "for the promotion . . . of the foreign and coastwise trade," and directed the Board to "operate vessels on such line[s]" itself until a "citizen can be secured to supply such service."  *Id.* at 991.  And so on.  The Jones Act was merely one of numerous provisions with no explicable intent but to promote the American shipping industry, labor, and merchant marine.  *See*, *e.g.*, *Novak*, 795 F.3d at 1016 ("The purpose of the Jones Act is to support this country's merchant marine and its shipbuilding and repair facilities, at least in part so they may be available in times of war or national emergency."); *Marine Carriers*

27

*Corp. v. Fowler*, 429 F.2d 702, 708 (2d Cir. 1970) (noting that the Jones Act's "aims are to protect the American shipping industry already engaged in the coastwise trade, to provide work for American shipyards, and to improve and enhance the American Merchant Marine"). With such a clear and corroborated purpose behind the Act, the Court must "assume that the objectives articulated by the legislature are actual purposes of the statute, unless an examination of the circumstances forces [it] to conclude [otherwise]." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n.7 (1981) (internal quotation marks omitted).

Here, the historical background and circumstances leading up to the Jones Act further put the lie to any claim that the law could have had a discriminatory motive. The Jones Act was but the latest of a long line of cabotage laws since the Founding. *See supra* 3–6. The first Congress adopted the same policy in the form of a duty, which James Madison explained was necessary to support "national security" and maintain a navy that would "defend our towns and cities." Annals of Cong. 246–47 (Joseph Gales ed., 1834).[13] And since 1817, with a few temporary exceptions, no foreign ship has been allowed to do what Koloa Rum desires and the Jones Act forbids: to stop at a port in one state and load goods destined for another state. *See supra* 5. The government "adopted its . . . policy long before [Hawaii] entered the picture and has applied the policy too consistently for [this court] to infer discriminatory purpose from its application" here. *Arlington Heights*, 429 U.S. at 270–71.[14] And it was not even the Jones Act that extended the cabotage laws

---

[13] *See also* David P. Currie, *The Constitution in Congress: Substantive Issues in the First Congress, 1789-1791*, 61 U. Chi. L. Rev. 775, 782 n.39 (1994) (noting that "one of Madison's reasons for encouraging American shipping was to facilitate eventual establishment of a Navy").

[14] Since the 1930s, the same policy (modeled on the Jones Act and its predecessors) applies to point-to-point *air* travel within the United States, a market that Congress has expressly reserved to domestic air carriers. 49 U.S.C. § 41703(c). No one would seriously claim that Congress enacted this cabotage law to discriminate against Hawaii's airports, yet that would be a necessary implication of declaring the Jones Act unconstitutionally discriminatory.

to Hawaii.  By February 1898—several months *before* Hawaii's annexation—the Jones Act's essential features already applied to all states.  As with other new territories like Florida, Alaska, and Puerto Rico, those cabotage restrictions began to apply to Hawaii soon after it joined the nation.  In Hawaii's case, that happened in 1900 via the Hawaiian Organic Act, the same law that put Hawaii at parity with the rest of the United States in numerous beneficial ways, including by making Hawaiians citizens and guaranteeing them constitutional rights.  *See supra* 6.  Rather than departing from the normal sequence of cabotage laws, the Jones Act only continued this policy.

Against this backdrop, and despite conceding that the Jones Act's "stated goals" were non-discriminatory, Koloa Rum points to five aspects of the Jones Act's history that supposedly reveal the law's "discriminatory purpose."  FAC ¶¶ 20–25.  These sparse snippets are insufficient to plausibly allege a discriminatory purpose because they reference only three individuals' views (one senator, one representative, and the territorial governor of Hawaii), and "scattered pieces of legislative history are quite inadequate to serve to attribute a discriminatory purpose to the Congress."  *United States v. Johnson*, 40 F.3d 436, 440 (D.C. Cir. 1994).[15]  In any event, none of Koloa Rum's allegations comes close to plausibly showing that even a single person had a discriminatory motive in enacting the Jones Act.

First, Koloa Rum alleges that the Jones Act's main proponent, Senator Wesley Jones, had previously supported other bills "that expressly sought to restrict" Hawaiian and Alaskan shipping.

---

[15] *See also Citizens for Const. Integrity v. United States*, 57 F.4th 750, 768 (10th Cir. 2023) (noting that "the statements of a few legislators concerning their motives for voting for legislation is a reed too thin to support invalidation of a statute"); *United States v. Suquilanda*, 116 F.4th 129, 143 (2d Cir. 2024) (refusing to attribute a discriminatory purpose to "Congress as a whole" based on "the fact that there were some members of Congress who made racist remarks or held discriminatory beliefs").

FAC ¶¶ 21–22.[16]  But the bills themselves merely proposed to extend certain cabotage laws to Hawaii, to require transportation of government supplies to the Philippines on American ships, and to promote and extend an American merchant marine.  *See*, *e.g.*, H.R. Rep. No. 56-375, at 1 (1900) (describing 1900 bill introduced by Jones to extend cabotage laws to Hawaii).  It is hardly evidence of animus against Hawaii that Senator Jones supported extending the application of laws to Hawaii that already applied to the rest of the states.  In fact, that bill's legislative history fatally undermines any allegations of a discriminatory purpose against Hawaii.[17]  The House Report noted that American vessels already serviced about eighty percent of the Hawaii trade and "several large steamships [were] already under construction or contract in American yards . . . to take the place of those foreign vessels taken out of this trade by the passage of this bill."  *Id.*  The Report thus concluded that the bill would "not diminish the transportation facilities between the islands and the United States, but will, on the contrary, lead to an early improvement in those facilities and also encourage the construction of additional vessels in the United States."  *Id.*  Nor can any animus against Hawaii be gleaned from a bill that would have required carriage of government cargo to the Philippines on American vessels, or another that simply promoted the country's merchant marine.

---

[16] Koloa Rum relies on a student law review note to support this allegation, which itself cites only to a Ph.D. dissertation.  That dissertation in turn cites to legislative history for three bills supported by Jones when he was in the House, but not the bills themselves, only one of which the dissertation says mentions Hawaii.  *See* Sam Heavenrich, Note, *The Neglected Port Preference Clause and the Jones Act*, 132 Yale L.J. 559, 596 & nn. 211–12 (2022) (citing William Stuart Forth, Wesley L. Jones: A Political Biography 61–62, 86 (Nov. 2, 1962) (Ph.D. dissertation, University of Washington) (ProQuest)).

[17] In resolving a motion to dismiss, a court may take judicial notice of "public records" and "consult . . . [the] legislative record to provide evidence of statutory purpose." *Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.*, 909 F.3d 446, 464–65 (D.C. Cir. 2018).

Second, Koloa Rum alleges that Senator Jones "was motivated to enact cabotage restrictions that benefit the Washington shipbuilding industry, even at the expense of other ports or states." FAC ¶ 20. This allegation has no relevance to Koloa Rum's claim that the Jones Act discriminates against *Hawaiian ports* in favor of *other States' ports*. One senator's alleged favoritism of a *Washington industry* over other States' economic interests is not the type of inter-*state* port preference that the Port Preference Clause reaches. *See*, *e.g.*, *Kansas*, 16 F.3d at 440 (legislative favoritism of "one Texas airport" over "another Texas airport" is "of no concern to the Port Preference Clause"); *cf. Clover Leaf Creamery Co.*, 449 U.S. at 463 n.7 ("We will not invalidate a state statute under the Equal Protection Clause merely because some legislators sought to obtain votes for the measure on the basis of its beneficial side effects on state industry."). Nor does this allegation that Senator Jones wanted to support industry constituents in his own state—an unremarkable allegation on its face—allow for a plausible inference that he, and indeed the entire U.S. Congress, enacted the Jones Act in an attempt to discriminate against Hawaii's ports.

Third, Koloa Rum alleges that shipping companies testified in support of the Jones Act, seeking to "protect their interests at the expense of Hawaiians and Alaskans." FAC ¶ 23. Of course American shipping companies would favor a law meant to reserve a domestic market for American carriers and boost the American shipping industry, and it is unsurprising that they would want this law to apply as widely as possible. The phrase "at the expense of Hawaiians and Alaskans" (or anything similar) does not appear in the legislative history that the Complaint points to. The phrase is instead no more than an argumentative restatement of Koloa Rum's opinion that the Jones Act has had harmful economic effects. The Complaint does not plausibly suggest that any "shipping compan[y]" thought the law would harm Hawaii, or had that purpose in supporting its passage. And even if an American carrier at the time did harbor that sentiment, what matters is

*Congress's* motive, and courts "ought not attribute to Congress an official purpose based on the motives of a particular group that lobbied for or against a certain proposal." *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 120 (2001).

Fourth, Koloa Rum claims that in the runup to the Jones Act's passage, "[t]he Governor of Hawai'i . . . testified that the Jones Act would 'penalize[]' the port of Hawai'i." FAC ¶ 23. But not only does this single quoted word from the legislative history fail to demonstrate anti-Hawaii intent by Congress; it is not even about the Jones Act. In the congressional hearing quoted by Koloa Rum, the Governor was discussing a *different* cabotage law that reserved for American carriers the coastwise transportation of *passengers*. *See Establishment of an American Merchant Marine: Hearings Before the S. Comm. on Com.*, 66th Cong. 1331 (1920) (hereinafter, *Merchant Marine Hearings*) (Statement of Charles J. McCarthy) (saying it was "difficult for Honolulu people to get passage" to California); *see also* Act of June 19, 1886, ch. 421, § 8, 24 Stat. 79, 81 (regulating coastwise passenger transportation). Worse still for Koloa Rum, Hawaii stakeholders in fact expressed broad *support* for the cabotage provisions during the runup to the Jones Act's passage. For example, Hawaii's congressional delegate wanted "to make it clear . . . that Hawaii is a thorough and consistent believer in the protection policy and principle." 58 Cong. Rec. 3520 (Aug. 1, 1919) (statement of Del. Kalaniana'ole). And Hawaii's governor praised the "Matson people" and noted that Hawaiians "want American ships." *Merchant Marine Hearings* at 1328.

Even if Hawaii's governor had criticized the Jones Act, though, this would *at most* show that some legislators (if they heard the Governor's comments) would be aware of arguments advanced by opponents of legislation—hardly an unusual occurrence in the halls of Congress—and that some asserted that the law might have certain consequences, which does not equate to agreeing with criticisms, welcoming them as part of the law's intended effect, or (even less) embracing a

"discriminatory motive." *See Feeney*, 442 U.S. at 279–80 (legislative action must be "'because of,' not merely 'in spite of,' its adverse effects on an identifiable group"); *Alaska v. Brown*, 850 F. Supp. 821, 827 (D. Alaska 1994) (holding under the Port Preference Clause that Congress's awareness of a negative consequence on a State does not support the "highly implausible proposition" that Congress had a discriminatory purpose against that state). Presumably, most legislators who reject criticism of proposed legislation and vote for a law do so because they do not agree that such negative consequences will follow from the enactment. And the events that followed confirm that Congress, far from wishing to inflict harm on Hawaii, was receptive to Hawaii's concerns. Senator Jones assured Hawaii's governor that his committee would "do anything they can to get you transportation." *Merchant Marine Hearings* at 1333. When Congress passed the Merchant Marine Act, it explicitly authorized the exemption of Hawaii from the passenger cabotage laws for two years. 41 Stat. 997. Thus, the only time the Merchant Marine Act referenced Hawaii, it was to *help* Hawaii in response to the territorial governor's expressed concerns about passenger travel.

Finally, Koloa Rum's quotation of one sentence from a congressman's statement inadvertently demonstrates Congress's lack of a discriminatory motive. *See* FAC ¶ 25. Koloa Rum alleges that the Jones Act's discriminatory purpose is "inextricably linked" to its express *nondiscriminatory* purpose because, "as one Senator put it, building up domestic shipbuilding meant break[ing] down the coastwise-trade laws between Hawaiʻi and the mainland." *Id.* (internal quotation marks omitted). Koloa Rum mischaracterizes the statement of Representative Julius Kahn of California (not "Senator"), which in any event does not show a discriminatory motive. Kahn, who voted for the Jones Act, stated that he had "always opposed" efforts "to break down the coastwise trade laws between Hawaii and the mainland." 58 Cong. Rec. 3519 (Aug. 1, 1919) (statement of Rep. Kahn). In other words, Representative Kahn *supported* application of the coastwise laws to trade between

Hawaii and the U.S. mainland. But that support does not suggest any ill intent directed at Hawaii. What matters is why he supported applying those policies as broadly as he did, which was not to discriminate against Hawaii, but because these laws incentivized the U.S. shipbuilding industry, which allowed for support—including with Matson ships—of national security in times of war. *See id.* (because of the coastwise laws, "several companies had built the finest vessels that were afloat on the Pacific [including] [t]he *Matsonia*. . . . When we got into [World War I], having these American ships, our Government was able to take them over immediately and put them into the transport service in carrying troops"). Representative Kahn was far from the only congressman who credited the cabotage laws with aiding America's victory in World War I. *See, e.g.*, 59 Cong. Rec. 6811 (May 10, 1920) (statement of Sen. Jones) (but for the coastwise laws, "the result of this war might have been far different, because when we got into this war the only ships that we really had available to transport our troops across the seas and carry supplies for them were ships taken out of the coastwise trade"); 59 Cong. Rec. 8607 (June 4, 1920) (statement of Rep. Cannon) ("[we] would have been in purgatory if we had not had the coastwise trade prior to the war"); *see also Merchant Marine Hearings* at 1011 (statement of Admiral R. E. Coontz) (without an American merchant marine "the war would have been lost"). Koloa Rum's allegations of discriminatory purpose therefore come to nothing.

*    *    *

Koloa Rum asks this Court to ignore the history of cabotage laws since the Founding, disregard the Jones Act's text, and overlook the Jones Act's clear, nondiscriminatory purpose. As between the "obvious" explanation that the Jones Act aims to promote an American merchant marine, and "the purposeful, invidious discrimination" that Koloa Rum alleges, "discrimination is

not a plausible conclusion." *Iqbal*, 556 at 682.  Koloa Rum's Port Preference Clause claim should therefore be dismissed.

**IV.    Koloa Rum Does Not Plausibly Allege That The Jones Act Violates The Due Process Clause.**

Koloa Rum's second claim, that the Jones Act infringes substantive due process, lacks any support.  It must also be rejected.  It is foreclosed by directly on-point Supreme Court precedent, and in any event incompatible with nearly a century of case law confirming that ordinary economic regulation is presumptively constitutional.

The Supreme Court has already considered and rejected Koloa Rum's due process argument.  In *Central Vermont*, the government seized merchandise from a non-Jones Act qualified vessel sailing between two points in the United States, whose owner argued that the Jones Act "deprive[d] it of property without due process of law."  294 U.S. at 41.  The Court rejected the challenge, concluding that the Jones Act is "no more arbitrary, burdensome, or unreasonable" than commonplace "statutes prohibiting transportation by a railroad of its own commodities."  *Id.*  The Court explained that the due process argument was "answered by the numerous cases in which this Court has upheld" similar economic language.  *Id.   Central Vermont* is binding precedent that forecloses Koloa Rum's claim.

And *Central Vermont*'s holding is but one application of the blackletter precept that routine economic legislation does not infringe a fundamental right.  "[T]he 'liberties' protected by substantive due process do not include economic liberties."  *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 721 (2010) (Scalia, J.) (plurality opinion).  It is thus "established beyond peradventure that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality."  *FERC v. Mississippi*, 456 U.S. 742, 754 (1982) (internal quotation marks omitted).

Koloa Rum cannot evade this principle by draping its claim in a supposed fundamental right to "earn a living."  FAC ¶ 83.  As a preliminary matter, Koloa Rum is a corporation, and it is far from clear that any such right would inhere in a corporate entity.  Many corporations exist to make no income or even operate at a loss, and Koloa Rum has pleaded no facts about its profits, costs, and ownership structure.  But even setting aside that concern, the "right to earn a living" alleged by Koloa Rum is but a euphemism for a claim to be free of any economic legislation that even indirectly raises its cost of doing business.  The Jones Act does not even directly regulate Koloa Rum, much less forbid it from selling liquor.  The business certainly reports "earning a living" today—employing 45 workers, shipping to 36 mainland states, and "continu[ing] to grow." *Id.* ¶¶ 4, 36.  Koloa Rum complains only that without the Jones Act's regulations on potential business partners, it could profit even more.  *See id.* ¶ 65.  This is not a valid substantive due process theory.  If a law implicated a fundamental right just because it raised a firm's cost of doing business, then every economic regulation would be presumptively unconstitutional.  Any tax on shipping—any tax on any business, for that matter—would need to surmount strict scrutiny.  As would a law *repealing* the Jones Act, which would paradoxically hurt American carriers' "right to earn a living" at least as much as the Jones Act is alleged to hurt Koloa Rum's.

This paradox, however, has an easy resolution: there simply is no "fundamental right to earn a living."  *See*, *e.g.*, *Fam. Div. Trial Laws. of Superior Ct.-D.C., Inc. v. Moultrie*, 725 F.2d 695, 709–10 (D.C. Cir. 1984) ("appellants' right to earn a living as lawyers is not so fundamental that it triggers strict judicial scrutiny"); *Tiwari v. Friedlander*, 26 F.4th 355, 361 (6th Cir. 2022) ("Economic regulations, even those affecting an individual's liberty to work in a given area, violate due process only when they impose burdens without any rational basis for doing so." (internal quotation marks omitted)); *see also Des Moines Midwife Collective v. Iowa Health Facilities*

*Council*, 23-cv-67 (S.D. Iowa), Dkt. No. 11, at 7 n.16 (Koloa Rum's counsel acknowledging that "courts have generally applied rational basis to claims involving" the supposed "right to earn a living").[18]

Koloa Rum's allegation of a fundamental right to earn a living is especially implausible given that coastwise laws date back to the Founding, and even before.  As early as the fourteenth century, English laws restricted trade by foreign vessels.  *See* Charlie Papavizas, *Journey to the Jones Act: U.S. Merchant Marine Policy 1776–1920* at 17–18 (2024).  The freedom to evade the coastwise laws to "earn a living" therefore cannot possibly be "so deeply rooted in our history and traditions" as to be a fundamental right.  *Washington v. Glucksberg*, 521 U.S. 702, 727 (1997).

Koloa Rum is on still weaker ground in arguing for heightened scrutiny based on Hawaii's alleged lack of "meaningful access to the political process," because it was not a State "at the time the Jones Act was passed."  FAC ¶ 84.  Setting aside that Hawaiian stakeholders supported the Jones Act—and even had the clout to negotiate a Hawaii-specific exception to other cabotage laws, *see supra* 33—no court has ever applied heightened scrutiny merely because a law disparately affects a group that was unable to vote on it.  That principle would be unworkable.  "[A] whole range of tax, welfare, public service, regulatory, and licensing statutes" "benefit[] or burden[]" one group more than another.  *Washington v. Davis*, 426 U.S. 229, 248 (1976).  Koloa Rum's argument would imply, therefore, that numerous economic regulations passed before, for example, the Voting Rights Act or the Nineteenth Amendment (both of which expanded the franchise), are presumptively unconstitutional; and that every time a new State enters the Union, a further swath of

---

[18] *See also*, *e.g.*, *Colon Health Ctrs. of Am., LLC v. Hazel*, 733 F.3d 535, 540, 548 (4th Cir. 2013) (rejecting the claim that a law limiting the opening of medical facilities violated a "right to earn a living" and holding that the law "does not infringe any fundamental or enumerated right"); *Medeiros v. Vincent*, 431 F.3d 25, 32 (1st Cir. 2005) ("The right to 'make a living' is not a 'fundamental right,' for . . . substantive due process purposes.").

laws is subject to strict scrutiny.  In short, Koloa Rum's novel theory would improperly resurrect a species of the rejected theory of discriminatory-effects unconstitutionality.  *See id.* at 239.  The rational basis test instead governs.

To prevail under that test, Koloa Rum faces an "unenviable task" of refuting "every conceivable basis which might support [the law]."  *Sanchez v. OSSE*, 45 F.4th 388, 396 (D.C. Cir. 2022) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)).  Under the rational-basis test, the court's "role is not to assess the wisdom of the agency's policy choices." *Id.* at 398.  The Court may not weigh a challenged law's costs and benefits.  *See id.*  The challenge fails as long as a "legislator might rationally assume" that a law carries a benefit, even if the assumption is "based on rational speculation unsupported by evidence or empirical data."  *Beach Commc'ns*, 508 U.S. at 315, 318.  "The assumptions underlying [the government's] rationale[] may be erroneous." *Id.* at 320.  But so long as the law "might be thought" to be "rational," it is constitutional. *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 712 (D.C. Cir. 2007) (en banc).  This forgiving standard applies "[a]t the motion-to-dismiss stage," when "the plaintiff must plausibly allege facts showing that no reasonably conceivable state of facts could provide a rational basis for the challenged policy."  *Sanchez*, 45 F.4th at 396.  Even to plead a rational-basis claim is thus "a tall task," *id.*, at which plaintiffs often fail.[19]

Koloa Rum has not plausibly alleged that the Jones Act fails the rational-basis test.  As the Complaint acknowledges, the law's "stated goals" were "ensuring the United States had a strong and self-sufficient maritime industry, protecting national security interests by maintaining a fleet

---

[19] *See*, *e.g.*, *Hettinga v. United States*, 677 F.3d 471, 479 (D.C. Cir. 2012) (affirming dismissal of rational-basis claim); *Lillemoe v. United States Dep't of Agric.*, *Foreign Agric. Serv.*, 344 F. Supp. 3d 215, 230 (D.D.C. 2018) (dismissing rational-basis claim); *Alexis v. District of Columbia*, 44 F. Supp. 2d 331, 346 (D.D.C. 1999) (same).

available for military use in times of war, and supporting American shipbuilding and maritime labor." FAC ¶ 24. A law that reserves the coastwise trade for American carriers and vessels could conceivably promote these objectives. The legislators who enacted the Jones Act certainly thought so, even crediting the law's predecessor for helping to win World War I. *See supra* 34. That is dispositive. Koloa Rum's conclusory allegations that the law is economically harmful and has "failed to accomplish its goals," FAC ¶¶ 30–40, are false, but more importantly, irrelevant. The government does not need evidence on rational-basis review. *Beach Commc'ns*, 508 U.S. at 315. So even supposing Koloa Rum ultimately convinced the Court that the Jones Act is a mistaken policy, this would not matter. The policy merits of the Jones Act is a judgment reserved to Congress.

The Ninth Circuit recently recognized as much, finding that a due process challenge to the Jones Act would be "an exercise in futility." *Novak*, 795 F.3d at 1020. The court explained that the Jones Act merely needed to have a rational basis, by being "reasonably related to a legitimate legislative purpose." *Id.* at 1022. And because "there are plausible reasons for Congress' action, our inquiry is at an end." *Id.* at 1023 (internal quotation marks omitted). In short, "[i]t is not for us to evaluate the wisdom of the Jones Act. That task is for Congress." *Id.*

Just so. Even taking the Complaint as true, the substantive due process claim fails as a matter of law and should be dismissed.

## CONCLUSION

The Complaint should be dismissed for lack of subject matter jurisdiction because Koloa Rum has not plausibly alleged standing. Even if Koloa Rum had plausibly alleged standing, the Complaint should still be dismissed with prejudice. The Port Preference Clause does not admit a discriminatory effects theory; the centuries-long history of the cabotage laws makes it impossible

for the Jones Act to have a discriminatory motive; and the due process claim fails as a matter of law.

Dated: July 30, 2025    Respectfully submitted,

        */s/ Miguel A. Estrada*
        Miguel A. Estrada (DC Bar No. 456289)
        Lucas C. Townsend (DC Bar No. 1000024)
        Amalia Reiss (DC Bar No. 241775)
        Eric Brooks* (DC Bar No. 1660507)
        Noah J. Delwiche (DC Bar No. 90027464)
        GIBSON, DUNN & CRUTCHER LLP
        1700 M Street, N.W.
        Washington, D.C. 20036-4504
        (202) 955-8500
        MEstrada@gibsondunn.com
        LTownsend@gibsondunn.com
        AReiss@gibsondunn.com
        EBrooks2@gibsondunn.com
        NDelwiche@gibsondunn.com

        *Application for admission pending

        Rachel S. Brass (*pro hac vice*)
        GIBSON, DUNN & CRUTCHER LLP
        One Embarcadero Center, Suite 2600
        San Francisco, CA 94111-3715
        (415) 393-8200
        RBrass@gibsondunn.com

        *Counsel for Intervenor-Defendant*
        *Matson Navigation Company, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2025, I caused a copy of the foregoing document to be served on all parties through the Court's CM/ECF system.


*/s/ Miguel A. Estrada*
Miguel A. Estrada (DC Bar No. 456289)