**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

KŌLOA RUM COMPANY,

                    *Plaintiff,*

          v.

KRISTI NOEM, *et al.*,

                    *Defendants.*

Case No. 1:25-cv-00554-JEB

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS**
**PLAINTIFF'S COMPLAINT**

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 2

I.    The Jones Act and the Regulation of Domestic Shipping in the United States .................... 2

II.   Plaintiff Koloa Rum .......................................................................................... 4

III.  Procedural History ........................................................................................... 4

STANDARD OF REVIEW ........................................................................................ 5

ARGUMENT ............................................................................................................. 5

I.    Koloa Rum Fails to State a Claim Under the Port Preference Clause. ................................ 5

    A.    The Port Preference Clause does not prohibit facially neutral laws like the Jones Act, even if they may provide "incidental advantages" to some ports. ............................... 6

    B.    Plaintiff's allegations that the Jones Act has a "discriminatory purpose" are irrelevant to the constitutional analysis and in any event do not support Plaintiff's theory ......... 11

    C.    Even if the Port Preference Clause does apply to neutral laws like the Jones Act, the Jones Act is still subject to the rational basis test and Plaintiff has not adequately alleged that the Jones Act lacks a rational basis. ........................................................ 15

II.   Koloa Rum Fails to State a Claim Under the Fifth Amendment's Due Process Clause. .... 23

    A.    The Jones Act does not violate the Due Process Clause because the Act at most incidentally and indirectly burdens any "right to make a living." ............................... 24

    B.    The Jones Act does not violate the Due Process Clause because the "right to make a living" is not a fundamental right and the Jones Act satisfies the rational basis test ... 26

      1.   The "right to make a living" is not a fundamental right and is thus subject to "reasonable government regulation." ........................................................................ 27

      2.   Plaintiff has not adequately alleged that the Jones Act lacks a rational basis. ......... 29

CONCLUSION .......................................................................................................... 29

## TABLE OF AUTHORITIES

**Cases**

*Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*,
  495 F.3d 695 (D.C. Cir. 2007) ..................................................................... 23, 26, 28

*Ala. Great S. Ry. v. United States*,
  340 U.S. 216 (1951) ............................................................................................. 7, 8, 10

*Alaska v. Brown*,
  850 F. Supp. 821 (D. Alaska 1994) ................................................................... 12

*Alden v. Maine*,
  527 U.S. 706 (1999) .............................................................................................. 9, 10

*Ambach v. Bell*,
  686 F.2d 974 (D.C. Cir. 1982) .......................................................................... 16

*Arab v. Blinken*,
  600 F. Supp. 3d 59 (D.D.C. 2022) .................................................................. 18

*Armour Packing Co. v. United States*,
  209 U.S. 56 (1908) ........................................................................................ *passim*

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...................................................................................... *passim*

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................... 5, 13, 22

*Beydoun v. Sessions*,
  871 F.3d 459 (6th Cir. 2017) ......................................................................... 25, 26

*Bond v. United States*,
  564 U.S. 211 (2011) ........................................................................................... 27

*Busic v. Transp. Sec. Admin.*,
  62 F.4th 547 (D.C. Cir. 2023) ......................................................................... 18

*City of Houston v. FAA*,
  679 F.2d 1184 (5th Cir. 1982) .......................................................................... 7

*City of Milwaukee v. Yeutter*,
  877 F.2d 540 (7th Cir. 1989) ..................................................................... 7, 8, 12

*Colo. Water Conservancy Dist. v. FERC*,
  730 F.2d 1509 (D.C. Cir. 1984) ...................................................................... 14

*Conn v. Gabbert*,
  526 U.S. 286 (1999) ....................................................................................... 24, 27

*Consumers Power Co. v. FEA*,
  No. 76-1759, 1977 WL 793 (D.D.C. July 8, 1977) ...................................... 7

*Dittman v. California*,
191 F.3d 1020 (9th Cir. 1999) ................................................................. 24, 28

*Doc Soc'y v. Blinken*,
No. CV 19-3632, 2023 WL 5174304 (D.D.C. Aug. 11, 2023)................................. 20

*Doe v. Moore*,
410 F.3d 1337 (11th Cir. 2005) ................................................................. 25

*Edwards v. D.C.*,
755 F.3d 996 (D.C. Cir. 2014) ................................................................. 18

*Fam. Div. Trial Laws. of Superior Ct.-D.C., Inc. v. Moultrie*,
725 F.2d 695 (D.C. Cir. 1984) ................................................................. 27

*FCC v. Beach Commc'ns, Inc.*,
508 U.S. 307 (1993)................................................................. 15, 16, 17

*Fed. Express Corp. v. U.S. Dep't of Com.*,
486 F. Supp. 3d 69 (D.D.C. 2020) ................................................................. 19, 20

*Franceschi v. Yee*,
887 F.3d 927 (9th Cir. 2018) ................................................................. 24, 26

*Fraternal Ord. of Police, Metro. Police Dep't Lab. Comm., D.C. Police Union v. D.C.*,
45 F.4th 954 (D.C. Cir. 2022)................................................................. 14

*Gallagher v. City of Clayton*,
699 F.3d 1013 (8th Cir. 2012) ................................................................. 20

*Golden Glow Tanning Salon, Inc. v. City of Columbus, Miss.*,
52 F.4th 974 (5th Cir. 2022) ................................................................. 27

*Hu v. City of New York*,
927 F.3d 81 (2d Cir. 2019)................................................................. 24, 25, 26

*Islamic Am. Relief Agency v. Gonzales*,
477 F.3d 728 (D.C. Cir. 2007)................................................................. 5

*Johnson v. Becerra*,
668 F. Supp. 3d 14 (D.D.C. 2023) ................................................................. 22, 23

*Kansas v. United States*,
16 F.3d 436 (D.C. Cir. 1994)................................................................. *passim*

*The Lizzie Henderson*,
29 F. Cas. 1373 (S.D. Fla. 1880) ................................................................. 8

*Lowry v. Barnhart*,
329 F.3d 1019 (9th Cir. 2003) ................................................................. 24

*Medeiros v. Vincent*,
431 F.3d 25 (1st Cir. 2005) ................................................................. 27

*Nevada v. Watkins*,

iv

914 F.2d 1545 (9th Cir. 1990) ............................................................... 7

*NLRB v. Noel Canning,*
573 U.S. 513 (2014) ........................................................................... 9

*Novak v. United States,*
795 F.3d 1012 (9th Cir. 2015) ...................................................... 17, 23

*Nuclear Energy Inst., Inc. v. Env't Prot. Agency,*
373 F.3d 1251 (D.C. Cir. 2004) ................................................. 7, 9, 11

*Oklahoma v. Castro-Huerta,*
597 U.S. 629 (2022) ..................................................................... 12, 15

*Pennsylvania v. Wheeling & Belmont Bridge Co.,*
59 U.S. 421 (1855) ..................................................................... *passim*

*Phila. Police & Fire Ass'n for Handicapped Child., Inc. v. City of Phila.,*
874 F.2d 156 (3d Cir. 1989) .............................................................. 25

*Rajah v. Mukasey,*
544 F.3d 427 (2d Cir. 2008) ............................................................. 19

*Sammon v. New Jersey Bd. of Med. Exam'rs,*
66 F.3d 639 (3d Cir. 1995) ............................................................... 20

*Sanchez v. Off. of State Superintendent of Educ.,*
45 F.4th 388 (D.C. Cir. 2022) ...................................................... *passim*

*Sec'y of Agric. v. Cent. Roig Ref. Co.,*
338 U.S. 604 (1950) .......................................................................... 16

*South Carolina v. Georgia,*
93 U.S. 4 (1876) ....................................................................... 6, 8, 12

*Tiwari v. Friedlander,*
26 F.4th 355 (6th Cir. 2022) ............................................................. 27

*Tri Cnty. Indus., Inc. v. D.C.,*
104 F.3d 455 (D.C. Cir. 1997) .......................................................... 25

*United States v. Johnson,*
40 F.3d 436 (D.C. Cir. 1994) ...................................................... 13, 14

*United States v. Ptasynski,*
462 U.S. 74 (1983) ........................................................................... 16

*United States v. Vaello Madero,*
596 U.S. 159 (2022) .......................................................................... 28

*Williamson v. Lee Optical of Okla. Inc.,*
348 U.S. 483 (1955) .......................................................................... 16

**Constitution**

U.S. Const. art 1 ....................................................................................................... *passim*

**Statutes**

46 U.S.C. § 50101 ............................................................................................ 3, 17, 19

46 U.S.C. § 55102(b) ............................................................................................... 3, 9

An Act to Amend the Merchant Marine Act, 1920, and For Other Purposes,
 Pub. L. 100-329, 102 Stat. 588 (1988)............................................................... 4

An Act to Amend Section 27 of the Merchant Marine Act, 1920,
 Pub. L. 74-191, ch. 355, 49 Stat. 442 (1935)................................................... 3

An Act to Amend Section 4370 of the Revised Statutes of the United States,
 Pub. L. 76-599, ch. 324, 54 Stat. 304 (1940)................................................... 4

An Act Giving the U.S. Shipping Board Power to Suspend Present Provisions of Law,
 Pub. L. 65-73, ch. 88, 40 Stat. 392 (1917)....................................................... 3

An Act to Provide for the Promotion and Maintenance of the American Merchant Marine,
 Pub. L. 66-261, ch. 250, 41 Stat. 988 (1920).................................................... 3

**Rules**

Fed. R. Civ. P. 12(b)(6)............................................................................................... 5

Fed. R. Civ. P. 25(d) ................................................................................................... i

**Other Authorities**

John Frittelli, Cong. Rsch. Serv., R45725, *Shipping Under the Jones Act: Legislative and
 Regulatory Background* 5 (Nov. 21, 2019)................................................... 18, 19

*Maritime Administration Needs to Improve Financial Assistance Programs*,
 Gov't Accountability Off. (June 30, 2025), https://files.gao.gov/reports/GAO-25-
 107304/index.html ........................................................................................... 22

# **INTRODUCTION**

The Jones Act has regulated domestic shipping within the United States since 1920.  The Act is the latest of a string of domestic shipping regulations, dating to the First Congress, that favor U.S.-built, -owned, and -operated vessels over foreign vessels, and the Jones Act requires that all domestic shipping within the United States use vessels built, owned, and primarily crewed by United States citizens.  The Act imposes this restriction to support the American merchant marine, the fleet of vessels privately owned by U.S. citizens and documented with a coastwise endorsement in the United States, and thus to protect American national security and promote American shipbuilding and commerce.

Plaintiff, a producer and seller of rum based in Hawai'i, argues that the Jones Act violates both the Port Preference Clause of Article I of the Constitution and Plaintiff's right to make a living, as protected by the Due Process Clause of the Fifth Amendment.  But under long-established Supreme Court and Circuit Court precedent, the Jones Act comes nowhere close to violating either Constitutional provision.

The Port Preference Clause prohibits Congress from imposing a "direct privilege or preference" for the ports of one state over the ports of another, but the Jones Act does not impose such a preference.  Rather, the Jones Act is a neutral rule that applies equally to all vessels and all locations in the United States.  Two hundred years of Supreme Court precedent confirm that the "incidental" impact of neutral laws like the Jones Act do not violate the Port Preference Clause.  And even if a law imposing only an incidental or disparate impact could be unconstitutional under the Port Preference Clause, the Jones Act would be subject only to rational basis review, as other facially neutral economic regulations are.  And the Jones Act easily passes that review.  The Act is rationally related to the Jones Act's stated purpose of protecting the American merchant marine

1

in support of a domestic industry that is critical to the Nation's national security.

Nor does the Jones Act violate Plaintiff's right to make a living under the Fifth Amendment's Due Process Clause. As an initial matter, Plaintiff is a rum distillery and the Jones Act is an economic regulation focused on shipping. The Jones Act does not bar Plaintiff from operating as a distillery or even limit how Plaintiff may operate. The Jones Act thus burdens Plaintiff's right to make a living—if at all—only indirectly and incidentally, so the Act imposes no constitutionally cognizable burden under the Due Process Clause. But even if the Jones Act did burden Plaintiff's right to make a living, that burden is constitutional. The Due Process Clause's substantive component strictly protects fundamental rights, but court after court—including the Supreme Court and the D.C. Circuit—have confirmed that the right to make a living is not fundamental. Laws burdening non-fundamental rights are constitutional under the Due Process Clause if they have a rational basis, which as explained above the Jones Act does.

For these reasons, the Court should grant Defendants' motion to dismiss.

## **BACKGROUND**

### I.    **The Jones Act and the Regulation of Domestic Shipping in the United States**

Since the founding, Congress has enacted laws that favor domestically owned and manufactured vessels over foreign vessels. Many of these laws regulated shipping in between points within the United States, a type of transportation known as cabotage. *See* Cabotage, Black's Law Dictionary (12th ed. 2024). For example, the third law passed by the First Congress in 1789 imposed lower duties on cargo transported within the United States on "all ships or vessels built within the [United] States, and belonging wholly to a citizen or citizens thereof" than on vessels "belonging wholly, or in part, to subjects of foreign powers." *See* First Cong., Sess. I, Ch. 3, § 1 (July 20, 1789). Just decades later, Congress imposed an even stricter rule, prohibiting domestic

shipping via any "vessel belonging wholly or in part to a subject of any foreign power." Fourteenth Cong., Sess. II, Ch. 31, § 4 (Mar. 1, 1817).

That 1817 prohibition on domestic shipping in foreign vessels was in effect for 100 years, and was only lifted briefly during World War I. *See* Pub. L. 65-73, ch. 88, 40 Stat. 392, 392 (1917). And right after World War I's end came the Jones Act. The Jones Act, formally Section 27 of the Merchant Marine Act of 1920, echoed the 1817 law and provided that "no merchandise shall be transported by water . . . between points in the United States. . . in any other vessel than a vessel built in and documented under the laws of the United States and owned by persons who are citizens of the United States." Pub. L. 66-261, ch. 250, 41 Stat. 988, 999 (1920) (codified as amended at 46 U.S.C. § 55102(b)). As Congress explained in the Jones Act's text, the Act was meant "[t]o provide for the promotion and maintenance of the American merchant marine," *id.* at 988, and noted that the United States's merchant marine was "necessary for the national defense and for the proper growth of [the United States's] foreign and domestic commerce." *Id.*; *see also* 46 U.S.C. § 50101 ("It is necessary for the national defense and the development of the domestic and foreign commerce of the United States that the United States have a merchant marine . . . .").

Since the Jones Act's passage, Congress has amended and expanded the Jones Act's prohibitions on domestic cargo shipping on foreign-built, -owned, or -operated vessels. In 1935, Congress prohibited vessels that originally qualified as a U.S.-built, owned, and operated vessel from being used for domestic shipping under the Jones Act if they were ever sold to foreign owners or place under foreign registry, even if they were later re-purchased by a domestic owner. *See* An Act to Amend Section 27 of the Merchant Marine Act, 1920, Pub. L. 74-191, ch. 355, 49 Stat. 442, 442 (1935). Just a few years later, Congress expanded the Jones Act's limits on domestic shipping

3

to cover towing vessels and salvage vessels.  *See* An Act to Amend Section 4370 of the Revised Statutes of the United States, Pub. L. 76-599, ch. 324, 54 Stat. 304, 304-05 (1940).  And more recently, in 1988 Congress provided that domestic shipping of even "valueless material," like trash or waste, must use U.S.-built, -owned, and -operated vessels.  *See* An Act to Amend the Merchant Marine Act, 1920, and For Other Purposes, Pub. L. 100-329, § 1, 102 Stat. 588, 588 (1988).

## II.    Plaintiff Koloa Rum

Plaintiff Koloa Rum is a "producer and seller of rum operating in Hawai'i."  First Am. Compl. (FAC) ¶ 13, ECF No. 13 (Mar. 31, 2025).  Plaintiff manufactures and distills its rum in Hawai'i, and both imports raw materials to Hawai'i from the mainland and exports its rum from Hawai'i to the mainland.  *Id.* ¶ 53.

Plaintiff alleges that because the Jones Act limits domestic shipping to domestic vessels, the domestic shipping market is less competitive and more expensive than the international shipping market.  *Id.* ¶ 41.  Absent the Jones Act, Plaintiff alleges that it could use lower-priced foreign vessels to import raw material and export its finished product rather than higher-priced domestic vessels; the Jones Act thus allegedly raises Plaintiff's costs.  *Id.* ¶ 55.  Further, Plaintiff alleges that the Jones Act affects Plaintiff, and other businesses in Hawai'i, differently than the Act affects businesses in other states because the lower 48 states have easier access to lower-priced international shipping and to lower-priced domestic transportation options.  *Id.* ¶ 45.

## III.    Procedural History

Plaintiff filed its complaint on February 25, 2025, *see generally* Compl., ECF No. 1, and its amended complaint on March 31, 2025, *see generally* FAC.  On April 11, 2025, Matson Navigation Company, Inc. moved to intervene in this case in support of Defendants, and on May 22, 2025, the American Maritime Partnership and the Maritime Trades Department of the AFL-

4

CIO did the same.  *See* Notice of Mot. of Matson Navigation Co., Inc. to Intervene in Supp. of Defs., ECF No. 15; Notice of Am. Mar. P'ship and Mar. Trades Dep't of the AFL-CIO's Mot. to Intervene in Supp. of Defs., ECF No. 31.  The Court granted those motions on June 30, 2025.  *See* Order at 4-5, ECF No. 36.

## STANDARD OF REVIEW

A court may dismiss all or part of a complaint where it fails to state a claim upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).  A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  While a court must take as true "nonconclusory factual allegation[s]," a court need not accept as true "legal conclusions," "conclusory" allegations, *id.* at 681, or "inferences that are unsupported by the facts set out in the complaint," *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007).  At bottom, a plaintiff's allegations must "nudge[] their claims across the line from conceivable to plausible."  *Twombley*, 550 U.S. at 570.

## ARGUMENT

### I.    Koloa Rum Fails to State a Claim Under the Port Preference Clause.

Plaintiff's first claim is that the Jones Act violates the Constitution's Port Preference Clause.  *See* FAC ¶ 77.  That clause provides that "[n]o Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another."  U.S. Const. art. I, § 9, cl. 6.  The clause "has never been relied on by the federal judiciary to hold an act of Congress unconstitutional." *Kansas v. United States*, 16 F.3d 436, 439 (D.C. Cir. 1994).

### A. The Port Preference Clause does not prohibit facially neutral laws like the Jones Act, even if they may provide "incidental advantages" to some ports.

The Port Preference Clause was intended to prevent Congress from, for instance "compel[ling] ships sailing in or out of the Chesapeake to clear or enter at Norfolk, or some port in Virginia—a regulation that would be injurious to the commerce of Maryland." *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. 421, 434 (1855); *see also Kansas*, 16 F.3d at 439 (referring to that regulation as the "paradigm evil the Clause was explicitly designed to prevent"). Consistent with that goal, the Supreme Court held 170 years ago that the Port Preference Clause is "a prohibition against some positive legislation by congress to th[e] effect" of imposing "a direct privilege or preference of the ports of any particular State over those of another." *Wheeling*, 59 U.S. at 435. But the Clause does not prohibit the "incidental advantages that might possibly result from the legislation of congress upon other subjects connected with commerce, and confessedly within its power." *Id.*

Indeed, the Supreme Court recognized:

"[t]here are many acts of congress passed in the exercise of this power to regulate commerce, providing for a special advantage to the port or ports of one State, and which very advantage may incidentally operate to the prejudice of the ports in a neighboring State, which have never been supposed to conflict with [the Port Preference Clause's] limitation upon [Congress's] power. The improvement of rivers and harbors, the erection of light-houses, and other facilities of commerce, may be referred to as examples."

*Id*. at 433. In short, the Port Preference Clause's "prohibition of . . . a preference does not extend to acts which may directly benefit the ports of one State and only incidentally injuriously affect those of another." *South Carolina v. Georgia*, 93 U.S. 4, 13 (1876); *see also Armour Packing Co. v. United States*, 209 U.S. 56, 80 (1908) ("The fact that regulation, within the acknowledged power of Congress to enact, may affect the ports of one state more than those of

another, cannot be construed as a violation of this constitutional provision [the Port Preference Clause].").

Both the D.C. Circuit and this Court have faithfully implemented the Supreme Court's guidance that the disparate impact of a neutral law does not violate the Port Preference Clause, acknowledging that "[t]he Supreme Court, long ago, recognized that the Clause does not bar 'incidental advantages that might possibly result from the legislation of Congress.'" *Kansas*, 16 F.3d at 440. Congress may "enact laws which 'greatly benefit particular ports and which incidentally result to the disadvantage of other ports in the same or neighboring states.'" *Id.* at 441 (quoting *Ala. Great S. Ry. v. United States*, 340 U.S. 216, 229 (1951)); *see also Nuclear Energy Inst., Inc. v. Env't Prot. Agency*, 373 F.3d 1251, 1307 (D.C. Cir. 2004) ("[T]he Port Preference Clause prohibits only 'positive legislation by Congress' that gives 'a direct privilege or preference to the ports of any particular State over those of another,' not federal enactments that merely confer 'incidental advantages' on one port over others." (quoting *Wheeling*, 59 U.S. at 433-35)). As this Court itself has put it, "the port preference clause . . . reaches only situations in which the ports of one state are directly preferred over those of another state, and not where the preference is only incidental or an accident of geography." *Consumers Power Co. v. FEA*, No. 76-1759, 1977 WL 793, at *7 (D.D.C. July 8, 1977).

Other courts agree, holding that "only explicit discrimination" between the ports of different states "violates the Port Preference Clause," while the "[d]isparate consequences of neutral rules do not." *City of Milwaukee v. Yeutter*, 877 F.2d 540, 545, 546 (7th Cir. 1989); *see also, e.g.*, *City of Houston v. FAA*, 679 F.2d 1184, 1198 (5th Cir. 1982) ("The Port Preference Clause gave small states protection against *deliberate discrimination* against them by other, more

powerful states. It does not . . . cover the situation before us, where the FAA has adopted what another realm of constitutional law would term a *facially neutral rule*." (emphasis added)); *State of Nev. v. Watkins*, 914 F.2d 1545, 1558 (9th Cir. 1990) ("[T]he [Port Preference] [C]lause does not prohibit legislation that 'incidentally results to the disadvantage of other ports in the same or neighboring States.'" (quoting *Ala. Great S. Ry*, 340 U.S. 229)).

Applying this reasoning, the Supreme Court has upheld a variety of facially neutral laws that nevertheless imposed incidental disadvantages on the ports of some states. One such law authorized a river bridge after which, Pennsylvania claimed, "navigation of the Ohio River by steamboats of the largest class will be obstructed, to the injury of" Pennsylvania. *Wheeling*, 59 U.S. at 422. Another law "closing [a river] channel on the South Carolina side of Hutchinson's Island," even though the "purpose and probable effect" of the closure would be to "improve the southern channel [near Georgia] at the expense of the northern" channel, near South Carolina. *South Carolina*, 93 U.S. at 11. A third law regulated interstate railroads, even though "the regulation of interstate commerce by rail has the effect to give an advantage to commerce wholly by water and to ports which can be reached by means of inland navigation" at the expense of ports which could be reached only by rail. *Armour Packing*, 209 U.S. at 80. And lower courts have upheld federal laws that, for instance, prohibited "airlines from offering direct interstate flights from Love Field" in Texas, *Kansas*, 16 F.3d at 438, and caused less shipping traffic to "go[] through Milwaukee than would do so" otherwise, *Yeutter*, 877 F.2d at 545. And in the one case of which the government is aware that invalidated a law under the Port Preference Clause, the state law at issue explicitly exempted only ships "owned wholly within the state of Florida" from pilotage fees, thus imposing the type of direct privilege or preference the Supreme Court has

recognized could violate the Port Preference Clause. *The Lizzie Henderson*, 29 F. Cas. 1373, 1373 (S.D. Fla. 1880).

The Jones Act is no different than the other neutral rules that courts have upheld from a Port Preference Clause challenge. The Jones Act, by its terms, applies to "the transportation of merchandise by water, or by land and water, between points in the United States to which the coastwise laws apply." 46 U.S.C. § 55102(b). The Act applies equally to ports (indeed, to "points") in all states, and thus imposes no "direct privilege or preference to the ports of any particular State over those of another." *Nuclear Energy Inst.*, 373 F.3d at 1307 (quoting *Wheeling*, 59 U.S. at 433-35). So the Jones Act is a facially neutral rule. The mere fact that the Act "may affect the ports of one state more than those of another, cannot be construed as a violation of this constitutional provision [the Port Preference Clause]." *Armour Packing*, 209 U.S. at 80.

Reinforcing this binding Supreme Court and D.C. Circuit precedent, "[h]istory also offers strong support" for the Jones Act's constitutionality. *NLRB v. Noel Canning*, 573 U.S. 513, 528 (2014); *see also Alden v. Maine*, 527 U.S. 706, 743-44 (1999) (noting that "early congressional practice . . . provides 'contemporaneous and weighty evidence of the Constitution's meaning.'" (quoting *Printz v. United States*, 521 U.S. 898, 905 (1997))). As explained above, the Jones Act's prohibition on foreign vessels performing domestic shipping was not novel in 1920, but part of Congress's consistent pattern of favoring domestic vessels in domestic shipping ever since the Founding. The same year the Constitution was ratified, the First Congress imposed a discriminatory tariff that imposed lower duties on domestic cargo transported on domestic ships than on foreign ships. *See* First Cong., Sess. I, Ch. 3, § 1 (July 20, 1789). Less than thirty years later, Congress passed a law analogous to the Jones Act that prohibited domestic shipping "in a

vessel belonging wholly or in part to a subject of any foreign power." Fourteenth Cong., Sess. II, Ch. 31, § 4 (Mar. 1, 1817). This bar on foreign vessels performing domestic shipping was effective for a century until it was briefly suspended in 1917 for World War I, *see* 40 Stat. at 392, and then reimposed three years later through the Jones Act itself.

As this history demonstrates, Congress has regulated domestic shipping since the founding of this country and has prohibited the domestic shipping of cargo on foreign vessels for all but three years between 1817 and today. Plaintiff's theory—that the Port Preference Clause bars neutral rules that favor domestic vessels—is thus at odds with both the First Congress's understanding of the Clause and Congress's long history of favoring U.S.-built, -owned, and -operated ships in domestic shipping. So here, the "early congressional practice," unbroken until the present day, "provides 'contemporaneous and weighty evidence'" against Plaintiff's theory. *Alden*, 527 U.S. at 743 (quoting *Printz*, 521 U.S. at 905).

Nonetheless, Plaintiff alleges that the Jones Act violates the Port Preference Clause because the "effect of the Jones Act is to discriminate against Hawai'ian ports" by "impos[ing] uniquely higher costs on shipping to and from Hawai'i." FAC ¶¶ 74, 75. By its terms, the Jones Act does no such thing. And as explained above, even laws that "greatly benefit particular ports and which incidentally result to the disadvantage of other ports" do not violate the Port Preference Clause. *Kansas*, 16 F.3d at 440 (quoting *Ala. Great S. Ry.*, 340 U.S. at 229). The alleged incidental effects of the Jones Act are no different from the effects of other laws described above that courts have found not to violate the Port Preference Clause.

In fact, the Supreme Court held in *Armour Packing* that a burden closely analogous to the burden Plaintiff claims here did not violate the Port Preference Clause. That case concerned a

challenge under the Port Preference Clause to a federal statute setting different railroad rates for different routes between different states. *See Armour Packing*, 209 U.S. at 66-67. There, the Supreme Court admitted that the railroad regulation challenged in the case could "give an advantage to commerce wholly by water and to ports which can be reached by means of inland navigation." *Id.* at 80. That regulation essentially imposed a pro-island, pro-water shipping preference the precise opposite of the pro-mainland, anti-shipping preference that Plaintiff alleges the Jones Act imposes. *See* FAC ¶¶ 45-46 (alleging that the Jones Act imposes lower burdens on business and ports in mainland states). But even the pro-water shipping preference in *Armour Packing* was dismissed as yet another "regulation, within the acknowledged power of Congress to enact, [that] may affect the ports of one state more than those of another, [and] cannot be construed as a violation of" the Port Preference Clause. 209 U.S. at 80. Any incidental advantage that the railroad regulations gave to "commerce wholly by water" were "natural advantages and [we]re not created by statutory law." *Id.* Likewise, any advantages that the Jones Act gives to ports with "greater access to international ships" or the ability to "move goods by truck, train, or other non-maritime means," FAC ¶ 30, are natural advantages not created by the Jones Act.

**B. Plaintiff's allegations that the Jones Act has a "discriminatory purpose" are irrelevant to the constitutional analysis and in any event do not support Plaintiff's theory.**

Plaintiff also alleges that the Jones Act is unconstitutional because "[t]he Jones Act was purposefully designed" to discriminate against Hawai'i. *Id.* ¶ 72; *see also id.* ¶¶ 73, 76. But that allegation makes out no plausible violation of the Port Preference Clause.

First, the analysis under the Port Preference Clause turns on a law's effects, not its purpose. Consistent with this long-standing principle, the Supreme Court has held that a law violates the Port Preference Clause only if it imposes a "direct privilege or preference of the ports of any

11

particular State over those of another." *Wheeling*, 59 U.S. at 435; *see also Nuclear Energy Inst.*, 373 F.3d at 1307 ("[T]he Port Preference Clause prohibits only 'positive legislation by Congress' that gives 'a direct privilege or preference to the ports of any particular State over those of another,' not federal enactments that merely confer 'incidental advantages' on one port over others." (quoting *Wheeling*, 59 U.S. at 433-35)). These binding cases emphasize what a law *does*—does it impose a direct preference or merely confer incidental advantages—not *why* it does so. Indeed, these cases merely reflect the general principle that "the text of a law controls over purported legislative intentions." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022). As explained above, under that rubric the Jones Act is constitutional: it is a neutral economic regulation, not a direct privilege or preference. And the "[d]isparate consequences of neutral rules do not violate the Port Preference Clause." *Yeutter*, 877 F.2d at 545.

In fact, the Supreme Court has even upheld a law under the Port Preference Clause even though the Supreme Court acknowledged that the law's "*purpose* and probable effect" would be to benefit one state over another. *South Carolina*, 93 U.S. at 11 (emphasis added). The law at issue in *South Carolina* would "improve" the portion of a river near Georgia "at the expense of" the portion of a river near South Carolina, aiding the former state and harming the latter. *Id.* That was constitutionally permissible. Why? Because the Port Preference Clause "does not extend to acts which . . . only incidentally injuriously affect" the ports of a state. *Id.* at 13. Just as the facially neutral law in *South Carolina* would have "incidentally" injured Georgia, so does the facially neutral Jones Act only "incidentally" injure Hawai'i (if it does so at all). In both cases, the Port Preference Clause is not violated. Admittedly, one district court has explicitly considered a law's purpose in evaluating a Port Preference Clause challenge. *See State v. Brown*, 850 F. Supp. 821,

827 (D. Alaska 1994). But the Court should not embrace this outlier approach, which ignores the past two centuries of Port Preference Clause jurisprudence, and would prohibit practically any economic regulation that legislators acknowledge could affect different states differently.

And second, even if unstated Congressional "purpose" could make out a Port Preference Clause violation, Plaintiff has not plausibly alleged that Congress's purpose in enacting the Jones Act was in fact discriminatory. Plaintiff alleges that the Jones Act was "purposefully designed to force Hawai'i to subsidize mainland commerce before Hawai'i was a state." FAC ¶ 72. But this allegation is conclusory, and in any event runs headlong into the text of the Jones Act itself, which says that the Act is meant to "provide for the promotion and maintenance of the American merchant marine," which was "necessary for the national defense and for the proper growth of [the United States'] foreign and domestic commerce." Merchant Marine Act of 1920, ch. 250. Plaintiff even acknowledges the Jones Act's stated non-discriminatory purpose in its complaint. *See* FAC ¶ 24. The Jones Act's textually committed non-discriminatory purpose is the best evidence of Congress's intent in enacting the law and makes Plaintiff's theory of hidden discriminatory purpose all the more implausible.

Plaintiff nevertheless presses its discriminatory-purpose theory with a potpourri of other allegations, but does so unsuccessfully. As an initial matter, Plaintiff's entire approach of mining history for stray evidence of purported discrimination is mistaken. The D.C. Circuit has been clear that "scattered pieces of legislative history are quite inadequate to serve to attribute a discriminatory purpose to the Congress." *United States v. Johnson*, 40 F.3d 436, 440 (D.C. Cir. 1994). But even taking Plaintiff's allegations on their own terms, none of them "nudge [Plaintiff's] claim of purposeful discrimination 'across the line from conceivable to plausible.'" *Iqbal*, 556

13

U.S. at 683 (quoting *Twombley*, 550 U.S. at 570).

Plaintiff's allegations regarding the individual views of Jones Act sponsor Senator Wesley Jones are among the weakest forms of legislative history, as "[t]he remarks of a single legislator, even the sponsor, are not controlling," especially where (as here) there is "clear statutory language." *N. Colo. Water Conservancy Dist. v. FERC*, 730 F.2d 1509, 1518 (D.C. Cir. 1984) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979)). Indeed, the D.C. Circuit has previously refused to rely on "'isolated statements' by a single legislator." *Fraternal Ord. of Police, Metro. Police Dep't Lab. Comm., D.C. Police Union v. D.C.*, 45 F.4th 954, 963 (D.C. Cir. 2022). And Senator Jones's comments themselves do not even support Plaintiff's theory. The comments either concern separate, irrelevant pieces of legislation distinct from the Jones Act, *see* FAC ¶ 21–22, or allege that Senator Jones had an individual legislative motivation totally distinct from—and thus unsupportive of—the purported discriminatory motivation that Plaintiff foists onto the Jones Act, *compare id.* ¶ 20, *with id.* ¶ 72.

The other allegations that Plaintiff marshals for its discriminatory-purpose theory are likewise unhelpful. Plaintiff's allegations that private shipping companies tried to protect their financial interests through the Jones Act may shed light on the motivations of those private parties, but not on the motivations of the congressmen who voted for the Act, much less of Congress as a whole. *See id.* ¶ 23. Similarly, Plaintiff's allegation that the Governor of Hawai'i testified in Congress that the Jones Act would have a detrimental effect on Hawai'i in 1920 shows one individual's prediction of the Jones Act's possible effects, *see id.*, but says nothing about the Act's purported purpose.

At bottom, Plaintiff offers only the "scattered pieces of legislative history" that the D.C.

Circuit has held are "quite inadequate to serve to attribute a discriminatory purpose to the Congress." *Johnson*, 40 F.3d at 440. Plaintiff's theory would "replace the actual text" of the Jones Act—facially neutral with a textually committed non-discriminatory purpose—"with speculation as to Congress' intent," precisely the opposite of the approach the Supreme Court has endorsed. *Castro-Huerta*, 597 U.S. at 642 (quoting *Magwood v. Patterson*, 561 U.S. 320, 334 (2010)).

### C. Even if the Port Preference Clause does apply to neutral laws like the Jones Act, the Jones Act is still subject to the rational basis test and Plaintiff has not adequately alleged that the Jones Act lacks a rational basis.

Plaintiff's Port Preference Clause argument boils down to the claim that the facially neutral Jones Act treats different States differently in a way that offends the Constitution. That theory is wrong. But even if facially neutral laws with some disparate impact could theoretically violate the Port Preference Clause, Courts routinely uphold laws imposing a disparate impact from constitutional challenges after applying deferential constitutional review, and this Court should do the same with the Jones Act here.

Besides the Port Preference Clause, other constitutional provisions also limit how Congress may treat different parties differently. "Whether embodied in the Fourteenth Amendment or inferred from the Fifth, equal protection" limits Congress's differential treatment of individuals. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Similarly, Article I's Uniformity Clause provides that "all Duties, Imposts and Excises shall be uniform throughout the United States." U.S. Const. art 1, § 8, cl. 1. Yet under each of these provisions—the Fifth Amendment, the Fourteenth Amendment, and the Uniformity Clause—a facially neutral law like the Jones Act may treat different parties differently yet be constitutional after a deferential, rational-basis review.

In the Fourteenth Amendment context, the Supreme Court has held that "a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional

15

rights must be upheld . . . if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Commc'ns*, 508 U.S. at 313.  The same is true for challenges to economic regulations under the Fifth Amendment's Due Process Clause.  The challenged law is constitutional so long as "there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 488 (1955); *see also Sec'y of Agric. v. Cent. Roig Ref. Co.*, 338 U.S. 604, 616-17 (1950) (applying a deferential standard of review to a law which allegedly "offend[ed] the Due Process Clause of the Fifth Amendment because of the [law's] alleged discriminatory character").  Similarly deferential is the standard of review for constitutional challenges under the Uniformity Clause.  Even where Congress has imposed a "geographically defined classification[]" that is not in fact uniform throughout the United States, that classification is constitutional so long as Congress has "exercised its considered judgment" and determined that the classification is "a necessary component of [Congress's] program." *United States v. Ptasynski*, 462 U.S. 74, 86 (1983).  Across all these cases, the Supreme Court has emphasized that while some might judge a given law "needless" or "wasteful," "it is for the legislature, not the courts, to balance the advantages and disadvantages" of different approaches towards structuring our economy.  *Williamson*, 348 U.S. at 487.  Indeed, "[t]he Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process." *Beach Commc'ns*, 508 U.S. at 314.

The Jones Act is owed the same deferential constitutional review.  As a neutral rule, the Jones Act does not "proceed[] along suspect lines," and as explained below the Act does not "infringe[] fundamental constitutional rights," *Beach Commc'ns*, 508 U.S. at 313; *see infra* Section

II.B.1.  The Act is thus subject to rational basis review.  *See Beach Commc'ns*, 508 U.S. at 313; *see also Ambach v. Bell*, 686 F.2d 974, 980 n.2 (D.C. Cir. 1982) ("[W]here equal protection violations are alleged in the context of economic regulation, the appropriate standard of review is one of limited scrutiny in which there must be a rational basis for the legislation.").  Indeed, in a separate case in which a plaintiff alleged that the Jones Act violates the Due Process Clause because "the Jones Act is discriminatory because its effects on Hawaii commerce are disproportionate as compared to the rest of the United States"—the same as Plaintiff's theory here—the Ninth Circuit held that "rational basis review applies."  *Novak v. United States*, 795 F.3d 1012, 1023 (9th Cir. 2015).

Plaintiff has also not adequately alleged that the Jones Act is irrational.  Under rational basis review, "[a] social or economic policy that 'neither proceeds along suspect lines nor infringes fundamental constitutional rights' must be upheld 'if there is any reasonably conceivable state of facts that could provide a rational basis' for the legislative choice."  *Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388, 396 (D.C. Cir. 2022) (quoting *Beach Commc'ns*, 508 U.S. at 313).  So "[a]t the motion-to-dismiss stage" here, Plaintiff "must plausibly allege facts showing that no reasonably conceivable state of facts could provide a rational basis for the challenged policy."  *Id.*  Plaintiff has not done so.

Turning first to the government interests involved, Plaintiff acknowledges the Jones Act is related to two well-established government interests: economic strength and national security.  "The Jones Act was ultimately enacted . . . with the stated goals of ensuring the United States had a strong and self-sufficient maritime industry, protecting national security interests by maintaining a fleet available for military use in times of war, and supporting American shipbuilding and

17

maritime labor." FAC ¶ 24; *see also* 46 U.S.C. § 50101 ("It is necessary for the national defense and the development of the domestic and foreign commerce of the United States that the United States have a merchant marine . . . ."). Of course, "protecting national security is a government interest of the highest order." *Busic v. Transp. Sec. Admin.*, 62 F.4th 547, 550 (D.C. Cir. 2023). So too is "promoting a major industry" like the domestic maritime industry. *Edwards v. D.C.*, 755 F.3d 996, 1002 (D.C. Cir. 2014); *see also* Decl. of Jennifer Carpenter in Supp. of Am. Mar. P'ship and Mar. of the AFL-CIO's Joint Mot. to Intervene ¶ 5, ECF No. 31-2 (May 22, 2025) ("In [the American Maritime Partnership's] assessment, there are roughly 40,000 Jones Act vessels operating in the U.S. domestic maritime industry, which support nearly 650,000 American jobs and have an annual economic impact of $150 billion.").

With these well-established government interests in mind, Plaintiff has failed to plausibly allege that those interests provide no "rational basis" for the Jones Act. Plaintiff's headline allegation that the Jones Act does not "bear even a rational relationship to a legitimate state interest," FAC ¶ 86, is the type of "conclusory" and "[t]hreadbare recital[] of the elements" of a claim that need not be taken as true, *Iqbal*, 556 U.S. at 678. In fact, the Jones Act's rational basis is straightforward and firmly grounded in the government interests set out above. The Act requires domestic shipping to use domestic vessels. The Jones Act thus guarantees the American merchant marine the domestic shipping business, "ensur[ing] that the United States maintains enough shipbuilding capacity and maintenance capability to support a domestic merchant fleet," capacity that "is available to the U.S. military in times of war or national emergency."[1] John Frittelli, Cong.

---

[1] "The Court may take judicial notice of information posted on official public websites of government agencies." *Arab v. Blinken*, 600 F. Supp. 3d 59, 63 n.1 (D.D.C. 2022).

Rsch. Serv., R45725, *Shipping Under the Jones Act: Legislative and Regulatory Background* 5 (Nov. 21, 2019).  The Jones act further "support[s] U.S. shipyards and repair facilities, as well as the supply chains that produce and repair American built ships" and "ensure[s] that intermodal equipment, terminals and other domestic infrastructure are available to the U.S. military in times of war or national emergency."  *Id.* at 2 (quoting Written Testimony of Mark Buzby, Maritime Administrator, House Committee on Armed Services, Subcommittees on Readiness and Seapower and Projection Forces, Hearing on National Defense Authorization Act for FY2019, March 8, 2018, p. 65).  Congress thus reasonably believes that the Jones Act supports the American merchant marine and advances Congress's goal of preserving that institution, an institution which Congress has judged necessary for national security.  *See* Merchant Marine Act of 1920, ch. 250; *see also* 46 U.S.C. § 50101.  So there is no doubt that the Jones Act is "rationally related to [the] legitimate government interest[s]" laid out above and satisfies rational basis review.  *Fed. Express Corp. v. U.S. Dep't of Com.*, 486 F. Supp. 3d 69, 75 (D.D.C. 2020).  Indeed, just a few years ago the Ninth Circuit held that the Jones Act satisfies the rational basis test.  Because "there are plausible reasons for Congress' action" in passing the Jones Act to "support this country's merchant marine and its shipbuilding and repair facilities," a court's "inquiry is at an end."  *Novak*, 795 F.3d at 1116, 1023.  The outcome here should be no different.

Plaintiff, perhaps recognizing the logic above that closely ties the Jones Act to the government interests involved, tries to shift the goalposts by arguing that even if the government interests pursued by the Act are legitimate, in practice the Act "demonstrably undermines" those interests.  FAC ¶ 86.  But Plaintiff's allegations about the Jones Act's level of success as a matter of fact are both legally irrelevant and factually insufficient to "plausibly allege . . . that no

19

reasonably conceivable state of facts could provide a rational basis" for the Act.  *Sanchez*, 45 F.4th at 396.

Whether or not the Jones Act achieves its goal of supporting the American merchant marine is irrelevant because an "ex ante rather than ex post assessment of the [Act] is required under the rational basis test."  *Rajah v. Mukasey*, 544 F.3d 427, 439 (2d Cir. 2008).  Otherwise put, if Congress "has assumed . . . that [the Jones Act] will serve the desired goal, the court is not authorized to determine whether. . . the desired goal has been served."  *Sammon v. New Jersey Bd. of Med. Exam'rs*, 66 F.3d 639, 645 (3d Cir. 1995); *see also Gallagher v. City of Clayton*, 699 F.3d 1013, 1020 (8th Cir. 2012) ("We need not determine whether outdoor secondhand smoke exposure actually causes harm. Because the City reasonably could believe this to be true, the Ordinance survives rational basis review.").  "Even if [Plaintiff is] right when [it] call[s] the [Jones Act] unwise and ineffective, that is no basis for the Court to 'substitute its assessment' for that of" Congress.  *Doc Soc'y v. Blinken*, No. CV 19-3632, 2023 WL 5174304, at *21 (D.D.C. Aug. 11, 2023) (quoting *Trump v. Hawaii*, 585 U.S. 667, 707 (2018)), *rev'd on other grounds sub nom. Doc Soc'y v. Rubio*, No. 23-5232, 2025 WL 1775000 (D.C. Cir. June 27, 2025).  Here, Congress judged that "it is necessary for the national defense and for the proper growth of [the United States's] foreign and domestic commerce that the United States shall have a merchant marine," Merchant Marine Act of 1920, ch. 250, and passed a law intended to advance those interests.  So no matter how much Plaintiff alleges that the Jones Act may have drawbacks or may have not fully achieved its goals, the Jones Act is "rationally related to a legitimate government interest" and satisfies rational basis review.  *Fed. Express Corp.*, 486 F. Supp. 3d at 75.

But even taking Plaintiff's allegations about the Jones Act's effects on their own terms,

they do not meet Plaintiff's high burden to negate every single "state of facts" that could "provide a rational basis" for the Jones Act. *Sanchez*, 45 F.4th at 396.

Easily dealt with is Plaintiff's allegations concerning the Jones Act's impact on national security. Plaintiff's headline allegation that the Jones Act does not "serve the interests of national security," FAC ¶ 35, is conclusory in itself and not entitled to the presumption of truth. But Plaintiff's other allegation that the Jones Act is an "obstacle to efficient military logistics due to the high costs and inefficiencies it creates," *id.* ¶¶ 38, 39, also does not meet Plaintiff's burden. Even if the Jones Act does impact military logistics, Congress may believe that advancing the Act's goals of supporting the American merchant marine capable of carrying cargo on American ships with American crews in a time of crisis outweighs the logistical downside, if any. The tradeoff between these goals is Congress's to make, and merely alleging such a tradeoff does not negate the Jones Act's "rational basis." *Sanchez*, 45 F.4th at 396.

Next are Plaintiff's allegations that "the Jones Act has failed in its stated purpose of supporting a domestic shipbuilding industry" and "has had the opposite effect." FAC ¶ 32. These baseline allegations are conclusory and the Court need not presume they are true. And here, too, Plaintiff's other allegations do not meet Plaintiff's heavy burden. Plaintiff alleges that U.S.-built ships are "three to five times more expensive to build" than foreign ships. *id.* ¶ 26. The Jones Act thus has "driven up the cost of usable ships," Plaintiff says, "result[ing] in a severely diminished domestic shipbuilding industry" and leading "the number of U.S.-built and U.S.-flagged ships [to] decline[] dramatically," *id.* ¶¶ 33, 36.

But this chain of logic has three problems that render Plaintiff's allegations implausible. First, even if U.S.-built ships are more expensive to build than foreign ships, Plaintiff nowhere

explains how the Jones Act itself has caused that difference. To be sure, Plaintiff does explain its theory of how the Jones Act has caused domestic *shipping* prices to increase. *See, e.g.*, *id.* ¶¶ 30-31. But the price to build a ship and the price to hire a ship to transport your rum are different prices with different determinants. And the Jones Act limits shipping, not shipbuilding. The Act does not restrict how many companies may enter the domestic shipbuilding industry or otherwise impose any direct costs on that industry. This disconnect renders implausible Plaintiff's allegation that the Jones Act raised domestic shipbuilding prices and thus harmed domestic shipbuilding.

Second, Plaintiff's chain of logic ignores perhaps the most logical effect of the Jones Act. The Jones Act restricted domestic shipping to domestically built ships, thus ensuring that domestic shipping companies would have to buy ships from domestic shipbuilders. By requiring domestic shipping companies to buy ships from only domestic shipbuilders, the Jones Act thus supports domestic shipbuilding by guaranteeing them some business. So even if the Jones Act also somehow raised the cost of building ships domestically, Congress could still have a "rational basis" for the Jones Act if it decided that guaranteeing domestic shipbuilders some business was worth imposing higher costs on those builders. *Sanchez*, 45 F.4th at 396.

And third, Plaintiff does nothing to exclude any "obvious alternative explanations" for the state of shipping and shipbuilding in the United States. *Johnson v. Becerra*, 668 F. Supp. 3d 14, 24 (D.D.C. 2023) (quoting *Twombly*, 550 U.S. at 567). Nowhere does Plaintiff acknowledge that factors besides the Jones Act also affect the size of the American merchant marine and the cost of domestic shipping. Differences in labor costs or environmental regulations between the United States and other countries surely also affect the relative cost of shipping and shipbuilding in the United States and other countries. Indeed the United States government often attributes much of

22

the difference to these other factors. *See Maritime Administration Needs to Improve Financial Assistance Programs*, Government Accountability Office (June 30, 2025), https://files.gao.gov/reports/GAO-25-107304/index.html (last accessed July 28, 2025).

Plaintiff does nothing to exclude the possibility that any decline in the "number of U.S.-built and U.S.-flagged ships," FAC ¶ 36, is due to these other factors. Nor does Plaintiff address the possibility that without the Jones Act to require that domestic shipping use those U.S.-built and U.S.-citizen-owned ships, the number of domestic ships would have declined even more. Essentially, Plaintiff holds the Jones Act singlehandedly responsible for the alleged decline of the domestic shipbuilding industry, an implausible position given the "obvious alternative explanations" for the industry's alleged decline. *Johnson*, 668 F. Supp. 3d at 24.

The rational basis test is forgiving. Where "[a] conceivably rational justification for the [challenged law] is readily apparent," the law survives. *Sanchez*, 45 F.4th at 398. For the reasons given above, the Jones Act has a conceivably rational justification.

## II.    Koloa Rum Fails to State a Claim Under the Fifth Amendment's Due Process Clause.

Plaintiff also claims that the Jones Act "deprives [Plaintiff] of its right to earn a living" and so violates the Due Process Clause of the Fifth Amendment by violating this fundamental right. FAC ¶ 82. "[T]he Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty." *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 702 (D.C. Cir. 2007) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997)). Where a "claimed right is not fundamental," that right "is subject only to rational basis scrutiny." *Id.* at 712.

Here, the Jones Act does not even cognizably burden the right to make a living. But even if the Jones Act did burden that right, the right to make a living is not fundamental and triggers only rational basis review of the Jones Act. And as explained above, Plaintiff has failed to adequately allege that the Jones Act fails that lenient standard.

### A. The Jones Act does not violate the Due Process Clause because the Act at most incidentally and indirectly burdens any "right to make a living."

As an initial matter, Plaintiff has not adequately alleged that the Jones Act places a constitutionally cognizable burden on Plaintiff's substantive due process rights, because the Jones Act—which regulates shipping, not rum distilling—has at most an indirect and incidental effect on Plaintiff's right to make a living.

The classic case concerning the right to make a living "deal[s] with a complete prohibition of the right to engage in a calling." *Conn v. Gabbert*, 526 U.S. 286, 292 (1999); *see also Dittman v. California*, 191 F.3d 1020, 1029-30 (9th Cir. 1999) (analyzing a state statute which "operate[d] as a complete barrier to entry into the profession of acupuncture"). Even in those cases, courts uphold the prohibition if it is "rationally related to a legitimate state interest." *Dittman*, 191 F.3d at 1031. But where a law does *not* completely prohibit a plaintiff from pursuing their chosen line of work but only makes pursing that work "more difficult," that law "does not rise to a violation of substantive due process" in the first place. *Franceschi v. Yee*, 887 F.3d 927, 938 (9th Cir. 2018); *see also Lowry v. Barnhart*, 329 F.3d 1019, 1023 (9th Cir. 2003) (holding that an "indirect and incidental burden on professional practice is far too removed from a complete prohibition to support a due process claim"). Likewise with laws that impose "business losses," costing a company "money, clients, and future business opportunities." *Hu v. City of New York*, 927 F.3d 81, 102–03 (2d Cir. 2019). A burden short of a "complete prohibition on [a Plaintiff's] ability to

24

practice his chosen profession" does not even implicate the "Due Process right of occupational choice" in the first instance, so there is no need to subject the law imposing that burden to the rational basis test. *Id.*

Decisions like *Franceschi*, *Lowry*, and *Hu* are just specific applications of the broader rule that a law imposes no substantive due process violation—even if a "fundamental right" is involved—if the law's burden on that right is "incidental or negligible." *Beydoun v. Sessions*, 871 F.3d 459, 468 (6th Cir. 2017); *see also Kansas*, 16 F.3d at 442 ("[S]omething more than a negligible or minimal impact on the right to travel is required before strict scrutiny is applied . . . ." (quoting *Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 921 (1986) (O'Connor, J., dissenting))); *Phila. Police & Fire Ass'n for Handicapped Child., Inc. v. City of Phila.*, 874 F.2d 156, 168 (3d Cir. 1989) ("[A]ny burden [placed by the challenged law] on family integrity is indirect and thus will not give rise to a violation of substantive due process . . . ."); *Doe v. Moore*, 410 F.3d 1337, 1344 (11th Cir. 2005) ("[I]n order to trigger substantive due process protection the Sex Offender Act must either directly or unduly burden the fundamental rights claimed by Appellants . . . ."); *cf. Tri Cnty. Indus., Inc. v. D.C.*, 104 F.3d 455, 459 (D.C. Cir. 1997) (holding that "*Silverman* [*v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988)] . . . confine[d] the concept of substantive due process . . . to actions that in their totality are genuinely drastic"). This approach makes sense. Numerous laws have *some* indirect effect on a constitutional right. In the right-to-make-a-living context, rules from environmental regulations to tax code provisions could affect a person's profession. But not all such rules should be subject to constitutional review.

With these principles in mind, the Jones Act burdens Plaintiff's right to make a living only indirectly and thus imposes no cognizable Due Process Clause burden. The Jones Act regulates

domestic shipping and places no limitations on how Plaintiff may "produce[] and sell[] rum," FAC ¶ 13, let alone "completely prohibits" Plaintiff from doing so, *Franceschi*, 887 F.3d at 938. So the Jones Act "does not rise to a violation of substantive due process." *Id.*

Admittedly, Plaintiff alleges that "[d]ue to Jones Act restrictions, Kōloa Rum Company faces increased costs, supply chain delays, and barriers to expanding its market share," and that "[a]bsent Jones Act restrictions, Kōloa Rum Company would be able to expand its operations and enter new markets on the mainland." FAC ¶¶ 65, 68. But "business losses alone do not implicate the Due Process right of occupational choice," *Hu*, 927 F.3d at 102, nor do laws that make pursuing a given occupation "more difficult," *Franceschi*, 887 F.3d at 938. Indeed, Plaintiff itself alleges that despite the Jones Act, Plaintiff is successful and "continues to grow." FAC ¶ 4. Any burden that the Jones Act allegedly places on Plaintiff is thus "incidental or negligible" and does not implicate substantive due process at all. *Beydoun*, 871 F.3d at 468.

**B. The Jones Act does not violate the Due Process Clause because the "right to make a living" is not a fundamental right and the Jones Act satisfies the rational basis test.**

But even if the Jones Act did implicate a substantive "right to make a living," the Act survives the deferential constitutional review to which it is subject. Substantive due process distinguishes between "fundamental" rights "deeply rooted in this Nation's history and tradition" and non-fundamental rights that lack that pedigree. *von Eschenbach*, 495 F.3d at 702 (quoting *Glucksberg*, 521 U.S. at 720–21). Fundamental rights are subject to strict scrutiny, but non-fundamental rights need only pass the comparably lenient rational basis review. *Id.* at 701-02, 712. The right to make a living is not fundamental, and as explained above, Plaintiff has failed to adequately allege that the Jones Act fails rational basis review.

1. **The "right to make a living" is not a fundamental right and is thus subject to "reasonable government regulation."**

Plaintiff's allegations that "[t]he right to earn a living is deeply rooted in this nation's history and traditions, . . . was a fundamental right at English common law, a primary concern of the Framers of the Constitution, and continued to enjoy strong protections long after ratification," FAC ¶ 83, are legal conclusions that this Court need not accept as true, *see Iqbal*, 556 U.S. at 678.

That is particularly true here because the Supreme Court and D.C. Circuit have already considered Plaintiff's argument and rejected it. While a "generalized due process right to choose one's field of private employment" may exist, that "right . . . is nevertheless subject to reasonable government regulation." *Conn*, 526 U.S. at 292. The D.C. Circuit has followed this guidance, holding that any "right to earn a living . . . is not so fundamental that it triggers strict judicial scrutiny of the challenged system; if the system reflects a rational choice aimed at furthering legitimate state interests, a court must uphold it." *Fam. Div. Trial Laws. of Superior Ct.-D.C., Inc. v. Moultrie*, 725 F.2d 695, 709–10 (D.C. Cir. 1984). The First, Fifth, Sixth, and Ninth Circuits have likewise held that the right to make a living is not fundamental and laws implicating that right are subject to only rational basis review. *See Medeiros v. Vincent*, 431 F.3d 25, 32 (1st Cir. 2005) ("The right to 'make a living" is not a 'fundamental right,' for either equal protection or substantive due process purposes."), *abrogated in other part by Bond v. United States*, 564 U.S. 211 (2011); *Golden Glow Tanning Salon, Inc. v. City of Columbus, Miss.*, 52 F.4th 974, 979 (5th Cir. 2022) ("The Supreme Court does not now recognize a fundamental right to work and has consistently applied rational basis review 'to state legislation restricting the availability of employment opportunities.'" (quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970))); *Tiwari v. Friedlander*, 26 F.4th 355, 361 (6th Cir. 2022) ("Economic regulations, even those affecting an

27

individual's liberty to work in a given area, violate due process only when they 'impose burdens without any rational basis for doing so.'" (quoting *Sheffield v. City of Fort Thomas*, 620 F.3d 596, 613 (6th Cir. 2010))); *Dittman*, 191 F.3d at 1031 n.5 ("The [Supreme] Court has never held that the 'right' to pursue a profession is a fundamental right, such that any state-sponsored barriers to entry would be subject to strict scrutiny.").

Even considering whether Plaintiff's asserted right is fundamental from first principles, Plaintiff has not plausibly alleged that the right they claim is "deeply rooted in this Nation's history and tradition." *von Eschenbach*, 495 F.3d at 702. As explained above the United States has regulated domestic shipping since the founding, and the specific prohibition that Plaintiff challenges—a law limiting domestic shipping to U.S.-built, -owned, and -operated vessels—has been in place since 1817, with only a short suspension of the requirement during World War I. *See* supra pp. 2-3. A right to ship goods domestically using foreign-built, -owned, or -operated vessels is thus hardly "deeply rooted in this Nation's history and tradition." *von Eschenbach*, 495 F.3d at 702.

Nor does the Jones Act deserve any heightened scrutiny under the Due Process Clause because "at the time the Jones Act was passed," Hawai'i' was a territory, not a state, and purportedly lacked "meaningful access to the political process." FAC ¶ 84 (citing *United States v. Carolene Products*, 304 U.S. 144, 152 n.4 (1938)). Courts apply rational basis review even to laws that treat territories "differently from States" in the present day. *United States v. Vaello Madero*, 596 U.S. 159, 165 (2022) (quoting *Harris v. Rosario*, 446 U.S. 651, 651 (1980)). With that in mind, it would be illogical to apply even stricter review to a law that purportedly injures a present-day State but was enacted while that State was a territory long in the past.

**2.  Plaintiff has not adequately alleged that the Jones Act lacks a rational basis.**

Because any right to make a living is "not fundamental," the Jones Act is "subject only to rational basis scrutiny." *von Eschenbach*, 495 F.3d at 712.  As explained above, Plaintiff has not adequately alleged that the Jones Act fails the deferential rational basis standard.  *See supra* Section I.C.  So Plaintiff has not adequately alleged that the Jones Act actually violates Plaintiff's right to making a living.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Defendants' Motion to Dismiss.

Dated: July 30, 2025                              Respectfully submitted,

                                                  BRETT A. SHUMATE
                                                  Assistant Attorney General

                                                  JOSEPH E. BORSON
                                                  Assistant Branch Director
                                                  Federal Programs Branch

                                                  */s/ Robert W. Meyer*
                                                  ROBERT W. MEYER
                                                  Trial Attorney (NY Bar No. 5942842)
                                                  United States Department of Justice
                                                  Civil Division, Federal Programs Branch
                                                  1100 L Street, N.W.
                                                  Washington, D.C. 20005
                                                  Tel.:   (202) 305-0872
                                                  Email:  Robert.W.Meyer@usdoj.gov

                                                  *Counsel for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 30, 2025, I filed the foregoing with the Clerk of the Court electronically via the Court's ECF system which sent notification of such filing to counsel of record for all parties.


<u>/s/ *Robert W. Meyer*</u>
ROBERT W. MEYER

30