**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

KŌLOA RUM COMPANY,

      **Plaintiff,**

        v.

KRISTI NOEM, Secretary of Homeland
Security, *et al.*,

      **Defendants,**

MATSON NAVIGATION COMPANY,
INC.,

      **Defendant-Intervenor,**

        and

AMERICAN MARITIME
PARTNERSHIP, *et al.*,

      **Defendant-Intervenors.**

Civil Action No. 25-554 (JEB)

## MEMORANDUM OPINION

      Kōloa Rum Company is a small business that distills premium rum on the Hawaiian

island of Kauai. Since its establishment in 2009, the company has thrived by sourcing local

ingredients, investing in the state's local economy, and cultivating a loyal customer base. That

success, according to Kōloa Rum, has long faced headwinds. The price of doing business on the

idyllic island is the thousands of miles of water separating Hawaii from a broader customer base

on the mainland. The distance itself, however, is not the problem. The alleged culprit is a

maritime statute known as the Jones Act.

1

Enacted in 1920, the Act regulates domestic shipping by requiring that all transport between United States ports be undertaken by vessels owned, built, and primarily crewed by U.S. citizens. Foreign vessels, in other words, may transport goods into or out of the United States, but they cannot transport items between ports within the country. The ostensible purpose of these restrictions is to preserve a robust American merchant marine for both commercial and national-security needs. For Kōloa Rum, the true purpose is discrimination. The company asserts that Hawaii's ocean-bound businesses are captive to expensive Jones Act vessels, while mainland businesses benefit from competitive alternatives like rail and trucking. Hawaii, as a result, is forced to keep the Jones Act fleet afloat.

Seeking safe harbor, Kōloa Rum filed this action against the Secretary of Homeland Security and the Acting Commissioner of Customs and Border Protection to enjoin enforcement of the Act. The company advances two constitutional claims. First, the Jones Act violates the Port Preference Clause by discriminating against Hawaiian ports through higher shipping costs and limited shipping options. Second, the Act violates the Due Process Clause by infringing on the company's substantive right to earn a living.

The Government — along with Intervenors Matson Navigation Company, Inc, and the American Maritime Partnership and the Maritime Trades Department of the AFL-CIO — moves to dismiss, advancing both jurisdictional and merits arguments to sink the suit. First, Intervenors maintain that Plaintiff lacks standing because the company is not the direct target of the Jones Act, thereby rendering any alleged injury too indirect and any redress too dependent on the speculative conduct of third parties. Second, Intervenors say that Plaintiff's challenge to the century-old Act is time barred under the six-year statute of limitations in 28 U.S.C. § 2401. Finally, both Defendants and Intervenors contend that Kōloa Rum fails to state claims upon

which relief could be granted.  Although the standing inquiry is no pleasure cruise, the Court concludes that Plaintiff has cleared the threshold.  The statute-of-limitations and merits waves, however, swamp Kōloa Rum's craft.  The Court will thus grant the Motion to Dismiss.

## I.    Background

### A.  Statutory Background

Section 27 of the Merchant Marine Act of 1920, more commonly known as the Jones Act, prohibits vessels from transporting "merchandise by water . . . between points in the United States" unless the vessel "is wholly owned by citizens of the United States" and holds "a certificate of documentation with a coastwise endorsement."  46 U.S.C. § 55102(b).  Vessels engaged in coastwise trade — the domestic transportation of merchandise — must be built, owned, and primarily crewed by U.S. citizens.  Id., §§ 55102(b), 12103, 12112(a), 8103(b)(1).  The exigency behind the Act was Congress's determination that fostering a domestic merchant marine was "necessary for the national defense and for the proper growth of [] foreign and domestic commerce."  Merchant Marine Act of 1920, ch. 250, § 1, 41 Stat. 988.  Limiting domestic commerce to domestic vessels would ensure both a viable U.S. shipping industry and vessels that could serve as a "naval or military auxiliary in time of war or national emergency."  Id.  Without such legislation, "U.S.-flag vessels would not be positioned to contend with foreign-flagged vessels" since "[t]he construction and operation costs of United States ships [] are substantially higher than those of their foreign counterparts."  Am. Trading Transp. Co. v. United States, 791 F.2d 942, 944 (D.C. Cir. 1986).

Prioritizing domestic vessels over foreign vessels in cabotage — the transport of goods or passengers from one port or place to another in the same country, see Cabotage, Black's Law Dictionary (12th ed. 2024) — is no 20th-century innovation.  In 1789, the third law passed by the

First Congress imposed duties on cargo with rates differing based on the provenance of a vessel. See Act of July 20, 1789, ch. 3, 1 Stat. 27.  "[A]ll ships or vessels built within the [United] States, and belonging wholly to a citizen" were subject to a one-time "rate of six cents per ton" when engaging in coastwise transportation.  Id., § 1, 1 Stat. at 27.  In contrast, foreign vessels "employed in the transportation of any of the produce or manufactures of the United States, coastwise within the said States," were required to, "on each entry, pay fifty cents per ton."  Id., § 3, 1 Stat. at 27–28.  Congress enacted such duties to build American maritime capacity for both commercial and national-security purposes.  See 1 Annals of Cong. 197 (1789) (Joseph Gales ed., 1834) ("Granting a preference to our own navigation will insensibly bring it forward to that perfection so essential to American safety.").

Our legislature further refined cabotage laws in the 19th century, establishing restrictions later incorporated into the Jones Act.  In 1813, for example, Congress required that "it shall not be lawful to employ on board of any public or private vessels of the United States any person or persons except citizens of the United States," imposing crew-nationality requirements that would remain central to later maritime legislation.  See Act of Mar. 3, 1813, ch. 42, § 1, 2 Stat. 809, 809.  The Navigation Act of 1817 transformed the previous duties imposed on foreign vessels engaged in cabotage into an outright ban, providing that "[n]o goods, wares, or merchandise, shall be imported . . . from one port of the United States to another port of the United States, in a vessel belonging wholly or in part to a subject of any foreign power."  Act of Mar. 1, 1817, ch. 31, § 4, 3 Stat. 351, 351.  Congress reaffirmed that restriction against foreign vessels in coastwise commerce by adapting the law to address evasive schemes.  An 1898 statute closed a significant loophole by prohibiting the coastwise transportation of goods routed through foreign

ports and by establishing forfeiture as the consequence for violations.  <u>See</u> Act of Feb. 17, 1898, ch. 26, 30 Stat. 248.

The above legislative developments created a framework for modern cabotage law that was firmly established by the 20th century.  The laws requiring that vessels transporting cargo domestically be U.S. built, owned, and crewed were temporarily suspended during World War I after the nation diverted much of its commercial fleet to support the war effort.  <u>See</u> Act of Oct. 6, 1917, ch. 88, 40 Stat. 392.  The Jones Act, however, reinstated those restrictions after the war and consolidated the scattered statutory provisions into a comprehensive statement of national maritime policy.  Those provisions have remained in place, with Congress periodically adjusting and refining their scope.  <u>See, e.g.</u>, An Act to Amend Section 27 of the Merchant Marine Act, 1920, ch. 355, 49 Stat. 442 (1935) (prohibiting vessels from requalifying for Jones Act operations if ever sold to foreign owners or placed under foreign registry); An Act to Amend Section 4370 of the Revised Statutes of the United States, ch. 324, 54 Stat. 304 (1940) (extending coverage to towing and salvage vessels); An Act to Amend the Merchant Marine Act, 1920, and for Other Purposes, Pub. L. No. 100-329, § 1, 102 Stat. 588, 588 (1988) (requiring Jones Act-compliant vessels for domestic transport of valueless material such as dredged material or waste).

B.  <u>Factual Background</u>

According to the facts set forth in the Amended Complaint, which the Court presumes true at this juncture, Kōloa Rum is a small business founded by Bob Gunter, a South Carolina native who came to Hawaii through his military service and remained to work in the sugar industry.  <u>See</u> ECF No. 13 (Am. Compl.), ¶ 1.  For nearly two decades the company "has bottled the spirit of Hawai'i, crafting world-class premium rum in the very same region where farmers

operated Hawaiʻi's first successful commercial sugar plantation in the 1800s." Id., ¶ 3. What started as a small business has grown to a company that employs 45 people and ships its product to "36 mainland states and several foreign countries." Id., ¶¶ 4, 13. Those operations primarily "rel[y] on maritime transportation to import and export goods to and from the mainland United States." Id., ¶ 13.

The company claims that, notwithstanding the above growth, the Jones Act restricts its ability to let its rum flow beyond the shores of Hawaii. Id., ¶ 5. From its perspective, the Act has failed to achieve its stated goals of supporting American shipbuilding and maritime capacity. Requiring coastwise vessels to be U.S. built, owned, and operated has driven costs three to five times higher than foreign alternatives, decimated the domestic shipbuilding industry, and reduced the Jones Act-compliant fleet to fewer than 100 oceangoing commercial vessels. Id., ¶¶ 26, 36–37. Hawaii, Kōloa Rum explains, bears a disproportionate brunt of the policy's effects. Mainland states have access to rail or trucking — options that are all unavailable to Hawaii. Id., ¶ 40. The state is instead limited to two Jones Act-compliant shippers for mainland trade even though "[o]ver 80% of Hawaii's goods are imported, and nearly all come via ship." Id., ¶¶ 40, 47. This lack of competition allegedly results in exorbitant shipping costs. For example, shipping a container from the West Coast to Hawaii costs two to three times more than shipping the same container to Asia — despite Asia being thousands of miles farther — imposing an estimated $1.2 billion annually in excess costs on Hawaii businesses and consumers. Id., ¶¶ 42, 50.

For Kōloa Rum, the Jones Act's alleged harms are not theoretical; they are a daily business reality. The company explains that it "imports raw materials such as sugar, glass bottles, and packaging from the mainland United States" and that it "regularly exports its rums to

distributors and other partners on the mainland." Id., ¶ 53. Each shipment — inbound and outbound — is subject to the Act's inflated costs and limited carrier options, placing Kōloa Rum at a structural disadvantage against mainland distillers that can rely on rail or trucking.

International shipping is equally fraught. Given the dearth of international shipping routes from Hawaii, Kōloa Rum must first direct shipments to the mainland to reach international customers. Id., ¶ 56. To fulfill an international order to Sydney, for example, it must send the product to Los Angeles — a leg that costs three times more than the subsequent Los Angeles-to-Australia shipment despite the shorter distance. Id., ¶¶ 57–58. Put simply, the company claims that it "would have access to shipping options with more competitive pricing and better service" were it not for the Jones Act's restrictions. Id., ¶ 67.

C. Procedural Background

Plaintiff filed this action on February 25, 2025, against the Secretary of Homeland Security and the Acting Commissioner of Customs and Border Protection to enjoin enforcement of the Jones Act. See ECF No. 1 (Compl.). The company subsequently filed an Amended Complaint with revisions and an added count. See Am. Compl., ¶¶ 80–86 (adding due-process claim). Matson Navigation Company, Inc. — "the leading Jones Act carrier for coastwise trade with Hawaii" — moved to intervene in support of Defendants on April 11. See ECF No. 15-1 (Matson Mot. to Intervene) at 1. The American Maritime Partnership and the Maritime Trades Department of the AFL-CIO (jointly AMP) — "two national associations representing hundreds of companies and unions comprising the American maritime industry" — did the same on May 22. See ECF No. 31-1 (AMP Mot. to Intervene) at 1. The Court granted those motions. See Order of June 30, 2025.

Kōloa Rum's Amended Complaint asserts two counts under separate clauses of the Constitution.  First, Plaintiff alleges that the Jones Act violates the Port Preference Clause, which prohibits Congress from giving preference to the ports of one state over another.  See U.S. Const. art. I, § 9, cl. 6.  As framed by the company, the Jones Act discriminates against Hawaiian ports in both purpose and effect by forcing Hawaiian businesses to use limited and expensive Jones Act vessels while mainland ports enjoy access to cheaper alternatives.  See Am. Compl., ¶¶ 70–78.  Second, Kōloa Rum contends that the Act violates the Fifth Amendment's Due Process Clause by restricting "[t]he right to earn a living" without being narrowly tailored to any compelling government interest or rationally related to a legitimate state interest.  Id., ¶¶ 81–86.  Plaintiff seeks a declaration that the Act's cabotage provisions are unconstitutional as applied to Hawaii and an injunction prohibiting their enforcement against the company.  Id. at 15.  Defendants and Intervenors now move to dismiss under Federal Rules of Civil Procedure 12(b)(1) for lack of jurisdiction and 12(b)(6) for failure to state a claim.

## II.    Legal Standard

When a defendant brings a Rule 12(b)(1) motion to dismiss, the plaintiff must demonstrate that the court indeed has subject-matter jurisdiction to hear his claims.  See Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992); U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).  "Because subject-matter jurisdiction focuses on the court's power to hear the plaintiff's claim, a Rule 12(b)(1) motion [also] imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."  Grand Lodge of Fraternal Ord. of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  For this reason, "the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim."  Id.

at 13–14 (quotation marks and citation omitted).  In policing its jurisdictional borders, the court treats the complaint's factual allegations as true and grants the plaintiff the benefit of all reasonable inferences.  See Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

Rule 12(b)(6), conversely, provides for the dismissal of an action where a complaint fails to "state a claim upon which relief can be granted."  In evaluating a motion to dismiss under that Rule, the court must "treat the complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quotation marks and citation omitted).  A court need not accept as true, however, "a legal conclusion couched as a factual allegation." Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (citation omitted).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, [if] accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotation marks omitted).  A plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," but the allegations "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

## III.    Analysis

In seeking dismissal, Intervenors first contend that Plaintiff lacks standing because its injuries are not traceable to the Jones Act and would not be redressed by a favorable ruling. Next, they assert that even if Plaintiff has standing, its suit is time barred under 28 U.S.C. § 2401.  Were Plaintiff able to overcome that hurdle, Defendants and Intervenors also maintain

that each of the two counts in the Amended Complaint is deficient. The Court addresses these arguments in turn.

A. Standing

Article III of the Constitution limits the jurisdiction of federal courts to resolving "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. That limitation requires a plaintiff to "have a personal stake in the case — in other words, standing." TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021) (cleaned up) (quoting Raines v. Byrd, 521 U.S. 811, 819 (1997)). At bottom, standing asks a simple question of plaintiffs: "What's it to you?" FDA v. All. for Hippocratic Med., 602 U.S. 367, 379 (2024) (quotation marks and citation omitted). To sufficiently answer that question, the plaintiff must show that she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). A "deficiency on any one of the three prongs suffices to defeat standing." U.S. Ecology, Inc., 231 F.3d 20 at 24.

1. *Injury in Fact*

Plaintiff must first demonstrate that it has suffered an injury in fact — "an invasion of a legally-protected interest." Lujan, 504 U.S. at 560. Common examples include "a physical injury, a monetary injury, an injury to one's property, or an injury to one's constitutional rights." All. for Hippocratic Med., 602 U.S. at 381. Such injuries must be "particularized," meaning that they "must affect 'the plaintiff in a personal and individual way' and not be [] generalized grievance[s]." Id. (quoting Lujan, 504 U.S. at 560 n.1). Those injuries must also be "actual or imminent, not speculative," meaning that they "must have already occurred" or are "likely to

occur soon." Id.  When seeking an injunction or similar prospective relief, "the plaintiff must establish a sufficient likelihood of future injury."  Id.

Kōloa Rum claims that it clears this bar because "it is suffering a concrete, particularized, and ongoing economic injury as a result of the Jones Act."  ECF No. 47 (Pl. Opp.) at 6. Plaintiff's theory, at its core, is that the Act restricts cabotage options for businesses located on an island state thousands of miles from the mainland.  Those restrictions allegedly produce cascading effects.  To begin, barring foreign vessels from coastwise trade prevents those vessels from stopping in Hawaii en route to mainland ports, and it incentivizes those vessels to bypass the state's smaller-volume ports in favor of larger mainland ports.  See Am. Compl., ¶ 60; Pl. Opp. at 3, 6.  The absence of cheaper and competitive foreign-shipping options, moreover, has resulted in only two Jones Act-compliant shippers being available to Hawaii businesses.  See Am. Compl., ¶ 47.  As a company that "regularly imports raw materials such as sugar, glass bottles, and packaging from the mainland United States," Kōloa Rum is forced to pay higher import prices imposed by those limited shipping options.  Id., ¶¶ 53–55.  Those inflated costs strike twice — once when importing materials and again when the company "exports its rum to distributors and other partners on the mainland."  Id., ¶ 53.  In short, the Jones Act's restrictions "reduce margins, depress growth, and make it harder to compete with distillers located in states that enjoy cheaper overland options."  Pl. Opp. at 3.

Intervenors understandably do not contest this alleged injury.  See, e.g., ECF No. 42-1 (Matson MTD) at 9.  Kōloa Rum's increased operational costs — higher prices both for importing materials and exporting finished products — are "a classic pocketbook injury sufficient to give [it] standing."  Tyler v. Hennepin County, 598 U.S. 631, 636 (2023); see also TransUnion, 594 U.S. at 425 (describing "monetary harms" as "traditional tangible harms").

Although Plaintiff's injury is presumably one shared by many other businesses in Hawaii, it is nevertheless a specific pecuniary harm rather than a "general legal, moral, ideological, or policy objection to a particular government action." All. for Hippocratic Med., 602 U.S. at 381. This prong is thus satisfied.

       2. *Causation*

       The question of traceability is less easily resolved. Standing requires not only a concrete injury but one that "was likely caused by the defendant." TransUnion, 594 U.S. at 423. When a plaintiff is the direct object of government action or inaction, "there is ordinarily little question that the action or inaction has caused him injury." Lujan, 504 U.S. at 561–62. If a plaintiff's injury "arises from the government's unlawful regulation (or lack of regulation) of someone else," however, standing is "substantially more difficult to establish." Id. at 562 (quotation marks and citation omitted). That is so because "the causal chain between the government's action and the plaintiff's injury is dependent upon actions of third parties." Ellingson Drainage, Inc. v. U.S. Fish & Wildlife Serv., 2025 WL 2926381, at *6 (D.D.C. Oct. 15, 2025). In those circumstances, plaintiffs cannot "rely on speculation about the unfettered choices made by independent actors not before the courts." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 414 n.5 (2013). There must instead be "substantial evidence of a causal relationship between the government policy and the third-party conduct." Nat'l Wrestling Coaches Ass'n v. Dep't of Educ., 366 F.3d 930, 941 (D.C. Cir. 2004), abrogation on other grounds recognized by Perry Cap. LLC v. Mnuchin, 864 F.3d 591 (D.C. Cir. 2017).

      Intervenors assert that "establish[ing] standing here is an especially tall order" because the Jones Act regulates shipping carriers, not businesses like Kōloa Rum. See Matson MTD at 9. Against that backdrop, they contend that Plaintiff's suit comes up short for two reasons. First,

they point out that the Complaint provides "no facts about Koloa Rum's actual costs and overhead, no facts about its mainland competitors and their relative costs, and . . . no facts establishing a causal connection to the Jones Act's cabotage provisions." Id. at 11.  The absence of those facts, they assert, is even more glaring given the multiple alternative explanations for Plaintiff's higher costs: Hawaii's remote geography naturally creates higher shipping costs than those for mainland states; Kauai's limited port facilities require an intrastate barge to the Port of Honolulu, where the state's Public Utilities Commission regulates "interisland transportation prices under state laws"; and a panoply of state alcohol regulations affects Kōloa Rum's ability to enter mainland markets. Id. at 11–12.

This position mistakes the pleading standard.  While Plaintiff must ultimately prove causation, under the "generous [motion-to-dismiss] standard of review," Nat'l Wrestling Coaches Ass'n, 366 F.3d at 938, "general factual allegations of injury resulting from the defendant's conduct may suffice." Lujan, 504 U.S. at 561.  Our Circuit has emphasized this distinction, explaining that "although at the pleading stage general factual allegations may suffice to establish standing, in response to a summary judgment motion the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific fact." ASPCA v. Feld Ent., Inc., 659 F.3d 13, 19 (D.C. Cir. 2011) (cleaned up).  Intervenors' demands for "actual costs and overhead" and information about "mainland competitors and their relative costs" seek the kind of detailed financial data reserved for that later stage of litigation. See Matson MTD at 11; see also Osborn v. Visa, Inc., 797 F.3d 1057, 1063 (D.C. Cir. 2015) ("A plaintiff's burden to demonstrate standing grows heavier at each stage of the litigation.").

Intervenors' reliance on alternative explanations similarly misconstrues the pleading requirements for establishing causation.  Several factors — geography, state regulations, labor

costs — may indeed affect Kōloa Rum's operational costs.  Standing, however, "does not require that the defendant be the most immediate cause, or even a proximate cause, of the [plaintiff's] injuries; it requires only that those injuries be 'fairly traceable' to the defendant."  Attias v. Carefirst, Inc., 865 F.3d 620, 629 (D.C. Cir. 2017) (quoting Lexmark Int'l, Inc. v. Static Ctrl. Components, Inc., 572 U.S. 118, 134 n.6 (2014)); see also Bennett v. Spear, 520 U.S. 154, 169 (1997) (holding injury fairly traceable when produced by defendant's "determinative or coercive effect upon the action of someone else").  Plaintiff, at a minimum, has alleged that the Jones Act creates a structural disadvantage by restricting available shipping carriers, which drives up the cost of importing raw materials and exporting finished products.  See Am. Compl., ¶¶ 49, 51.  That other factors contribute to Kōloa Rum's costs does not negate that the injuries remain "fairly traceable" to the Jones Act and would "likely be redressed" if enforcement were enjoined.  Bennett, 520 U.S. at 171 (quotation marks omitted).

Second, Intervenors submit that Kōloa Rum's alleged injuries depend on independent business decisions of third-party carriers — the true objects of the cabotage restrictions.  Carriers make route and pricing decisions based on numerous factors beyond the Jones Act, including labor and immigration laws, international tariffs, fleet and port characteristics, taxes, and employee-protection requirements.  See Matson MTD at 12.  Even without the Jones Act, foreign carriers would still face substantial costs from complying with these laws and would make independent judgments about whether to serve Hawaii based on economic and regulatory considerations.  Intervenors fault Kōloa Rum for alleging no facts demonstrating that carriers would predictably respond to a Jones Act repeal by entering the Hawaii market and lowering prices.  Id.  Where the direct cause of a plaintiff's injury arises from the independent decisions of third parties rather than the government regulation itself, courts require that plaintiffs adduce

facts showing that third-party choices "have been or will be made in such manner as to produce causation."  Lujan, 504 U.S. at 562.

Despite the substantial difficulty of establishing third-party causation, there are "circumstance[s] where government regulation of a business may be likely to cause injuries to other linked businesses."  Diamond Alt. Energy, LLC v. EPA, 606 U.S. 100, 116 (2025) (quotation marks and citation omitted).  As the Supreme Court has explained, "[W]hen the government regulates (or under-regulates) a business, the regulation (or lack thereof) may cause downstream or upstream economic injuries to others in the chain, such as certain manufacturers, retailers, suppliers, competitors, or customers."  All. for Hippocratic Med., 602 U.S. at 384.  In those cases, "commonsense economic principles" allow courts to draw reasonable inferences in analyzing either causation or redressability.  Diamond, 606 U.S. at 116.

In Diamond Alternative Energy, for example, fuel producers challenged EPA's approval of California regulations that required automakers to manufacture more electric vehicles and fewer gas-powered ones.  Id. at 104.  While those producers were not the direct object of the regulations, they alleged that restricting the production of gas-powered vehicles would decrease the sale of fuel, causing the producers to "take in less revenue than they would in a free market."  Id. at 104–05.  EPA and California, in turn, argued that the chain was too attenuated because it depended on automakers' independent decisions about vehicle production and consumer demand for electric- versus gas-powered vehicles.  Id. at 113.  The Court disagreed, finding the chain clear and supported by basic economic principles: fewer gas-powered vehicles produced meant fewer such vehicles available for consumers, which directly reduced gasoline consumption by those consumers.  Id. at 116–17.  "[C]ommonsense inferences" could be drawn about such market relationships, even across multiple layers of third-party behavior.  Id. at 116.

Fundamental economic principles equally support Kōloa Rum's standing, particularly "standard principles of 'supply and demand.'" Osborn, 797 F.3d at 1065 (quoting Adams v. Watson, 10 F.3d 915, 923 (1st Cir. 1993)); see also Novak v. United States, 795 F.3d 1012, 1024 (9th Cir. 2015) (Friedland, J., concurring) ("[T]he law of supply and demand tells us that, when demand for a good remains constant, a decrease in the supply of that good will cause an increase in price."). The Jones Act operates as a wholesale prohibition on foreign carriers serving domestic routes, which not only reduces the number of available vessels but specifically eliminates alternative vessels that cost less than Jones Act-compliant ships. See Am. Trading Transp. Co., 791 F.2d at 944 (without government protection, U.S. vessels cannot compete with cheaper foreign vessels). Kōloa Rum uses these carriers, relying on maritime shipping to export its products and import its materials. With foreign competition eliminated, it must pay the higher rates charged by a restricted pool of Jones Act shippers — which has dwindled to just two serving Hawaiian businesses. See Am. Compl., ¶ 47. The causal chain is arguably more direct than Diamond's. There, the injury to fuel producers depended not only on automakers' production decisions but also on whether consumers would choose to buy gas-powered vehicles in a market increasingly favoring electric alternatives. Here, by contrast, Kōloa Rum has no choice but to use maritime shipping and pay whatever rates the restricted market commands. The Act directly restricts shipping options, and Kōloa Rum directly bears the cost.

At bottom, Plaintiff has established causation at this stage. The Jones Act excludes foreign carriers from the coastwise shipping industry, limiting the supply of available vessels and eliminating cheaper alternatives. The effects, in this context, require neither speculation nor guesswork: the law of supply and demand dictates that restricting supply and the wholesale

elimination of lower-cost options drives up prices. On these allegations, it is reasonable to conclude that the Jones Act is a substantial factor behind Kōloa Rum's steep operational costs.

### 3. *Redressability*

Our jurisdictional voyage reaches its last stop: redressability. In addition to establishing that it has suffered an injury that is traceable to Defendants' conduct, Kōloa Rum must also show that it is "likely that a favorable decision by the court would redress [its] injury." In re Navy Chaplaincy, 534 F.3d 756, 760 (D.C. Cir. 2008). Causation and redressability are usually seen as "flip sides of the same coin." All. for Hippocratic Med., 602 U.S. at 380 (quoting Sprint Commc'ns Co. v. APCC Servs., Inc., 554 U.S. 269, 288 (2008)). Intervenors, accordingly, contend that Plaintiff's injury is not redressable largely for the same reasons they dispute that the injury is traceable to enforcement of the Jones Act.

Plaintiff primarily seeks two forms of relief in this suit: declaratory and injunctive relief. It first asks for "[a]n entry of judgment declaring the Jones Act's cabotage provisions unconstitutional under the Port Preference Clause and Due Process of Law Clause of the Fifth Amendment as applied to interstate commerce between the ports of Hawaiʻi and the mainland United States." Am. Compl. at 15. Kōloa Rum also seeks "[a]n entry of a permanent injunction prohibiting Defendants from enforcing these provisions against Kōloa Rum Company as applied to interstate trade with Hawaiʻi." Id.

Intervenors initially assert that Plaintiff's injury is not redressable because any remedy provided by the Court will affect only third parties — *i.e.*, shipping companies — who will make decisions independent of the Jones Act's enforcement. As they see it, Kōloa Rum has not demonstrated "a substantial likelihood that third-party carriers would open new routes from Hawaii to the mainland or lower shipping prices if Koloa Rum prevailed." Matson MTD at 14.

That is so because several factors external to the Jones Act affect ocean-shipping services, such as labor and immigration laws or tariffs.  Id. at 12–13.

Although the Jones Act targets shipping companies, as opposed to Plaintiff, a favorable ruling from this Court would still likely redress Kōloa Rum's injuries.  While redressability is "substantially more difficult to establish" when it depends on the future choices of third parties, Lujan, 504 U.S. at 562 (quotation marks and citation omitted), that difficulty arises in contexts where the relationship between the third party and the challenged government action is attenuated.

Take the oft-cited National Wrestling Coaches Association.  There, wrestling coaches lacked standing to challenge the Department of Education's interpretation of Title IX regulations because universities would remain bound by the statute and other regulations even if the interpretations were invalidated.  See 366 F.3d at 940.  "Save for . . . speculation about 'better odds,'" the appellants could not demonstrate that any remedy would modify the universities' conduct in the manner sought.  Id. at 944.  In Renal Physicians Association v. U.S. Department of Health & Human Services, 489 F.3d 1267 (2007), nephrologists challenged an HHS regulation creating voluntary "safe harbor" methodologies for determining fair-market-value compensation, alleging that it resulted in lower medical-director payments.  Id. at 1269–71.  The D.C. Circuit similarly found redressability lacking because the safe harbors were merely optional guidance — even if invalidated, providers could continue using the same methodologies, which HHS had deemed sufficient.  Id. at 1277–78.

The relationship between the Jones Act and the decision of shipping companies is not so attenuated.  The Act is a wholesale prohibition barring foreign vessels from transporting goods between U.S. ports.  See 46 U.S.C. § 55102.  Eliminating that prohibition would directly expand

the pool of carriers eligible to serve Hawaii-mainland routes, injecting competition into a market currently restricted to two Jones Act-compliant shippers.  See Am. Compl., ¶¶ 47, 65–67.  It is true that shipping companies may consider several factors in deciding which markets to serve.  Yet the Jones Act is the sole legal barrier preventing carriers from entering the market, and its invalidation would remove that barrier entirely.  The relationship between the government restriction, third-party behavior, and a favorable judicial decision is not speculative, moreover.  The Jones Act's very purpose is to bar conduct that Congress believed would otherwise occur.  Cf. Diamond, 606 U.S. at 118 ("[I]f invalidating the regulations would change nothing in the market, why are EPA and California enforcing and defending the regulations?").

Kōloa Rum need not prove the precise magnitude of price reductions or guarantee that specific carriers will enter specific routes.  "Even 'one dollar'" of reduced costs would satisfy redressability.  Id. at 114 (quoting Uzuegbunam v. Preczewski, 592 U.S. 279, 292 (2021)).  Plaintiff need only "show a predictable chain of events," id. at 121 (quoting All. for Hippocratic Med., 602 U.S. at 385), based on "commonsense economic principles."  Id. at 116.  That standard is met here.  Lifting this legal prohibition on market entry creates a predictable result: the introduction of cheaper, competitive alternatives to U.S. shipping.  Cf. Matson Navigation Co. v. DOT, 770 F. Supp. 3d 44, 53 (D.D.C. 2025) ("[Jones Act] requirements are intended to ensure that U.S.-built ships (which are relatively expensive to build) are protected from competing with foreign-built ships (which are often less expensive to build) in domestic trade.").  That is sufficient, at this stage, to establish that judicial relief would "likely" redress Kōloa Rum's injuries.  Lujan, 504 U.S. at 561 (quoting Simon v. E. Ky. Welfare Rts. Org., 426 U.S. 26, 38 (1976)).

Intervenors briefly supplement their redressability argument by shifting focus from the effect of the remedy Plaintiff seeks to the Court's authority to grant such a remedy. As they see it, "[I]t is not obvious that the order Koloa Rum seeks — a universal injunction covering trade between Hawaii and every other State in the nation — is even permissible." Matson MTD at 15. Their concern, however, is unwarranted.

A universal injunction is an injunction that "prohibit[s] enforcement of a law or policy against <u>anyone</u>, anywhere." <u>Trump v. CASA, Inc.</u>, 606 U.S. 831, 837 n.1 (2025). Yet Kōloa Rum is not seeking such an expansive remedy. In Jones Act terms, Plaintiff is not asking to throw open every coastwise route from San Juan to Anchorage. The company, instead, seeks "a permanent injunction prohibiting Defendants from enforcing [Jones Act] provisions against <u>Kōloa Rum Company</u> as applied to interstate trade with Hawai'i." Am. Compl. at 15 (emphasis added). Granting such party-specific relief is well within the Court's authority and constitutes the minimal amount of relief needed to satisfy the redressability requirement. <u>See, e.g.</u>, <u>Uzuegbunam</u>, 592 U.S. at 291 ("True, a single dollar often cannot provide full redress, but the ability to effectuate a partial remedy satisfies the redressability requirement.") (quotation marks and citation omitted).

*    *    *

In sum, while Plaintiff's suit presents difficult standing questions, the Court believes that Kōloa Rum has sufficiently established that subject-matter jurisdiction exists here.

B.  <u>Merits</u>

Plaintiff's success on standing proves as evanescent as the breeze in the face of additional grounds for dismissal. Intervenors contend that Kōloa Rum's claims are time barred, and both

20

Defendants and Intervenors argue that neither count states a claim for relief.  The Court agrees in full and explains why, beginning with timeliness.

       1.  *Statute of Limitations*

"A statute of limitations is an affirmative defense."  Suarez v. Compass Coffee LLC, 2025 WL 3062798, at *11 (D.D.C. Nov. 3, 2025).  That defense "may be raised by pre-answer motion under Rule 12(b) when the facts that give rise to the defense are clear from the face of the complaint."  Smith-Haynie v. District of Columbia, 155 F.3d 575, 578 (D.C. Cir. 1998).  In other words, a court may dismiss the action if "the factual allegations in the complaint . . . clearly demonstrate all elements of the statute of limitations defense and . . . the plaintiff has no viable response to the defense."  Stewart v. Int'l Union, Sec. Police, & Fire Pros. of Am., 271 F. Supp. 3d 276, 281 (D.D.C. 2017) (quoting United States ex rel. Landis v. Tailwind Sports Corp., 51 F. Supp. 3d 9, 38 (D.D.C. 2014)).

Intervenors argue that Plaintiff's claims are barred under 28 U.S.C. § 2401.  See ECF No. 44-1 (AMP MTD at 9).  That provision is the "general, catchall provision for civil actions against the United States," Norwest Bank Minn. Nat. Ass'n v. FDIC, 312 F.3d 447, 450 (D.C. Cir. 2002), and provides: "[E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."  28 U.S.C. § 2401(a) (emphasis added).  As courts here recognize, "[B]oth APA and constitutional challenges are subject to § 2401."  Jafarzadeh v. Nielsen, 321 F. Supp. 3d 19, 36 (D.D.C. 2018); see also Spannaus v. U.S. Dep't of Just., 824 F.2d 52, 55 (D.C. Cir. 1987), overruling on other grounds recognized by Jackson v. Modly, 949 F.3d 763 (D.C. Cir. 2020) ("[T]he words 'every civil action' mean what they say.").  Putting this together, Intervenors maintain that Plaintiff's 2025 filing — "105 years after Congress enacted the Jones Act and approximately 16 years after

Kōloa Rum first became allegedly affected by the Jones Act's provisions" — is well beyond the six-year statute of limitations.  See AMP MTD at 10.

That Kōloa Rum filed this suit over 100 years after the Jones Act was enacted is irrelevant.  To hold that constitutional challenges must be brought within six years of a statute's enactment would effectively immunize legislation such as the Jones Act.  Under such a theory, the Jones Act became unchallengeable after 1926, and no plaintiff could ever contest its constitutionality beyond that year regardless of when they were injured by the statute.

Placing an unconstitutional statute beyond judicial review by virtue of its age contradicts not only logic but law.  In Corner Post, Inc. v. Board of Governors of Federal Reserve System, 603 U.S. 799 (2024), for instance, the Supreme Court assessed the metes and bounds of § 2401 by determining whether the limitations period for APA suits runs once a regulation is promulgated or "when the plaintiff is injured by agency action, even if that injury did not occur until many years after the action became final."  Id. at 807.  The Court adopted the latter interpretation.  It explained that "[a] right of action accrues when the plaintiff has a complete and present cause of action, which is when she has the right to file suit and obtain relief."  Id. at 809 (cleaned up).  That interpretation rested not only on the text of § 2401 but also on the "deep-rooted historic tradition that everyone should have his own day in court."  Id. at 824 (quoting Richards v. Jefferson County, 517 U.S. 793, 798 (1996)).  To hold otherwise would leave judicial review "only [for] those fortunate enough to suffer an injury within six years of a rule's promulgation."  Id.

While 1920 is not the year in which the clock starts on Kōloa Rum's alleged injury, Intervenors are correct that the company's injury "first accrued" in 2009.  See ECF No. 50 (AMP Reply) at 1.  Plaintiff's Complaint describes Kōloa Rum as a company that was established in

2009, see Am. Compl., ¶ 2, and "relies on maritime transportation to import and export goods to and from the mainland United States." Id., ¶ 13. The constitutional injuries Plaintiff alleges fully existed from that date. Count I, for instance, alleges that the Jones Act violates the Port Preference Clause by "discriminat[ing] against the ports of Hawai'i," which not only results in higher shipping costs but also places Hawaiian companies at a competitive disadvantage relative to their mainland counterparts. Id., ¶¶ 77–78. Count II, in a similar vein, alleges that the added costs and uneven playing field imposed by the Jones Act "deprive[] Kōloa Rum Company of its right to earn a living without due process of law." Id., ¶ 82. Put simply, the injuries Plaintiff alleges are fundamentally market based: a Hawaiian shipping market skewed by Jones Act enforcement that places island businesses at a structural disadvantage. Kōloa Rum was injured by that distortion when it engaged in interstate commerce in 2009, giving it a "complete and present cause of action" that persisted through 2015 — the deadline by which suit should have been filed. Corner Post, 603 U.S. at 812.

Plaintiff contests the 2009 accrual date by advancing a "fresh harm" theory. See Pl. Opp. at 13. By its line of reasoning, the company does not have a one-time claim that arose in 2009. Instead, each time Kōloa Rum imports raw materials or exports its products, "the Jones Act's cabotage restrictions force it to pay inflated rates unavailable to mainland competitors" and "diminish its ability to compete on equal terms." Id. In other words, "each shipment . . . constitutes a fresh application of the challenged provisions." Id. at 14.

That theory is unavailing. Kōloa Rum's suit is not premised on any discrete enforcement action against the company. See AMP Reply at 3 ("Kōloa Rum is challenging the Jones Act itself — not a specific enforcement ruling or some discrete agency action against the company."). It does not allege that CBP prevented a specific shipment from using a foreign vessel, issued a

penalty against the company, or took any enforcement action directed at the company.  Plaintiff, instead, challenges the overall effects of the Act's enforcement throughout Hawaii: that "[t]he Jones Act imposes uniquely higher costs on shipping to and from Hawaiʻi," Am. Compl., ¶ 75, and that it forces Hawaiian companies to "operate[] at a competitive disadvantage compared to businesses that have access to ports in other states."  Id., ¶ 78.  The alleged injury is the discriminatory market structure itself — the continuing effects of a statutory framework that existed when Kōloa Rum entered the market in 2009 — not discrete enforcement actions occurring with each shipment.

Given the nature of this injury, Plaintiff's theory is best understood as alleging an "on-going and continuing violation" rather than repeated violations that each restarts the clock.  Figueroa v. D.C. Metro. Police Dep't, 633 F.3d 1129, 1131 (D.C. Cir. 2011) (quotation marks omitted).  The continuing-violation doctrine provides that "the statute of limitations may be tolled during periods of 'continuing violations' of unlawful activity."  Citizens for Resp. & Ethics in Washington v. FEC, 236 F. Supp. 3d 378, 392 (D.D.C 2017) (citing Earle v. District of Columbia, 707 F.3d 299, 306 (D.C. Cir. 2012)).  The D.C. Circuit has emphasized, however, that the doctrine addresses continuous unlawful activity rather than the "lingering effect of an unlawful act."  Earle, 707 F.3d at 306 (quoting Felter v. Kempthorne, 473 F.3d 1255, 1260 (D.C. Cir. 2007)).  The doctrine, accordingly, applies only in two circumstances.  The first, and "more common," scenario is where the challenged conduct's "character as a violation did not become clear until it was repeated during the limitations period, typically because it is only its cumulative impact . . . that reveals its illegality."  Appalachian Voices v. McCarthy, 989 F. Supp. 2d 30, 44 (D.D.C. 2013) (quoting Earle, 707 F.3d at 306).  The second application that courts have "occasionally recognized" is "where a statute imposes a continuing obligation to act."  Earle, 707

F.3d at 307 (cleaned up) (quoting <u>AKM LLC v. Sec'y of Lab.</u>, 675 F.3d 752, 763 (D.C. Cir. 2012) (Garland, J., concurring)).

Neither of those circumstances applies.  The alleged constitutional violations — discrimination against Hawaiian ports and the resulting deprivation of the right to earn a living — were clear when Kōloa Rum began operations; they were not revealed only through repeated impact.  <u>Cf.</u> <u>Singletary v. District of Columbia</u>, 351 F.3d 519, 526 (D.C. Cir. 2003) (applying continuing-violation doctrine to hostile-work-environment claim because "very nature" of those claims "involves repeated conduct") (quotation marks omitted).  Nor does Plaintiff allege that Defendants are in continual violation of any statutory obligation to undertake a nondiscretionary action.  <u>Cf.</u> <u>Yukon-Kuskokwim Health Corp. v. United States</u>, 444 F. Supp. 3d 215, 220–21 (D.D.C. 2020) (applying continuing-violation doctrine when agency failed to comply with statutory deadline for environmental remediation).  Rather, Kōloa Rum challenges the continuing effects of the Jones Act's exclusion of foreign vessels — precisely what <u>Earle</u> forbids.  The market conditions complained of are the "lingering effect[s] of an unlawful act" that existed when the company began operations in 2009 and persisted through the 2015 filing deadline. <u>Earle</u>, 707 F.3d at 306 (citation omitted).

Last, Plaintiff claims that § 2401 is of no concern because of the nature of the relief sought.  As Kōloa Rum sees it, the company "does not seek damages for shipments made long ago" but rather "prospective relief against ongoing enforcement of an unconstitutional law."  Pl. Opp. at 12–13.  Yet the distinction does little to render Plaintiff's claims timely.  As canvassed above, § 2401 applies not only to APA claims but to constitutional claims as well.  <u>See, e.g.</u>, <u>Neighbors of Casino San Pablo v. Salazar</u>, 442 F. App'x 579, 580 (D.C. Cir. 2011) (finding § 2401 barred constitutional challenge to Omnibus Indian Advancement Act).  Furthermore,

"Section 2401(a) generally 'applies to <u>all civil actions</u> whether legal, equitable, or mixed.'" <u>Felter</u>, 473 F.3d at 1259 (emphasis added) (quoting <u>Kendall v. Army Bd. for Corr. of Mil. Recs.</u>, 996 F.2d 362, 365 (D.C. Cir. 1993)).  Regardless of whether Kōloa Rum seeks damages or an injunction, the limitations period ran in 2015.  Plaintiff's claim has already sailed.

### 2. *Port Preference Clause*

Even if this suit were timely, its Port Preference Clause claim faces shoals aplenty. Kōloa Rum contends that the Jones Act violates the Clause in both its design and effects.  <u>See</u> Am. Compl., ¶¶ 69–79.  The company specifically argues that Congress enacted the Jones Act "to prefer mainland U.S. ports over the ports of Hawai'i," <u>id.</u>, ¶ 71, and that the statute carries out that purpose by "impos[ing] uniquely higher costs on shipping to and from Hawai'i."  <u>Id.</u>, ¶ 75.  According to Plaintiff, the constitutional violation arises from the combination of the Act's discriminatory purpose and its discriminatory effect, regardless of whether the statute is facially neutral.  <u>See</u> Pl. Opp. at 14.  The Court thus addresses two issues: whether the Port Preference Clause extends beyond direct discrimination to reach facially neutral statutes, and if so, whether Plaintiff has plausibly alleged that Congress enacted the Jones Act to discriminate against Hawaiian ports.

### a.  Direct Preference

Even judges generally familiar with our Constitution have likely never considered the Port Preference Clause before.  That Clause provides the following: "No Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another."  U.S. Const. art. I, § 9, cl. 6.  The Clause arose from concerns raised by Maryland's delegation at the Convention.  Those delegates feared that Congress, influenced by larger states such as Virginia, would "favor the ports of particular States[] by requiring vessels destined to or

from other States to enter & clear thereat." 2 <u>The Records of the Federal Convention of 1787</u>, at

417 (Max Farrand ed., 1911). As an example, Congress could "compel ships sailing in or out of

the Chesapeake to clear or enter at Norfolk, or some port in Virginia." <u>Pennsylvania v.</u>

<u>Wheeling & Belmont Bridge Co.</u>, 59 U.S. (18 How.) 421, 434 (1855). Such a requirement

would operate as an effective tax on Maryland-bound vessels, creating financial incentives to

unload cargo at the Virginia port rather than continue to their Chesapeake destinations. <u>Kansas</u>

<u>v. United States</u>, 16 F.3d 436, 440 (D.C. Cir. 1994). Adopting the Clause allayed those fears and

served as a mechanism to prevent larger states from using their congressional influence to

channel commerce through their own ports at the expense of smaller states.

The fundamental problem for Plaintiff is that the Clause has been interpreted narrowly to

apply only to instances of direct discrimination "in which the ports of one state are directly

preferred over those of another state." <u>Consumers Power Co. v. FEA</u>, 1977 WL 793, at *7

(D.D.C. July 8, 1977) (citing cases). The interpretation is so narrow, in fact, that the Clause "has

never been relied on by the federal judiciary to hold an act of Congress unconstitutional."

<u>Kansas v. United States</u>, 16 F.3d at 439; <u>but see</u> <u>id.</u> (explaining Clause is not a "nullity" but

"simply has not yet been seriously impinged upon").

The framework for interpreting the Port Preference Clause originated in <u>Wheeling</u>, 59

U.S. (18 How.) at 435. In that case, the Supreme Court considered whether a congressionally

authorized bridge over the Ohio River violated the Clause by preferring Virginia's port of

Wheeling over Pennsylvania's port of Pittsburgh. <u>Id.</u> at 433. The Court rejected the challenge,

holding that the Clause reaches only legislation that grants "a <u>direct</u> privilege or preference of the

ports of any particular State over those of another." <u>Id.</u> at 435 (emphasis added). The Clause, in

contrast, does not proscribe "incidental advantages that might possibly result from the legislation

27

of congress upon other subjects connected with commerce, and confessedly within its powers."
Id.  The Court elaborated that "many acts of congress" provide advantages to certain ports that
"may incidentally operate to the prejudice of the ports in a neighboring State," yet such acts
"have never been supposed to conflict with [the Port Preference Clause's] limitation upon its
power."  Id. at 433.

Subsequent Supreme Court decisions have consistently applied Wheeling's framework,
asking whether a statute or regulation creates a "direct privilege" by preferring ports of one state
over another, or whether any advantages are merely "incidental" effects of a neutral regulation.
In each instance, the Court rejected the challenge.  See South Carolina v. Georgia, 93 U.S. 4, 13
(1876) (upholding federal appropriations for river improvements despite effects on neighboring
state's port-based commerce); Armour Packing Co. v. United States, 209 U.S. 56, 80 (1908)
(upholding Elkins Act regulation of railroad rebates); La. Pub. Serv. Comm'n v. Tex. & N.O.R.
Co., 284 U.S. 125, 131–32 (1931) (upholding Interstate Commerce Commission rate order
despite benefits to particular ports); Ala. Great S. R. Co. v. United States, 340 U.S. 216, 229
(1951) (upholding rate order where any benefits were the result of geography).

The sole Supreme Court case to consider a Port Preference Clause challenge to the Jones
Act neither deviated from nor elaborated upon Wheeling's framework.  In Alaska v. Troy, 258
U.S. 101 (1922), Alaska — which was then still a territory — challenged a portion of the Act
that excluded it from the statute's Canadian through-route exception.  Id. at 109–10.  The Court
resolved the challenge without determining whether that provision created a constitutionally
cognizable "preference" among ports.  It assumed, for purposes of decision, that the provision
advantaged state ports relative to those of Alaska and quickly disposed of the case on the
threshold ground that the Clause extends to states, not territories.  The decision, in short, did not

expound the principles articulated in Wheeling concerning direct and incidental port preferences. It instead established that statehood is a necessary, but not sufficient, condition for invoking the Port Preference Clause.  See generally id. at 110–12.

Only a handful of courts of appeals have waded into the waters of the Port Preference Clause.  In doing so, they have interpreted Wheeling to prohibit statutes that create direct port preferences, not neutral legislation with incidental advantages that flow from Congress's lawful exercise of authority.  In City of Milwaukee v. Yeutter, 877 F.2d 540 (7th Cir. 1989), for instance, the Seventh Circuit rejected a Port Preference Clause challenge alleging that the federal Food for Peace program diverted cargo away from the Great Lakes.  Id. at 543.  The court looked to Wheeling and explained that "[d]isparate consequences of neutral rules do not violate the Port Preference Clause."  Id. at 545 (citing Wheeling, 59 U.S. (18 How.) at 433–36).  It held that the challenge was "doom[ed]" as "only explicit discrimination violates the Port Preference Clause." Id. at 546.  The Fifth Circuit rejected, on similar grounds, a challenge to the Transportation Department's perimeter rule for flights to and from Washington National Airport.  City of Houston v. FAA, 679 F.2d 1184, 1198 (5th Cir. 1982).  While the petitioners argued that the rule preferred smaller states, the court found the Clause inapplicable "where the FAA has adopted what another realm of constitutional law would term a facially neutral rule."  Id.  And in Thomson Multimedia Inc. v. United States, 340 F.3d 1355 (Fed. Cir. 2003), the Federal Circuit rejected a Port Preference Clause challenge to exemptions from the Harbor Maintenance Tax. Id. at 1367.  Emphasizing the provision's limited reach, the court explained that "the Clause does not prohibit a facially nondiscriminatory law that has incidental, disparate effects on ports of one or more states."  Id. at 1364.

Plaintiff concedes that lower courts have reaffirmed a narrow interpretation of Wheeling. See Pl. Opp. at 17. Conspicuously absent from that concession is that the D.C. Circuit is among them. In Nuclear Energy Institute, Inc. v. Environmental Protection Agency, 373 F.3d 1251 (D.C. Cir. 2004), that court drew parallels between the Port Preference Clause and the Uniformity Clause, explaining that both provisions "have been narrowly construed to prohibit certain forms of direct discrimination between States within the legislative spheres to which the provisions apply: taxation and port-related commerce-and-revenue regulation, respectively." Id. at 1307 (emphasis added). Looking in part to Wheeling, the court recognized that "the Supreme Court has upheld legislation challenged under these provisions on the grounds, *inter alia*, that the legislation was based on neutral factors or only incidentally burdened or benefitted a particular State." Id.

Applying these principles to Kōloa Rum's claim demonstrates that the Jones Act is neutral legislation that does not create any direct preferences by channeling commerce through the ports of one state at the expense of others. The Act applies uniformly to "the transportation of merchandise by water, or by land and water, between points in the United States to which the coastwise laws apply." 46 U.S.C. § 55102(b). It imposes citizenship, construction, and operation requirements on all vessels engaged in such transportation. Id. §§ 55102(b), 12103, 12112(a), 8103(b)(1). Nothing in the text or statutory structure singles out any state — be it Hawaii, Florida, California, or Alaska — for favored or disfavored treatment. Congress, moreover, enacted such legislation pursuant to its "authority to legislate in the field" of "maritime regulation," Marshall v. District of Columbia, 559 F.2d 726, 728 n.9 (D.C. Cir. 1977), expressing the need "to develop and encourage the maintenance of []a merchant marine." Merchant Marine Act of 1920, ch. 250, § 1, 41 Stat. 988, 988.

While Plaintiff alleges that the Jones Act disadvantages Hawaii businesses, see Am. Compl., ¶¶ 40–51, any such effects are incidental to neutral legislation, not direct preferences. As Kōloa Rum itself acknowledges, Hawaii is "uniquely dependent on maritime shipping" because "[b]usinesses located in mainland states have shipping options that do not require [water transport]." Id., ¶¶ 40, 45. That dependence, however, exists independent of the Jones Act — the statute did not create Hawaii's island geography, its distance from the mainland, or the resulting reliance on maritime transportation.

As the D.C. Circuit recognized, "[A]ll state boundaries can be termed an 'accident of geography,'" Kansas v. United States, 16 F.3d at 441 n.4, and disparate effects cannot be dismissed on that basis alone. Yet the disparity Plaintiff challenges flows from applying uniform and longstanding cabotage restrictions to different geographic contexts. Although Hawaii experiences greater impact because its island geography makes water transport unavoidable, the same effects would apply to any non-contiguous point in the United States, including Alaska and U.S. territories. These represent the "natural advantages" (or disadvantages) that are "not created by statutory law," Armour Packing, 209 U.S. at 80 — the type of incidental effects that do not violate the Port Preference Clause. As the Supreme Court held, "The fact that regulation, within the acknowledged power of Congress to enact, may affect the ports of one state more than those of another, cannot be construed as a violation of this constitutional provision." Id.

####    b.   Discriminatory Purpose

Plaintiff resists such narrow interpretation of the Port Preference Clause, arguing that the Clause extends to facially neutral statutes enacted with a discriminatory purpose. See Pl. Opp. at 19; see also Armour Packing, 209 U.S. at 80 (Clause "intended to prevent legislation intended to give, and having the effect of giving, preference"). Even accepting that approach, however,

31

Kōloa Rum's claim founders.  The inquiry turns on the interpretation of a century-old statute, which "raises a pure question of law and is thus properly resolved on the pleadings."  Bouknight v. District of Columbia, 109 F. Supp. 3d 244, 246 (D.D.C. 2015) (resolving interpretation of § 1981 as pure question of law on motion to dismiss).  Properly construed, the text, structure, and history of the Jones Act reflect a neutral cabotage policy rather than a congressional purpose to discriminate against Hawaii.

"The best evidence of [legislative] purpose is the statutory text adopted by both Houses of Congress and submitted to the President."  W. Va. Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 98 (1991); see also All. of Artists & Recording Cos. v. DENSO Int'l Am., Inc., 947 F.3d 849, 862–63 (D.C. Cir. 2020) (rejecting reliance on equivocal legislative history where statutory text is clear).  Congress could not have been clearer in stating the exigency behind the Jones Act: "To provide for the promotion and maintenance of the American merchant marine."  Merchant Marine Act of 1920, ch. 250, 41 Stat. 988.  Congress deemed this objective "necessary for the national defense and for the proper growth of [the nation's] foreign and domestic commerce," ensuring that the United States would maintain "a merchant marine of the best equipped . . . vessels sufficient to carry the greater portion of its commerce and serve as a naval or military auxiliary in time of war or national emergency."  Id., § 1, 41 Stat. at 988.  Courts have long recognized as much.  See Pa. R.R. Co. v. Dillon, 335 F.2d 292, 295 n.5 (D.C. Cir. 1964) ("Encouragement of a strong United States-flagship Merchant Marine was the primary motivation for the Merchant Marine Act of 1920."); Novak, 795 F.3d at 1016 ("The purpose of the Jones Act is to support this country's merchant marine[,] . . . at least in part so they may be available in times of war or national emergency."); Marine Carriers Corp. v. Fowler, 429 F.2d

702, 708 (2d Cir. 1970) ("[The Jones Act's] aims are to protect the American shipping

industry . . . and to improve and enhance the American Merchant Marine.").

As canvassed above, see supra Section I.A., the Jones Act did not emerge in isolation but

was instead part of a long tradition of cabotage laws.  "From our First Congress in 1789,

American shipping in the United States coastwise maritime trade has been protected from

foreign competition."  Am. Mar. Ass'n v. Blumenthal, 590 F.2d 1156, 1158 (D.C. Cir. 1978).

That protection took various forms: higher taxes on foreign vessels transporting U.S. products

coastwise, see Act of July 20, 1789, ch. 3, 1 Stat. 27; requirements that only U.S. citizens could

be employed on American vessels, see Act of Mar. 3, 1813, ch. 42, 2 Stat. 809; and ultimately an

outright prohibition on the use of foreign vessels in domestic trade.  See Act of Mar. 1, 1817, ch.

31, 3 Stat. 351.  This cabotage framework remained in force for a century until it was briefly

suspended in response to World War I.  See Act of Oct. 6, 1917, ch. 88, 40 Stat. 392.

The Jones Act both recodified longstanding cabotage policy and pursued the broader

objective of strengthening the American merchant marine through several mechanisms: it

directed the sale of government vessels to American buyers, see Merchant Marine Act of 1920,

ch. 250, § 5, 41 Stat. 988, 990; it authorized the Shipping Board to develop new steamship lines

for foreign and coastwise trade, id., § 7, 41 Stat. at 991; and it appropriated funds for loans to

construct vessels in American shipyards.  Id., § 11, 41 Stat. at 993.  In short, the cabotage

provisions were but one component of a multifaceted statutory scheme aimed not at preferring

ports but at promoting "a merchant marine of the best equipped and most suitable types of

vessels" for "national defense" and "commerce."  Id., § 1, 41 Stat. at 988.

That the Jones Act concerns commercial and national-security interests — rather than a

scheme to disadvantage Hawaii — is reinforced by Congress's use of similar cabotage laws in

other modes of transportation.  Shortly after the Act was enacted, Congress applied essentially

identical cabotage restrictions to the burgeoning aviation industry.  The Air Commerce Act of

1926 provided that "no foreign aircraft shall engage in interstate or intrastate air commerce."  Air

Commerce Act of 1926, ch. 344, § 6, 44 Stat. 568, 572.  The Civil Aeronautics Act of 1938

refined this restriction, establishing that "no foreign aircraft shall engage in air commerce

otherwise than between any State, Territory, or possession of the United States . . . or the District

of Columbia, and a foreign country."  Civil Aeronautics Act of 1938, ch. 601, § 1107, 52 Stat.

973, 1028.  The consistent application of cabotage principles across maritime and aviation

commerce demonstrates that these restrictions reflect a neutral policy judgment about reserving

domestic commerce for domestic carriers, not a specific scheme designed to disadvantage

particular states.

 Despite clear statutory text and centuries of cabotage policy, Plaintiff points to a

constellation of statements from a handful of individuals — Senator Wesley Jones (the namesake

of the Jones Act), shipping companies, Hawaiian officials, and Representative Julius Kahn — as

evidence of discriminatory purpose.  See Am. Compl., ¶¶ 20–25; Pl. Opp. at 20.  Those

statements, however, fail to evince that Congress was motivated by a desire to discriminate

against Hawaii when it passed the Jones Act.

 At the outset, the D.C. Circuit has made clear that "scattered pieces of legislative history

are quite inadequate to attribute a discriminatory purpose to the Congress."  United States v.

Johnson, 40 F.3d 436, 440 (D.C. Cir. 1994).  Moreover, "the remarks of a single legislator, even

the [bill's] sponsor, are not controlling" where there is "clear statutory language."  N. Colo.

Water Conservancy Dist. v. FERC, 730 F.2d 1509, 1518 (D.C. Cir. 1984) (cleaned up).  Such

statements "reflect at best the understanding of individual [c]ongressmen."  Zuber v. Allen, 396

U.S. 168, 186 (1969); see also NLRB v. SW Gen., Inc., 580 U.S. 288, 306 (2017) ("What Congress ultimately agrees on is the text that it enacts, not the preferences expressed by certain legislators."). By the same token, courts "ought not attribute to Congress an official purpose based on the motives of a particular group that lobbied for or against a certain proposal." Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 120 (2001). These principles carry particular force here, where Plaintiff attempts to use isolated statements to overcome both the Jones Act's express statutory purpose and consistent historical practice.

Even if the statements Kōloa Rum identifies are probative of congressional intent, none supports the conclusion that the Act was enacted to discriminate against Hawaii. Take, for instance, Senator Jones's statements. See Am. Compl., ¶¶ 20–21. The ones Plaintiff highlights concerned separate legislative proposals introduced by then-Representative Jones in 1900, which merely extended to Hawaii cabotage laws already applying to other states. See H.R. Rep. No. 56-375, at 1 (1900). Plaintiff emphasizes that Jones asserted, "[T]he most important effect of this measure will be the restriction of trade between Hawaii and the United States to American vessels." Pl. Opp. at 20 (quoting William Stuart Forth, Wesley L. Jones: A Political Biography 86 (1962)). But that merely describes cabotage's core purpose — reserving domestic commerce for domestic carriers to promote the merchant marine — rather than animus toward Hawaii. The 1900 House Report accompanying the bill confirms that focus. It noted that American vessels already serviced 80% of Hawaii trade and that "several large steamships [were] already under construction" to service that trade, and it concluded that the bill would "not diminish the transportation facilities between the islands and the United States, but will, on the contrary, lead to an early improvement." H.R. Rep. No. 56-375, at 1 (1900).

Shipping companies' support for the Jones Act comes as no surprise. See Am. Compl., ¶ 23 ("The legislative history of the Jones Act is replete with testimony from shipping companies that sought to protect their interests . . . ."). Once more, cabotage restrictions aim to bolster the American merchant marine, an objective that naturally benefits the domestic shipping industry. Yet the legislative history does not demonstrate that the shipbuilders pursued their interests "at the expense of Hawaiians and Alaskans," a gloss added by Plaintiff. Id.

Some Hawaiian stakeholders, contrary to Plaintiff's framing, supported the cabotage provisions. A delegate from the territory declared that "Hawaii is a thorough and consistent believer in the protection policy and principle." 58 Cong. Rec. 3520 (1919) (statement of Del. Jonah Kalaniana'ole). Hawaii's governor, furthermore, spoke on behalf of the territory to emphasize, "We want ships and we want American ships if we can get them." Establishment of an American Merchant Marine: Hearings Before the S. Comm. on Com., 66th Cong. 1328 (1920) (statement of Gov. Charles J. McCarthy). To the extent Governor McCarthy expressed concerns, those qualms related to passenger-cabotage restrictions, not the cargo provisions at issue here. Id. at 1331. Senator Jones responded by assuring the governor that his committee would "do anything they can to get you transportation," id. at 1333, and Congress followed through by exempting Hawaii from passenger-cabotage laws for two years. See Merchant Marine Act of 1920, ch. 250, § 22, 41 Stat. 988, 997. That hardly shows a congressional purpose to disfavor Hawaii.

Last, Kōloa Rum's reliance on statements from Representative Kahn similarly falls short in establishing discriminatory purpose. Plaintiff alleges that Kahn stated that "building up domestic shipbuilding meant 'break[ing] down the coastwise-trade laws between Hawai'i and the mainland,'" demonstrating that the Jones Act is "inextricably linked" to a discriminatory

purpose.  See Am. Compl., ¶ 25 (citation omitted).  This badly muddles the congressman's statement.  True, he explained that "efforts were constantly being made to break down the coastwise-trade laws between Hawaii and the mainland" — that is, to repeal cabotage laws like the Jones Act — and that he "always opposed the proposed change."  58 Cong. Rec. 3519 (1919) (statement of Rep. Julius Kahn).  But the reason he supported these restrictions, the Congressman explained, was to support American jobs and national security, not to disadvantage Hawaii: "As the result of the defeat of the proposed changes, there were no [fewer] than 8 or 10 American ships . . . giving employment to American shipbuilders, American seamen, and American officers . . . ."  Id.  And when World War I began, the government "was able to take them over immediately and put them into the transport service in carrying troops."  Id.  Other legislators similarly emphasized cabotage's connection to national defense.  See, e.g., 59 Cong. Rec. 8607 (1920) (statement of Rep. Joseph Cannon) ("[We] would have been in purgatory if we had not had the coastwise trade prior to the war . . . .").

At bottom, the Jones Act is a facially neutral statute with a nondiscriminatory purpose: promoting the American merchant marine for commerce and national defense.  It emerged from a centuries-old tradition of cabotage laws dating to the First Congress in 1789 and applies uniformly across transportation modes, including aviation.  The Act was subject to protracted debate — as significant legislation often is — and the legislative record reveals that Congress enacted the legislation to advance American shipbuilding, employment, and national security, not to discriminate against particular ports.   The wisps of legislative history Plaintiff identifies are insufficient to overcome the Act's express purpose and its place within a longstanding regulatory tradition.

3. *Substantive Due Process*

Plaintiff's claim under the Due Process Clause runs aground on different sands.  Kōloa Rum maintains that enforcement of the Jones Act "deprives [the company] of its right to earn a living."  Am. Compl., ¶ 82.  The thrust of the claim is that "Kōloa Rum Company's ability to share its unique, award-winning spirits . . . is crippled by an outdated, protectionist statute" that burdens Plaintiff's bottom line.  Id., ¶ 5.  In short, the Act allegedly "restricts a fundamental right" that "is deeply rooted in this nation's history and traditions" and cannot pass muster under strict scrutiny.  Id., ¶¶ 83–84.  The Court disagrees, finding that Kōloa Rum does not sufficiently allege that any fundamental right is burdened.  Rational-basis review therefore applies; under that deferential standard, the Jones Act survives.

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."  "The threshold question" when assessing a substantive-due-process claim "is whether the government's action deprives the plaintiff of a constitutionally protected interest."  Fraternal Ord. of Police, Metro. Police Dep't Lab. Comm., D.C. Police Union v. District of Columbia, 502 F. Supp. 3d 45, 60 (D.D.C. 2020).  Substantive due process protects only a narrow set of interests that are "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty."  Washington v. Glucksberg, 521 U.S. 702, 721 (1997) (quotation marks and citation omitted).  Given that "such rights are not set forth in the language of the Constitution," courts have been "cautioned against expanding the substantive rights protected by the Due Process Clause."  Abigail All. for Better Access to Developmental Drugs v. von Eschenbach, 495 F.3d 695, 702 (D.C. Cir. 2007) (*en banc*).  Courts, accordingly, must "exercise the utmost care

whenever . . . asked to break new ground in this field." <u>Glucksberg</u>, 521 U.S. at 720 (quotation marks and citation omitted).

Plaintiff here has not adequately alleged that the Jones Act subjects it to any constitutionally cognizable burden. The Supreme Court has recognized a "generalized due process right to choose one's field of private employment." <u>Conn v. Gabbert</u>, 526 U.S. 286, 291–92 (1999); <u>see also</u> <u>McKinney v. District of Columbia</u>, 142 F.4th 784, 795 (D.C. Cir. 2025) ("One of the liberty interests protected by the Fifth Amendment is the right to follow a chosen profession free from unreasonable governmental interference.") (quotation marks and citation omitted). That right "is nevertheless subject to reasonable government regulation." <u>Conn</u>, 526 U.S. at 292. Typical cases that implicate the right "all deal with a complete prohibition of the right to engage in a calling." <u>Id.</u>; <u>see also</u> <u>Abdelfattah v. U.S. Dep't of Homeland Sec.</u>, 787 F.3d 524, 539 (D.C. Cir. 2015) ("[A]n individual must suffer a binding disqualification from work or broad preclusion from his or her chosen field."); <u>Hu v. City of New York</u>, 927 F.3d 81, 102–03 (2d Cir. 2019) (recognizing "complete prohibition" standard); <u>Singleton v. Cecil</u>, 176 F.3d 419, 426 n.8 (8th Cir. 1999) (<em>en banc</em>) (same); <u>Franceschi v. Yee</u>, 887 F.3d 927, 938 (9th Cir. 2018) (same).

With these principles in mind, the Jones Act does not deprive Plaintiff of a right to pursue an occupation. The Act regulates domestic shipping; it does not bar Kōloa Rum from distilling and selling rum. If anything, Plaintiff's own descriptions intimate success in the rum trade. Kōloa Rum "employs around 45 people," "ships its spirits to 36 mainland states and several foreign countries," and "continues to grow." Am. Compl., ¶¶ 4, 13. This case does not present a situation where Congress has made it impossible for someone to pursue a particular profession. Plaintiff's true complaint is that, if not for the Jones Act, the company could make <u>more</u> money.

See Am. Compl., ¶ 65 ("Due to Jones Act restrictions, Kōloa Rum Company faces increased costs, supply chain delays, and barriers to expanding its market share, placing it at a competitive disadvantage compared to mainland distilleries that do not face these shipping constraints."). Yet a desire for increased profits in a preferred regulatory environment does not implicate the right to a chosen occupation, nor does it transform Jones Act enforcement to "actions that in their totality are genuinely drastic." Tri Cnty. Indus., Inc. v. District of Columbia, 104 F.3d 455, 459 (D.C. Cir. 1997).

　　　In any event, the recognized right to engage in one's chosen profession — the closest analogue to what Kōloa Rum claims — likely does not trigger strict scrutiny. See, e.g., Doe v. Rogers, 139 F. Supp. 3d 120, 155 (D.D.C. 2015) (explaining that "the review applied in these cases is properly characterized as rational basis review"); Robinson v. Huerta, 123 F. Supp. 3d 30, 41 n.7 (D.D.C. 2015) ("[A] number of courts have held that limitations on the right to engage in a profession are subject to rational basis review.").

　　　Plaintiff's attempt to stake its claim on a "right to earn a living," Am. Compl., ¶ 82, does little to change the analysis. Kōloa Rum concedes that "D.C. Circuit precedent . . . has deemed the right [to earn a living] nonfundamental," and the company asserts its claim "to preserve it for appellate review." Pl. Opp. at 31. That concession accords with the weight of authority that addresses both the right to earn a living and the right to engage in a chosen profession. See, e.g., Fam. Div. Trial Laws. of the Superior Ct.-D.C., Inc. v. Moultrie, 725 F.2d 695, 709–10 (D.C. Cir. 1984) ("[The] . . . right to earn a living as lawyers is not so fundamental that it triggers strict judicial scrutiny of the challenged system; if the system reflects a rational choice aimed at furthering legitimate state interests, a court must uphold it."); Medeiros v. Vincent, 431 F.3d 25, 32 (1st Cir. 2005) ("The right to 'make a living' is not a 'fundamental right,' for either equal

protection or substantive due process purposes."); <u>Golden Glow Tanning Salon, Inc. v. City of</u>

<u>Columbus</u>, 52 F.4th 974, 979 (5th Cir. 2022) ("The Supreme Court does not now recognize a

fundamental right to work . . . ."); <u>Tiwari v. Friedlander</u>, 26 F.4th 355, 361 (6th Cir. 2022)

("Economic regulations, even those affecting an individual's liberty to work in a given area,

violate due process only when they impose burdens without any rational basis for doing so.")

(cleaned up); <u>Dittman v. California</u>, 191 F.3d 1020, 1031 n.5 (9th Cir. 1999) ("The Court has

never held that the 'right' to pursue a profession is a <u>fundamental</u> right, such that any state-

sponsored barriers to entry would be subject to strict scrutiny.").

        Undeterred, Kōloa Rum presses an alternative theory: that the Jones Act warrants

heightened scrutiny under footnote four of <u>United States v. Carolene Products Co.</u>, 304 U.S. 144

(1938), because Hawaii was a territory rather than a state when the statute was enacted and

therefore lacked "meaningful access to the political process." Am. Compl., ¶ 84. Novel as it

may be, this theory does not elevate the standard of review above rational basis.

        The famous footnote does not suggest that heightened scrutiny applies whenever a statute

was enacted during a period of limited political participation. Rather, it identifies narrow

circumstances where courts may be less deferential to legislative judgments. More searching

review, for instance, is needed for "legislation which restricts those political processes which can

ordinarily be expected to bring about repeal of undesirable legislation." <u>Carolene Products Co.</u>,

304 U.S. at 152 n.4. "[E]xacting judicial scrutiny" is also needed when "prejudice against

discrete and insular minorities . . . tends seriously to curtail the operation of those political

processes ordinarily to be relied upon to protect minorities." <u>Id.</u> Neither circumstance applies to

this case. The Jones Act does not regulate voting, representation, political association, or any

other mechanism of democratic participation.  Nor are Hawaiian residents a "discrete and insular" minority unable to protect their interests through the political process.

Plaintiff's theory — that courts must assess political access as it existed at the time of enactment, rather than at the time of review — is without precedent.  Kōloa Rum cites no decision holding that heightened scrutiny applies because a jurisdiction lacked representation decades earlier, and no court has ever adopted such a backward-looking approach to footnote four.  The absence of authority is unsurprising.  If historical political status at enactment were sufficient to trigger heightened scrutiny, then any federal law enacted before the admission of states would be subject to constitutional doubt whenever it disproportionately affected newly enfranchised groups.  Hawaii is hardly unique in this regard; Arizona, New Mexico, Oklahoma, and Alaska all achieved statehood in the twentieth century, and federal laws predating their admission presumably remain on the books.  Plaintiff offers no limiting principle that would make its approach administrable.

Contrary to Kōloa Rum's methodology, footnote four evaluates political powerlessness and minority status by reference to present political realities in addition to historical conditions. When determining whether a group qualifies as a discrete and insular minority, courts look at whether the group is identifiable, has experienced discrimination, and is "relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process."  S.A. Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 28 (1973); see also Mass. Bd. of Ret. v. Murgia, 427 U.S. 307, 313 (1976); Lyng v. Castillo, 477 U.S. 635, 638 (1986); City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 445 (1985).  The inquiry is "strict," and even groups with substantial histories of discrimination have failed to satisfy it.  United States v. Skrmetti, 605 U.S. 495, 550 (2025) (Barrett, J., concurring) ("In fact, as far as I can tell, we have

never embraced a new suspect class under this test.").  Nothing in this doctrine suggests that

historical territorial status, long since cured by statehood, can substitute for present political

exclusion.

That present-focused inquiry reflects a broader constitutional premise: when social or

economic legislation is at issue, courts presume that even misguided policy choices can be

"eventually . . . rectified by the democratic processes."  Cleburne, 473 U.S. at 440.  Once Hawaii

achieved statehood and full representation in Congress, it obtained access to precisely those

political mechanisms.  Its residents may vote, lobby, organize, and seek repeal of federal statutes

like any other state's electorate.  See, e.g., Press Release, Congressman Ed Case, Case Re-

Introduces Bills to Attack Key Driver of Hawai'i's High Cost of Living (Jan. 14, 2021),

https://perma.cc/28MC-F7HH  (highlighting Hawaiian congressman's bill to reform Jones Act).

This stands in stark contrast to groups that footnote four was designed to protect — those "so

little able to defend their interests through participation in the political process, so vulnerable to

oppression by an unsympathetic majority" that courts bear "a special responsibility to ensure that

the[y] . . . are not deprived of their constitutional rights."  Doe v. District of Columbia, 701 F.2d

948, 960 n.14 (D.C. Cir. 1983) (separate statement of Edwards, J.).  Hawaiian residents, who

enjoy full voting rights and congressional representation, bear no such resemblance.

Finally, precedent confirms that courts do not apply heightened scrutiny even where

political exclusion is ongoing, much less where it ended decades ago.  The Court has repeatedly

applied rational-basis review to federal statutes that treat territories differently from states,

notwithstanding those territories' lack of voting representation in Congress.  See United States v.

Vaello Madero, 596 U.S. 159, 165 (2022) (applying rational basis to law excluding Puerto Rico

residents from Supplemental Security Income program); Harris v. Rosario, 446 U.S. 651, 651–52

(1980) (applying rational basis to law providing lower welfare benefits to Puerto Rico than to states); <u>Sec'y of Agric. v. Cent. Roig Refin. Co.</u>, 338 U.S. 604, 616–19 (1950) (holding that law setting different sugar quotas for island territories than mainland refiners did not offend due process. It would make little sense to apply heightened scrutiny to a law allegedly burdening a present-day state based on its historical territorial status, when courts apply rational-basis review to laws disadvantaging territories that remain unrepresented today.

Under this lower standard, the Court can quickly drop anchor. Plaintiff "must plausibly allege facts showing that no reasonably conceivable state of facts could provide a rational basis for the challenged policy." <u>Sanchez v. Off. of the State Superintendent of Educ.</u>, 45 F.4th 388, 396 (D.C. Cir. 2022). That means Kōloa Rum "must allege facts sufficient to overcome the presumption of rationality that applies to government classifications" and "offer more than a conclusory assertion that the policy is without rational basis." <u>Dixon v. District of Columbia</u>, 666 F.3d 1337, 1342 (D.C. Cir. 2011) (quotation marks and citation omitted). While the burden is far from insurmountable, a plaintiff challenging the rationality of economic legislation "faces the unenviable task of refuting every conceivable basis which might support it." <u>Sanchez</u>, 45 F.4th at 396 (quotation marks and citation omitted); <u>see also</u> <u>Hettinga v. United States</u>, 677 F.3d 471, 478 (D.C. Cir. 2012) ("We grant statutes involving economic policy a strong presumption of validity.") (quotation marks and citation omitted).

Plaintiff does not clear this bar. In mounting its due-process claim, Kōloa Rum insists that the Jones Act does not have "even a rational relationship to a legitimate state interest" since it allegedly "undermines the domestic shipping industry and American businesses involved in interstate commerce." Am. Compl., ¶ 86. The company specifically points to the declining number and quality of American-built commercial ships in support of the proposition that the

Act "has failed to establish a flourishing American maritime fleet and in fact jeopardizes American security by reducing the size and quality of that fleet."  Pl. Opp. at 23.

Yet the Court's role "is not to assess the wisdom of" the Jones Act.  Sanchez, 45 F.4th at 398.  Under rational-basis review, "judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted."  FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 314 (1993) (quoting Vance v. Bradley, 440 U.S. 93, 97 (1979)).  While Plaintiff protests the success of the Act, "whether in fact the provision [accomplishes] its objects is not the question." W. & S. Life Ins. Co. v. State Bd. of Equalization of Cal., 451 U.S. 648, 671–72 (1981) (emphasis omitted).  Rational basis, instead, asks whether "[Congress] rationally could have believed" that the Act "would promote its objective."  Id. at 672 (emphasis omitted).

The Jones Act passes that test with room to spare.  The statute's stated purposes — maintaining a strong domestic merchant marine, protecting national security by ensuring that vessels are available for military use, and supporting American maritime employment, 46 U.S.C. § 50101 — are paradigmatic examples of legitimate governmental interests.  See, e.g., Busic v. Transp. Sec. Admin., 62 F.4th 547, 550 (D.C. Cir. 2023) ("[P]rotecting national security is a government interest of the highest order."); Cal. Bankers Ass'n v. Shultz, 416 U.S. 21, 46 (1974) ("The plenary authority of Congress over both interstate and foreign commerce is not open to dispute . . . .").  It is hardly irrational for Congress to prioritize domestic vessels over foreign ones in the interest of maintaining at least a vestige of an American merchant marine for commerce or national-security purposes.  Congress and the President have thought so since the Founding, and they have reaffirmed that judgment with multiple revisions to the Jones Act. Other courts assessing the validity of the Act have come to the same conclusion.  See, e.g.,

Novak, 795 F.3d at 1023 (applying rational-basis review and concluding that "[i]t is not for us to evaluate the wisdom of the Jones Act" when "[t]hat task is for Congress").

The Jones Act may not be the most efficient method of maintaining a merchant marine. It may not have succeeded as well as Congress hoped.  But rational-basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."  Beach Commc'ns, Inc., 508 U.S. at 313.  Plaintiff's grievance is, at bottom, a policy dispute of the sort that is best brought to Congress, not this Court.

## IV.    Conclusion

For the foregoing reasons, the Court will grant Defendants' Motions to Dismiss.  A separate Order to that effect will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: January 20, 2026